**EXHIBIT A**



**DONOVAN | HATEM LLP**

*counselors at law*

Christian G. Samito
617-406-4592 direct
csamito@donovanhatem.com

January 28, 2005

**BY FACSIMILE (617-241-5115)
AND FIRST CLASS MAIL**

John A.K. Grunert, Esq.
Campbell Campbell Edwards & Conroy
One Constitution Plaza
Third Floor
Boston, MA 02129

Re:    **Trans-Spec Truck Service Inc., d/b/a/ Truck Service v. Caterpillar, Inc.
         Civil Action No. 04-11836-RCL**

Dear Attorney Grunert:

This is to confirm our January 28, 2005 telephone conference regarding your January 21, 2005 letter addressing discovery issues. We reached the following agreement:

To the extent that they are in Trans-Spec Truck Service Inc.'s ("Trans-Spec"), possession, custody, or control, Trans-Spec will make available for inspection at its office all reports, correspondence, memoranda, estimates, work orders, and job tickets relative to any of the trucks generated by persons or companies that have inspected or serviced them. Please advise as to dates when you are available to perform this inspection. We agree with your suggestion that the inspection of documents within Trans-Spec's office should take place after 3:00 p.m., by which time most of Trans-Spec's employees will have left. As to documents stored in Trans-Spec's onsite trailer, however, inspection can begin as early in the morning as you would like. We understand, and expect, that this inspection will take several days.

Pursuant to the above tender of documents, we agree that the Rule 30(b)(6) deposition scheduled for February 7, 2005 is cancelled.

As to the General Objections of Specific Applicability in both Trans-Spec's document responses and answers to interrogatories, we will incorporate the relevant objections within each response. We will, however, reserve our right to supplement all responses in a timely manner if and when additional responsive information becomes available.

Trans-Spec has produced all responsive documents in its possession, custody, or control for document request numbers 4 and 5. These are generally in the form of handwritten, informal notes written by officers or employees of Trans-Spec on copies of Sterling or Caterpillar documents. Thus, neither responses need to be amended.

John A.K. Grunert, Esq.
January 28, 2005
Page 2

As to request numbers 9 and 11, we will amend the responses to indicate that no notes or memoranda were generated by Trans-Spec in connection with efforts it made, or considered making, to rent vehicles for temporary use or to trade in the trucks.

As to request number 13, we will amend the response to indicate that Trans-Spec no longer has the Sterling warranties in its possession, custody, or control. It seems that Trans-Spec discarded these warranties when they expired. Sterling warrantied only the cab and mainframe of the trucks for a period of two years after delivery.

We apologize for the copying error in responding to request number 14 and we will send double-sided, complete copies of responsive documents.

We will amend interrogatory answer number 4 to reflect the location where all responsive conversations took place as well as to indicate whether any memorandum was made by Trans-Spec of any conversation.

Our objection to interrogatory number 6 stands. We will, however, try to provide a more specific factual answer for Trans-Spec's contention that the engine problems are a result of design or manufacturing defects rather than improper installation. We will likely have to supplement any initial answer, as this question contemplates technical information that may require expert assistance. Similarly, we will likely have to supplement any answer to interrogatory number 7 for the same reason. As you pointed out, both interrogatory numbers 6 and 7 are closely related. While we will amend the answer to interrogatory 15 to more simply identify the defects Trans-Spec alleges were in the C-12 engines when they left Caterpillar's hands, this response, too, will likely require supplementation after the involvement of expert assistance.

As to interrogatory numbers 10 and 11, our initial objection stands at this point, though we will review this matter further and get back to you in a timely manner regarding amended answers. It is likely that we will be able to amend the answers so that Caterpillar will not need to consider a motion to compel.

We will amend our answer to interrogatory number 12 to describe with greater specificity the "particular purpose" for which Trans-Spec alleges Caterpillar impliedly warranted the engines would be suitable.

Trans-Spec has answered interrogatory number 13 in accordance with the requirements of Fed. R. Civ. P. 33(d) through the records produced pursuant to Trans-Spec's Local Rule 26.2 and Fed. R. Civ. P. 26(a)(1) Automatic Disclosures. Trans-Spec will not, at this time, amend its response.

