UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                      )
TRANS-SPEC TRUCK SERVICE, INC.          )
d/b/a TRUCK SERVICE,                             )
                                                      )
                        Plaintiff                   )
                                                      )
vs.                                                   )          CIVIL ACTION NO. 04-11836-RCL
                                                      )
CATERPILLAR INC.                                 )
                                                      )
                        Defendant                )
_____)

CATERPILLAR INC.'S OPPOSITION TO THE MOTION OF TRANS-SPEC TRUCK
SERVICE, INC. d/b/a TRUCK SERVICE, TO COMPEL ANSWERS TO ITS FIRST
SET OF INTERROGATORIES AND FIRST REQUEST FOR PRODUCTION
OF DOCUMENTS PROPOUNDED TO DEFENDANT CATERPILLAR INC.,
AND REQUEST FOR ORAL ARGUMENT

        Caterpillar Inc. opposes Trans-Spec Truck Service, Inc.'s motion to compel further

answers to interrogatories and Rule 34 requests and for an award of attorney's fees and costs.

BACKGROUND

        This is an action for alleged breach of warranty.  Trans-Spec entered into negotiations

with Sterling Truck Corporation for the purchase of 22 heavy duty trucks for use in its business.

Trans-Spec and Sterling agreed the trucks would be equipped with Caterpillar C-12 diesel

engines.  Sterling purchased the C-12 engines directly from Caterpillar and installed them in the

trucks it built for Trans-Spec.[1]  Sterling sold the trucks to Trans-Spec through a dealer,

Minuteman Trucks.  The trucks were delivered to Trans-Spec in December, 1999, and January,

---

[1]     Trans-Spec says at page 2 of its motion that Trans-Spec purchased the engines.  That is untrue.  Sterling
purchased the engines from Caterpillar, *see* the invoices attached under Tab A, and installed them in trucks.  Trans-
Spec purchased the *trucks* from Sterling.  There were no direct dealings between Caterpillar and Trans-Spec in
connection with this transaction.

1

2000.  Trans-Spec promptly put them to use in its business and, so far as Caterpillar knows, continues to use them.  Trans-Spec has put several hundred thousand miles on all of the trucks.

When Caterpillar sold the engines to Sterling it provided a standard limited warranty with each of them that ran to the benefit of the first user, in this case Trans-Spec.  Depending on whether the delivery date was in 1999 or 2000, the applicable warranty was either SELF5271 (applicable to engines delivered in 1999) or SELF 5302 (applicable to engines delivered in 2000).  Copies of the warranties are attached under Tab B: they do not differ from one another in any way that seems material to this litigation.  Generally, each specifies two warranty periods for trucks of the type involved in this case: a "standard" warranty period of 24 months running from the date of delivery and an "extended" warranty period applicable only to specified components. The "extended" warranty period was 60 months running from the date of delivery or 500,000 miles, whichever occurred first.[2]  The "extended" warranty applied to, among other specified components, the flywheel housing.

If a defect in material or workmanship was found during the standard warranty period, the warranties provided Caterpillar would, during normal working hours and through a place of business of a Caterpillar dealer or other approved establishment:

-    Provide (at Caterpillar's choice) new, Remanufactured or Caterpillar-approved repaired parts or assembled components needed to correct the defect;

-    Replace lubricating oil, filters, coolant and other service items made unusable by the defect;

-    Provide reasonable or customary labor needed to correct the defect, including labor for removal and installation when necessary to make the repair; and

-    Provide reasonable or customary towing to the nearest authorized repair facility or reasonable travel expenses from the nearest authorized repair facility, if the

---

[2]   The extended warranty period under SELF5302 was 60 months, 500,000 miles, or 10,000 operating hours, whichever occurred first.  Caterpillar does not presently believe the added limitation makes a difference in this case.

vehicle is inoperable or continued operation would result in additional engine damage.

If a defect in material or workmanship was found during the extended warranty period in a component subject to the extended warranty, the warranties provided Caterpillar would, during normal working hours and at a place of business of a Caterpillar dealer or other source approved by Caterpillar, provide (at Caterpillar's choice) new, remanufactured, or Caterpillar-approved repaired parts or assembled components needed to correct the defect. The warranties each provided that the user was responsible for giving prompt notice of warrantable failures.

Both warranties contain the following statement in capitalized, bold-faced type that is larger than most of the rest of the text:

**THIS WARRANTY IS EXPRESSLY IN LIEU OF ANY OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, EXCEPT CATERPILLAR EMISSION-RELATED COMPONENTS WARRANTIES FOR NEW ENGINES, WHERE APPLICABLE. REMEDIES UNDER THIS WARRANTY ARE LIMITED TO THE PROVISION OF MATERIAL AND SERVICES, AS SPECIFIED HEREIN. CATERPILLAR IS NOT RESPONSIBLE FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES.**

In addition to the warranties Caterpillar gave, Trans-Spec purchased so-called On-Highway Vehicle Engine Extended Service Coverage ("ESC") from a Caterpillar dealer, MiltonCAT.[3]  *See* Tab C.  The ESC provided that Caterpillar would pay 100% of the service and labor charges for failures due to defects in material or workmanship of covered parts that occurred during the contract period.  The contract period was 60 months from the date of delivery or 500,000 miles, whichever occurred first.  The ESC, which ran concurrently with the Caterpillar warranties, provided coverage for many parts which were not covered by the

---

[3]  MiltonCAT's name at the time was Southworth-Milton, Inc.  Caterpillar will refer to it in this Opposition by its current name.

