Kevin G. Holmes                                                04/11/2005

80

1         A.   Al Cardoza has been giving us specifics as
2    to what he requests us to do with these engines.
3         Q.   What have those specifics been? What has
4    he been telling you to do with the engines?
5         A.   Either replace the flywheel housing or
6    repair the front engine cover leaks.
7         Q.   How would you repair the front engine cover
8    leaks? Has he been giving you specifics to repair it?
9    Or is there just a set procedure for doing so?
10        A.   Actually, there are set procedures that are
11   obviously there. And obviously we have to follow those.
12        Q.   Has he been telling you to patch any of the
13   engines or flywheel housings or flywheel housing bolts
14   or any components?
15        A.   There was a unit here, yes, that was
16   patched.
17        Q.   Is patching sufficient for these types of
18   problems that you've been seeing in Trans-Spec's C-12
19   engines?
20             MR. GRUNERT: Object to the form.
21        A.   Unfortunately so, not in the engine that
22   was here, no.
23        Q.   Do you know why Al Cardoza told you to
24   simply patch the engine?

Kevin G. Holmes                                                04/11/2005

81

1   A. Specifically, no, I don't. Obviously, I'm
2   sure, from a cost standpoint, yes.
3   Q. Was it obvious that patching wouldn't be
4   sufficient to make this repair on this engine?
5   A. For the vehicle's longevity, yes.
6   Q. Why?
7   A. Because a piece of the engine block was
8   broken.
9   Q. How did Al Cardoza tell Tri State to patch
10  the engine block?
11  A. He said to put the piece back on and epoxy
12  it.
13  Q. How long did it last? Do you know?
14  A. Unfortunately so, I don't know that now. I
15  believe that's, you know, a vehicle that has not been
16  back here so I would not know that.
17  Q. Did you or -- do you know if the person who
18  was dealing with this particular engine from Tri State,
19  did that person voice any concern with Al Cardoza
20  regarding the insufficiency of that patching?
21  A. I believe there were pictures taken and
22  all, yes.
23  Q. Do you have those pictures?
24  A. Unfortunately so, I don't personally. But

1   I do believe there is a disk, yes.
2       Q.   Okay.  You said that cost consideration was
3   a factor, you thought, in that decision.  Could you
4   explain what you meant by that?
5       A.   Again, an engine bell housing or flywheel
6   housing repair would be in the vicinity of maybe $3,000,
7   $3500 between parts and labor, as opposed to an engine
8   replacement which would be in excess of $20,000.
9       Q.   How much would patching cost?
10      A.   Again, the patching would encompass --
11  probably be about that 32 to $3500.
12      Q.   Okay.  From what you've seen, is there a
13  permanent fix for Trans-Spec's types of problems with
14  the engines?
15      MR. GRUNERT:  Object to the form and competence.
16      A.   Other than replacement, as I mentioned
17  earlier, no.
18      Q.   Okay.  Does Caterpillar ever authorize a
19  dealer such as Tri State to make a repair pursuant to a
20  warranty and then subsequently refuse to pay it?
21      A.   Yes.
22      Q.   Could you tell me about that.
23      A.   Actually, we've -- we have had claims that
24  we have been authorized to perform and we do get charged

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11836-RCL

)
TRANS-SPEC TRUCK SERVICE, INC. )
d/b/a TRUCK SERVICE, )
    Plaintiff )
)
vs. )
)
CATERPILLAR INC. )
    Defendant )
)

**PLAINTIFF, TRANS-SPEC TRUCK SERVICE INC., d/b/a TRUCK SERVICES,
AMENDED ANSWERS TO CATERPILLAR INC.'S
FIRST SET OF INTERROGATORIES**

The plaintiff, Trans-Spec Truck Service, Inc. ("Trans-Spec") answers the below interrogatories as follows:

### GENERAL OBJECTIONS OF SPECIFIC APPLICABLITY

1. These answers to interrogatories are qualified by the objections specifically asserted herein and the answers do not constitute a waiver of any objection asserted.

2. Trans-Spec reserves the right to supplement these responses in a timely manner.

### INTERROGATORIES

**INTERROGATORY NO. 1**

Identify every person whom you expect to offer expert testimony on your behalf at trial and, as to each such person, state the subject matters on which he or she will testify, state the substance of the facts and opinions to which he or she will testify, and summarize the grounds for each opinion to which he or she will testify.

**ANSWER NO. 1**

Trans-Spec has not determined which experts, if any, it will call at trial and reserves the right to supplement this answer in a timely fashion.


EXHIBIT H

**INTERROGATORY NO. 10**

Describe comprehensively and in detail the basis for your contention that Trans-Spec's purported claim to recover incidental and consequential damages, damages for loss of use, and costs of additional service employees [as to which see ¶42 of the amended complaint] is not barred by the exclusion of incidental and consequential damages contained in the written warranties Caterpillar gave with respect to the engines and in the extended service contract of which a copy is attached as Exhibit C to the amended complaint.

**ANSWER NO. 10**

Trans-Spec objects to this interrogatory as it poses a question of law. Without waiving and subject to this objection, Trans-Spec states that on multiple occasions, Caterpillar orally waived any such exclusion, including during meetings with Trans-Spec on June 9, 2004 and in or around August 2004.

On June 9, 2004, Cardoza orally extended Caterpillar's warranty on the Trans-Spec C-12 engines until June 21, 2005. Guidotti also attended this meeting, which was held at Milton-CAT's facility in Milford, Massachusetts; was present at Cardoza's representation; and, agreed with it. Guidotti further represented that the problems with the C-12 engines were not Trans-Spec's fault and that Caterpillar would make Trans-Spec whole.

In August 2004, Schoening again orally extended Caterpillar's warranty on the Trans-Spec C-12 engines until June 21, 2005 at a meeting with Howard and Barton held at Milton-CAT's facility in Milford, Massachusetts. Schoening reiterated Guidotti's representation at the June 9, 2004 meeting that the problems with the C-12 engines were not Trans-Spec's fault and that Caterpillar would make Trans-Spec whole. Cardoza attended this meeting.

Additionally, Calderbank and Cardoza have made "off the record" representations to Trans-Spec that Trans-Spec would be made whole for the damage it has suffered as a result of the defective C-12 engines.

**INTERROGATORY NO. 11**

Describe comprehensively and in detail the basis for your contention that Trans-Spec's purported claim for alleged breaches of implied warranties are not barred by the disclaimers of all implied warranties contained in the written warranties Caterpillar gave with respect to the engines and in the extended service contract of which a copy is attached as Exhibit C to the amended complaint.

