UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| TRANS-SPEC TRUCK SERVICE, INC. d/b/a TRUCK SERVICE, ) ) ) | |
| Plaintiff ) | |
| ) | |
| vs. ) | CIVIL ACTION NO. 04-11836-RCL |
| ) | |
| CATERPILLAR INC. ) | |
| ) | |
| Defendant ) | |

MEMORANDUM IN SUPPORT OF CATERPILLAR INC.'S MOTION TO COMPEL
PRODUCTION OF DOCUMENTS

This is an action for alleged breach of warranty. In 1999 the plaintiff Trans-Spec Truck

Service, Inc. ("Trans-Spec") contracted with Minuteman Trucks, Inc. ("Minuteman") to acquire

22 heavy trucks built by the Sterling Truck Corporation ("Sterling"). Trans-Spec planned to use

the trucks in the segments of its business involving fuel oil delivery and hauling aggregate.[1]

Second Amended Complaint, ¶¶8 and 26. Sterling purchased Caterpillar C-12 diesel engines and

installed them in the trucks in accordance with Trans-Spec's directions. *Id.*, ¶¶8 and 11.

Minuteman delivered the Sterling trucks to Trans-Spec over the course of December, 1999 and

January, 2000. *Id.*, ¶12. Caterpillar gave a written limited warranty with each engine. In

addition, Caterpillar and Trans-Spec entered into an Extended Service Coverage contract

whereby Caterpillar agreed to pay for repairs to specified parts that might fail because of defects

in material or workmanship outside the scope of the warranty. The limited warranty and the

Extended Service Coverage contract both excluded coverage for failures caused by anything

---

[1] A third segment of Trans-Spec's business is operation of a repair shop where it services customers' trucks. This repair shop is distinct from the shop, *see infra*, where Trans-Spec services and maintains its *own* trucks.

other than defects in the material or workmanship of the Caterpillar engines. *See* Caterpillar
Inc.'s Responses to Trans-Spec Truck Service Inc.'s First Set of Interrogatories, ¶¶7, 8, and 17
and the copies of the limited warranties and Extended Service Coverage contract which are
collected in Exhibit A to this memorandum.  Thus, Caterpillar is not responsible for engine
failures caused by improper design of the trucks into which Sterling installed the engines or by
improper use, servicing, or maintenance of the trucks or engines.

In November, 2001, flywheel housings on two of the engines failed and were repaired at
no expense to Trans-Spec.  In December, 2001, the flywheel housing on another engine failed.  It
too was repaired at no expense to Trans-Spec.  Over the course of 2002, Trans-Spec experienced
two or three more flywheel housing failures, one of them a repeat failure.[2]  They were repaired at
no expense to Trans-Spec. *See* Second Amended Complaint, ¶14 When additional flywheel
housing failures occurred in the first part of 2003, however, Caterpillar concluded the failures
were not being caused by defects in the material or workmanship of the engines, and it stopped
paying for the repairs.  Thereafter, for a time, Trans-Spec performed its own flywheel housing
repairs at a repair facility in Worcester where it routinely services its trucks. *Id.*, ¶¶15, 16, and
27 and the excerpts of the deposition testimony of Joseph Howard collected in Exhibit B.
Caterpillar eventually resumed paying to repair the flywheel housing failures as a good will
gesture, *Id.*, ¶27 and the deposition testimony of Joseph Howard contained in Exhibit B, but in
August, 2004, Trans-Spec commenced this action seeking to recover expenses it incurred in

---

[2]  Business records available to Caterpillar from several sources substantiate two failures.  Trans-Spec says there
were three but has not produced substantiating documentation.  The variance is immaterial for present purposes, but
it illustrates one of the reasons why Caterpillar needs to see the business records subject to this motion.

repairing its own engines and millions of dollars in alleged business losses which it claims it sustained as a result of trucks being out of service.[3]

Trans-Spec claims the flywheel housing failures were caused by a design defect in the C-12 engine. *Id.*, ¶17. Caterpillar does not believe that to be the case, largely because it has sold more than 100,000 C-12 engines and its records indicate that substantially fewer than 1% have had flywheel housing problems; Trans-Spec, by contrast, has experienced at least one flywheel housing failure on something like 90% of the C-12 engines in its 22 Sterling trucks and several such failures on many of them. In addition, vibration testing Caterpillar caused to be performed on one of the engines disclosed no unusual vibration generated by the engine. *See* Exhibit C. Caterpillar believes the flywheel housing problems Trans-Spec has experienced are caused by a combination of deficient design of the Sterling trucks and abusive use of them by Trans-Spec.

