UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TRANS-SPEC TRUCK SERVICE, INC. d/b/a TRUCK SERVICE,<br><br>Plaintiff<br><br>vs.<br><br>CATERPILLAR INC.<br><br>Defendant | CIVIL ACTION NO. 04-11836-RCL |

## MEMORANDUM IN SUPPORT OF CATERPILLAR INC.'S MOTION FOR SANCTIONS

The undersigned has not filed a motion of this type in more than twenty years. The plaintiff Trans-Spec Truck Service Inc. ("Trans-Spec"), however, and more especially its attorneys at the firm of Donovan Hatem LLP, have through their failure to deal honestly and forthrightly with Caterpillar, and through violation of Fed. R. Civ. P. 30, caused Caterpillar needlessly to incur over $10,000 in legal fees and expense. Conduct of that kind and expense of that magnitude cannot properly be ignored. This is especially so because the episode leading to this motion is not the first time Trans-Spec, and more especially its attorneys at the firm of Donovan Hatem, have sought to achieve tactical goals through misleading statements and conduct. So long as such behavior is condoned it can be expected to continue.

### ARGUMENT

Fed. R. Civ. P. 30(g)(1) provides:

> If the party giving the notice of the taking of a deposition fails to attend and proceed therewith and another party attends in person or by attorney pursuant to the notice, the court may order the party giving the notice to pay such other party the reasonable expenses incurred by that party and that party's attorney in attending, including reasonable attorney's fees.

On January 30, 2006, Trans-Spec's attorneys served notices of taking depositions of Caterpillar's trial experts. As relevant here, they noticed the deposition of Richard Bowes for 10:00 AM on Monday, February 13; the deposition of Matthew Kiser for 10:00 AM on Tuesday, February 14; the deposition of Nathan Bjerk for 10:00 AM on Wednesday, February 15; and the deposition of William Angus for 10:00 AM on Thursday, February 16. All four depositions were noticed for a Radisson Hotel located at 117 N. Western Avenue in Peoria, Illinois. Copies of these four notices are collected in Exhibit 1. The reason the depositions were noticed for an address in Peoria is that all four witnesses work and reside in the Peoria area.[1]

There is no direct flight from Boston to Peoria and experience shows the trip generally ends up taking close to a full day; so in practical terms the schedule of depositions meant an attorney for Caterpillar had to travel to Peoria on Thursday, February 9, so that the witness noticed for Monday – Mr. Bowes – could be prepared on Friday, *see* footnote 1, and so that the file materials he had been asked to produce could be assembled and reviewed for completeness. It also meant a second Caterpillar attorney would need to travel to Peoria on the weekend before the 13th: scheduling the depositions for four consecutive days meant there would have to be one Caterpillar attorney to appear at the deposition while a second attorney prepared the following day's witness to testify. Caterpillar's attorney John Grunert therefore arranged to fly to Peoria on a flight leaving in the early afternoon on February 9 and a second attorney, Christopher Parkerson, made arrangements to fly to Peoria on Sunday, February 12.[2] These facts and others

---

[1] Messrs. Bowes, Kiser, Bjerk and Angus are Caterpillar employees. They are not retained expert witnesses and do not ordinarily provide testimony as part of their work for Caterpillar. None of them, indeed, has ever testified as an expert witness at trial or at deposition. They are real, working engineers. This was going to be a first for them.

[2] Because of reports of an impending snowstorm, Mr. Parkerson later changed his flight to an early afternoon flight on Saturday, February 11. He had no difficulty getting a Saturday flight to Peoria on short notice. Affidavit of Christopher Parkerson, ¶9. The weather, in other words, is no excuse for what happened here.

recited in this memorandum are set forth in the affidavits of Mr. Grunert and Mr. Parkerson which are attached respectively as Exhibits 2 and 3.

