**EXHIBIT**
Exhibit H

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TRANS-SPEC TRUCK SERVICE INC., <br> D/B/A TRUCK SERVICE <br><br> Plaintiff, <br> v. <br><br> CATERPILLAR INC. <br><br> Defendant. | CIVIL ACTION NO.:04-11836RCL |

## THIRD AMENDED COMPLAINT AND JURY CLAIM

The plaintiff, Trans-Spec Truck Service Inc., d/b/a Truck Service, by and through their undersigned counsel, files this Complaint against the defendant, Caterpillar Inc., and alleges the following:

### THE PARTIES

1. Plaintiff, Trans-Spec Truck Service Inc., d/b/a Truck Service ("Trans-Spec"), is a duly organized Massachusetts corporation with its principal place of business located at 7 Cristo Lane Millbury, Massachusetts 01527.

2. Defendant, Caterpillar Inc. ("Caterpillar"), is a duly organized foreign corporation with its principal place of business located at 100 N.E. Adams, Peoria, Illinois 61629.

### JURISDICTION AND VENUE

3. Plaintiff, Trans-Spec, is a duly organized Massachusetts corporation with its principal place of business located at 7 Cristo Lane, Millbury, Massachusetts 01527.

4. Caterpillar is a duly organized foreign corporation with a principal place of business at 100 N.E. Adams, Peoria Illinois 61629. Caterpillar is in the business of manufacturing and selling heavy equipment and heavy-duty engines throughout the United States and conducts business in the Commonwealth of Massachusetts. Caterpillar is engaged in trade or commerce as defined by Mass. Gen. L. ch. 93A. Caterpillar's agent for service in Massachusetts is CT Corporation System, 101 Federal Street, Boston, Massachusetts, 02210

5. The jurisdiction of this Court is invoked and is proper pursuant to 28 U.S.C. Sec. 1332(a) on the basis of diversity of the parties.

6. The amount in controversy in this matter exceeds $75,000.

7. Venue in this Court is proper pursuant to 28 USC §1391(b) and the Local Rules of the United States District Court for the District of Massachusetts.

## FACTS

8. In 1999, Trans-Spec and Sterling Truck Corporation ("Sterling") prepared specification proposals for Trans-Spec's anticipated purchase of twenty-two heavy-duty, custom-built trucks to be used by Trans-Spec's oil delivery service and dump trailer operations.

9. Around that time in which Trans-Spec contemplated what types of engines to purchase for the twenty-two trucks, two representatives from Caterpillar's local agent and distributor, Southworth Milton, Inc. ("Milton"), repeatedly met with Trans-Spec personnel to discuss and make representations regarding the capabilities of the Caterpillar C-12 engine, its appropriateness for Trans-Spec's intended use, and the warranties associated with it. These representatives were named Albert Cardoza ("Cardoza") and Harry Calderbank ("Calderbank").

10. Additionally, a regional Caterpillar representative based out of Caterpillar's Connecticut office took part in the discussions leading up to Trans-Spec's purchase of Caterpillar C-12 engines, including making representations regarding the capabilities of the C-12 engine, the appropriateness of the C-12 engine for Trans-Spec's intended use, and the warranties associated with the C-12 engine.

11. Caterpillar orally waived any exclusion of express or implied warranties during the communications referenced in paragraphs 9 and 10.

12. As indicated in the final Specification Sheet attached as Exhibit A, Trans-Spec purchased Caterpillar C-12 engines for installation in the twenty-two trucks (there is a Specification Sheet for each of the twenty-two trucks; Trans-Spec attaches only one as an exemplar).

13. Caterpillar's C-12 engine was an appropriate engine for fuel hauler and dump trailer operations in the New England area where Trans-Spec operates its trucks.

14. Caterpillar shipped completely-assembled C-12 model engines to Sterling, which then incorporated the engines into the trucks pursuant to the Specification Sheet at Exhibit A.

15. Pursuant to page 3 of Caterpillar's Truck Application and Installation Guide attached as Exhibit B, Caterpillar approved Sterling's installation procedure prior to installation of the C-12 engines in Trans-Spec's trucks.