Similarly, Trans-Spec has answered interrogatory number 14 in accordance with the requirements of Fed. R. Civ. P. 33(d) through the records produced pursuant to Trans-Spec's Local Rule 26.2 and Fed. R. Civ. P. 26(a)(1) Automatic Disclosures. Additional responsive information, however, might be located during the pending onsite document inspection, tendered here pursuant to Fed. R. Civ. P. 33(d) as well as document request number 15.

John A.K. Grunert, Esq.
January 28, 2005
Page 3

Trans-Spec further notes that much of the above-information is in Caterpillar's files, pursuant to its ability to enter specific engine numbers into its computer database and generate complete and detailed records for any and all repairs and claims for that engine since the time the engine left the factory. Similarly, Trans-Spec notes that Caterpillar can globally search for problems relevant to specific engine parts for particular engine models. We expect to see all responsive files included in the document response due from Caterpillar by the end of business today, so as to obviate the need for Trans-Spec to file a motion to compel.

Finally, we thank you for your courtesy regarding the health of Mr. Howard's wife and the potential impact this might have on the tracking order presently in effect in this case. We will review that tracking order and discuss with you shortly the possible need to jointly request that Judge Lindsay make appropriate modifications.

Thank you for your attention to this matter.

Very truly yours,

Christian G. Samito

cc: Nancy M. Reimer, Esq.

00892122

**EXHIBIT B**

# DONOVAN | HATEM LLP

*counselors at law*

Christian G. Samito
617-406-4592 direct
csamito@donovanhatem.com

March 24, 2005

**BY FIRST CLASS MAIL**

Christopher R. Howe, Esq.
Campbell Campbell Edwards & Conroy
One Constitution Plaza
Third Floor
Boston, MA 02129

**Re:    Trans-Spec Truck Service, Inc. d/b/a/ Truck Service v. Caterpillar Inc.
          Civil Action No. 04-11836-RCL**

Dear Attorney Howe:

Enclosed are complete copies of responsive warranty documents in Trans-Spec
Truck Service, Inc.'s possession, custody, or control.  We will seasonably
supplement this production if and when other responsive documents become
available.  Please note that in some instances, I have included multiple copies of the
same document due to difficulty maintaining legibility in photocopying.

Should you have any questions, please feel free to contact me.

Very truly yours,

Christian G. Samito

Enclosures
cc: Nancy M. Reimer, Esq. (w/o encl.)
00905677

**EXHIBIT C**

# DONOVAN | HATEM LLP

*counselors at law*

**Christian G. Samito**
617-406-4592 direct
csamito@donovanhatem.com

March 10, 2005

**BY FACSIMILE (617-241-5115)**
**AND FIRST CLASS MAIL**

Christopher R. Howe, Esq.
Campbell Campbell Edwards & Conroy
One Constitution Plaza
Third Floor
Boston, MA 02129

Re:    **Trans-Spec Truck Service Inc., d/b/a/ Truck Service v. Caterpillar Inc.**
       **Civil Action No. 04-11836-RCL**

Dear Attorney Howe:

I am writing in response to your letter of earlier today. Due to the nature of Trans-Spec's business, its garage is in use almost twenty-four hours a day and the welding bay is in use twelve hours a day. Accordingly, Trans-Spec can make the following offers to you regarding your review of Trans-Spec's business records in its file trailer:

1) Trans-Spec is prepared to bring the file trailer into its garage so that the work space will be heated. Trans-Spec will run an extension cord into the trailer so that you can put a light inside as well as operate your scanning equipment. The level of exhaust fumes are the same whether in the upstairs office or the garage bay, and my paralegal has informed me that while she did notice the faint smell of fumes in the office, the level was certainly tolerable;

2) Pursuant to option number 1, your review can be accomplished any time during the day. In the alternative, Trans-Spec offers that it can, with difficulty, shut down its garage from 1:00 – 4:00 a.m., or shut down its welding bay from 9:00 p.m. to 6:00 a.m., bring its file trailer into the respective location during those times, and allow you to review the documents while no repair work is being performed on Trans-Spec's trucks;

3) If Caterpillar would like to review the documents while the file trailer is either in the garage or welding bay with no repair work being performed and during times other than those listed in option number 2, Caterpillar can agree to pay for the cost of repairs to Trans-Spec's trucks performed offsite during Caterpillar's document inspection; or,

4) Caterpillar can rent a generator to power a heat source, light source, and its electrical equipment, and review the documents in the file trailer in its present location.