extended part of those warranties.  The ESC contained the following statement in capitalized

bold-face letters larger in size than most of the other text:

> **CATERPILLAR'S RESPONSIBILITIES UNDER THIS SERVICE CONTRACT ARE LIMITED TO THE PROVISION OF MATERIALS AND LABOR AS SPECIFIED HEREIN.**
>
> **CATERPILLAR DISCLAIMS ANY EXPRESS OR IMPLIED WARRANTIES IN CONNECTION HEREWITH, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.**
>
> **REMEDIES UNDER THIS SERVICE CONTRACT ARE LIMITED TO THE PROVISION OF MATERIALS AND LABOR AS SPECIFIED HEREIN.**
>
> **CATERPILLAR IS NOT RESPONSIBLE FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES.** [4]

In November, 2001, flywheel housings on two or three of Trans-Spec's trucks were

replaced.[5]  Another one was replaced in December, 2001.  Two or three more appear to have

been replaced during the year 2002.[6]  Over the course of 2003, it appears, flywheel housings

were replaced about nine times, and in 2004 several more replacements were needed.  It is

difficult to determine exactly what the extent of the problem with flywheel housings was in 2003

and 2004 because Trans-Spec has referred to flywheel housing problems that are not

corroborated by actual repair records or other ordinary-course-of-business records defense

counsel has seen.  It is clear, nonetheless, that flywheel housing problems on Trans-Spec's trucks

became unusually frequent in 2003 and 2004, even in light of the substantial mileage on the

---

[4]  Trans-Spec has refused to answer Caterpillar's interrogatory asking it to identify the documents containing express warranties it claims Caterpillar breached.  *See* pages 5 to 7 of the Memorandum in Support of Caterpillar Inc.'s Motion to Compel Further Answers to Interrogatories which is on file with the court.  Caterpillar assumes, however, that one or more of the documents described in the preceding paragraphs is what Trans-Spec relies on.

[5]  Records defense counsel has seen indicate that flywheel housings were replaced on Trans-Spec trucks ##8500 (engine #2KS27893) and 9700 (engine #2KS27835).  Defense counsel has also seen an apparently litigation-related memorandum prepared by or for Trans-Spec indicating that the flywheel housing was also replaced on truck #8400 (engine #2KS27953) in November, 2001; but defense counsel has seen no actual repair records or other ordinary-course-of-business records corroborating that memorandum.

[6]  Records defense counsel has seen confirm replacement of two flywheel housings in 2002.  There is, once again, an apparently litigation-related memorandum prepared by or for Trans-Spec which refers to a third replacement, but defense counsel has seen no corroborating repair records or other ordinary-course-of-business records.  It appears the Trans-Spec memorandum may refer to one of the confirmed replacements but merely contain an incorrect date.

trucks by that time.[7] So far as Caterpillar can determine, Trans-Spec has never paid for any flywheel housing replacement reported to Caterpillar even though Caterpillar has concluded the repeated failures are caused by improper installation of the engines by Sterling rather than by defects in the engines themselves.[8]

ARGUMENT

Ordinarily, Caterpillar would set forth in a document of this type the text of each discovery request at issue, the text of the response to it, and the related argument. This is because litigants are required to respond to discovery requests as they are actually worded and the adequacy of each response (including objections) can therefore only properly be judged in light of what the request to which it responds actually said. Vague generalities like those with which Trans-Spec has mostly contented itself are not a good basis for deciding discovery motions.[9] Unfortunately, when as here a party files a motion directed to nearly every one of 45 separate discovery requests, it is impractical to adopt the usual format. Just quoting the requests and responses would fill more than 30 single-spaced pages. So Caterpillar has no alternative but

---

[7]   Trans-Spec says at page 2 of its motion that "the major design defect in the C-12 engine block causing these difficulties is its propensity to crack due to the added torque generated by its increased horsepower." So far as defense counsel can tell, only one of Trans-Spec's engines has ever sustained a cracked engine block .for any reason. The recurrent problem Trans-Spec has experienced has been loosening of the bolts that attach the flywheel housing to the rear of the engine, with resulting damage to the housing and associated parts. If Trans-Spec really claims to have experienced recurrent problems with cracked engine blocks as stated at page 2 of its motion, rather than with flywheel housings, Caterpillar asks the court to require Trans-Spec to provide documentation of the problem as required by Local Rule 7.1(B)(1).

[8]   Trans-Spec says at page 2 of its motion that "when a seventh truck became inoperable due to these engine difficulties, Caterpillar refused to pay for any more repairs to trucks of the Trans-Spec fleet." Caterpillar asks Trans-Spec to identify with specificity and to document *any* flywheel housing replacements for which Trans-Spec has been required to pay. Caterpillar also asks Trans-Spec to identify with specificity all other work on the engines for which Trans-Spec claims it should have been, but was not, reimbursed under warranty or under the ESC. Caterpillar also asks the court to disregard factual statements like the quoted one when they are not supported, as Local Rule 7.1(B)(1) requires them to be, by affidavits or other documents setting forth or evidencing the asserted facts. Caterpillar believes Trans-Spec's counsel, out of zeal for their client, have included many inaccurate factual statements in their motion. Requiring Trans-Spec to provide evidential support for factual statements may alleviate that problem.