**ANSWER NO. 11**

Trans-Spec objects to this interrogatory as it poses a question of law. Without waiving and subject to this objection, Trans-Spec states that on multiple occasions, Caterpillar orally waived any such exclusion, including during meetings with Trans-Spec on June 9, 2004 and in or around August 2004.

On June 9, 2004, Cardoza orally extended Caterpillar's warranty on the Trans-Spec C-12 engines until June 21, 2005. Guidotti also attended this meeting, which was held at Milton-CAT's facility in Milford, Massachusetts; was present at Cardoza's representation; and, agreed with it. Guidotti further represented that the problems with the C-12 engines were not Trans-Spec's fault and that Caterpillar would make Trans-Spec whole.

In August 2004, Schoening again orally extended Caterpillar's warranty on the Trans-Spec C-12 engines until June 21, 2005 at a meeting with Howard and Barton held at Milton-CAT's facility in Milford, Massachusetts. Schoening reiterated Guidotti's representation at the June 9, 2004 meeting that the problems with the C-12 engines were not Trans-Spec's fault and that Caterpillar would make Trans-Spec whole. Cardoza attended this meeting.

Additionally, Calderbank and Cardoza have made "off the record" representations to Trans-Spec that Trans-Spec would be made whole for the damage it has suffered as a result of the defective C-12 engines.

**INTERROGATORY NO. 12**

Describe with specificity the "particular purpose" for which you allege Caterpillar impliedly warranted the engines would be suitable, and describe comprehensively and in detail all documents and other information Caterpillar had when it contracted with Sterling to sell Sterling the engines that (a) gave it reason to know of that particular purpose and (b) gave it reason to know Sterling was relying on Caterpillar's skill or judgment to select or furnish engines that were suitable for that particular purpose.

**ANSWER NO. 12**

Trans-Spec objects to this Interrogatory in that it cannot make any representations as to what documents Caterpillar received from Sterling nor can Trans-Spec make representations regarding the contents of Caterpillar's files. Without waiving and subject to this objection, Trans-Spec states that it is a common carrier for hire, regulated by the Department of Transportation, in the business of transporting general commodities and bulk items including but not limited to oil, aggregate, processed materials, petroleum, and liquid asphalt. Caterpillar warranted that the engines would be suitable for these particular purposes. Caterpillar was well acquainted with Trans-Spec's business, applications, and services due to an ongoing business relationship between the two companies dating back to 1986. From that time, Caterpillar wanted to sell engines to Trans-Spec and Trans-Spec obliged them for fourteen years.

Caterpillar further learned about Trans-Spec's business operations because Trans-Spec purchased the first FLC112 Freightliner truck that had a Caterpillar 3176 engine integrated into it. Trans-Spec agreed to let Caterpillar conduct performance testing on this truck, as part of its research for future development, in 1991-1992. Cardoza attended these tests.

Additionally, Caterpillar learned about Trans-Spec's business operations through its close contact with Trans-Spec personnel as part of its ongoing business relationship with Trans-Spec. For example, in or around 1996, Caterpillar invited and paid for Lind to attend the introduction

## Page 1

Vol.
Pages 1 - 156
Exhibits 1 - 8

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
NO. 04-11836RCL

TRANS-SPEC TRUCK SERVICE, INC.
d/b/a TRUCK SERVICE,
Plaintiff

vs.

CATERPILLAR, INC.,
Defendant

AUDIO-VISUAL DEPOSITION of RALPH A. LIND, JR., a witness called by and on behalf of the Defendant, pursuant to the provisions of the Federal Rules of Civil Procedure, before Heather S. Cruz, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Campbell, Campbell, Edwards and Conroy, One Constitution Plaza, Boston, Massachusetts, on Tuesday, May 10, 2005, commencing at 9:37 a.m.

C.J. REPORTING
A5 Colonial Drive, Unit No. 7
Andover, Massachusetts 01810
(978) 409-9090/fax (978) 409-9091
www.cjreporting.com

## Page 2

1  APPEARANCES:
2  DONOVAN HATEM, LLP
   By Christian G. Samito, Esquire
3  Two Seaport Lane
   Boston, Massachusetts 02210
4  On behalf of the Plaintiff
5  CAMPBELL, CAMPBELL, EDWARDS & CONROY
   By John A.K. Grunert, Esquire
6  One Constitution Plaza
   Boston, Massachusetts 02129
7  On behalf of the Defendant
8  Also Present: William Barton, Videographer
                 In Court Technologies
9                One Constitution Plaza
                 Boston, Massachusetts 02129
10
   Also Present: Joseph Howard
11

## Page 3

                INDEX
    DEPOSITION OF RALPH A. LIND, JR.

                                      Page
    Examination by Mr. Grunert     4, 139
    Examination by Mr. Samito         113

                EXHIBITS

Nos.                              For I.D.

1  Driver's Vehicle Inspection Report   25
   dated 10/17/03
2  Repair Order and Invoice dated 6/3/03   28
3  Preventive Maintenance Inspection       28
   Report dated 1/27/03

4  A Service Sheet dated 9/18/03           29

5  B Service Sheet dated 3/07/03           30

6  Invoice No. 65992                       74

7  Invoice No. 98663                       87

8  Invoice No. 88088                       87

## Page 4

                    PROCEEDINGS
    THE VIDEOGRAPHER: We are now on the record. The date is May 10, 2005. The time is approximately 9:37 a.m.
    We are located at the offices of Campbell, Campbell, Edwards and Conroy in Boston, Massachusetts. The Defendant in the case of Trans-Spec Truck Services, Incorporated, d/b/a Truck Service versus Caterpillar, Incorporated, Civil Action No. 0411836 RCL.
    We will now take the audio-visual deposition of Mr. Ralph Lind. My name is William Barton of In Court Technologies, Boston, Massachusetts, and I am the videographer for this deposition. The stenographer is Heather Cruz of C.J. Reporting.
    At this time the attorneys will introduce themselves for the record.
    MR. GRUNERT: My name is John Grunert with the firm of Campbell, Campbell, Edwards and Conroy. I represent the Defendant, Caterpillar, Inc.
    MR. SAMITO: Christian G. Samito of Donovan Hatem, LLP. I represent the deponent, Mr. Lind, and the Plaintiff, Trans-Spec Truck Service.
    THE VIDEOGRAPHER: The stenographer will now swear in the witness.