Trans-Spec operates a shop at 22 Eskow Road in Worcester where it performs repair, servicing, and maintenance on the trucks it operates in its business, *see generally* 49 C.F.R. §393.3, where inspections of the trucks are performed at the beginning or end of each shift, *see generally* 49 C.F.R. §396.11, and where more thorough inspections, *see generally* 49 C.F.R. §396.21, are periodically made. Trans-Spec creates and retains records of the work and inspections it does on its trucks at the Eskow Road facility. *See* pages 170 to 171 of the deposition testimony of Joseph Howard contained in Exhibit D. Records of those types related to the 22 trucks involved in this case, going all the way back to Trans-Spec's acquisition of them, are stored in cardboard boxes stacked in a trailer at the Eskow Road facility. They number in the tens of thousands. Affidavit of Joshua M. Gelman (Exhibit E to this memorandum) at ¶5;

---

[3] Caterpillar's limited warranty and Extended Service Coverage contract both conspicuously disclaim coverage for consequential damages. Trans-Spec alleges an undocumented "subsequent oral modification" in an effort to avoid the legal effect of those disclaimers.

deposition testimony of Robert Barton contained in Exhibit F; photographs of the trailer and boxes contained in Exhibit G.  These records are of interest to Caterpillar for several reasons.

One reason is that having comprehensive histories of the mechanical problems the trucks have exhibited over time is likely to assist its engineers in diagnosing the exact cause of the flywheel housing failures that are at the center of this litigation.  It is likely the deficiency in the design of the Sterling trucks that is contributing to cause the flywheel housing failures will have manifested itself in other "symptoms" as well, and those "symptoms" are likely to be discernible from careful review of the repair and maintenance histories of the 22 trucks.

A second reason is that comprehensive historical records related to these trucks are needed to assess when each truck was out of service as a result of a flywheel housing failure versus when it was out of service for other reasons.  Trans-Spec alleges its business has been impaired because its trucks were out of service so much; but Trans-Spec had lots of problems with its trucks that did not involve flywheel housings or even engines, and those problems caused trucks to be out of service too.  Trans-Spec has been unwilling or unable to segregate downtime associated with flywheel housing failures from downtime caused by other factors. The records stored in Trans-Spec's trailer should help Caterpillar draw that distinction.

A third reason is the need to evaluate how Trans-Spec has been using its trucks and the manner in which it has been servicing them.  Caterpillar already knows that some of Trans-Spec's trucks have been involved in motor vehicle accidents which put them out of service for substantial periods of time and may have damaged them in ways that contribute to the flywheel housing problems Trans-Spec wishes to lay at Caterpillar's doorstep.  *See* the deposition testimony of Robert Barton contained in Exhibit H (pages 189-192).  Caterpillar is also concerned Trans-Spec may have operated its trucks more aggressively than it should have done,

imposing unusual stress on their engines that may have exacerbated the problem caused by Sterling's design; and Caterpillar is concerned the quality and frequency of routine servicing and maintenance Trans-Spec has performed may have been inadequate to keep the trucks in good operating condition. The records stored in Trans-Spec's trailer will likely illuminate those issues.

So when Caterpillar served its first set of Rule 34 document requests on December 1, 2004, it included Request No. 15, which asks Trans-Spec to produce:

> All reports, correspondence, memoranda, estimates, work orders, and job tickets (both paper and electronic) relative to any of the trucks generated by persons or companies that have inspected or serviced them.

Caterpillar specified that the requested documents should be produced for inspection and copying on January 5, 2005, at the offices of its counsel, Campbell Campbell Edwards & Conroy, P.C., One Constitution Plaza, Boston, Massachusetts. *See* the copy of Caterpillar's request that is attached to the accompanying motion.

On January 14, 2005, Trans-Spec served its Rule 34(b) response to Caterpillar's first set of Rule 34 requests. In response to Request No. 15, it stated:

> Trans-Spec responds that entities not under its control have possession, custody, or control of all documents responsive to this request.

No objection to the proposed site of the document inspection was asserted. *See* the copy of Trans-Spec's initial response to Caterpillar's request which is attached to the accompanying motion. Defense counsel did not believe that response and promptly served a Rule 30(b)(6) notice of taking Trans-Spec's deposition on the subject of its generation and maintenance of records. *See* Exhibit I. Before the deposition date arrived Trans-Spec's counsel notified defense counsel that they had misunderstood Request No. 15 and that Trans-Spec did indeed have numerous responsive documents. Trans-Spec's counsel said Trans-Spec would make the records available for viewing where they were stored, respectively in its office at 22 Eskow Road and in

a storage trailer at that address. Caterpillar's counsel agreed to give that proposal a try to see if it was feasible.[4]

In February, 2005, representatives of Caterpillar spent about a day-and-a-half at Trans-Spec's facility reviewing and copying documents. The documents they were able to review during that time were all dated in or after 2003 and were stored in Trans-Spec's "office." Caterpillar's representatives brought scanning equipment with them to copy the documents because Trans-Spec has just one photocopy machine and not a very fast one. Caterpillar's representatives copied a few thousand pages of documents.