Late in the day on February 8, a dispute arose between Trans-Spec's attorneys, Nancy Reimer and Christian Samito, and Caterpillar's attorney Grunert.  Attorneys Reimer and Samito wanted the several Caterpillar witnesses to ship their files from Peoria to Donovan Hatem's Boston office on the 9th rather than producing them at the times and place of their depositions as the rules of civil procedure contemplate, *compare* Fed. R. Civ. P. 30(b)(5), and as is routinely done[3].  Attorneys Reimer and Samito threatened to file an emergency motion to compel production of the documents in Boston; Mr. Grunert told them he would be leaving for Logan Airport shortly after 11:00 AM the following day so that there would be no one familiar with the case to appear in opposition to such an emergency motion after that time.  Mr. Grunert took from the conversation that the depositions would proceed as scheduled unless some relief granted in response to the threatened emergency motion dictated otherwise.  <u>Affidavit of John Grunert</u>, ¶6. The Court, after all, had been unequivocal that February 17 was the deadline for completing these depositions and that no further extensions of time for doing so would be granted:

> The motion [for amendment of the scheduling order] is granted to the extent that it seeks a change in the scheduling order.  However, the scheduling order will be changed only to this extent:  the deadline for expert reports from the plaintiff shall be December 7, 2005; the deadline for expert reports from the defendant shall be January 13, 2006; expert discovery shall be concluded by February 17, 2006; dispositive motions shall be filed not later than March 17, 2006.  The modification granted today is the third of such modifications in this case.  *The court will grant no further requests for amendments to the scheduling order.*

---

[3]  Trans-Spec's counsel had never proposed to Caterpillar's counsel an *agreement* to alter the customary procedure regarding production of expert witnesses' files and, indeed, had never discussed the subject with Caterpillar's counsel at all prior to the late afternoon on February 8.  <u>Affidavit of John Grunert</u>, ¶5.

Order (October 26, 2005) granting in part and denying in part Trans-Spec's motion to amend the scheduling order (emphasis supplied). It would be a foolish attorney who decided to defer expert depositions based on an assumption that the Court would not enforce *that* order.

No emergency motion was served or filed on the afternoon or evening of the 8th. No emergency motion was served or filed on the morning of February 9 either. It looked to Mr. Grunert like Trans-Spec's counsel had thought better of their position. In any event, the depositions had not been cancelled and he had a flight to catch; so not long after 11:00 AM on February 9 he left for Logan Airport, as he had told Attorneys Reimer and Samito he would do in the absence of further developments. Affidavit of John Grunert, ¶¶6 and 7.

At 11:36 AM, Trans-Spec's counsel faxed a letter to Mr. Grunert at his office – where they knew he would not be – purporting to "confirm" the conversation of the prior afternoon.[4] An e-mailed version followed at 12:22 PM. The letter, of which the faxed and e-mailed versions are in Exhibit 4, stated in relevant part:

> ... I informed you I would not proceed with the depositions as noticed and will seek an emergency court order requiring the production of the documents prior to the taking of the depositions.

Mr. Grunert was not in his office to receive the fax or e-mail but, in due course, the letter was brought to the attention of Mr. Parkerson, who promptly called Mr. Grunert as he sat at the gate in waiting to board his flight to Peoria (via Chicago). He reported the content of the letter. Mr. Grunert, who had personal knowledge of what had been said the prior afternoon, instructed Mr. Parkerson to communicate immediately with Trans-Spec's counsel to obtain from them an

---

[4] This letter is the type of "confirmatory" letter which prompted the Boston Bar Association to promulgate Civility Standard B.4.b.: "A lawyer should not write a letter to ascribe to another lawyer a position he or she has not taken or to create 'a record' of events that have not occurred." Boston Bar Association Civility Standards for Civil Litigation, ¶B.4.b. ((June 28, 1994). Caterpillar is confident the Court has seen enough examples of such correspondence to give it no more credence than it is due. The part of the letter that is relevant to the present motion is discussed in the text.

unequivocal statement of what they were or were not going to do with respect to these depositions. <u>Affidavit of John Grunert</u>, ¶8. Mr. Parkerson telephoned Trans-Spec attorney Christian Samito at approximately 12:30 PM and told him that Mr. Grunert would be boarding his flight within a few minutes but would not board it Mr. Samito would provide an unequivocal statement, in writing, that the depositions would not go forward as scheduled *regardless of the outcome of the threatened emergency motion*. Mr. Samito orally refused to provide such a statement. <u>Affidavit of Christopher Parkerson</u>, ¶6. Mr. Parkerson then – at 12:39 PM – sent Attorneys Samito and Reimer an e-mail:

> Nancy and Christian,
>
> This is to confirm the substance of my telephone conference with Christian Samito of a few minutes ago, and his denial of my request for confirmation in writing that the depositions of Caterpillar's experts noticed for next week will not go forward. John Grunert is at Logan Airport and boards a plane to Peoria, IL in 15 minutes. He intends to fly to Peoria without a clarification of the points in your letter faxed earlier this morning. If he flies to Peoria and your emergency motion is unsuccessful, we will move for sanctions for the costs of the wasted flight and travel expenses.
>
> We are simply requesting an unequivocal confirmation of your intentions not to go forward in order to avoid any confusion. Please respond within the next 15 minutes so that I can attempt to save everyone time and money. Thank you for your help on this issue.

The e-mail chain of which this and later e-mails are a part is attached to this memorandum as Exhibit 5. Apparently unwilling to give an unequivocal response, Mr. Samito replied at 12:49 PM:

> I believe Nancy Reimer was very clear on the telephone yesterday, as confirmed in her letter of this morning: *in the absence of Caterpillar's producing the requested documents beforehand*, we would not be taking the depositions of Caterpillar's "experts" next week.

(Emphasis supplied). That response missed the point. Trans-Spec's attorneys had said they would file an emergency motion. If they did what they said they would do, they might win – it seemed unlikely, but Caterpillar's counsel owns no crystal ball -- and the Court might order the

documents produced in Boston within the next couple of days, whereupon the depositions would go forward as scheduled. Conversely, if they lost their emergency motion and were confronted with the need to take the depositions as scheduled or forfeit them, would they really choose to forego them? Mr. Parkerson sent another e-mail, at 1:07 PM:

> Nancy and Christian:
>
> I appreciate your response, but it does not help me understand your position any better than the letter did. I simply need to know what your intentions are with regard to these depositions in order to communicate to the witnesses that are scheduled to be deposed whether or not the depositions will go forward. Are you cancelling the depositions regardless of the outcome of your emergency motion?

No prompt answer arrived. Mr. Grunert boarded the flight. At 1:21 PM, Mr. Samito responded to Mr. Parkerson:

> *No, we are not cancelling the depositions regardless of the outcome of the emergency motion.* I will say, however, that we wish to review the documents beforehand because very likely, we will decide that no oral testimony is necessary. I am at a loss as to why Caterpillar refuses to cooperate when it is likely that production of the documents will obviate the need for the deposition and eliminate the need to travel to Peoria, incur additional fees on behalf of both parties, and take up the days of several Caterpillar employees.

(Emphasis supplied)[5]. Finally, the needed unequivocal answer had been obtained. Whether or not the depositions would go forward as scheduled would depend, so far as Trans-Spec's counsel were concerned, on the outcome of their emergency motion. This is exactly the answer Mr. Grunert expected, because it was what Trans-Spec's counsel had conveyed orally the previous afternoon. But Caterpillar's counsel did not have the luxury of awaiting action on an as-yet-unseen motion and Trans-Spec's counsel's decision about what they would do in light of whatever that action might be; Caterpillar's counsel had to get to Peoria to prepare Monday's

---

[5] The suggestion that depositions might be avoided altogether if the experts' files were produced in Boston was made for the first time in the telephone conference on the afternoon of February 8. Affidavit of John Grunert, ¶6. Needless to say, eleventh-hour statements about what Trans-Spec's lawyers *might* decide to do, with nothing approaching a statement of what they *would* do, were of no use. To this day Trans-Spec's attorneys have never said they *would* forego *any* expert's deposition if the expert's file were delivered to them.

witness; and both of Caterpillar's counsel had to be in Peoria by early Monday morning to appear at the deposition which, according to Mr. Samito's final e-mail, *was not cancelled.*

Trans-Spec finally filed its emergency motion at 3:18 PM on February 9, by which time Mr. Grunert was in the air over the midwest. What effort, if any, Trans-Spec's attorneys made to get the motion addressed on an emergency basis is unknown to Caterpillar; but it was not addressed on February 9 or 10 and so far as Caterpillar knows has not been addressed yet. Apart from Caterpillar's service of an opposition to the emergency motion, there were no further communications between Trans-Spec's counsel and Caterpillar's counsel on February 9 or 10. Affidavit of John Grunert, ¶¶7 and 8; Affidavit of Christopher Parkerson, ¶9.