16. Trans-Spec accepted delivery of the twenty-two trucks, powered by Caterpillar C-12 engines, in or around December 1999 and January 2000.

17. Each truck cost Trans-Spec $74,500.00 plus a $5,200.00 set-up charge.

18. As part of its purchase, at or around the time of delivery, Trans-Spec received from Caterpillar coverage for the engines "against defects in materials or workmanship under normal use" for five years or 500,000 miles, according to the terms and conditions as specified on the back of the Registration Certificate attached as Exhibit C.

19. As part of its purchase, at or around the time of delivery, Trans-Spec also received from Caterpillar a concurrent two year warranty, attached as Exhibit D, pursuant to which "Caterpillar Inc. or any of its subsidiaries ('Caterpillar') warrants new . . . C-12 . . . engines sold by it for use in powering on-highway vehicles . . . to be free from defects in material and workmanship" for "24 months after date of delivery to the first user."

20. At all relevant times, Trans-Spec operated the trucks within normal parameters.

21. By November 2001, serious problems with the flywheel housings in Trans-Spec's C-12 engines began to manifest. Specifically, flywheel housings and/or flywheel housing bolts began to loosen from the Caterpillar C-12 engines. These flywheel housings and/or flywheel housing bolts also began to crack.

22. At first, Caterpillar paid for the corresponding work performed on the engines in connection with the flywheel housing failures pursuant to the five year/500,000 mile warranty at Exhibit C and the two year warranty at Exhibit D.

23. During this period, Caterpillar authorized work that made it appear to Trans-Spec as if Caterpillar had honored its two year and five year/500,000 mile warranties as to Trans-Spec's flywheel housing failures.

24. During this period, Caterpillar chose to continually replace one defective part on Trans-Spec's engines with a part containing the same defects.

25. During this period, Caterpillar did not rectify the defect on all twenty-two of Trans-Spec's engines.

26. Caterpillar did not offer Trans-Spec a permanent or reliable fix for these problems.

27. Beginning in 2003, Caterpillar further breached its warranty obligations and refused to further reimburse for work performed on the flywheel housings on the engines in Trans-Spec's trucks.

3

28. Caterpillar's decision referenced in Paragraph 26 forced Trans-Spec to perform in-house repairs, with Caterpillar's knowledge and assent, on multiple flywheel housing failures which subsequently occurred.

29. The Caterpillar employees who stopped reimbursement for Trans-Spec's flywheel housing failures did not investigate whether defective Caterpillar materials or workmanship caused Trans-Spec's problems prior to making their decision, did not consult with any engineers, and did they consult with Caterpillar's Warranty Administration Department.

30. Caterpillar knew that the aluminum flywheel housings used in its C-12 engines were flawed. For examples of the resultant failures, see the photographs of cracked C-12 flywheel housings, formerly in Trans-Spec's trucks, attached as Exhibit E.

31. Caterpillar knew or should have known of the design defect(s) in its C-12 engine. Caterpillar had full opportunity to inspect and examine the engines in question as well as to repair them. Caterpillar failed, however, to take adequate and appropriate remedial steps to address the problems once it became aware of them.

32. The design of the flywheel housings in Caterpillar's C-12 rendered that engine model defective.

33. Defects in Caterpillar materials or workmanship caused the flywheel housing failures Trans-Spec suffered.

34. Caterpillar had no basis for rejecting Trans-Spec's claims for reimbursement pursuant to the warranties at Exhibits C and D.

35. Caterpillar was aware of alternatives to fix the C-12 engine defects including the use of: a) cast iron flywheel housings; b) a flywheel housing disclosed in a Caterpillar patent application dated in July 1998 (a year and a half before Trans-Spec took delivery of the engines) attached as Exhibit F and which described precisely what happened on the C-12 engines in Trans-Spec's trucks; or, c) the use of a metal plate under bolt heads as suggested in a confidential Caterpillar document produced in the course of discovery in this case. Caterpillar did not employ any of these three fixes on the C-12 engines in Trans-Spec's trucks.