World Trade Center East | 617 406 4500 main
Two Seaport Lane | 617 406 4501 fax
Boston, MA 02210 | www.donovanhatem.com

Christopher R. Howe, Esq.
March 10, 2005
Page 2

As we have discussed numerous times, Trans-Spec cannot allow its documents offsite for inspection or photocopying due to Department of Transportation regulations. When the Department of Transportation needs to review any of Trans-Spec's documents, it sends its inspectors to Trans-Spec's location.

Furthermore, Trans-Spec is making every effort to accommodate Caterpillar's discovery needs, to the point where it will sacrifice its normal business operations. In light of the shocking paucity of Caterpillar's own discovery responses, it is ironic and inappropriate that Caterpillar even asks for additional considerations beyond that offered in our March 4, 2005 letter.

In response to Caterpillar's comments regarding Trans-Spec's responses to Caterpillar's discovery requests, I can inform you that once Mr. Howard returns a signed copy of Trans-Spec's amended answers to interrogatories to us, I will send to you that document as well as Trans-Spec's amended responses to document requests. I hope to be able to send both to you by early next week.

Finally, I notice that you decline to address the issue of the photographs that you took during your earlier document inspection. Trans-Spec gave you permission to photograph the file trailer and its contents during your recent onsite inspection of documents, not other parts of Trans-Spec's facility. Your taking photographs other then the file trailer and its contents was both unauthorized and inappropriate because your visit was not a Fed. R. Civ. P. 34 inspection. I ask that you send me a copy of all the pictures that you took and remind that any such inspection must be performed pursuant to the Rules and not in the unofficial and unsanctioned manner which Caterpillar chose to implement.

Thank you for your attention to this matter. Please advise as soon as possible as to how you wish to proceed.

Very truly yours,

Christian G. Samito

cc: Nancy M. Reimer, Esq.
00902453

**EXHIBIT D**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11836-RCL

```
_____  )
                                 )
TRANS-SPEC TRUCK SERVICE, INC.   )
d/b/a TRUCK SERVICE,             )
        Plaintiff                )
                                 )
vs.                              )
                                 )
CATERPILLAR INC.                 )
        Defendant                )
_____  )
```

**PLAINTIFF, TRANS-SPEC TRUCK SERVICE INC., d/b/a TRUCK SERVICES,
AMENDED ANSWERS TO CATERPILLAR INC.'S
FIRST SET OF INTERROGATORIES**

The plaintiff, Trans-Spec Truck Service, Inc. ("Trans-Spec") answers the below

interrogatories as follows:

**GENERAL OBJECTIONS OF SPECIFIC APPLICABLITY**

1.     These answers to interrogatories are qualified by the objections specifically

asserted herein and the answers do not constitute a waiver of any objection asserted.

2.     Trans-Spec reserves the right to supplement these responses in a timely manner.

**INTERROGATORIES**

**INTERROGATORY NO. 1**

Identify every person whom you expect to offer expert testimony on your behalf at trial and, as
to each such person, state the subject matters on which he or she will testify, state the substance
of the facts and opinions to which he or she will testify, and summarize the grounds for each
opinion to which he or she will testify.

**ANSWER NO. 1**

Trans-Spec has not determined which experts, if any, it will call at trial and reserves the right to
supplement this answer in a timely fashion.

- 1 -

**INTERROGATORY NO. 2**

Identify every officer, director, employee, and representative of Trans-Spec who participated in negotiations with Sterling with respect to Trans-Spec's purchase of the trucks.

**ANSWER NO. 2**

Joseph M. Howard, Jr. ("Howard")
Trans-Spec Truck Service, Inc.
7 Cristo Lane
Millbury, MA 01527

Ralph Lind ("Lind")
2 Mason Road
Milbury, MA 01527

**INTERROGATORY NO. 3**

Identify every officer, director, employee, and representative of Sterling who participated in negotiations with Trans-Spec with respect to Trans-Spec's purchase of the trucks.