[9]   Caterpillar does not intend to respond to the general invective in Trans-Spec's motion. Caterpillar trusts the court understands its choice not to respond does not signify agreement but just a wish not to waste the court's time. Suffice it to say that the allegations of wrongdoing -- "shirking," "duplicity," etc. -- are inaccurate.

just to attach copies of its discovery responses under Tabs D and E and devote the text of this Opposition to discussing them.[10]

1.    <u>Document Requests</u>

Trans-Spec's first document request asks Caterpillar to produce "[a]ll documents concerning the histories of Trans-Spec's C-12 engines, from the time of their fabrication to the present."[11]  In response, Caterpillar said it would produce the requested documents except to the extent they are protected by the attorney/client privilege or the work product immunity or insofar as they have already been produced in the case either in Caterpillar's automatic disclosure or by Trans-Spec itself.[12]  Trans-Spec is dissatisfied with that response.

Trans-Spec's counsel refers to information about the engines contained in Caterpillar's "database."  But that information has been supplied:  it is contained in the documents bearing Bates numbers 000000 to 000013 and 000018 to 000224 which were produced by Caterpillar long ago in its automatic disclosure.  Caterpillar told Trans-Spec it would re-produce those documents if specifically asked it to do so, but Trans-Spec has never asked for them.  So what is Trans-Spec's problem?

When a party serves a discovery request asking for "[a]ll documents concerning" a subject involved in litigation, the party almost guarantees that an objection based on attorney/client privilege and work product immunity will be forthcoming.  That is why attorneys interested in obtaining useful information rather than in generating procedural litigation avoid language like that.  Typically, a lawyer hired to handle a matter corresponds with his or her client

---

[10]  Trans-Spec's motion is very confusingly organized.  Rather than try to mirror its confusing form, Caterpillar will instead address the requests at issue seriatim.

[11]   The drafting style of Trans-Spec's counsel is extremely verbose and convoluted, resulting in discovery requests that are verbose, convoluted, and sometimes rather difficult to follow.  When defense counsel quotes a discovery request in the text, unless otherwise indicated, verbiage that is merely redundant is omitted to save space.  The court should always refer to Tab D or E for the complete text.

[12]  Though not required by Rule 34, Caterpillar's written response to Trans-Spec's document request was expressly verified.

concerning relevant facts so that he or she can understand the case. The histories of the engines involved in this case are relevant, so defense counsel has corresponded with Caterpillar about them. That correspondence constitutes "documents concerning" the histories of the engines as those words are commonly understood. Similarly, a lawyer hired to handle a matter typically studies relevant evidential materials and prepares file memoranda analyzing them: that is one means by which conscientious lawyers obtain accurate understanding of relevant facts. The undersigned has studied available historical documents concerning these engines and has, indeed, prepared file memoranda as a result of the study. Those memoranda are "documents concerning" the histories of the engines. Documents of these types are obviously protected from discovery by one or both of the attorney/client privilege and the work product immunity. They are only illustrative examples of the multitude of generically similar documents generated in this case as in every other substantial case by the in-house and outside lawyers handling the defense and by persons acting at the direction of those lawyers.

Trans-Spec says Caterpillar is obligated to create a detailed privilege log in which it identifies and describes all such obviously-protected materials generated in connection with this case by Caterpillar's in-house and outside counsel and those working with them. In-house and outside counsel, in other words, are supposed to sit down and go through their litigation files page by page and create a list for Trans-Spec's counsel of all the correspondence, memoranda, etc. that they or their associates have prepared over the course of the litigation that address the history of the engines. That, Caterpillar believes, is ludicrous. Where a discovering party takes a position in the discovery process that is self-evidently taken principally for the purpose of imposing useless work and expense on a party, without any realistic likelihood that substantial relevant information will be disclosed, Rule 26(b)(2)(iii) mandates that the court limit the scope

of the requested discovery on the ground that its "burden or expense ... outweighs its likely benefit." *See also* Fed. R. Civ. P. 26(g)(2) and (3).  Nothing in Rule 26(b)(5) is to the contrary. *See* the Advisory Committee Note to the 1993 amendments to Rule 26(b):

> The rule does not attempt to define for each case what information must be provided when a party asserts a claim of privilege or work product protection.  Details concerning time, persons, general subject matter, etc., may be appropriate if only a few items are withheld, but may be unduly burdensome when voluminous documents are claimed to be privileged or protected, particularly if the items can be described by categories.

*See also* Local Rule 34.1(E) (requiring only that, when an assertion of privilege is made, the party asserting it identify the specific privilege).  When the court reviews Caterpillar's objection to Trans-Spec's first document request, it will see that Caterpillar fully complied with Rule 26(b)(5) as its meaning is illuminated by the Advisory Committee Note.  Trans-Spec's argument with respect to a privilege log is worse than frivolous: it is abusive.  *See* Fed. R. Civ. P. 26(g)(3).

Trans-Spec's second request asks Caterpillar to produce "[a]ll documents concerning the specifications and histories of Trans-Spec's trucks from the time of their fabrication to the present."  Again, Caterpillar identified the responsive documents which had already been produced as part of its automatic disclosure, said it would re-produce them if specifically asked, but has never been asked to do so.  Yet Trans-Spec complains about the response.

Caterpillar did not design, manufacture, or sell Trans-Spec's trucks and played no role in that process.  Caterpillar did not warrant the trucks and, therefore, did not receive warranty claims concerning them.  Caterpillar sold and warranted *engines* and, therefore, received warranty claims related to *engines*. To this day, because of roadblocks erected by Trans-Spec, Caterpillar does not know the histories of the *trucks*.  If Trans-Spec's counsel has a good faith factual basis for saying Caterpillar has failed to produce any non-privileged, non-work-product "documents concerning" the trucks, Trans-Spec's counsel should present Caterpillar and the court

with the evidence to support the assertion.  Local Rule 7.1(B)(1).  Otherwise, the assertion must be disregarded.