## Page 5

        RALPH A. LIND, JR., having been satisfactorily identified by a Massachusetts driver's license and duly sworn by the Notary Public, was examined and testified as follows:
        MR. GRUNERT: The parties have agreed that we're going to have the usual stipulations, except that the witness is going to read and sign the transcript. So objections except to the form of the question are reserved until the time of trial. Motions to strike are reserved until the time of trial. Notarization of the witness' signature is waived.
    EXAMINATION BY MR. GRUNERT:
Q   State your full name, please, sir.
A   Ralph Andrew Lind, Junior.
Q   Have you had your deposition taken before?
A   I don't know. I don't think so. Not for this, but.
Q   Have you had the misfortune on any earlier occasion to sit in a room like this with a stenographer and have attorneys question you under oath and have your testimony taken down stenographically?
A   Yes.
Q   What was the occasion for that?
A   I don't remember.
Q   Was it --

## Page 6

A   It was something to do with a driver a long time ago for Truck Service.
Q   This was a case in which you were not a plaintiff or a defendant, you were a witness testifying in a case that somebody else had brought?
A   Yes.
Q   Do you remember who the plaintiff in that case was?
A   No.
Q   Do you remember who it was who took your deposition?
A   No.
Q   Were you represented by an attorney at that deposition?
A   I don't remember. It was years ago.
Q   What's your address?
A   2 Mason Road, Milbury, Mass.
Q   Are you married?
A   Yes.
Q   Children?
A   Yes.
Q   Are you employed?
A   Yes.
Q   Who is your employer?
A   London Taxis of North America.
Q   When you go to work in the morning, where do you go?
A   Sudbury, Massachusetts.

EXHIBIT 1

Page 61

1  serviceability. How easy was it to work on the truck.
2  Because the truck is down for as long as it needs to be
3  serviced. So the faster you can get it fixed and back
4  on the road or serviced and back on the road is what I
5  was concerned with.
6  Q  Okay. Were there particular characteristics of these
7     trucks that you were concerned with from a perspective
8     of serviceability? Were there particular features that
9     you told Mr. Medbery you needed on these trucks in
10    order to make them adequately serviceable for what you
11    knew Trans-Spec's needs were?
12 A  As far as features, no. Component locations, yes.
13 Q  Okay. And were there specific components that you were
14    concerned about?
15 A  Yes.
16 Q  Which specific components were you concerned about?
17 A  Battery location. Battery and cable location. Air
18    drier. Fuel filter location. Basically all the
19    service needs. Everything that required a basic which
20    on the A Service Sheets. Every component that had to
21    be checked on and serviced, I was concerned with where
22    it was located and its accessibility to a technician.
23         My specifications weren't based on that sheet
24    you got in your hand.

Page 62

1  Q  Were there some power take-offs? How many power
2     take-offs from the transmission on these trucks were
3     there?
4  A  Depended on the truck.
5  Q  So on these 22 Sterling trucks, some of them had more
6     power take-offs than others?
7  A  Some had two, some only had one.
8  Q  Do you know why some had two while some only had one?
9  A  Because some trucks did multiple duties. They worked
10    on dump trailer and tanker.
11 Q  So the ones that had tanker plus dump trailer had two
12    power take-offs?
13 A  Yes.
14 Q  Do you remember which trucks it was that had two power
15    take-offs?
16 A  No.
17 Q  Do you remember how many of the trucks were used for
18    those dual purposes as distinct from just delivering
19    fuel?
20 A  No.
21 Q  The trucks that were equipped to handle a dump trailer,
22    do you know about how much of their time was spent
23    hauling aggregate or other material in a dump trailer
24    as contrasted with hauling fuel?

Page 63

1  A  No, I don't. I didn't dispatch the trucks so I didn't
2     know what they were doing.
3  Q  Were the trucks that were equipped to handle a dump
4     trailer used for that purpose more during the warm
5     months than during the winter months?
6  A  Yes.
7  Q  Were they used for that purpose principally during the
8     warm months?
9  A  Dump trailer, yes. Mostly in the summer.
10 Q  Okay. My question was pretty unclear. The trucks that
11    were equipped to handle a dump trailer, during the
12    summer months, was hauling aggregate and other material
13    in a dump trailer what they were mostly used for during
14    the summer?
15 A  Yes.
16 Q  And then during the winter months they would be
17    switched over to fuel delivery?
18 A  To tanker. Yes.
19 Q  You mentioned early on when we were talking about the
20    documents that you prepared, you mentioned weight slips
21    or overweight slips?
22 A  Yes.
23 Q  And I take it that you also filled out other paperwork
24    for various types of permits that were necessary for

Page 64

1  hauling?
2  A  Fire marshall permits. Numerous permits, yes.
3  Q  Where were -- where would those types of documents be
4     kept at Trans-Spec?
5  A  Copies of them were in my desk or in my filing cabinet
6     in my office. And the original was kept with the
7     truck. Or a copy was with the truck and one was kept
8     at the registry or whoever issued the permit; fire
9     department, registry, so on.
10 Q  As the years passed, would those various permits and
11    slips of various types, documents, would they be stored
12    somewhere at Trans-Spec?
13 A  I think I only kept them for a year. Because I would
14    copy them over for the next year and make any changes I
15    needed to be done and then throw the other ones away.
16 Q  So as they expired?
17 A  Threw them away.
18 Q  You just dump them?
19 A  Yes. Dump the ones in the truck. I don't know if I
20    actually got rid of the ones that I had in my office.
21 Q  Okay. When Trans-Spec's trucks were hauling aggregate
22    or asphalt or various materials that were hauled in the
23    dump trailers, would scale tickets be generated in
24    order to determine how much material had been

Page 65

1  delivered?
2  A  Scale tickets you mean I generate?
3  Q  No. No. I assume that the trucks --
4  A  Getting back into the documents the driver had. No. I
5     don't know what the driver had for documents other than
6     the driver's inspection report.
7  Q  Okay.
8  A  I could guess, yes, but because I've seen scale houses
9     at different locations, but I've never dealt with the
10    scale tickets.
11 Q  Getting back to the process of specing the Sterling
12    trucks that were involved in this case. Did you have
13    any discussions particularly with Mr. Medbery
14    concerning the C-12 engines?
15 A  I don't think so. I don't know. Maybe as far as
16    serviceability. But I don't remember a specific
17    conversation.
18 Q  Did you have any conversations with him concerning the
19    fly wheels or the fly wheel housings?
20 A  Not that I know of.
21 Q  In connection with the process of specing these trucks,
22    did you have any conversations with Mr. Calderbank?
23 A  Only as far as my recollection of Boca Raton. I don't
24    remember any specific conversations I had with him.