The remaining documents, *i.e* those from 1999 into 2003, are not stored in Trans-Spec's office. They are stored in 35 or so cardboard boxes stacked in an unelectrified, unlighted, unheated trailer. *See* Exhibits F and G. Their number is conservatively estimated as at least 25,000. Affidavit of Joshua M. Gelman (Exhibit E) ¶5. It is impractical for Caterpillar's representatives to copy that many documents under those conditions: without high speed scanning equipment operated by persons trained in its use, it would take weeks to do the work even if (as Trans-Spec has offered) an extension cord were run to the unelectrified trailer so that a lightbulb could be hung and a scanner plugged in. Caterpillar has inquired of IKON Office Solutions, the copyhouse it generally uses for large copying jobs, about the possibility of leasing high speed scanning equipment to do the job on-site at Trans-Spec's trailer; but information supplied by IKON indicates it may not even be possible to do the work there (because of the need for a telephone line) and that, if it is possible, the charges by IKON alone (*i.e.*, disregarding several days' worth of hourly fees of paralegals or attorneys who would have to attend the event) would likely exceed $8,000. *Id.*, ¶¶2 to 6.

---

[4] The Rule 30(b)(6) deposition was cancelled.

The only sensible approach to accomplishing this task is to send the documents out for copying at a copyhouse, where the work can be done in a day or two at relatively modest expense in an orderly way by professionals using appropriate equipment in suitable surroundings. Caterpillar proposed that solution to Trans-Spec. It offered to pay the copyhouse's charge. It is immaterial to Caterpillar whether *Trans-Spec* has the documents copied and supplies the copies to Caterpillar or whether *Caterpillar itself* takes charge of the arrangements; either way would be fine, and Caterpillar has told Trans-Spec that if it wishes Caterpillar to handle the arrangements Caterpillar will transport the documents to and from the copyhouse at its own expense and a Trans-Spec representative is invited to accompany them to be sure they get safely to the copyhouse and safely back to Trans-Spec's trailer. Trans-Spec has rejected all of Caterpillar's proposals.

Trans-Spec has not asserted that removing the documents from its storage trailer for a few days would interfere with its business operations, the usual reason asserted by companies that want their documents inspected on-site. *See, e.g.*, Niagara Duplicator Co., Inc. v. Shackleford, 162 F.2d 25, 26 (D.C. Cir. 1947); Cartwright v. Greenpoint Basin & Const. Co., 2 F.R.D. 338, 338 (E.D. N.Y. 1942). There is no dispute that the records remaining to be copied are all two years old or older, *see* page 178 of the testimony of Robert Barton contained in Exhibit F, and sitting, unused, in dead storage. *Compare* Sprintz v. Smoler Bros., 50 N.Y.S.2d 348, 349 (N.Y. Supreme Court 1944) (ordering production in New York of a Chicago defendant's business records under similar circumstances). Trans-Spec can certainly get by without them for a few days. When conditions at the location where documents are stored make on-site inspection and copying onerous, an order requiring production at a different location is appropriate so long as the party seeking production bears the expense of moving the documents.

Compagnie des Bauxites de Guinea v. Insurance Co. of North America, 651 F.2d 877, 883 (3rd Cir. 1981), aff'd, 456 U.S. 694 (1982); Monks v. Hurley, 28 F. Supp. 600, 600 (D. Mass. 1939); Krypton Broadcasting of Jacksonville, Inc. v. MGM-Pathe Communications Co., 629 So.2d 852, 855-856 (Fla. App. 1994); Evangelos v. Dachiel, 553 So.2d 245, 246-247 (Fla. App. 1989). Copying the documents at Trans-Spec's trailer will be very onerous and Caterpillar has offered to bear the expense of copying them elsewhere.  So what's the problem?

Trans-Spec's stated objection is that federal regulations assertedly require it to keep these documents constantly on its property, that it might be penalized by the federal authorities if it does not do so, and that it therefore cannot let the documents be removed from its premises even for a few days for copying.  That objection, however, is meritless.