Mr. Grunert spent Friday, February 10, with Mr. Bowes getting him prepared to testify and to produce his file on Monday, February 13. Affidavit of John Grunert, ¶11. As set forth in ¶¶9 of Mr. Parkerson's affidavit, he changed his Sunday flight to Saturday because of warnings of an approaching snowstorm and flew to Peoria that day. Messrs. Grunert, Parkerson, and Bowes convened Monday morning, collected Mr. Bowes's file together, and Messrs. Bowes and Parkerson drove to the site of the deposition while Mr. Grunert began to prepare the next day's scheduled witness, Mr. Kiser. Affidavit of Christopher Parkerson, ¶10; Affidavit of John Grunert, ¶14. Trans-Spec's counsel did not appear for the deposition. No court reporter was there either. Mr. Parkerson inquired at the hotel and was astonished to learn that Trans-Spec's counsel had never even reserved a conference room for the depositions. Affidavit of Christopher Parkerson, ¶10 and the letter attached to it. Apparently, Trans-Spec's attorneys had never really

intended to take the depositions as scheduled at all. Apparently, it had all been a ploy of some sort.[6]

The string of e-mails that ensued on February 13 is attached as Exhibit 6. What is remarkable is that, even then, Caterpillar's counsel had to ask repeatedly for straightforward confirmation that the depositions scheduled for February 14, 15 and 16 would not proceed as scheduled, so that the witnesses noticed for those days could be released to do their jobs and so that Caterpillar's counsel could avoid an even longer stay in Peoria.

The Court has previously expressed perplexity about the why the parties to this case are not more successful in managing their differences without court involvement. The present motion – which is the first of its kind that the undersigned has brought in more than twenty years – requires comment on that subject. Law professors often tell their students, and experienced lawyers often tell new associates, that a lawyer's reputation for integrity and fair dealing is crucial to his or her success in dealing with the courts and other lawyers. Once it becomes known that what a particular lawyer says cannot be trusted, that he or she is willing to mislead interlocutors when it suits his or her perceived purposes to do so, the opportunity evaporates for the day-to-day compromise, informal agreements, and accommodations that are more or less the norm for the majority of Massachusetts lawyers in their dealings with each other. That is what occurred early in this case, continues to this day, and explains the contentiousness of which the Court has witnessed only a small fraction. The Court is naturally skeptical of statements of this sort, in part because it does not see most of what goes on in a case and thus has no easy way to

---

[6]  If Trans-Spec's counsel dispute this, Caterpillar asks the Court to require them to produce the documentation of their reservations of a conference room at the Radisson Hotel and of their hotel reservations in Peoria, the documentation of their reservation of a court reporter for the depositions, documentation of their travel arrangements to Peoria, and documentation of when all those reservations and arrangements were allegedly cancelled. The word "apparently" is used advisedly in the text because Caterpillar naturally does not have full information on this subject. But the Radisson Hotel reported it had never had reservations for these depositions, and it would be consistent with what Caterpillar's counsel has seen in the past in this case.

assess how it is being conducted.  In light of the issues presented by this motion, however, Caterpillar thinks the Court should see at least one other example – one that, unlike most, can be concisely described -- of the kind of conduct that has consistently plagued the litigation.