36. The flywheel housing and the bolted connection between the housing and the engine block reveal inherent design defects including overstressing of the flywheel housings under normal operating conditions and an under-designed bolted connection resulting from improper joint design. These defects could be remedied by proper engineering design and analysis.

37. Upon Caterpillar's demand, in January 2004, Sterling agreed to supply additional transmission mounts to be installed in all the trucks in an effort to provide additional support and prevent flywheel housing failures.

38. The transmission mounts referenced in Paragraph 36 were installed into all twenty-two trucks to no effect. The flywheel housings on the C-12 engines in Trans-Spec's trucks continued to fail.

39. Trans-Spec believed that Caterpillar would correct the defects in its engines pursuant to assurances in its warranties attached at Exhibits C and D.

40. Trans-Spec initiated this litigation only after years of negotiation, beginning in 2002, with Caterpillar and Caterpillar's local agent and distributor, Milton, failed to remedy its losses.

41. Trans-Spec declined to file suit earlier because it relied on repeated assurances that Caterpillar would compensate it for the damages it suffered.

42. Caterpillar's actions in agreeing to repair the initial flywheel housing failures until 2003 gulled Trans-Spec into thinking that Caterpillar had and would implement an adequate and reliable fix for the flywheel housing defects on its truck engines and that Caterpillar would employ that fix on every one of the truck engines when they failed.

43. Caterpillar simply replaced the defective flywheel housings on Trans-Spec's engines with similarly flawed parts until refusing, in 2003, to do even that.

44. Caterpillar's affirmative acts referenced in paragraphs 42 and 43 prevented Trans-Spec from discovering its cause of action until Trans-Spec realized, though repeat flywheel housing failures, that Caterpillar never fixed the defective parts in the first place.

45. Cardoza, an employee of Caterpillar's agent and local distributor, Milton, had continual conversations with both Caterpillar and Trans-Spec about the flywheel housing failures beginning in late 2002.

46. Cardoza and Calderbank made repeated representations to Trans-Spec that Trans-Spec would be made whole for the damage it suffered as a result of the defective C-12 engines.

47. Early in 2004, Cardoza accompanied Caterpillar's Truck Engine District Manager for the New England region, Troy Guidotti ("Guidotti"), on a site visit to Trans-Spec's facility to inspect failed flywheel housings.

48. In June 2004, Joseph M. Howard, Jr. ("Howard") and Robert Barton ("Barton") of Trans-Spec attended a meeting at the Milton facility in Milford, Massachusetts to address the

defective engines. This meeting included, among others, Guidotti and Cardoza. Additionally, Edward Blake and Michael Bumpus represented Sterling, and William Witcher represented Minuteman Trucks Inc. (the dealer through which Trans-Spec purchased the trucks in 1999) at this June 2004 meeting.

49. Caterpillar, through Guidotti, said at this June 2004 meeting: a) it would repair all of the engine breakdowns pursuant to its warranty obligations, thus acknowledging that Trans-Spec's engine problems were Caterpillar's responsibility; b) "Caterpillar will make you whole"; and, c) assured that the problems with Trans-Spec's C-12 engines were not Trans-Spec's fault..

50. In August 2004, Howard and Barton met with Stephen W. Schoening, Caterpillar's Northeast Region Manager, who reiterated that Caterpillar needed to address Trans-Spec's situation and assured Trans-Spec that its C-12 engine problems were not its fault and that Caterpillar would make Trans-Spec whole.

51. When Caterpillar repeatedly failed to make Trans-Spec whole for the damages it suffered as a result of the faulty C-12 engines, Trans-Spec reluctantly commenced this litigation on August 23, 2004.

52. Caterpillar mandated inappropriate or inadequate repairs to be performed on Trans-Spec's engines even where it purported to honor its warranty obligations or otherwise assume financial responsibility for repair of the flywheel housings on Trans-Spec's C-12 engines.