**ANSWER NO. 3**

Bob Kerrick
Sterling Truck Corporation ("Sterling")
250 South Edgeware Road
St. Thomas, ON, Canada N5P 4C4

Edward Blake
Sterling Truck Corporation
4420 Sherwin Road
Willoughby, OH 44094

Donald Medbery
3 Covered Bridge Road
Dover, NH 03820

**INTERROGATORY NO.4**

State with respect to every oral warranty you allege Caterpillar gave concerning the engines (a) the specific words that were spoken by Caterpillar, (b) the identity of the individual( s) who spoke the words, (c) the date( s) on which the words were spoken, (d) whether the conversation in which the words were spoken was in person or via telephone, (e) where the conversation occurred if it was in person, and (f) whether any memorandum was made by Trans-Spec of the conversation.

**ANSWER NO. 4**

Harry Calderbank ("Calderbank"), Ring Power Corp., 8050 Philips Highway, Jacksonville, FL 32256, represented in person in either Milford, Massachusetts or Worcester, Massachusetts, in or around March 1999, that if Trans-Spec purchased Caterpillar C-12 engines, Caterpillar would provide extended 500,000 mile serious nucleus warranty coverage for those engines at no charge. The inservice date extended warranty agreement sent to Trans-Spec by Calderbank after Trans-Spec's purchase of the engines confirms this warranty. Calderbank routinely offered this warranty coverage to Trans-Spec for every purchase Trans-Spec made. Trans-Spec made no memorandum regarding Calderbank's representation.

On June 9, 2004, Al Cardoza ("Cardoza"), Milton-CAT, 100 Quarry Drive, Milford, MA 01757, orally extended Caterpillar's warranty on the Trans-Spec C-12 engines until June 21, 2005. Troy N. Guidotti ("Guidotti"), also attended this meeting, which was held at Milton-CAT's facility in Milford, Massachusetts; was present at Cardoza's representation; and, agreed with it. Guidotti further represented that the problems with the C-12 engines were not Trans-Spec's fault and that Caterpillar would make Trans-Spec whole. Trans-Spec made no memorandum regarding this meeting.

In August 2004, Steve W. Schoening ("Schoening"), Northeast Regional Manager, Caterpillar Inc., 175 Powder Forest Drive, Weatogue, CT 06089, again orally extended Caterpillar's warranty on the Trans-Spec C-12 engines until June 21, 2005 at a meeting with Howard and Robert Barton ("Barton") held at Milton-CAT's facility in Milford, Massachusetts. Schoening reiterated Guidotti's representation at the June 9, 2004 meeting that the problems with the C-12 engines were not Trans-Spec's fault and that Caterpillar would make Trans-Spec whole. Cardoza attended this meeting. Trans-Spec made no memorandum regarding Schoening's extension.

Additionally, Calderbank and Cardoza have made "off the record" representations to Trans-Spec that Trans-Spec would be made whole for the damage it has suffered as a result of the defective C-12 engines.

**INTERROGATORY NO. 5**

Set forth each and every fact on which you rely to support your contention in ¶ 9 of the amended complaint that Harry Calderbank was a "Caterpillar representative" at the meeting described in that paragraph.

**ANSWER NO. 5**

Calderbank worked for Milton-CAT from at least the early 1990s until Trans-Spec's purchase of the C-12 engines and he represented that he was a Caterpillar representative. Calderbank received commissions from Caterpillar for his sales of Caterpillar engines. Milton-CAT, formerly known as Southworth-Milton, Inc., is Caterpillar's distributor in the New England area. Milton-CAT solely distributes Caterpillar products.

## INTERROGATORY NO. 6

Set forth comprehensively and in detail the factual basis for your contention that the problems Trans-Spec has had with the engines are caused by design or manufacturing defects in them rather than by improper installation of the engines by Sterling.

## ANSWER NO. 6

Trans-Spec objects to this interrogatory to the extent that it seeks information privileged due to the attorney/client relationship or because it was prepared in anticipation of litigation or trial, or because it constitutes attorney work product. Without waiving and subject to these objections, Trans-Spec states that it believes that the problems with the engines are caused by design defects in the C-12 engine, specifically its propensity to crack due to the added torque generated by its increased horsepower, causing serious and chronic problems with the flywheel housings, front structures, valves, crankshaft seals, and cylinder block castings. This contention is based on statements made by Cardoza and Charlie Bertram ("Bertram") during the dyno test of one of the trucks at 9:00 a.m. on July 6, 2004 at the Milton-CAT facility in Milford, Massachusetts. Additionally, as a practical matter, the difference between the C-12 engine and other similar Caterpillar models is its increased horsepower. Thus, the front structures have repeatedly cracked and leaked almost immediately after Trans-Spec's purchase of the trucks; the valves on the engines have consistently broken, and no cure has been found for the recurring flywheel housing failures that have afflicted the engines. Trans-Spec reserves the right to supplement this response in a timely manner.