Trans-Spec takes the same position with respect to Caterpillar's privilege and work product objections asserted in response to Request No. 2 as it takes with respect to the same objections asserted in response to Request No. 1.  Trans-Spec's position is meritless for the same reason so, to save space, Caterpillar merely refers the court to its earlier discussion of the issue.

Trans-Spec's third request asks for "[a]ll documents concerning" specifications and performance of C-12 engines generally, all notices "regarding actual or potential service issues or defects" in them sent to dealers, and the same documents concerning four models of engines that are not even involved in the case.  In response, Caterpillar produced copies of all the so-called service letters it has sent to dealers that have any applicability to Trans-Spec's engines but objected on a variety of grounds to producing anything else.  Trans-Spec now complains about Caterpillar's response, *see* page 9 of its motion, but the court will search Trans-Spec's motion in vain for any explanation for why anything further might be relevant.  *See* <u>Continental Ins. Co.</u> v. <u>McGraw</u>, 110 F.R.D. 679, 681-682 (D. Colo. 1986) (party moving to compel further discovery responses bears the burden of proving that the responses are inadequate); 7 Moore's Federal Practice (3rd ed. 2004) §37.03 at 37-23 (same).

"All documents concerning the specifications ... concerning" the engines includes within its scope, *inter alia*, every engineering drawing of every component part and of every assembly contained in the engine  -- and these are big engines -- as well as a host of other documents "concerning" them in one way or another.  A request of that breadth and vagueness is "unreasonably cumulative or duplicative" and "the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy,

the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2)(i) and (iii). Trans-Spec, indeed, has not suggested how documents beyond what Caterpillar has produced might have *any* "importance ... in resolving the issues," much less importance that would warrant the effort and expense of making a production of the breadth suggested by its third request. A party who brings a motion to compel further discovery at a minimum bears the burden of demonstrating why further discovery is reasonably needed; Trans-Spec has not even *described* why it might be needed, much less *demonstrated* a need.

Trans-Spec says Caterpillar has described the 3126, 3176, C-10 and C-13 engines as "generations" of the C-12 engine, but that statement is false. Caterpillar nowhere said anything of the sort. Those engines are not "generations" of the C-12 engine and differ from it in many respects. There is nothing before the court, either by way of intelligent explanation or by way of evidential material, to suggest that information about four models of engines that concededly are *not* involved in the case and that the court has no reason to believe bear any material resemblance to the engines that *are* involved in it might be "relevant to the claim or defense of either party." Fed. R. Civ. P. 26(b)(1).

The reference to "generations" of C-12 engines which Trans-Spec has misrepresented as a reference to 3126, 3176, C-10 and C-13 engines refers to the fact that heavy commercial products like the C-12 engine (unlike, for example, automobiles and many other consumer products) undergo frequent improvements and other modifications to reflect advances in technology and changes in the marketplace. Service letters of the type produced by Caterpillar in response to the third request, for example, may prescribe upgrades to an earlier "generation" of C-12 engine that have already been incorporated as standard equipment in subsequent

10

generations. This is why only service letters that are applicable to Trans-Spec's engines are of any relevance: service letters applicable to Trans-Spec's engines address characteristics of those engines; service letters pertaining solely to earlier (or, for that matter, later) "generations" of C-12 engines will pertain to characteristics that Trans-Spec's engines did not have.

Space does not permit Caterpillar top discuss fully all of the objectionable features of the third request. All of the objections are valid. So far as the objections based on privilege and work product, Caterpillar refers the court to its earlier discussion on those issues. So far as the other objections, Caterpillar merely asks the court to read the actual language of the request and of the response to it, consider the practical difficulty confronted by a corporation called upon actually to *respond* to a request drafted as this one is, consider what might motivate such a request, and then deny Trans-Spec's motion.

Trans-Spec's fourth request asks for "[a]ll documents concerning defects, service issues, and returns for service" concerning eight parts or assemblies in the 144,000+ C-12 engines that Caterpillar has sold as well as in four other types of engines that are not involved in this case. Assuming that each of the 144,000+ C-12 engines had just one service claim made with respect to one or another of the identified parts or assemblies and that each service claim is reflected by two sheets of paper[13], this request alone would therefore generate more than 288,000 pages of documents *even if limited just to the C-12 engine*. If it were to turn out that the average number of claims was *two* instead of one, the volume of the production would exceed 576,000 pages.[14] Trans-Spec's counsel, however, tells the court (again without reference to supporting evidential material) that Caterpillar can "easily" provide the requested production.

---

[13]   A typical Service Claim User Worksheet is attached under Tab F. It is two pages long.
[14]   Defense counsel assumes Trans-Spec is aware of its obligation to reimburse Caterpillar for the reasonable cost of making copies of documents produced to it.

This is a case which, on the face of the warranty and ESC language quoted earlier in this Opposition, borders on the frivolous. It is a case in which Trans-Spec has to this day failed to identify even a single instance in which it has been required to pay for allegedly warrantable repairs to its engines. It is a case in which Trans-Spec, so far as can be inferred from documents it has produced, has put half a million miles or more on all or nearly all of the trucks it claims have been rendered inoperable by engine defects. Rule 26(b)(2)(iii) says the court "shall" limit discovery if "the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." The incidence of service claims with respect to things like fuel injectors, intake and exhaust valves, cylinder heads, turbo chargers, etc. in 144,000+ C-12 engines -- much less in 3126, 3176, C-10 and C-13 engines -- is of no importance in resolving issues in this case and will be of no use to Trans-Spec. Trans-Spec's lawyers would never even bother to look at the many hundreds of thousands of pages of documents they have requested.