Page 66

1  Q  In connection with specing the Sterling trucks involved
2     in this case, did you have any conversations with
3     Mr. Cardoza from Southworth-Milton?
4  A  Some conversations I believe.
5  Q  What conversations did you have with Mr. Cardoza in
6     connection with specing these trucks?
7  A  I don't know if it was actually in specing the trucks,
8     more as it was the ability of the engine as far as
9     horsepower and torque ratings.
10 Q  Tell me what you remember about the conversation or
11    conversations you had with Mr. Cardoza in connection
12    with these Sterling trucks.
13 A  I don't really remember specific conversations. I know
14    we talked about the engines. Their ability. The
15    horsepower ratings. The torque ratings. What they
16    were suppose to be able to do. I don't remember the
17    actual conversations.
18 Q  Other than the torque ratings and the horsepower
19    ratings, what do you remember Mr. Cardoza telling you
20    about what the engines were suppose to be able to do?
21 A  I don't. I don't remember.
22 Q  So what you remember of getting from him is torque
23    ratings, horsepower?
24 A  Uh-huh. Yes.

**Page 67**

1  Q  And you remember that you talked with him about other
2     things, but you simply don't recall what was said?
3  A  Correct. I talked to Al a lot and about many different
4     things, and I can't remember what we talked about.
5  Q  Did you talk with anyone other than Mr. Cardoza from
6     Southworth-Milton during the process of specing out the
7     Sterling trucks?
8  A  No.
9  Q  Did you talk with anyone from Caterpillar in the
10    process of specing out these trucks?
11 A  Not that I remember. No.
12 Q  What discussions do you remember having with Mr. Howard
13    in the process of specing out these trucks?
14 A  We talked a lot about the trucks and what he thought.
15    These trucks were suppose to be the last truck, the
16    right truck for our job. And we spent a lot of hours
17    talking about many things. Drive shafts and rear
18    axils. The engine in particular. We thought it was
19    the right engine. The cab design. The doors.
20    Mirrors. Everything. We talked about a lot of things.
21    Cruise control.
22 Q  When you spoke -- when you spoke with him about the
23    rear axil, what was the discussion on that subject?
24 A  Well, we had Rockwell rear axils in our Freightliners

**Page 68**

1  which were an all-wheel drive. They had an inter-axil
2  lock and we decided -- he decided that to go with an
3  anti-lock braking traction control system or something
4  to that effect, and it was a simple conversation as to
5  eliminating the axil lock on the Sterlings because we
6  saw what kind of damage they could do in the
7  Freightliners when the driver didn't know how to use
8  it. So specifically. And stuff like that.
9  Q  What do you remember talking with him about so far as
10    the drive line was concerned?
11 A  I know he chose to go with a Spicer. I believe a
12    Spicer drive line over the Rockwell drive line or the
13    Meritore drive line because of Merko Bigward's
14    recommendations.
15 Q  Because of?
16 A  Merko Bigward. A Meritore rep. He didn't recommend
17    his drive line. He recommended actually his
18    competitor.
19 Q  And the person's name is Merko Bigward?
20 A  Yes.
21 Q  Is Merko Bigward the person that Jay Howard dealt with
22    in connection with choosing a Meritore transmission?
23 A  Possibly.
24 Q  Do you know where Mr. Bigward operates out of?

**Page 69**

1  A  No. I don't think he's our rep anymore in
2     Massachusetts.
3  Q  Did you accompany Mr. Howard to a meeting up in Saint
4     Thomas, Ontario concerning these trucks?
5  A  Yes, I did.
6  Q  Is that the only meeting that you attended with
7     Sterling representatives in connection with specing
8     these trucks?
9  A  The only meeting. I believe it is. I don't remember
10    any others.
11 Q  Apart from that meeting, did you talk with any people
12    from Sterling concerning these trucks during the
13    process of specing them?
14 A  Other than Don Medbery?
15 Q  Don Medbery works for Minuteman, right?
16 A  Sterling. Not that I'm aware of.
17 Q  How long did you spend in Ontario with Sterling?
18 A  I believe we were there two days. I'm not 100 percent
19    sure.
20 Q  Was anyone from Southworth at that meeting?
21 A  I don't remember.
22 Q  Was anyone from Caterpillar at that meeting?
23 A  I don't remember. I remember me, Jay, Don Medbery and
24    I believe Dick Witcher.

**Page 70**

1  Q  Dick Witcher.
2  A  Minuteman Trucks.
3  Q  Do you remember who was there from Sterling?
4  A  I don't know his name. I could picture the guy but I
5     don't know his name.
6  Q  Did you make any notes at that meeting?
7  A  No, sir.
8  Q  What was the purpose of that meeting?
9  A  We were going to see the truck come off the line and
10    make any changes at the end of the line that we thought
11    would benefit serviceability of the vehicle.
12 Q  So you actually saw a truck that met the specifications
13    that Trans-Spec had given Sterling, you actually saw a
14    truck of that type fully assembled?
15 A  We saw a truck that they thought would meet our
16    specifications. I believe it was one of our trucks.
17 Q  And did you inspect it after it came off the end of the
18    assembly line?
19 A  Yes.
20 Q  Did you have any changes that you requested?
21 A  Yes.
22 Q  What changes did you request?
23 A  Air drier location. That I remember specifically. I
24    believe battery location and battery cable length.

**Page 71**

1  Keep going back to those because I remember those
2  specifically were one of my complaints.
3  Q  Were there any other changes that were requested either
4     by you or by Mr. Howard?
5  A  I don't remember any others.
6  Q  Were there any particular features of the trucks that
7     Trans-Spec had ordered that were discussed at that
8     meeting other than the air drier location and the
9     battery location and the battery cable length?
10 A  I don't remember.
11 Q  Was there any discussion of the engine?
12 A  Not that I can remember. No.
13 Q  Was there any discussion about the transmission?
14 A  Again, not that I can remember.
15 Q  Was there any discussion of the design of the frame?
16 A  I don't know. Might have been. See, I was more
17    concerned with the serviceability of the vehicle. I
18    don't know what he talked about. I didn't discuss with
19    anybody anything other than the serviceability of the
20    truck and what I thought would make it easier for me to
21    service. You're getting into components, and I wasn't
22    involved in the components per se.
23 Q  There was no discussion of fly wheels or fly wheel
24    housing, I assume?