First of all, no federal regulation requires Trans-Spec to keep the records now at issue.[5] Retention requirements for a motor carrier's records of *repair and maintenance* of its trucks are established by 49 C.F.R. §396.3(c), which requires that such records "shall be retained where the vehicle is either housed or maintained for a period of 1 year and for 6 months after the motor vehicle leaves the motor carrier's control."  The records now at issue, being from 2003 and earlier, have already been retained for longer than the one-year period specified by §396.3(c), so Trans-Spec is under no constraint as to how to handle them (except, of course, for the constraints imposed by Caterpillar's request for them and the law of spoliation).  Retention requirements for reports of a motor carrier's drivers' inspections of their trucks are established by 49 C.F.R. §396.11(c)(2), which provides that they must be retained for three months from the date they are written.  The records now at issue, being from 2003 and earlier, are much more than three months old.  Retention requirements for reports of periodic inspections of a motor carrier's trucks

---

[5] Massachusetts law incorporates the pertinent federal regulations without any exceptions material to the present issue.  540 C.M.R. §14.03.

are established by 49 C.F.R. §396.21(b)(1), which provides that such reports "shall be retained where the vehicle is either housed or maintained" for a period of fourteen months from the date of the report.  More than fourteen months has passed since the most recent of the reports boxed up in Trans-Spec's trailer were prepared.  So Trans-Spec has at all times since it served its response to Request No. 15 been free, if it *chose*, to permit Caterpillar to take these tens of thousands of pages of old records to a copyhouse.  *Compare generally* <u>Compagnie de Bauxites de Guinea</u>, 651 F.2d at 884 (offer to produce documents for inspection at the offices where they were kept was perceived by the court as a litigation tactic).

Even if there really were a regulatory requirement that Trans-Spec preserve these old records, nothing in the applicable regulations prohibits it from shipping them off-site for a few days for copying.  The regulations say where the records are to be kept; they do not say they have to be kept at those locations 24 hours per day, 7 days per week, 52 weeks per year, even if there is good reason (a discovery request, for example, or a court order) for moving them briefly, and the purpose of the regulations does not require so draconian a construction.  Indeed, in 1993 the Federal Highway Administration promulgated "regulatory guidance" allowing such records to be maintained at a location of the motor carrier's choice, so long as the motor carrier made them available within two business days upon request by the Administration. 58 Fed. Reg. 60734, 60762 (November 17, 1993).  *See* 63 Fed. Reg. 33254, 33259 (June 18, 1998). The purpose of specifying locations for retention of servicing and inspection records is to assure that they are readily available for inspection upon request by agents or representatives of the Federal

Motor Carrier Safety Administration, a purpose codified in 49 C.F.R. §390.29[6], not to impose needless constraints on the motor carrier. *See* 63 Fed. Reg. at 33259 (promulgation of §390.29 was for the purpose of providing motor carriers with "increased flexibility in complying with recordkeeping requirements.")  Caterpillar's proposed form of order takes account of this purpose: if a special agent or authorized representative of the Federal Motor Carrier Safety Administration happens to notify Trans-Spec that he or she wants to review these old records at the very time that Caterpillar happens to have them off-site being copied, Caterpillar will stop the copying and transport the records back to Trans-Spec's trailer (or to any other location specified by the special agent or authorized representative) within 48 hours of being notified by Trans-Spec of the inspection request.  Caterpillar does not believe Trans-Spec has any realistic reason for concern that the Federal Highway Administration would penalize it for shipping old records off-site for copying in compliance with a court order which included a provision of this type. *See* Exhibit F at pages 177 to 178 (when the government inspected these records in late 2004 it provided Trans-Spec about a week's advance notice).

The documents requested in Caterpillar's Request No. 15 are relevant and need to be copied so that Caterpillar's attorneys and engineers can have adequate opportunity to analyze and synthesize them; Caterpillar has proposed to copy them in a reasonable way and at its own expense; Caterpillar's proposal will not interfere with Trans-Spec's business operations; no

---

[6] 49 C.F.R. §390.29 provides:

(a) A motor carrier with multiple offices or terminals may maintain the records and documents required by this subchapter at its principal place of business, a regional office, or driver work-reporting location unless otherwise specified in this subchapter.

(b) All records and documents required by this subchapter which are maintained at a regional office or driver work-reporting location shall be made available for inspection upon request by a special agent or authorized representative of the Federal Motor Carrier Safety Administration at the motor carrier's principal place of business or other location specified by the agent or representative within 48 hours after a request is made. Saturdays, Sundays, and Federal holidays are excluded from the computation of the 48-hour period of time.

regulatory requirement prevents Trans-Spec from doing what Caterpillar asks it to do.  The Court should therefore order Trans-Spec's production of documents in accordance with Caterpillar's proposal.

CONCLUSION

Caterpillar's motion to compel production of documents should be allowed.

CATERPILLAR INC.,

By its attorneys,

CAMPBELL CAMPBELL EDWARDS
& CONROY, P.C.

John A. K. Grunert  (BBO: 213820)
One Constitution Plaza
Boston, MA  02129
(617) 241-3000

CERTIFICATE OF SERVICE

I, John A. K. Grunert, hereby certify that on June 21, 2005, I served the within memorandum by causing a copy to be mailed, by first class mail, postage prepaid, to Nancy M. Reimer, Esquire, Donovan Hatem, LLP, Two Seaport Lane, Boston, MA  02210.

John A. K. Grunert