Trans-Spec supplied reports from its proposed experts on December 7.  On December 8 Caterpillar's counsel sent Trans-Spec's counsel an e-mail asking for proposed deposition dates during the week of December 19.  Copies of this communication and others referenced in this paragraph are collected in Exhibit 7.  As Caterpillar later learned at the deposition of Trans-Spec's proposed expert Thomas Service (taken January 20), Trans-Spec's counsel Nancy Reimer communicated with him the very day she received the December 8 e-mail and asked him his availability "if any" for deposition during the specified week.  Mr. Service promptly replied that he was available on December 20, 21, and 22.  Ms. Reimer instructed him to hold December 21; *but neither she nor anyone else told Caterpillar's counsel of his availability.*  Affidavit of John Grunert, ¶9.  Hearing nothing in response to his e-mail, on December 9 Caterpillar's counsel served notices of taking Trans-Spec's proposed experts' depositions.  He noticed them for dates during the last week in December, assuming from counsel's silence that the week of December 19 was not feasible for the proposed experts.  Affidavit of John Grunert, ¶9.  The immediate response from Trans-Spec counsel Christian Samito, on December 9, was that neither witness was available for deposition on dates Caterpillar's counsel had proposed but that he would ask them to provide dates *in January* and let Caterpillar's counsel know when he had heard from them.  Later, on December 14, Mr. Samito explained that no deposition dates had been provided on December 9 "because, as I indicated in my letter of that date, we needed to confer with Dr. Ekchian and Dr. Service regarding their availability."  Yet when Mr. Samito wrote both of those letters, he and Ms. Reimer had actual knowledge that at least the witness Service was, indeed,

available on three out of the five days Caterpillar had proposed in its December 8 e-mail. There was no need to "confer" with him about his availability: they knew he was available, because he had told them he was. The problem was that his availability did not suit Trans-Spec's counsel's tactical preference for later depositions.[7] The solution to that problem was easy for Trans-Spec's counsel: just say they do not know his availability, even though they really did.

Once an attorney learns of that kind of duplicity in an opponent – and Caterpillar's counsel learned of it long before this readily documentable episode occurred – he would be foolish to rely on the opponent's forthrightness. He consequently becomes insistent, as illustrated in the account at pages 4 to 6 of this memorandum, that important representations be in writing, and that they be stated very clearly and very unequivocally. When met with a refusal to give a very clear and unequivocal statement – Mr. Samito's verbose e-mails of February 9 are good examples – the assumption is that the opponent is being duplicitous because that is likely to be the case. The result is that issues which, with a trustworthy attorney, would be resolved informally and amicably end up having to be resolved by the Court. It is a sorry way to conduct a piece of litigation, but it is the reality in a small minority of cases of which unfortunately this case is one.

Rule 30(g) entitles a party to recover attorney's fees and expenses incurred with respect to a deposition noticed by the opposing party for which the opposing party does not appear. Reasonably necessary travel time, as well as travel expenses, are recoverable. *E.g.*, West v. West, 126 F.R.D. 82, 83 (N.D. Ga. 1989). These deposition were noticed by Trans-Spec; they were not cancelled until after the first of them was scheduled to begin in Peoria, Illinois; Trans-Spec's counsel did not appear for them; Caterpillar's counsel did appear, in Peoria, for the one

---

[7]  Trans-Spec's counsel wanted to delay depositions of its proposed experts until after Caterpillar's expert reports fell due on January 13; Caterpillar wanted to take them before that date so its experts could take them into account in finishing their work.

scheduled for February 13; Caterpillar's counsel also devoted substantial time to assuring the witness and his file were ready for the deposition. The attached affidavits of counsel document the reasonableness of the fees and expenses for which recovery is sought and there is no need to repeat here what is said in them. The Court should note that, in light of the language of Rule 30(g), no compensation is requested for the wasted time and the inconvenience Trans-Spec cavalierly imposed on Messrs. Bowes, Kiser, Bjerk and Angus. Caterpillar requests that its fees and expenses be assessed against both Trans-Spec and its attorneys, jointly and severally, so that perhaps in the future those attorneys will be deterred from the kind of conduct that has marred this case.

CONCLUSION

Caterpillar's motion for sanctions should be granted in its entirety.

CATERPILLAR INC.,

By its attorneys,

CAMPBELL CAMPBELL EDWARDS & CONROY, P.C.

_____
John A.K. Grunert (BBO: 213820)
One Constitution Plaza
Boston, MA  02129
(617) 241-3000

CERTIFICATE OF SERVICE

I, John A.K. Grunert, hereby certify that on February 17, 2006, I served the within memorandum by causing it to be transmitted electronically and by first class mail, postage prepaid, to Nancy Reimer, Esquire, Donovan Hatem LLP, Two Seaport Lane, Boston, MA 02210.

_____
John A.K. Grunert