53. Caterpillar authorized work which it knew would not fix Trans-Spec's flywheel housings but which would extend performance of the engines to the future, make Trans-Spec believe that Caterpillar had fixed the problems, and postpone this lawsuit.

54. In some instances, repairs had to be repeatedly performed on the same engine.

55. The problems described above fell under Caterpillar's warranty obligations and should have been rectified by Caterpillar. See Exhibits C and D. Caterpillar's repeated failure to do so forced Trans-Spec to take this action.

56. These flywheel housing problems have resulted in several of the trucks leaking oil, a violation of environmental laws. In some instances, the oil leakage began while the truck was at a job site. This caused friction between Trans-Spec and some of its customers and even a loss of some business.

57. These flywheel housing problems have damaged not only the Caterpillar C-12 engines in the trucks but separately caused damage to the trucks themselves, including but not limited to: 1) clutches; 2) clutch brakes; 3) input shafts; 4) input shaft bearings; 5) motor mounts; 6) starters; and, 7) transmissions.

58. Flywheel house failures caused several of Trans-Spec's Trucks to require towing and these trucks suffered damage caused by tow trucks.

59. By reason of the contents of paragraphs 1 through 58, the warranties at Exhibits C and D failed of their essential purpose.

## COUNT I
### Breaches of Warranties of Merchantability and Fitness and Express Warranties

60. Plaintiff repeats and realleges the contents of paragraphs 1 through 59 as if set forth in full herein.

61. Defendant Caterpillar is a designer, manufacturer, distributor and marketer of goods and has extended express and implied warranties concerning the product at issue in this action.

62. From 2001 to the present, serious defects in the C-12 engines supplied by Caterpillar have caused continual, long-term breakdowns among Trans-Spec's twenty-two trucks.

63. Caterpillar knew or should have known of the design defects in its C-12 engines.

64. As a result of the engine defects, Caterpillar has breached several warranties under Massachusetts law.

65. Caterpillar made express and/or implied warranties of merchantability, safety and fitness for ordinary purposes, pursuant to Mass. Gen. L. ch. 106, §§ 2-313; 2-314; and 2-315, for which the trucks were to be used, and made further warranties that the trucks would be fit for the particular purpose for which they were to be used. All of these warranties were relied upon by Plaintiff.

66. Caterpillar made express warranties pursuant to Exhibits C and D that the engines, and specifically their flywheel housings and flywheel housing bolts, were covered against defects in materials or workmanship. Caterpillar drafted these warranties. All of these warranties were relied upon by Plaintiff.

67. Caterpillar breached the warranties referenced in paragraphs 65 and 66 as well as the implied warranty of to perform repairs in a workmanlike manner. The C-12 engines sold by Caterpillar to Trans-Spec were not merchantable, not fit for the ordinary purposes for which they were used, not fit for the particular purposes for which they were used, and not repaired when they broke.

68. Trans-Spec gave Caterpillar timely notification of said breaches and Caterpillar had full opportunity to inspect or examine its engines as well as to repair them pursuant to their warranty obligations. Caterpillar failed to take adequate and appropriate remedial steps to address the problems once they became known to it.

69. The injuries sustained by Trans-Spec were the direct and proximate result of Caterpillar's negligence and breaches of warranties.

70. The damages accrued by Trans-Spec to date now exceed $ 2.5 million, and include, without limitation, direct, incidental and consequential damages, costs of repair, loss of use, costs for additional service employees who would not otherwise have been necessary, as well as attorneys' fees and court costs.

71. Plaintiff seeks recovery with interest thereon as available at law.

WHEREFORE, Plaintiff, Trans-Spec Truck Service Inc., d/b/a Truck Service, hereby demands judgment by this Court against Defendant, Caterpillar, Inc., in an amount which is adequate to compensate it for its damages together with interest, costs, and attorneys' fees.