## INTERROGATORY NO. 7

Set forth comprehensively and in detail the factual basis for your contention that the problems Trans-Spec has had with the engines are caused by design or manufacturing defects in them rather than by characteristics of the trucks for which Trans-Spec and/or Sterling selected them.

## ANSWER NO. 7

Trans-Spec contends that the problems it has had with the engines are caused by design or manufacturing defects in them rather than by characteristics of the trucks because Sterling and Caterpillar both knew of Trans-Spec's business applications because of prior business transactions and assured Trans-Spec that the C-12 engines were suitable for the characteristics of the trucks. Caterpillar has been selling engines to Trans-Spec dating to 1986. Trans-Spec reiterated these business applications during the negotiations leading to the purchase of Caterpillar engines and fabrication of the trucks. Trans-Spec relied upon representations made by both Caterpillar and Sterling that Caterpillar's C-12 engine was appropriate for Trans-Spec's applications. Since accepting the trucks, Trans-Spec used the trucks only for the applications for which they were designed, and which both Sterling and Caterpillar knew about prior to recommending the C-12 engine.

Notwithstanding the representations of both Sterling and Caterpillar, as well as Trans-Spec's appropriate use of the trucks for the applications for which they were designed, the C-12 engines

have manifested serious and chronic problems with their flywheel housings, front structures, valves, crankshaft seals, and cylinder block castings. This contention is based on statements made by Cardoza and Bertram during the dyno test of one of the trucks at 9:00 a.m. on July 6, 2004 at the Milton-CAT facility in Milford, Massachusetts.

## INTERROGATORY NO. 8

Describe comprehensively and in detail all efforts Trans-Spec has made to rent vehicles for temporary use as substitutes for trucks when they were out of service, including in your description the identities of all Trans-Spec officers, directors, employees and representatives who participated in such efforts, when the efforts were made, what the efforts were, and the identities of the persons and companies that were contacted in connection with such efforts.

## ANSWER NO. 8

Howard negotiated with John Walsh at AMI Leasing ("AMI") (now owned by Penske Truck Leasing Co., L.P. ("Penske"), 83 Progress Avenue, Springfield, MA 01104 in March 2003 in an attempt to obtain a service lease for trucks for Trans-Spec. AMI refused to rent or lease trucks to Trans-Spec, however, because it could only sell trucks, not rent or lease them, due to liability concerns and internal company policies. After Penske purchased AMI, Howard met with sales manager Ed Dede ("Dede") to again inquire about leasing trucks for Trans-Spec. Dede reported that Caterpillar had made no contact with Penske in an attempt to provide rental assistance for Trans-Spec. Dede also reported that Penske did not have any product pumps for Penske trucks because Penske could not rent trucks to fuel or gasoline haulers in the first place. Thus, Dede informed Howard that not only was Penske prohibited from renting trucks to Trans-Spec due to internal company policies based on liability concerns, he had no appropriate trucks to rent even if it were allowed to do so.

## INTERROGATORY NO. 9

Describe comprehensively and in detail all efforts Trans-Spec has made to trade in any of the trucks, including in your description the identities of all Trans-Spec officers, directors, employees and representatives who participated in such efforts, when the efforts were made, what the efforts were, and the identities of the persons and companies that were contacted in connection with such efforts.

## ANSWER NO. 9

In or about March 2004, Howard verbally contacted Steve Gustafson, Sales Managaer at Tri-State Freightliner, and John David Herring ("Herring") at The Truck Connection, Atlanta, Georgia, regarding a possible trade in of the trucks. In June 2004, Herring verbally offered $40,000.00 per truck, but when Howard disclosed the engine problems with the trucks, Herring's offer dropped to $34,000.00 per truck. Due to the amount outstanding on the trucks, Trans-Spec could not trade in the trucks at that price. On advice of counsel, Trans-Spec further decided against any trade-in for fear of potential liability and lawsuits against it for selling defective trucks.