Caterpillar is, however, willing to agree that the incidence of failures of flywheel housings on C-12 engines is significantly probative, because it is unusual frequency of failures of that part that has created Trans-Spec's problem. So Caterpillar has invested the time and money needed to compile a listing -- not "[a]ll documents concerning" but a listing -- of claims it has received of flywheel housing failures on C-12 engines generally. Caterpillar will be happy to disclose that list to Trans-Spec by way of compromise with respect to Request No. 4 if it will resolve the dispute as to that request.

So far as Caterpillar's objection based on privilege and work product is concerning, it again refers the court to the earlier discussion of that issue. So far as its other objections to the

fourth request are concerned, Caterpillar again relies on the court's own good judgment after it has read the actual language of the request and of the response to it.

The fifth request asks for "[a]ll documents concerning Trans-Spec." Caterpillar has produced all of its non-protected (as to which see the earlier discussion) documents that concern Trans-Spec's acquisition and use of the engines involved in this case, which number in the hundreds. That, however, is not good enough for Trans-Spec. Trans-Spec feels Caterpillar should do a corporate-wide search for every piece of paper generated or obtained over the past two decades (Caterpillar understands from Trans-Spec that Trans-Spec first acquired a Caterpillar product in the mid-1980s) which even mentions Trans-Spec's name, or the name of any of its personnel. The excuse for this facially improper request is Trans-Spec's assertion that "[a]s a defense for its wrongdoing, Caterpillar repeatedly pleads ignorance about Trans-Spec's business operations and truck applications." Trans-Spec does not direct the court's attention to any filing in which Caterpillar has made such an assertion.

Caterpillar's defense to Trans-Spec's claim is not ignorance of the general nature of Trans-Spec's business operations or truck applications. It is true Caterpillar has no extensive knowledge on those subjects: Caterpillar typically does not have extensive direct dealings with end-users like Trans-Spec, which purchase products and services from dealerships.[15] Caterpillar's defenses to Trans-Spec's claims, so far as Caterpillar can discern them at this point, include (a) there was nothing whatsoever wrong with the C-12 engines when they left Caterpillar's hands, (b) the problems with the flywheel housings that Trans-Spec has experienced are probably the result of improper installation of the engines by the truck manufacturer and therefore not

---

[15] Trans-Spec's reference at page 7 to invitations by Caterpillar to certain events is a good example of Trans-Spec's confusion. Caterpillar invites *dealer* personnel to those kinds of events. Customers get invited along to them by *dealer* personnel hoping to impress them enough to win sales. It is typically the *dealer* who is knowledgeable about the businesses of customers within its region because it is the *dealer* who needs to know what a customer's equipment needs may be and who interacts with the customer in making sales and providing servicing.

warrantable by Caterpillar, (c) misuse, abuse of improper maintenance by Trans-Spec may also play a role in some of the problems, with the same legal consequence, (d)  the claims for alleged breach of implied warranties and for alleged consequential or incidental damages are barred by the plain language of the warranties and ESC, (e) Caterpillar fully complied with all of its obligations under the warranties it gave and under the ESC, and (f) Trans-Spec has done nothing to try to mitigate the impact on its business of the problems it has encountered with the engines. It is true that Caterpillar has asserted, truthfully, that its ignorance of the histories of the trucks involved in this case and the manner in which they have been used and maintained has thus far prevented Caterpillar from determining the extent to which misuse, abuse, or improper maintenance plays a role in the case.  It is also true that Caterpillar does not have enough information concerning Trans-Spec's operations over the past few years to determine whether or not this claim is an outright fraudulent attempt by a financially challenged company to obtain an infusion of capital, or to assess Trans-Spec's claim that it has fallen on hard times because of engine problems rather than because of mismanagement or other factors.  Caterpillar's assertions of ignorance on those subjects, however, do not render relevant every piece of  paper mentioning Trans-Spec that may have come into Caterpillar's possession over the past 20 years.  They render relevant only Caterpillar's documents concerning Trans-Spec generated over the past few years; and those documents have been produced.

The only complaint articulated by Trans-Spec in its motion with respect to Request No. 6 has to do with the objection based on privilege and work product. Trans-Spec wants a privilege log.  Trans-Spec has not, however, even asserted that the document tendered in response to the request is not adequate to its needs, much less explained why it might be inadequate, and has not contested the formal objections Caterpillar asserted to the request.  Rule 26(b)(5) therefore has

no application.  *See* the last paragraph of the Advisory Committee Note to the 1993 amendment to Rule 26(b)(5) (explaining that the provisions of Rule 26(b)(5) come into play only if protected information is "otherwise discoverable").

Trans-Spec's complaints about the response to Request No. 7 concern the privilege and work product objection and the objection that the request does not adequately identify what is sought.  Caterpillar's discussion earlier in this Opposition on the privilege and work product issue is equally applicable here.  Caterpillar has produced the non-privileged documents it can identify.  If Trans-Spec would like to be a little clearer about what it means by "[a]ll documents concerning ... handling of any and all claims," then maybe Caterpillar could assure Trans-Spec unequivocally that it has everything; but Caterpillar does not think that language is sufficiently clear without explanation to enable it to say with assurance that it has produced everything Trans-Spec's counsel intended those words to mean.