**Page 72**

1  A  Not by me.
2  Q  Not that you remember?
3  A  Correct.
4         MR. GRUNERT: I'm going to show him this
5  document.
6         MR. SAMITO: Is it in this packet that you
7  gave me?
8         MR. GRUNERT: Yes, it is.
9         MR. SAMITO: Do you know where, so I could
10 follow along?
11        MR. GRUNERT: Probably right on top.
12        MR. SAMITO: Okay.
13        THE VIDEOGRAPHER: Could I change tapes at
14 this time?
15        MR. GRUNERT: Sure. This is a good time.
16        THE VIDEOGRAPHER: The time is approximately
17 11:28. We are off the record for a tape change.
18        (Off the record.)
19        THE VIDEOGRAPHER: We are on the record. The
20 time is approximately 11:29.
21 Q  Mr. Lind, let me show you a sample document from a
22    mound of documents that I recently obtained from
23    Minuteman Trucks.
24        As a result of your work at Minuteman Trucks,

Page 121

```
 1    I don't remember, I didn't know that was dropped off by
 2    Colony, but we did have a truck dropped off that we
 3    examined and I went over that truck.
 4  Q Do you remember -- you don't remember who dropped it
 5    off?
 6  A I don't.
 7  Q But an AT-9513 was dropped off at some point?
 8  A Yes.
 9  Q And you examined it?
10  A Yes, I did.
11  Q What did you think of it?
12  A I thought it was a nice truck, one that we could use.
13  Q Do you remember what kind of engine it had?
14  A It had a -- I think it had a C-12 in it.
15  Q Did you examine the engine?
16  A Yes, I did.
17  Q What did you think?
18  A I thought it was, again, I thought it was the right
19    engine.  It looked like -- that truck looked like
20    something we could work with.  It would do what we
21    wanted.
22  Q Did you have any complaints about the engine or the
23    AT-9513 that you examined?
24  A Minor cosmetics and component locations like I stated
```

Page 122

```
 1    earlier in the -- where some things were located on the
 2    truck I didn't particularly care for.  Air driers, oil
 3    filters, the battery box locations.  But as far as the
 4    layout of the truck, I thought it was good.
 5  Q Who is Don Medbery?
 6  A I believe he's a salesman -- he was a salesman for
 7    Minuteman Trucks.
 8  Q When did you first meet Mr. Medbery?
 9  A Sometime during the specing, potential purchasing of
10    the Sterlings.
11  Q Did he speak to you or?
12  A I spoke to Don quite a few times.  I've even been to
13    his house and worked on some of his computers, so.
14  Q What did Mr. Medbery tell you specifically regarding
15    Trans-Spec's truck purchase, outside of the computer
16    conversations, but focused on the truck purchase?
17  A I only remember him saying he was the salesman for
18    Minuteman Trucks and he was potentially selling the
19    trucks to us.  And he basically stopped by our lot for
20    just to let us know he was still around and -- I don't
21    remember a lot of the conversations I had with him.  I
22    basically tried to avoid him.
23  Q Did Al Cardoza make any representations concerning the
24    suitability of the C-12 for Trans-Spec's business
```

Page 123

```
 1    applications?
 2  A Al Cardoza, yes.
 3  Q What were those representations?
 4  A As far as the C-12s, he had computer programs that
 5    showed printouts of what the engine was capable of
 6    doing.  He could do drivability chart or graph of the
 7    way that the engine would perform in certain
 8    conditions.
 9  Q Was it a Caterpillar specing program that he used?
10  A I believe it was something like that.  I don't know
11    exactly.
12  Q And did he show you printouts?
13  A Yes.
14  Q Did you view the printouts?
15  A Yes.
16  Q Did you see him input the data?
17  A Yes.  We tried -- he was in my office with the laptop
18    on numerous occasions changing transmission final drive
19    ratios, rear axil ratios, imputing different data to
20    come up with different startability of the trucks, how
21    it would take off from a dead stop with a load and
22    certain road conditions.  Degraded the road and stuff
23    like that.
24  Q Did he show you based on that program that the C-12 was
```

Page 124

```
 1    suitable for Trans-Spec's business purposes?
 2        MR. GRUNERT:  Object to the form.
 3  Q You can answer.
 4  A Yes.
 5  Q Did Mr. Cardoza show you that the C-12 was suitable for
 6    80,000 gross commercial weight vehicles in New England?
 7  A 80,000 vehicles?
 8  Q 80,000 gross commercial weight vehicle.
 9  A The gross commercial weight rating, yes.
10  Q What did Al Cardoza say about serviceability of the
11    trucks?
12  A I don't remember talking to him about serviceability.
13    I knew how to service a truck, so I didn't really talk
14    to him about stuff like that.
15  Q Well, you said earlier that that was one of the main
16    concerns that you had in terms of serviceability of the
17    engines.  Did you discuss that at all with Al Cardoza?
18  A No.
19  Q You didn't.  Okay.  Do you recall what sort of data the
20    documents showed?
21  A The computer printouts.  It was a graph type document
22    that printed out -- had line graphs that would show --
23    on one side it had horsepower ratings and then grades
24    of the road and then the line would go -- it was just a
```

Page 125

```
 1    basic graph that showed you how the truck would react
 2    to certain conditions.  Or the engine, not the truck.
 3  Q How long did you spend with Mr. Cardoza plugging in
 4    these various conditions?
 5  A In total, I have no idea.
 6  Q Did it happen at one meeting or was it --
 7  A No.  No.  No.  It was done it a few times.  When Jay --
 8    when Al would print something out, I would tell Jay
 9    what Al come up with and he would try different final
10    drive ratios, transmissions.  We were also going for
11    fuel mileage, so axil ratios meant a lot.  How the
12    truck would take off with a load, but it also had to
13    get to the right road speed.  So it was a lot of
14    variables.
15  Q Earlier you spoke about a trip to Canada and an
16    examination of the Sterling factory when the trucks
17    were being built.  Did you meet any Caterpillar
18    employees during that visit?
19  A I don't remember a CAT employee.
20  Q Okay.  I would like to show you a document to mark.
21        MR. SAMITO:  I'll show it to you.  I don't
22    have another copy of that.
23        MR. GRUNERT:  I've got the original.  Do you
24    want to just refer to the deposition --
```