## COUNT II
### Violation of Mass. Gen. L. ch. 93A

72. Plaintiff repeats and realleges the contents of paragraphs 1 through 71 as if set forth in full herein.

73. At all relevant times, Caterpillar engaged in trade or commerce within the meaning of Mass. Gen. L. ch. 93A, § 1(b).

74. The conduct of Caterpillar constituted a violation of the Massachusetts Consumer Protection Act, Mass. Gen. L. ch. 93A, § 11, causing Trans-Spec substantial loss and injury in excess of $ 2.5 million.

75. The conduct of Caterpillar complained of herein occurred primarily and substantially in the Commonwealth of Massachusetts.

76. Caterpillar breached its warranties under Massachusetts law, statute and regulation, and therefore, is guilty of violation of Mass. Gen. L. ch. 93A, §§ 2 and 11 by its breaches of warranties and duties pursuant to the statutes and regulations.

77. Caterpillar's violations of the Massachusetts Consumer Protection Act were willful and/or knowing violations of said statute, entitling Trans-Spec to recovery of multiple damages pursuant to Mass. Gen. L. ch. 93A, § 11.

78. As a direct and proximate result of Caterpillar's unfair and deceptive acts and practices and violations of Mass. Gen. L. ch. 93A, Trans-Spec has been seriously injured and significantly damaged, suffering, without limitation, direct, incidental and consequential damages, costs of repair, loss of use, costs for additional service employees who would not otherwise have been necessary, as well as attorneys' fees and court costs.

WHEREFORE, Plaintiff, Trans-Spec Truck Service Inc., d/b/a Truck Service, hereby demands judgment by this Court against Defendant, Caterpillar, Inc., in an amount which is adequate to compensate it for its damages, trebled pursuant to G.L. c. 93A § 11, together with interest, costs, and attorneys' fees.

### COUNT III
### Negligence

79. Plaintiff repeats and realleges the contents of paragraphs 1 through 78 as if set forth in full herein.

80. The injuries sustained by Trans-Spec are the direct and proximate result of Caterpillar's negligent design, development, assembly, manufacture, inspection, testing, marketing, advertising, and distribution of the C-12 engines purchased by Trans-Spec.

81. As a direct and proximate result of Caterpillar's negligence, Trans-Spec has accrued damages to date in excess of $2.5 million, including, without limitation, direct, incidental, and consequential damages, costs of repair, loss of use, costs for additional service employees who would not otherwise have been necessary, as well as attorneys' fees and court costs.

82. Plaintiff seeks recovery with interest thereon as available at law.

WHEREFORE, Plaintiff, Trans-Spec Truck Service Inc., d/b/a Truck Service, hereby demands judgment by this Court against Defendant, Caterpillar, Inc., in an amount which is adequate to compensate it for its damages together with interest, costs, and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Trans-Spec Truck Service Inc., d/b/a Truck Service, demands that this Court:

1. Award money damages to the Plaintiff in an amount to be determined at trial, in excess of $2.5 million, exclusive of interest, and treble the damages pursuant to G.L. c. 93A § 11;

2. Award multiple, consequential and punitive damages;

3. Award exemplary damages pursuant to Mass. Gen. L. ch. 93A;

4. Award interest;

5. Award attorneys' fees, costs and disbursements of this action; and,

6. Order such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff, Trans-Spec Truck Service Inc., d/b/a Truck Service, requests a jury trial.

Plaintiff,
TRANS-SPEC TRUCK SERVICE INC.,
D/B/A TRUCK SERVICE
By their attorneys

/s/ Christian G. Samito
Nancy Reimer, Esq., BBO#555373
Christian G. Samito, Esq., BBO#639825
Donovan Hatem, LLP
Two Seaport Lane
Boston, MA 02210
(617) 406-4500

Date: March 1, 2006
00982272

## CERTIFICATE OF SERVICE

I, Christian G. Samito, hereby certify that on this 1st day of March, 2006 I caused a copy of the foregoing THIRD AMENDED COMPLAINT AND JURY CLAIM to be served electronically and by mail, postage prepaid, to:

John A. K. Grunert, Esq.
Campbell Campbell Edwards & Conroy
One Constitution Plaza, 3rd Floor
Boston, MA 02129

/s/ Christian G. Samito
Christian G. Samito

00982272