**INTERROGATORY NO. 10**

Describe comprehensively and in detail the basis for your contention that Trans-Spec' s purported claim to recover incidental and consequential damages, damages for loss of use, and costs of additional service employees [as to which see ¶42 of the amended complaint] is not barred by the exclusion of incidental and consequential damages contained in the written warranties Caterpillar gave with respect to the engines and in the extended service contract of which a copy is attached as Exhibit C to the amended complaint.

**ANSWER NO. 10**

Trans-Spec objects to this interrogatory as it poses a question of law. Without waiving and subject to this objection, Trans-Spec states that on multiple occasions, Caterpillar orally waived any such exclusion, including during meetings with Trans-Spec on June 9, 2004 and in or around August 2004.

On June 9, 2004, Cardoza orally extended Caterpillar's warranty on the Trans-Spec C-12 engines until June 21, 2005. Guidotti also attended this meeting, which was held at Milton-CAT's facility in Milford, Massachusetts; was present at Cardoza's representation; and, agreed with it. Guidotti further represented that the problems with the C-12 engines were not Trans-Spec's fault and that Caterpillar would make Trans-Spec whole.

In August 2004, Schoening again orally extended Caterpillar's warranty on the Trans-Spec C-12 engines until June 21, 2005 at a meeting with Howard and Barton held at Milton-CAT's facility in Milford, Massachusetts. Schoening reiterated Guidotti's representation at the June 9, 2004 meeting that the problems with the C-12 engines were not Trans-Spec's fault and that Caterpillar would make Trans-Spec whole. Cardoza attended this meeting.

Additionally, Calderbank and Cardoza have made "off the record" representations to Trans-Spec that Trans-Spec would be made whole for the damage it has suffered as a result of the defective C-12 engines.

**INTERROGATORY NO. 11**

Describe comprehensively and in detail the basis for your contention that Trans-Spec's purported claim for alleged breaches of implied warranties are not barred by the disclaimers of all implied warranties contained in the written warranties Caterpillar gave with respect to the engines and in the extended service contract of which a copy is attached as Exhibit C to the amended complaint.

**ANSWER NO. 11**

Trans-Spec objects to this interrogatory as it poses a question of law. Without waiving and subject to this objection, Trans-Spec states that on multiple occasions, Caterpillar orally waived any such exclusion, including during meetings with Trans-Spec on June 9, 2004 and in or around August 2004.

- 6 -

On June 9, 2004, Cardoza orally extended Caterpillar's warranty on the Trans-Spec C-12 engines until June 21, 2005. Guidotti also attended this meeting, which was held at Milton-CAT's facility in Milford, Massachusetts; was present at Cardoza's representation; and, agreed with it. Guidotti further represented that the problems with the C-12 engines were not Trans-Spec's fault and that Caterpillar would make Trans-Spec whole.

In August 2004, Schoening again orally extended Caterpillar's warranty on the Trans-Spec C-12 engines until June 21, 2005 at a meeting with Howard and Barton held at Milton-CAT's facility in Milford, Massachusetts. Schoening reiterated Guidotti's representation at the June 9, 2004 meeting that the problems with the C-12 engines were not Trans-Spec's fault and that Caterpillar would make Trans-Spec whole. Cardoza attended this meeting.

Additionally, Calderbank and Cardoza have made "off the record" representations to Trans-Spec that Trans-Spec would be made whole for the damage it has suffered as a result of the defective C-12 engines.

## INTERROGATORY NO. 12

Describe with specificity the "particular purpose" for which you allege Caterpillar impliedly warranted the engines would be suitable, and describe comprehensively and in detail all documents and other information Caterpillar had when it contracted with Sterling to sell Sterling the engines that (a) gave it reason to know of that particular purpose and (b) gave it reason to know Sterling was relying on Caterpillar's skill or judgment to select or furnish engines that were suitable for that particular purpose.