The eighth request asks for "[a]ll documents concerning Caterpillar's business relationship with Southworth-Milton, Inc., a/k/a MiltonCAT."  MiltonCAT has been a Caterpillar dealer for decades and sells millions of dollars worth of Caterpillar products (though not C-12 engines) each year.  It is a major corporation.  There are literally millions of documents responsive to the eighth request, virtually none of which have any conceivable relevance to this case.  Service of such a request was a sanctionable act under Rule 26(g)(3), as was filing a motion to compel production in accordance with it.

If what Trans-Spec wanted was a copy of the sales and service agreement between Caterpillar and MiltonCAT that says MiltonCAT is not Caterpillar's agent, then Trans-Spec should have asked for that document.[16]  It would have been produced subject to an appropriate

---

[16] Trans-Spec refers at page 14 of its motion to "information known by Trans-Spec to the contrary" with respect to the "agency" issue.  As usual, no evidential support for the statement is included.  It must therefore be disregarded.

confidentiality order. No such request was made. Instead, a grossly objectionable request was served. Litigants are not required to rewrite their opponents' discovery requests to cure objectionable features. The proper response to an objectionable discovery request is an objection; anything more is a matter of grace, not of obligation.

Trans-Spec says it wants contracts concerning MiltonCAT's distribution of Caterpillar products. How would they be relevant where, as here, the products in question were not distributed by MiltonCAT? Trans-Spec says it wants "documents concerning subsidies and money exchanges" between MiltonCAT and Caterpillar. That means every invoice for every piece of equipment MiltonCAT ever bought from Caterpillar, not to mention every communication concerning every piece of warranty work Caterpillar ever reimbursed MiltonCAT for performing on any of the pieces of Caterpillar equipment it has sold over the past several decades. At what would be the relevant of such documents anyway? Trans-Spec does not say. Finally, Trans-Spec says it wants "policies regarding approval for warranty claims on Caterpillar engines. How is that relevant? What warranty claims has Trans-Spec made with respect to these engines that have not been paid? Trans-Spec's position with respect to this request is just one more illustration that Trans-Spec's intent is to use discovery as a weapon, not as a tool for learning useful information.

The ninth request seeks marketing and promotional literature regarding the C-12 engine as well as the 3126, 3176, C-10 and C-13 engines. Caterpillar produced the literature regarding the C-12 but not the stuff for the other engines. Trans-Spec is unhappy. It says advertisements for the other engines is "relevant ... for its comparative value" but does not say how any such comparison could be useful. Trans-Spec then refers to the supposed ability of advertising

---

Local Rule 7.1(B)(1). So must the similarly unsupported statements concerning supposed warranty procedures contained later on page 14.

concerning *other* engines to show "capabilities, performance, and defects unique to the C-12."[17] That might have been a good argument with respect to advertising for the C-12 -- which has been produced -- but common sense says that advertising about *other* engines is only going to disclose capabilities, performance, and other characteristics of *those* engines. Trans-Spec is just being silly.

So far as defense counsel can determine, Trans-Spec's only gripe about the response to the tenth request has to do with the privilege and work product objection. Trans-Spec wants a privilege log. Trans-Spec has not suggested why the substantive response to the request is inadequate, however, or why the other objections asserted to it are not meritorious. So Rule 26(b)(5) never comes into play. *See* the discussion *supra.*.

The eleventh request seeks "[a]ll documents concerning" any communication between Caterpillar and Trans-Spec or between Caterpillar and Sterling on any subject at any time between the creation of the world and the day Trans-Spec purchased the trucks involved in this case. Caterpillar produced the non-privileged documents concerning communications on the subject of these trucks and engines but otherwise objected. Trans-Spec is unhappy. It wants a privilege log, but that gripe has been addressed earlier. It complains about Caterpillar's objection that the request does not adequately describe what is requested, but that objection is obviously correct. Equally important, Trans-Spec says not one word about why the documents Caterpillar *did* produce are not fully adequate to the needs of this case or about why Caterpillar's obviously correct objections based on overbreadth and undue burden do not independently require denial of Trans-Spec's motion.

The twelfth request asks for "[a]ll documents concerning any efforts Caterpillar made, or considered making to provide rental assistance" to Trans-Spec to help it out. Caterpillar made

---

[17]  Trans-Spec repeats its false characterization of these engines as "generations" of the C-12.

such an offer in June 2004 as part of the many efforts it made to resolve this dispute amicably, but Trans-Spec was not interested. *See* the Affidavit of Troy Guidotti, attached under Tab G. Many of the documents "concerning" that offer are, of course, protected by attorney/client privilege and those issues have already been adequately discussed. To the extent there may be any other documents concerning Caterpillar's efforts to resolve the issues amicably, they are not discoverable simply because they are irrelevant. How could evidence concerning Caterpillar's unsuccessful settlement efforts possibly be admissible at trial or lead to admissible evidence?