Page 126

```
 1        MR. SAMITO:  We can.  Yeah.  From -- I assume
 2    that you had it.
 3        MR. GRUNERT:  Rather than mark it.
 4        MR. SAMITO:  That would be fine if we use
 5    that.
 6        MR. GRUNERT:  This is an exhibit that --
 7    actually several exhibits that were marked at the first
 8    day of Mr. Howard's deposition.
 9        THE WITNESS:  Okay.  Yes.
10  Q If you could turn to the -- you'll see that the -- it's
11    marked Exhibit 4 Howard deposition.  The first page is
12    a cover letter from me to Attorney Howe.  If you look
13    at the third page.  Do you recognize this document?
14  A Yes.
15  Q What is this document?
16  A It's an extended -- it's a warranty basically.
17    Extended service coverage warranty document.
18  Q When did you first see this document?
19  A As far as the date, I don't remember when I saw it.
20  Q But have you seen it before today?
21  A Yeah.  I signed it.
22  Q Where did you sign it?
23  A Down on the lower left-hand corner.  That is my
24    signature.
```

1

```
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 2
 3   TRANS-SPEC TRUCK    )
     SERVICE, INC.,      )
 4                       )
                Plaintiff)
 5                       )
       vs.               ) CIVIL ACTION NO. 04-11836-RCL
 6                       )
     CATERPILLAR, INC.,  )
 7                       )
                Defendant)
 8   _____)
 9
10             DEPOSITION OF DONALD MEDBERY, a witness
11   called on behalf of the Defendant, pursuant to
12   Federal Rules of Civil Procedure 30 and 45, before
13   Camille Palladino-Duffy, Registered Professional
14   Reporter and Notary Public in and for the State of
15   New Hampshire, at the Marriott Residence Inn, 1
16   International Drive, Portsmouth, New Hampshire, on
17   Thursday, May 12, 2005, commencing at 10:04 a.m.
18
19
20
21
22                    C. J. Reporting
                A5 Colonial Drive, Unit No. 7
23              Andover, Massachusetts   01810
                       978-409-9090
24                  www.cjreporting.com
```

EXHIBIT J

26

1  for their, you know, for their software for specs,
2  specking out a truck.
3  Q. All right. Does Spec Pro 1.11 identify
4     proprietary Sterling software?
5  A. Right.
6  Q. And you, as a salesman, had access to that
7     software --
8  A. Correct.
9  Q. If you were generating a proposal --
10 A. Uh-huh.
11 Q. -- how would you use that software? What inputs
12    would you make into that software?
13 A. What inputs I would use?
14 Q. Yes.
15 A. Well, first of all, you just call up the standard
16    chassis, which is the, you know, the LT 9500, and
17    then that would automatically -- everything that
18    was standard on the truck would pop up. And then
19    you'd start working from there, depending on what
20    the customer wanted as far as engines and
21    transmissions and rear-ends and suspensions and
22    what not, instrumentation and frames. And when
23    you do all that, you would just input it in there
24    and it would automatically convert it over and you

27

1  just print it out.
2  Q. When you would input a particular piece of
3     equipment a customer had said he wanted on the
4     truck, would this Spec Pro 1.11 program
5     automatically adjust any other equipment on the
6     truck to accommodate the new specification you had
7     input?
8  A. Well, if you put in an engine, then you would
9     get -- if it didn't -- it wouldn't automatically
10    supplement the transmission or whatever. It would
11    just tell you -- I've worked with a lot of these
12    systems in my career so I can't specifically say
13    what Sterling's is now because I try to blank out
14    everything that happened at Sterling.
15       So what would normally happen would be an
16    asterisk or something would come up, or a message
17    would come up and say, you know, "horsepower
18    exceeds the limits of the standard transmission
19    and you must pick another transmission to go into
20    that grade," and stuff like that.
21 Q. You've worked with a lot of these. I haven't
22    worked with any of them.
23 A. I understand.
24 Q. And that's why I'm trying to understand generally

28

1  how they work.
2     This is a proprietary Sterling software that,
3  as you enter specifications into the software, it
4  is designed to alert you to the fact -- or to
5  alert you if what you have entered creates an
6  issue as to the --
7  A. Correct.
8  Q. -- as to the standard --
9  A. Just --
10 Q. -- truck?
11 A. If there's a non-compliance factor entered there.
12 Q. Okay. And did you make use of that Sterling
13    proprietary software throughout your discussions
14    with Mr. Howard with respect to these trucks that
15    his company ultimately bought?
16 A. Well, we speced it out for what the loads are, so
17    we would put the correct specifications in. But
18    we would work -- but you got to remember, we also
19    worked with the suppliers, the component
20    suppliers, like your supplier at Caterpillar,
21    Cummins or Detroit, and Fuller transmissions,
22    Eaton transmissions or rear ends. And we would --
23    the factory would allow you to do so much and
24    that's why you have gross, you know, GCW, you

29

1  know, combined gross weight. And then if it got
2  beyond that, then you had to get, you know,
3  approval by engineering.
4  Q. Did you, yourself, have any communications with
5     Southworth-Milton in connection with Mr. Howard's
6     purchase of these trucks?
7  A. Well, that's a common thing that happens. The
8     engine supplier, transmission people, whatever,
9     whatever it was that was going to go into a truck
10    and when an order for 22 trucks comes up, they are
11    all around there sniffing at your door.
12       So, I mean, they all want the business, so
13    they come up with their recommendations and then
14    they, obviously, you send them down to see
15    Mr. Howard because he's buying the truck and let
16    them all do the battle on the battle ground down
17    there and you sit back and watch it until the
18    smoke clears.
19 Q. Did --
20 A. And then you end up with a set of specs.
21 Q. Who from Southworth-Milton do you remember talking
22    to about this particular transaction?
23 A. A very, very knowledgeable guy named Harry
24    Calderbank.