## ANSWER NO. 12

Trans-Spec objects to this Interrogatory in that it cannot make any representations as to what documents Caterpillar received from Sterling nor can Trans-Spec make representations regarding the contents of Caterpillar's files. Without waiving and subject to this objection, Trans-Spec states that it is a common carrier for hire, regulated by the Department of Transportation, in the business of transporting general commodities and bulk items including but not limited to oil, aggregate, processed materials, petroleum, and liquid asphalt. Caterpillar warranted that the engines would be suitable for these particular purposes. Caterpillar was well acquainted with Trans-Spec's business, applications, and services due to an ongoing business relationship between the two companies dating back to 1986. From that time, Caterpillar wanted to sell engines to Trans-Spec and Trans-Spec obliged them for fourteen years.

Caterpillar further learned about Trans-Spec's business operations because Trans-Spec purchased the first FLC112 Freightliner truck that had a Caterpillar 3176 engine integrated into it. Trans-Spec agreed to let Caterpillar conduct performance testing on this truck, as part of its research for future development, in 1991-1992. Cardoza attended these tests.

Additionally, Caterpillar learned about Trans-Spec's business operations through its close contact with Trans-Spec personnel as part of its ongoing business relationship with Trans-Spec. For example, in or around 1996, Caterpillar invited and paid for Lind to attend the introduction

of its C-12 engine in Orlando, Florida. In March 1999, Lind, Howard, and a Caterpillar representative, on information and belief Calderbank, attended the meetings between Trans-Spec and Sterling in St. Thomas, Canada that led to Sterling's fabrication and Trans-Spec's purchase of the trucks. In or around 2000, Caterpillar invited and paid for Howard to inspect the Caterpillar facilities in Peoria with Calderbank. Accordingly, Caterpillar knew about Trans-Spec's business operations since 1986 and was very well acquainted with Trans-Spec's applications at the time that it warranted that its C-12 engines would be suitable and appropriate for Trans-Spec's trucks.

## INTERROGATORY NO. 13

Identify with specificity the documents containing express warranties you claim Caterpillar has breached.

## ANSWER NO. 13

Pursuant to Fed. R. Civ. P. 33(d), Trans-Spec refers Caterpillar to the documents it produced pursuant to Trans-Spec's Local Rule 26.2 and Fed. R Civ. P. 26(a)(1) Automatic Disclosures.

## INTERROGATORY NO. 14

State separately with respect to each of the trucks all dates on which the truck was out of service as a result of engine problems and, as to each date, the nature of the engine problem that caused it to be out of service and the mileage on the truck at the time.

## ANSWER NO. 14

Pursuant to Fed. R. Civ. P. 33(d), most of this information has been produced pursuant to Trans-Spec's Local Rule 26.2 and Fed. R Civ. P. 26(a)(1) Automatic Disclosures. Furthermore, pursuant to Fed. R. Civ. P. 33(d), Trans-Spec will produce additional responsive documents for inspection at its office at a mutually convenient time.

## INTERROGATORY NO. 15

Describe with specificity every respect in which the engines were defective when they left Caterpillar's hands.

## ANSWER NO. 15

Trans-Spec believes that the major design defect in the C-12 engine is its propensity to crack due to the added torque generated by its increased horsepower, causing serious and chronic problems with the flywheel housings, front structures, valves, crankshaft seals, and cylinder block castings. This contention is based on statements made by Cardoza and Bertram during the dyno test of one of the trucks at 9:00 a.m. on July 6, 2004 at the Milton-CAT facility in Milford, Massachusetts. Thus, the front structures have repeatedly cracked and leaked almost immediately after Trans-



Spec's purchase of the trucks; the valves on the engines have consistently broken, and no cure has been found for the recurring flywheel housing failures that have afflicted the engines.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS __ DAY OF MARCH, 2005

Joseph M. Howard, Jr.,
President, Trans-Spec Truck Service, Inc.

As to objections:

Nancy M. Reimer, Esq., BBO#555373
Christian G. Samito, Esq., BBO#639825
Donovan Hatem, LLP
Two Seaport Lane
Boston, MA 02210
(617) 406-4500

Date: March 21, 2005

## CERTIFICATE OF SERVICE

I, Christian G. Samito, hereby certify that on this 21st day of March, 2005, I served a copy of the foregoing PLAINTIFF, TRANS-SPEC TRUCK SERVICE INC., d/b/a TRUCK SERVICES, AMENDED ANSWERS TO CATERPILLAR INC.'S FIRST SET OF INTERROGATORIES, to be mailed, postage prepaid to:

Richard P. Campbell, Esq.
Christopher Howe, Esq.
Campbell Campbell Edwards & Conroy
One Constitution Plaza, 3rd Floor
Boston, MA  02129

Christian G. Samito, Esq.