The fourteenth request asks for "[a]ll documents concerning Caterpillar's claim" that suitable trucks were available to Trans-Spec for rental as substitutes for trucks that were inoperable. Caterpillar objected to producing privileged documents (as to which see the earlier discussion); objected to the request's failure to specify what it seeks with adequate particularity and, relatedly, to the undue burden of re-producing documents (such as pleadings and affidavits previously served on Trans-Spec's counsel) already provided to Trans-Spec; and said that Caterpillar has not assembled the publicly available documents that show that such trucks were available. Trans-Spec is unhappy. It wants an order compelling Caterpillar "to produce specific information and documents showing that trucks with similar specifications to those used by Trans-Spec can be rented for temporary use." But Rule 34 requires Caterpillar only to produce documents in its possession, custody, or control. Neither Rule 34 nor any other rule requires Caterpillar to pay people to go out into the marketplace and assemble information just so that Trans-Spec's lawyers can have it.

The fifteenth request asks for "[a]ll documents concerning" Caterpillar's affirmative defense that Trans-Spec failed to provide timely notice of alleged breaches of warranty. Caterpillar objected to producing the privileged documents, objected to re-producing documents

already provided to Trans-Spec's counsel, but identified by Bates number most of those documents. Caterpillar then told Trans-Spec that because it has thus far refused to identify *any* specific instance in which Caterpillar allegedly breached a warranty Caterpillar cannot respond further. If Trans-Spec will simply do that -- if Trans-Spec will simply identify specific engine failures that it claims were warrantable but that it allegedly had to pay to repair - then Caterpillar will be happy to produce non-privileged documents it may have responsive to this request. If Trans-Spec will not identify the alleged breaches, however, Caterpillar sure cannot identify documents that might bear on the timeliness of the notice it received of them.

The sixteenth and seventeenth requests ask for "[a]ll documents concerning" Caterpillar's defenses based on disclaimers of implied warranties and of express warranties other than those it gave. Caterpillar identified by Bates number the already-produced documents containing the disclaimers. No discussion of this request is really needed: Caterpillar asks the court just to read the responses it gave. Trans-Spec's position would simply be silly if it had not forced Caterpillar to incur expense in responding to it.

The eighteenth and nineteenth requests ask for "[a]ll documents concerning" Caterpillar's misuse and superseding cause defenses. Caterpillar identified by Bates number the several hundred documents it had already produced that are responsive to the requests but told Trans-Spec that it cannot give a fuller response until (a) Trans-Spec identifies the specific instances in which it alleges Caterpillar breached its warranty and (b) until Caterpillar has had an opportunity to learn the post-sale history of these trucks and engines (an opportunity it still has not enjoyed). How, after all, can Caterpillar determine the reasons for any specific failure that Trans-Spec alleges should have been, but was not, repaired under warranty if Trans-Spec refuses to identify the failure? And how can Caterpillar identify documents showing misuse or superseding cause if

the persons likely to have those documents -- in this instance Trans-Spec itself and Sterling -- have not disclosed them?[18]

The twentieth request asks for "[a]ll documents concerning" Caterpillar's affirmative defense that Trans-Spec is not the real party in interest. Caterpillar objected on privilege grounds -- lawyers drafting affirmative defenses often correspond with their client or write memoranda to the file concerning them -- but said it has no non-privileged documents. A party's statement that it has no responsive documents is a perfectly satisfactory response to a document request.

The twenty-first and twenty-second requests ask for "[a]ll documents concerning" two additional affirmative defenses asserted by Caterpillar. Caterpillar's responses, and the reasons for them, were the same as those discussed above with respect to requests numbered 18 and 19. Those responses are perfectly appropriate for a stage of the litigation at which much of the relevant information has not yet been obtained by Caterpillar. It is, indeed, customary for broad "contention" discovery like these requests to be fully answered only after more basic factual discovery is well-advanced. *Compare* Fed. R. Civ. P. 33(c). For the same reason, Caterpillar's concededly preliminary responses to the "contention" requests numbered 23, 24, 25, 26, 27 and 28 are adequate for now. Rule 26(e) makes provision for supplementation of incomplete responses upon proper request after adequate time to assemble more complete information has passed. A request for supplementation under Rule 26(e), not a motion to compel, is the proper vehicle for Trans-Spec to use to obtain more complete responses to these requests.

The twenty-ninth request asks for "[a]ll documents concerning Caterpillar's business relations with Trans-Spec" over the past fifteen years and the thirtieth request asks for documents concerning Trans-Spec's purchase and use of a different kind of engine back in the early 1990s.

---

[18]   Caterpillar served a document subpoena on Sterling in February but as yet has no responsive documents. Caterpillar's efforts to get copies of Trans-Spec's records relative to the histories of the trucks have as yet produced extremely incomplete results.

Caterpillar identified the documents it has already produced that are responsive to request number 29, said it would look for some additional documents if Trans-Spec will provide specified information to aid it in its search, but otherwise objected to producing anything more. What is relevant in this case is the transaction whereby Trans-Spec acquired the allegedly defective C-12 engines and what has happened to those engines since they left Caterpillar's hands. Documents generated in connection with other transactions involving other products are of no apparent relevance. If Trans-Spec thinks they are, Caterpillar invites Trans-Spec to identify specific transactions -- Trans-Spec, after all, knows what Caterpillar products it has acquired better than Caterpillar does -- and explain why details of those specific transactions are likely to be probative on issues in this case. Caterpillar will be happy to consider any such explanation. In its absence, however, no further responses to these requests are appropriate.

2.    <u>Interrogatories</u>

The third interrogatory asks for identification of "every officer, director, employee, agent, or representative of Caterpillar and/or MiltonCAT" who *ever* participated in a meeting, had a telephone conversation, or wrote a letter or memorandum in which Trans-Spec was mentioned for any reason in any context. Caterpillar identified people who have had involvement with Trans-Spec in connection with the transaction involved in this case. It identified some of the lawyers who have worked on defending this case. Otherwise, it objected.