8

Deposition of Ronald Medbery

**Page 30**

1  Q. What do you remember Harry Calderbank telling you
2     and what do you remember telling Harry Calderbank?
3  A. I'm sure we had several conversations because we
4     didn't only talk about Mr. Howard's trucks, we
5     talked about many, many trucks. Conversations
6     always went the same way. Just want to make sure
7     that what we prepared would do the job for the
8     application. That's what our job is.
9  Q. Well, tell me in a little more detail what you
10    mean by that?
11 A. Well, if you, obviously, not only Harry Calderbank
12    was involved, you have a regional representative
13    from Caterpillar factory as Cummins does and
14    Fuller does, and all of them, and they get
15    involved when the number gets up. Even they get
16    involved sometimes when it's only onesies or
17    twosies, because you want to make sure you're not
18    getting out of the box.
19 Q. I'm going to ask you about the people from
20    Caterpillar that you dealt with in a minute, but
21    what I want to find out is your best memory of the
22    discussions that you had with Mr. Calderbank
23    concerning this transaction.
24 A. Well, Mr. Calderbank had a -- also had a

**Page 31**

1     computer-generated specifications and it came
2     directly from Caterpillar. And he would run that
3     specs off so that I could input them into my
4     specifications so that we have the correct engine
5     application and for torque and horsepower for the
6     proposed application that it's going to be
7     introduced into.
8  Q. So, I take it then, that Mr. Calderbank provided a
9     document to you that contained various parameters
10    for the engines that he was talking with you
11    about?
12 A. Everything. It would be fuel economy, it would be
13    road speeds, gradibility, miles per gallon, just
14    about anything you'd want to know before so that
15    you know that when you bought it, you know what
16    you got.
17 Q. Do you remember, other than fuel economy, road
18    speed, gradibility, miles per gallon, what other
19    information he gave you about the engine?
20 A. Well, I can only say that every engine
21    representative, including Mr. Calderbank, was
22    always exuberant about what their engine would do.
23    It was always better than the other guys. So,
24    that's what you have to do because that's what you

**Page 32**

1     have to believe in.
2  Q. Being a salesman yourself --
3  A. I understand that. And he was very, very
4     thorough. Harry Calderbank was a very, very
5     thorough guy. He was knowledgeable and very -- he
6     just didn't want to do the wrong thing. I mean,
7     he was very conscientious. Still is to this day,
8     I imagine, if he's still alive.
9  Q. He's not in Massachusetts anymore.
10 A. Okay.
11 Q. Do you remember when he actually gave you a
12    document to look at?
13 A. Oh, yeah. I mean, I would have. I wouldn't be
14    able to do -- I would never proceed on my own just
15    because I think I'm smart, I wouldn't proceed in
16    set up a set of specifications for a customer for
17    one truck, let alone 22 without documentation from
18    the -- not only from him, but from the other guys.
19 Q. Well, just talking about Mr. Calderbank for now --
20 A. Okay.
21 Q. -- I take it he gave you a document that had data
22    in it such as fuel economy, road speed,
23    gradibility, miles per hour, horsepower --
24 A. Performance.

**Page 33**

1  Q. -- torque --
2  A. Performance capability.
3  Q. And you would then input that data into this Spec
4     Pro 1.11 --
5  A. Correct.
6  Q. -- program?
7  A. Correct.
8  Q. And how would that Spec Pro 1.11 program
9     manipulate the engine data that you were
10    inputting?
11 A. Well, the only data you put in was the engine
12    itself because in the model -- in the exact model
13    and the rating, and the Spec Pro was already
14    programmed to handle all the engines, you know,
15    handle Caterpillar's engine requirements and their
16    specifications, you know, to be presented in the
17    chassis.
18 Q. All right. So if I understand correctly then,
19    what you input into Spec Pro was, in this case,
20    C-12 engine?
21 A. Right, C-12.
22 Q. And what other information about the engine would
23    you put in?
24 A. I put in horsepower and torque.

34

1  Q. And you then relied on this proprietary Sterling
2     software to determine what the various specific
3     parameters of those engines would be and how they
4     would fit in this Sterling truck overall?
5  A. Well, what it would do is, specifically, it would
6     tell you that if you wanted a 10-speed
7     transmission, it would punch out the 10-speed with
8     the torque limits in it. And if you wanted a
9     40,000 pound rear axle, it would punch out the
10    rear axle. And if you wanted the ratio, it would
11    tell you, you know, what the ratios are, you know,
12    that you are going to use, it's going to produce
13    the road speed and where the fuel economy would be
14    most efficient, and it would do the same thing --
15       These were friendly systems or software
16    systems that were compatible and they would do the
17    same thing on both ends. His would tell -- Harry
18    Calderbank's would tell you all the same things
19    that Minuteman's would tell you because
20    Minuteman -- not Minuteman -- Sterling would get
21    all that information from Cat corporate, see, and
22    they worked in conjunction with Cat corporate so
23    that they had all these compatible information
24    plugged in.

35

1  Q. Now, what information did you give Mr. Calderbank
2     about the specifications that you had generated in
3     connection with the transaction that Mr. Howard
4     was contemplating?
5  A. He would already have it and he would already do
6     his own research. He would present me with the
7     stuff that he printed out and he would have the
8     same information I had.
9  Q. I'm not --
10 A. So I didn't present him with any information other
11    than the fact that we have a truck and we can put
12    his engine in it and it's all accepted, and where
13    do we go from here, Harry?
14 Q. I'm not asking you about information that you gave
15    him about the engine, I'm asking you what
16    information you gave Mr. Calderbank about the
17    specifications for the truck that you had been
18    generating over the course of these many
19    iterations of quotations that you were putting
20    together on your computer?
21 A. Well, you got -- he got a copy of this. We would
22    present him a copy of this so he could understand
23    exactly what was going on, but we would discuss
24    the axles, transmissions, weights, it was all

36

1     covered.
2  Q. Now, did you give Mr. Calderbank a copy of more
3     than one --
4  A. Probably not.
5  Q. -- quotation that you put together?
6  A. Probably not. I think he probably had a copy of
7     the -- when I worked with him and he gave me his
8     information, I plugged the information in. When
9     it was all finalized, if he wanted a copy of it,
10    I'd give it to him.
11 Q. What if he didn't ask you for a copy?
12 A. Then I wouldn't give it to him.
13 Q. Do you remember specifically giving him any
14    specification proposals similar in type to Exhibit
15    Howard No. 2?
16 A. I would say I don't remember it now.
17 Q. So you don't know whether you actually gave it to
18    him or not?
19 A. No.
20    MR. SAMITO: Objection.
21    MR. GRUNERT: Q. Do you remember how many
22    versions of the specification proposals you put
23    together over the course of negotiating with
24    Mr. Howard to arrive at the final specifications?

37

1  A. Several.
2  Q. Do you remember when during the negotiation
3     process with Mr. Howard whereby you came up with
4     these revised proposals? Do you remember when in
5     that process you had your meeting or meetings with
6     Mr. Calderbank?
7  A. Yeah, when Mr. Calderbank called me and said that
8     Mr. Howard was going to go with Cat engines.
9  Q. So that's when you went and had your meeting with
10    Mr. Calderbank and he gave you the --
11 A. Final specifications.
12 Q. -- specifications for the C-12?
13 A. Right.
14 Q. After that point in time, did you have any other
15    meetings with Mr. Calderbank to go over with him
16    any changes that had been made to the
17    specifications, the truck specifications?
18 A. Not that I recollect.
19 Q. Did you keep any notes of your meetings with
20    Mr. Calderbank?
21 A. They are all in the bottom of the landfill in
22    Rochester, New Hampshire. Anything to do with
23    this transaction and Minuteman is in the bottom of
24    the landfill.