00891215

**EXHIBIT E**

# DONOVAN | HATEM LLP

*counselors at law*



Christian G. Samito
617-406-4592  direct
csamito@donovanhatem.com

March 4, 2005

**BY FACSIMILE (617-241-5115)**
**AND FIRST CLASS MAIL**

Christopher R. Howe, Esq.
Campbell Campbell Edwards & Conroy
One Constitution Plaza
Third Floor
Boston, MA 02129

Re:    **Trans-Spec Truck Service Inc., d/b/a/ Truck Service v. Caterpillar Inc.**
       **Civil Action No. 04-11836-RCL**

Dear Christopher:

I am writing to partially respond to several of the issues raised during our telephone conference earlier today.

I spoke with my client regarding Caterpillar's objections to Trans-Spec's producing its business records in its file trailer, as they are kept in the ordinary course of business.  Trans-Spec is prepared to bring the file trailer into its garage so that your work space will be heated. Furthermore, Trans-Spec will run an extension cord into the trailer so that you can put a light inside as well as operate your scanning equipment.  That should eliminate your objections as to this matter.

As to Caterpillar's search for documents regarding its business history with Trans-Spec, including but not limited to those regarding testing done in or around 1990-1993 on a FLD12 Freightliner truck that had a Caterpillar 3175 engine integrated into it, please be advised that Trans-Spec was known as Flynn's Truck Service, Inc., before it changed its name to its present form.  I have learned that this name was in use during Trans-Spec's early years.  This fact might facilitate your search and I wanted to bring it to your attention as soon as I learned it.

Finally, Trans-Spec gave you permission to photograph the file trailer and its contents during your recent onsite inspection of documents.  I have since learned that you also took photographs of others parts of Trans-Spec's facility.   I ask that you send me a copy of all the pictures that you took.  Also, as I did not understand your visit to be a Fed. R. Civ. P. 34 inspection, I would ask that any such inspection be performed pursuant to the Rules and not in an unofficial and unsanctioned manner.

World Trade Center East      617 406 4500  main
Two Seaport Lane      617 406 4501  fax
Boston, MA 02210      www.donovanhatem.com

Christopher R. Howe, Esq.
March 4, 2005
Page 2


Thank you for your attention to this matter. Please advise as soon as possible as to how you wish to proceed.

Very truly yours,

Christian G. Samito

cc: Nancy M. Reimer, Esq.
00900891

**EXHIBIT F**

CAMPBELL CAMPBELL EDWARDS & CONROY
PROFESSIONAL CORPORATION



ONE CONSTITUTION PLAZA
THIRD FLOOR
BOSTON, MA 02129
TEL: (617) 241 3000
FAX: (617) 241 5115

**CHRISTOPHER R. HOWE**
**(617) 241-3029**
chowe@campbell-trial-lawyers.com

March 10, 2005

<u>VIA FACSIMILE AND REGULAR MAIL</u>

Christian G. Samito, Esquire
Donovan Hatem, LLP
Two Seaport Lane
Boston, MA 02210

Re:    <u>Trans-Spec Truck Service, Inc. v. Caterpillar Inc.</u>
       <u>U.S.D.C., Civil Action No. 04-11836-RCL</u>

Dear Mr. Samito:

Please accept this letter in response to your correspondence of March 4, 2005 regarding the pending onsite document inspection. You state that you spoke with your client and Trans-Spec is now willing to bring the file trailer into its garage so that electricity and heat can be used for the inspection. We are willing to continue the inspection under these conditions if your client agrees to cease performing repairs on its trucks while the inspection is ongoing. As your paralegal can attest, the exhaust fumes from the repair bay make working in the office difficult; I can only imagine how intolerable the conditions would be working in the bay itself. If your client agrees to cease performing repairs on its trucks while the inspection is ongoing, we are glad to continue the inspection in the trailer.

Please advise how your client wishes to proceed as we would like to get these repair documents copied as soon as possible. I look forward to hearing from you shortly.

Very truly yours,

Christopher R. Howe

CRH;bko

cc:    Richard P. Campbell, Esquire