The names of the secretaries in Caterpillar's legal department who have mentioned Trans-Spec's name are not relevant; the names of file clerks who have done so are not relevant; the names of people who may have handled warranty claims submitted by Trans-Spec twenty years ago on some sort of Caterpillar product uninvolved in this case are not relevant. If Trans-Spec wanted to learn the identities of people having knowledge of discoverable -- *i.e.* relevant and

non-privileged -- matter, it could have and should have asked for names of people knowledgeable about specific transactions that Trans-Spec has a good faith basis for thinking bear somehow on this case.  Trans-Spec did not do that.  The answer it got to this interrogatory is completely adequate in the context of this case.

The fourth interrogatory wants Caterpillar to identify everyone who had any participation of any type in designing the C-12 engine or four other types of engines.  An answer to this interrogatory, if it could be given, would result in a list of hundreds of names.  Where would that get Trans-Spec?  What use would a list of hundreds of names of people who played some undefined role in designing some part of an engine containing thousands of parts and assemblies be?  Caterpillar gave Trans-Spec the name of an engineer who has evaluated flywheel housings on C-12 engines, and if Trans-Spec wants to depose someone knowledgeable about relevant aspects of the design of the C-12 engine it can simply prepare and serve an appropriate Rule 30(b)(6) deposition notice.  Caterpillar's objection that this interrogatory as drafted is overbroad and unduly burdensome, however, is certainly valid.

The fifth interrogatory asks for the basis of Caterpillar's contention that Trans-Spec could have leased trucks to substitute for any of its own trucks that were inoperable.  Caterpillar has answered the interrogatory.  Trans-Spec may not like the answer, but Caterpillar can only provide the information it has.  If Trans-Spec wants to propound a Rule 26(e) request for supplementation later in the case, after further investigation and factual discovery has occurred, it is free to do so; but as matters stand now it is not entitled to anything more.

The sixth interrogatory asks for the factual basis of Caterpillar's untimely notice defense. Caterpillar has told Trans-Spec that, until Trans-Spec tells Caterpillar the specific instances in which a warrantable failure was allegedly not repaired at Caterpillar's expense, Caterpillar cannot

answer the question.  Caterpillar's records indicate that it has never failed to pay for a warrantable repair to Trans-Spec's engines: indeed, it has paid even for repairs that were *not* warrantable.  Caterpillar will be happy to provide a supplemental answer to this interrogatory if Trans-Spec identifies the specific repairs at issue, but until Trans-Spec has done so Caterpillar cannot provide anything further.

The eighth interrogatory asks for the factual basis of Caterpillar's affirmative defense based on warranty disclaimers.  The court will see that Caterpillar has answered the question fully.  What more does Trans-Spec want?

The ninth through eighteenth interrogatories are "contention" interrogatories that Caterpillar has answered without objection to the extent that it can do so without (a) having obtained any records from Sterling, (b) having obtained Trans-Spec's records pertaining to the trucks at issue, or (c) having deposed any of the Trans-Spec employees knowledgeable about the trucks, the engines, their histories and handling, or Trans-Spec's business activities.  Rule 33(c) specifically contemplates that "contention" interrogatories like these will often not be answered until significant factual discovery has been completed.  That has not yet occurred.  Trans-Spec's motion should be denied without prejudice to its right, after factual discovery of the foregoing types has been completed, to serve a Rule 26(e) request for supplementation.

The nineteenth interrogatory asks Caterpillar to tell Trans-Spec what Sterling should have done differently in designing its trucks to avoid the problems Trans-Spec has encountered. Caterpillar, of course, did not design those trucks.  It is trying to learn exactly what Sterling did wrong, but having received no documents from Sterling and few documents from Trans-Spec, it has not reached a determination yet.  In any event, that kind of analysis is classic expert opinion of the type that is appropriately included in expert reports.  If Trans-Spec is dissatisfied with

Caterpillar's expert disclosures when they have been made in accordance with the schedule for such disclosures established by the court, the rules will provide Trans-Spec with appropriate remedies.  For now, however, Caterpillar's answer to this interrogatory is fully satisfactory.

The twentieth interrogatory asks for a "comprehensive" and "detailed" history of Caterpillar's business relationship with Trans-Spec over the past fifteen years, information that Trans-Spec itself has and which Trans-Spec, being a much smaller company than Caterpillar and run by a single person (Mr. Howard), can much more easily assemble than Caterpillar can.  In any event, a comprehensive history of the type requested by interrogatory 20 is of no relevance to this case.  What Caterpillar products Trans-Spec may have bought in 1990 and what promotional events its employees may have attended in 1993 have no bearing on whether or not Caterpillar has fulfilled its warranty obligations with respect to twenty-two C-12 engines sold in December 1999 and January 2000.  If Trans-Spec feels differently, it should state in meaningful detail, not meaningless generalities, how an answer to this interrogatory is reasonably likely to move the ball forward on any issue involved in this litigation.

<u>REQUEST FOR ORAL ARGUMENT</u>

Caterpillar request an opportunity to present oral argument in opposition to Trans-Spec's motion.

CATERPILLAR INC.,

By its Attorney,

CAMPBELL CAMPBELL EDWARDS
& CONROY, P.C.

s/ John A. K. Grunert
John A. K. Grunert, Esquire, BBO #213820
One Constitution Plaza, 3rd Floor
Boston, MA 02129
(617) 241-3000