**Page 38**

1  Q. So the answer is you made notes, but they have
2     been disposed of?
3  A. I made lots of notes. Lots of notes.
4  Q. Now, you said that you also interacted in
5     connection with this transaction with one or more
6     individuals from Caterpillar's regional office.
7     Do you remember who those people were?
8  A. Nope. It was a guy that came up from Connecticut.
9     I don't remember him. So, I usually remember all
10    those guys but, obviously, he didn't make much of
11    an impression on me, but they usually came in and
12    they blew all their smoke and then they'd leave
13    town. They'd leave the water carrying up to guys
14    like Harry Calderbank.
15 Q. Do you remember specifically what discussions you
16    had with the person from the Caterpillar district
17    office in connection with the transaction that you
18    were negotiating with Mr. Howard?
19 A. I believe the discussion would be very brief
20    because, you know, you really like to deal with
21    the local guys, but these factory guys like to
22    come in and touch base with everybody, which is
23    what their job is, but I can't remember the guy's
24    name, which is very unusual, but I can't remember

**Page 39**

1     the guy's name, so I remember that he came -- on
2     this particular deal, he ended up going to the
3     dealership a couple of times and talking to the
4     owner of the company.
5        And then he had a visit with me, maybe once
6     or twice, but it's more or less the fact to let us
7     know at Sterling that Caterpillar wanted this
8     transaction. They wanted this deal.
9  Q. All right. Did you discuss things like discounts
10    on the engines or financial terms?
11 A. No -- excuse me. I didn't mean to interrupt. We
12    didn't deal with that. He dealt with Harry.
13 Q. Okay. Did you discuss with the individual from
14    the district office the detailed specifications
15    that you had put together for these trucks?
16 A. More than likely, but I can't recollect that.
17 Q. No memory?
18 A. You know, more than likely we discussed it with
19    every guy that contacted us regarding the
20    specifications.
21 Q. Would you -- do you think that you discussed with
22    the individual from the district office the type
23    of transmission that was going to be in the
24    trucks?

**Page 40**

1  A. Oh, I'm sure we discussed that because he's
2     checking up on the local guys. So, I mean, I'm
3     sure that all comes into the discussion.
4  Q. Do you remember what kind of transmission you told
5     the person from the district office was going to
6     be in the trucks?
7  A. No, I can't really say that I remember I told him
8     what kind of transmission would be in the trucks.
9  Q. Do you remember talking about how the frame of the
10    trucks was going to be designed?
11 A. No, because Sterling makes that determination at
12    the engineering level at the factory.
13 Q. When you talked with the fellow from the district
14    office, did you mostly talk to him about things
15    such as the weight and the loads that these trucks
16    were going to be carrying and items of that sort?
17 A. Not -- no, not, because that was normally done
18    through Harry Calderbank and he submitted that to
19    Peoria on an approval basis.
20 Q. I'd like you to tell me as best you can what you
21    actually remember telling the fellow from
22    Caterpillar about these trucks that you were
23    negotiating with Mr. Howard about?
24 A. Not anything different than what I would

**Page 41**

1     ordinarily talk to the Cummins guy or anything
2     else. I know that I'm a very thorough guy, as far
3     as discussing specifications, performance, and
4     getting -- and making sure that the customer has,
5     you know, gets what he pays for.
6  Q. Do you remember what you told the fellow from
7     Caterpillar about the nature of Mr. Howard's
8     business?
9  A. I don't think I would discuss that with the guy
10    from Caterpillar.
11 Q. All right. In terms of performance requirements,
12    do you recall what you told the fellow from
13    Caterpillar?
14 A. No. No.
15 Q. In terms of specifications, do you know what you
16    told the fellow from Caterpillar?
17 A. Well, we would discuss the general specifications.
18    I mean, that's -- normally, the engine would be
19    the -- because he's the engine rep, that would be
20    the real meat of the conversation, and I can only
21    tell you this, that the C-12 was an engine that
22    they really bet their -- they really bet their
23    load on. So they were bragging that engine up
24    like there was no tomorrow.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11836-RCL

TRANS-SPEC TRUCK SERVICE, INC. )
d/b/a TRUCK SERVICE, )
    Plaintiff )
 )
vs. )
 )
CATERPILLAR INC. )
    Defendant )

**AFFIDAVIT OF JOSEPH M. HOWARD, JR.,
IN SUPPORT OF PLAINTIFF'S MOTION TO AMEND**

I, Joseph M. Howard, Jr., state:

1. I am the President of Trans-Spec Truck Service, d/b/a Truck Service ("Trans-Spec").

2. Trans-Spec's Automatic Disclosures, tendered on November 10, 2004, document more than sixteen separate flywheel housing repairs performed in house by Trans-Spec on the engines.

3. To date, Trans-Spec has had to make no less than **eighteen** in house repairs to the flywheel housings on the trucks at issue, in addition to performing other work related to the damage caused by the defective Caterpillar C-12 engines.

4. Trans-Spec had to purchase and install a new engine in one of the trucks at issue.

5. Caterpillar had full knowledge, in advance, of the repair work performed by Trans-Spec, and Milton CAT's Al Cardoza routinely inspected the repair work following its completion.

6. Nonetheless, and in full breach of its warranty obligations, Caterpillar declined to reimburse Trans-Spec in any way for either parts or labor associated with these repairs.

- 1 -



- 2 -

7. Trans-Spec asserts a bona fide claim based on its good faith belief that Caterpillar negligently designed, developed, assembled, manufactured, inspected, tested, marketed, advertised, and distributed the C-12 engines purchased by Trans-Spec.

8. Thus far, other than attorney-produced materials, Trans-Spec has fully opened its files to Caterpillar.

9. Caterpillar already has access to all of Trans-Spec's documentation

10. The damage caused by Caterpillar's defective engine units was not confined to the engines alone.

11. Caterpillar's defective engine units not only caused damage to other critical systems throughout Trans-Spec's trucks, they caused oil leaks which damaged Trans-Spec's property and that of Trans-Spec's customers.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 19 DAY OF APRIL, 2005.

_____
Joseph M. Howard, Jr.