UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| TRANS-SPEC TRUCK SERVICE, INC. d/b/a TRUCK SERVICE, | ) ) ) | |
| Plaintiff | ) ) | |
| vs. | ) ) | CIVIL ACTION NO. 04-11836-RCL |
| CATERPILLAR INC. | ) ) | |
| Defendant | ) ) | |

## MEMORANDUM IN SUPPORT OF CATERPILLAR INC.'S MOTION FOR SUMMARY JUDGMENT ON ALL REMAINING CLAIMS

Counts I and II of the Second Amended Complaint have been dismissed pursuant to Fed. R. Civ. P. 12(b)(6), mostly on statute of limitations grounds. Those counts purported to assert claims for alleged breaches of express and implied warranties, violation of the Magnuson-Moss Warranty Act, and violation of G.L. c. 93A. Caterpillar now moves for summary judgment on the remaining count, Count III, which purports to state a negligence claim. Caterpillar is entitled to summary judgment on the negligence claim in its entirety because Caterpillar contractually excluded all liability in negligence. Caterpillar is separately entitled to summary judgment on the negligence claim, in part, by virtue of the economic loss doctrine. In addition, Caterpillar is entitled to summary judgment on Trans-Spec's demand for punitive damages contained in ¶2 of its Prayer for Relief because Massachusetts law does not permit punitive damages in a common law negligence case.

1

Caterpillar will first briefly set forth basic background information to put the motion in context.[1]  Caterpillar will then discuss separately each ground on which it is entitled to summary judgment, summarizing in each section any additional undisputed facts material to it.[2]

## BACKGROUND FACTS

Trans-Spec is in the business of hauling petroleum products and providing end dump trailer services.  Second Amended Complaint, ¶8.  Its owner and president, Joseph Howard, decided in 1999 that it was time to replace some of Trans-Spec's fleet of heavy trucks.  Deposition of Howard, 13-14.[3]  He negotiated the acquisition of 22 custom-built Sterling Truck Corporation ("Sterling") trucks through a Sterling dealership called Minuteman Trucks.  Sterling agreed with Howard to equip the trucks with Caterpillar C-12 engines.  Deposition of Howard, 77-83, 85-91, 93-94, 104-108.  Sterling purchased engines from Caterpillar, installed them in the trucks it built, and delivered the trucks to Trans-Spec in December, 1999, and January 2000.  Second Amended Complaint, ¶¶8, 11, and 12; Deposition of Howard, 142.

Caterpillar provided a standard limited warranty for the engines.[4]  Trans-Spec Deposition, Vol. 2 at 62-63, and Exhibits 5 and 6 to the Deposition of Howard referenced

---

[1]  Some background facts recited in this memorandum may not be "material" in the summary judgment sense but are nonetheless helpful to a clear understanding of the issues. Caterpillar does not believe there is any genuine dispute as to any of them.  Undisputed "material" facts are set forth in the Statement of Undisputed Material Facts in the motion for summary judgment itself.  *See* LR 56.1.

[2]  Many "facts" recited in the statement of undisputed facts and in this memorandum are taken from Trans-Spec's pleadings or discovery responses. Caterpillar assumes them true solely for purposes of this motion. Caterpillar does not waive its right to contest their accuracy in any other context.

[3]  Howard was deposed individually on May 3, 2005, but also appeared as Trans-Spec's designee pursuant to Fed. R. Civ. P. 30(b)(6) to provide information known or reasonably available to the corporation on several subjects.  His testimony in the latter capacity, which was given on August 9 and September 28, 2005, is referenced as "Trans-Spec Deposition" volume 1 or 2; his individual testimony is referenced as "Deposition of Howard."  All excerpts from the Deposition of Howard are collected in Exhibit A in the Appendix of Exhibits.  All excerpts from Trans-Spec Deposition, Vol. 1 and Vol. 2 are collected, respectively, in Exhibits B and C in that Appendix.

[4]  There were actually two warranties, one for engines delivered before January 1, 2000, and the other for engines delivered on or after that date.  Affidavit of Clarissa Kolmer, ¶5 (Exhibit D in the Appendix).  The dispositive language in the two warranties, however, is identical.

therein; Affidavit of Clarissa Kolmer, ¶5. The warranty contains the following language in bold-faced capital letters:

> **CATERPILLAR EXCLUDES ALL LIABILITY FOR OR ARISING FROM ANY NEGLIGENCE ON ITS PART OR ON THE PART OF ANY OF ITS EMPLOYEES, AGENTS, OR REPRESENTATIVES IN RESPECT OF THE MANUFACTURE OR SUPPLY OF GOODS OR THE PROVISION OF SERVICES RELATING TO THE GOODS.**

(Copies of the warranties are in Exhibit E in the Appendix.) Trans-Spec took advantage of Caterpillar's warranty to obtain repairs to the engines at no cost. Affidavit of Clarissa Kolmer, ¶¶5.

Flywheel housings began to loosen on C-12 engines in some of Trans-Spec's 22 Sterling trucks in 2001. A few more failures of the same type occurred in 2002. All told, there were six such failures over the course of those two years. Many more occurred in 2003, 2004, and early 2005.[5] Second Amended Complaint, ¶¶14 and 16. Caterpillar initially paid for repair of the flywheel housing failures but, in mid-2003, determined the failures were not being caused by defects in the material or workmanship of its engines and therefore stopped paying for the repairs.[6] Deposition of Kolmer, 14, 52, 74-77 (Exhibit G in the Appendix). Trans-Spec alleges it sustained substantial loss of revenue and other economic losses as a result of down time resulting from flywheel housing failures and as a result of having to repair some of the failures at its own expense in its own repair shop. It also claims the resale value of the trucks was impaired by the alleged engine defects. See Second Amended Complaint, ¶¶16, 20, 24 and 42.

---

[5] Trans-Spec sold 20 of the 22 trucks in mid-2005. The other two trucks had been wrecked in accidents – not caused by engine problems – and Trans-Spec planned to sell them for parts. Trans-Spec Deposition, Vol. 2, 56-58.
[6] Caterpillar has sold over 100,000 C-12 engines with flywheel housings of the same type that were on Trans-Spec's engines. The overall rate of flywheel housing failures is less than 1%. Deposition of Bowes, 138-141, 179 (Exhibit F in the Appendix). Trans-Spec, by contrast, experienced at least one flywheel housing failure on at least 20 of its 22 Sterling trucks and multiple failures on many of them. It did not take a rocket scientist to see that the cause of the problem was with Sterling's custom-built trucks and/or Trans-Spec's handling of them, not with the C-12 engine.

Trans-Spec commenced this action in August, 2004, purporting to assert claims for alleged breaches of express and implied warranties, alleged violation of the Magnuson-Moss Warranty Act, and alleged violation of G.L. c. 93A. It sought a preliminary injunction requiring Caterpillar to provide it with replacement trucks, averring that "grave and dangerous repercussions across New England will result" and "the transportation of heating oil in this Commonwealth would be crippled" if the preliminary injunction were not granted. Complaint and Jury Demand, ¶¶30 and 31. The preliminary injunction was denied; the Commonwealth somehow survived the winter of 2004; the litigation proceeded. In May, 2005, Trans-Spec amended its complaint to add a negligence count. The original claims have now been dismissed, leaving only the late-added negligence claim.

1.    The Negligence Claim Is Barred as a Matter of Law by the Contract Between Caterpillar and Trans-Spec

"There can be no doubt that under the law of Massachusetts in the absence of fraud a person may make a valid contract exempting himself from any liability to another which he may in the future incur as a result of his negligence or that of his agents or employees acting on his behalf." Sharon v. City of Newton, 437 Mass. 99, 105 (2002) (quoting Schell v. Ford, 270 F.2d 384, 386 (1st Cir. 1959)) (internal quotation marks and elipses omitted). "The allocation of risk by agreement is not contrary to public policy" and, in the absence of fraud or duress, merely reflects "sensible business judgments." Minassian v. Ogden Suffolk Downs, Inc., 400 Mass. 490, 493 (1987). Accord, e.g., City of Everett v. Barletta Engineering Corp., 2005 WL 1683869, *3 (Mass. Super. 2005)[7]. At least outside the consumer context, the fact that a contract containing an exemption from negligence liability may have been presented on a "take it or leave it" basis or may be viewed as a contract of adhesion is no reason to deny its enforcement.

---

[7] A copy of this opinion is attached to this memorandum for the Court's convenience.

<u>Minassian</u>, 400 Mass. at 492. Similarly, a contracting party's failure to read an exemption from negligence liability does not render it unenforceable. <u>Lee</u> v. <u>Allied Sports Associates, Inc.</u>, 349 Mass. 544, 550-551 (1965). These principles have been part of the law of Massachusetts for a very long time. *See* the cases cited at *id.*

The warranties Caterpillar gave with respect to the engines in Trans-Spec's trucks contained a clear, unequivocal, and conspicuous exclusion of all liability for negligence. There is no dispute Trans-Spec sought and received benefits under those warranties. There is similarly no dispute, if it is relevant, that Trans-Spec was not compelled to specify Caterpillar engines for its trucks and that, in fact, it considered equipping its trucks with other manufacturers' engines before settling on Caterpillar engines largely because of its favorable experience with Caterpillar products. *E.g.* <u>Deposition of Howard</u>, 33-38, 66-69, 77-82. Count III of the Second Amended Complaint therefore fails as a matter of law because Caterpillar indisputably excluded all liability for negligence in its contract with Trans-Spec.

2.   <u>Trans-Spec's Negligence Claim Fails in Part by Virtue of the Economic Loss Doctrine</u>

    (a)   <u>Trans-Spec's Claim Fails in its Entirety as to the Engines Bearing Serial Numbers 2KS27878 and 2KS27861 Because There is no Evidence that Negligence with Respect to them, if any, Caused Damage to Property Other than the Engines Themselves</u>

Under the so-called economic loss doctrine, there may be no recovery for negligence in the design or manufacture of a product if the negligence causes no personal injury and no substantial damage to property other than the allegedly defective product itself. <u>Bay State-Spray & Provincetown Steamship Co.</u> v. <u>Caterpillar Tractor Co.</u>, 404 Mass. 103, 104, 107 (1989); <u>Marcil</u> v. <u>John Deere Ind. Equip. Co.</u>, 9 Mass. App. Ct. 625, 629-631 (1980).[8]   This case

---

[8]   Judge Posner of the Court of Appeals for the 7th Circuit explained with respect to the phrase "economic loss": "This cost is called in law 'economic loss,' to distinguish it from an injury to the plaintiff's person or property (property other than the product itself), the type of injury on which a products liability suit usually is founded. It

involves 22 separate trucks containing 22 separate engines. The economic loss doctrine dictates that Trans-Spec is entitled to no recovery in negligence with respect to any specific engine which it cannot prove caused substantial damage to other property.[9] So if, with respect to any specific engine, there is no competent evidence that a failure of the flywheel housing caused substantial damage to something other than the engine itself, Caterpillar is entitled to summary judgment on the claim with respect to that engine. Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986). This is the case with respect to at least two engines, Serial Numbers 2KS27878 and 2KS27861.

Serial Number 2KS27878 was installed by Sterling in the truck identified by Trans-Spec as Truck 6200 and Serial Number 2KS27861 was installed by Sterling in Truck 7800. There is no documentary evidence that any flywheel housing failure of any type ever occurred on either of these two trucks. Trans-Spec Deposition, Vol. 1, at 113-114 and Exhibit 6 thereto (included in the Appendix as Exhibit H); Trans-Spec Deposition, Vol. 2, 87-89, 111-115. While Howard asserts that *some* type of flywheel housing failure occurred on every one of the Sterling trucks, and therefore *must* have occurred on these two, he cannot say what type of failure occurred on them. It may have involved only loosening bolts which Trans-Spec "caught prior to doing damage" and simply retightened. Trans-Spec Deposition, Vol. 1, 114; Trans-Spec Deposition, Vol. 2, 81, 85-86, 115. Neither of Trans-Spec's putative expert witnesses holds opinions on this subject. *See* the excerpts of the reports of Thomas Service and Jack Ekchian contained in Exhibit I in the Appendix. So much of Trans-Spec's claim as seeks damages for negligence with

---

(cont'd.) would be better to call it a 'commercial loss,' not only because personal injury and especially property losses are economic losses too – they destroy values which can be and are monetized – but also, more important, because tort law is a superfluous and inapt tool for resolving purely economic disputes. We have a body of law designed for such disputes. It is called contract law. Products liability law has evolved into a specialized branch of tort law for use in cases in which a defective product caused, not the usual commercial loss, but a personal injury to a consumer or bystander."

[9] Caterpillar assumes for purposes of this motion only that "other property" means property of Trans-Spec other than the engines and includes non-engine components of trucks in which the engines were installed. *See* Berish v. Bornstein, 437 Mass. 252, 267-268 (2002)

respect to Serial Numbers 2KS27878 and 2KS27861 therefore fails as a matter of law in its entirety because there will be no evidence from which a jury could find that any flywheel housing failure on those engines, if there really were such failures, damaged anything other than the engines themselves.

> (b)     Trans-Spec's Negligence Claim Fails as a Matter of Law with Respect to All Other Engines Insofar as Trans-Spec Seeks to Recover for Alleged Expenses of Repairing or Replacing the Failed Flywheel Housings, for Alleged Reduced Resale Value, for Alleged Lost Income and Diminished Value of its Business, and for Alleged Clean-up Costs for Oil Spills

Trans-Spec says that every time a flywheel housing broke (as distinct from just loosening, as to which *see* Trans-Spec Deposition, Vol. 1 at 114 and 117 and Trans-Spec Deposition, Vol. 2 at 81) several non-engine parts of the truck in which the engine was installed were damaged.  Second Set of Supplemental Answers of the Plaintiff, Trans-Spec Truck Service, Inc., d//b/a Truck Service, to the Third Set of Interrogatories of the Defendant, Caterpillar Inc., supplemental answer #3 (cited portions are collected in Exhibit J in the Appendix).  Caterpillar does not seek summary judgment under the economic loss doctrine with respect to so much of Trans-Spec's claim as seeks recovery of the alleged cost of replacing non-engine truck parts damaged by flywheel housing failures.[10]  *Compare* Berish, 437 Mass. at 267-268 (2002).

Caterpillar does, however, seek summary judgment under that doctrine on so much of Trans-Spec's claim as seeks recovery: (i) for alleged expense of repairing the allegedly defective engines themselves, (ii) for alleged diminution in resale value of the trucks, and (iii) for alleged lost income and diminution in the value of Trans-Spec's business. This is because there is no evidence that any of these types of losses was proximately caused by damage to non-engine

---

[10]   As discussed in Section 1, however, Trans-Spec's negligence claim in its entirety is barred by the contractual exclusion of negligence liability.

components.  As articulated by the Ohio Supreme Court in Queen City Terminals, Inc. v. General American Transp. Corp., 73 Ohio St.3d 609, 615, 653 N.E.2d 661, 668 (1995):

> [T]he mere coupling of personal injury or property damages with indirect economic damages is not enough to entitle a plaintiff to recover the indirect economic damages. The plaintiff must show that the indirect damages *arose from* the property damage or personal injury.  There must be a direct causal nexus between the tangible damage and the indirect losses in order for the economic losses to be recoverable.

(emphasis original).

The applicable law is illustrated by W.R. Construction & Consulting, Inc. v. Jeld-Wen, Inc., 2002 WL 31194870 (D. Mass. 2002)[11].  W.R. Construction, a contractor, purchased windows for installation in a residence it was constructing for a customer.  The windows were defective and necessitated extensive uncompensated repair work on the structure by W.R. Construction.  The defects also permitted a water leak that caused about $2000 in damage to equipment W.R. Construction had stored in the structure.  W.R. Construction sued the seller of the windows in breach of warranty and negligence.  In support of its negligence claim, W.R. Construction argued that the $2000 in damage to its equipment entitled it, notwithstanding the economic loss doctrine, to recover for the uncompensated expense and effort it devoted to repairing the defective windows and damage caused by them to the structure in which it had installed them.  The District Court rejected W.R. Construction's argument.

> [U]nder the economic loss doctrine, a plaintiff may not seek to redress economic loss in tort on account of "minimal" property damage or personal injury.  [*Rich Products Corp. v. Kemutec, Inc.*, 66 F.Supp. 2d 937, 968-969 (E.D. Wis. 1999)] (citing *Miller v. United States Steel Corp.*, 902 F.2d 573, 576 (7th Cir. 1990)).  Rather, whether such a tort-based claim may be brought depends on "a direct and continuous causal chain between the property damage and the economic loss."  *Queen City Terminals, Inc. v. General American Transportation*, 73 Ohio St. 3d 609, 615-16 (1995) (holding that "in order to recover indirect economic damages in a negligence action, the plaintiff must prove that the indirect economic damages arose from tangible physical injury to persons or from tangible property damage"); *see Icelandic Coast Guard v. United Technologies Corp.*,

---

[11]  A copy of this opinion is attached to this memorandum for the Court's convenience.

722 F. Supp. 942 (D. Conn. 1989) (recovery in tort for economic losses permitted where losses were "attributable to and are inextricably tied to" injuries).

Applying that analysis, the Court held that W.R. Construction could not recover for its services and expense devoted to repairing the allegedly defective windows and the damage they caused to the residence in which they were installed because W.R. Construction was not caused to perform those services and incur that expense *by the damage to its equipment*. *Compare* Miller, 902 F.2d at 576 ("Incidental property damage, however, will not take a commercial dispute outside the economic loss doctrine; the tail will not be allowed to wag the dog") (citation omitted).

Icelandic Coast Guard v. United Technologies Corp., 722 F. Supp. 942, 947-948 (D. Conn. 1989), is also illustrative. The Icelandic Coast Guard sought recovery in negligence for the cost of replacing a helicopter that crashed at sea as a result of alleged defects, the cost of searching for and recovering the wreckage, loss of use of the helicopter, as well as for the costs of searching for and recovering the bodies of crewmen who died in the crash. *Id.,* 945. The court held that expense incurred by the Coast Guard in searching for and recovering the crewmen's bodies, arising as it did out of personal injuries to the crewmen, was loss of the type recoverable in tort. The mere existence of those claims, however, did not entitle the Coast Guard also to pursue a negligence claim to recover purely economic losses – the cost of replacing the helicopter, loss of use of the helicopter, the expense of recovering the wreckage – that were caused entirely by defects in or damage to the product itself. As to those claims, by virtue of the economic loss doctrine, the only recovery was in breach of warranty. *Id.*, 948.

These principles require dismissal as a matter of law of substantial elements of Trans-Spec's purported negligence claim even if the claim were not contractually barred in its entirety.

(i)    Expense of Repairing or Replacing Failed Flywheel Housings Themselves

Trans-Spec seeks recovery of expense it allegedly incurred for parts and labor connected with "in-house repairs ... on the flywheel housings of sixteen trucks." Second Amended Complaint, ¶20. That kind of expense is exactly the kind of damages barred by the economic loss doctrine. E.g., Marcil, 9 Mass. App. Ct. at 630 n.3. By definition, the expense of repairing the allegedly defective product itself is not incurred as a result of damage to property other than the product itself. Caterpillar is therefore entitled to summary judgment under Fed. R. Civ. P. 56(d) on so much of Trans-Spec's claim as seeks recovery for expenses it incurred in  making repairs to the engines themselves.

(ii)    Alleged Diminution in Resale Value

Trans-Spec seeks to recover alleged diminution in the resale value of at least 20 of the trucks which it attributes to the alleged flywheel housing defects[12]: it avers, Second Amended Complaint, ¶24, that its trucks should have had a resale value of $45,000 apiece but asserts, Trans-Spec Deposition, Vol. 1, 26-30, 54-56, that the price it was actually able to obtain for them was only $33,500 because of its report to the purchaser of recurrent flywheel housing problems. Trans-Spec's own testimony therefore establishes that the diminution in value of the trucks, if it existed, was caused by the alleged engine defects themselves, not by incidental damage to other parts of the trucks. Diminution in value of the allegedly defective product is exactly the kind of damages barred by the economic loss doctrine. Marcil, 9 Mass. App. Ct. at 630 n.3. Caterpillar is thus entitled to judgment as a matter of law pursuant to Rule 56(d) on so much of Trans-Spec's claim as seeks to recover for alleged diminution in the re-sale value of its trucks.

---

[12] Caterpillar does not understand Trans-Spec to seek recovery for alleged diminution in value of the trucks it did not resell because it had wrecked them. If it does, the same analysis set forth in this paragraph applies to them.

(iii)     Alleged Lost Income and Diminution in the Value of its Business

Trans-Spec seeks recovery for alleged lost income[13] and related diminution in the value of its business.  Trans-Spec claims it lost numerous accounts, and thus substantial revenue, because so many of its trucks were down with flywheel housing problems that it could not service its customers reliably.  Damages of this type are exactly the kind barred by the economic loss doctrine,  Marcil, 9 Mass. App. Ct. at 630, n.3, unless there is competent evidence from which a jury could find that the alleged loss resulted not from downtime caused by the inoperable engines themselves (compensable, if at all, only in contract) but, instead, by downtime caused by damage to "other property."  There is no such evidence.

Caterpillar assumes for purposes of this motion that Trans-Spec could prove it lost income as a result of downtime caused by the flywheel housing failures it experienced; Caterpillar further assumes for purposes of this motion (though it doubts) that Trans-Spec could quantify the total alleged lost income and resulting diminution in the value of its business with enough precision to get to the jury.  But proving and quantifying loss is not the issue; the issue is proving proximate cause, *i.e.*, was the lost income caused by damaged *non-engine components* or was it caused by problems with the engines themselves?  *Compare* Augat, Inc. v. Aegis, Inc., 417 Mass. 484, 488 (1994) ("The plaintiffs had to prove that Isotronics sustained monetary losses due to the defendants' wrongdoings. ... Many factors bear on the financial performance of a company.  The plaintiffs had to show the portion of Isotronic's losses, at least in general terms, that was attributable to the defendants' misconduct.")   Put another way, can Trans-Spec prove that downtime attributable to incidentally-damaged non-engine components like starters,

---

[13]   Trans-Spec lost money and paid no federal income tax in 2000, 2001, 2002, 2003 and 2004.  Deposition of Pappas, 28-35 (excerpts from Mr. Pappas's deposition are collected in Exhibit K in the Appendix). Yet Trans-Spec experienced no flywheel housing failures at all on the trucks involved in this case until late 2001 and a total of only 6 prior to 2003.  Second Amended Complaint, ¶14.

clutches, and engine mounts caused it to lose appreciably more income than it would have lost as a result of the downtime caused by the engine damage alone?

Trans-Spec has judicially admitted, Second Amended Complaint, ¶16, that its business "requires that it operate all of its trucks six days a week." *See, e.g.*, Schott Motorcycle Supply, Inc. v. American Honda Motor Co., 976 F.2d 58, 61 (1st Cir. 1992) (a plaintiff's averments in the complaint are judicial averments and binding upon it), so any downtime for any reason of more than a single day experienced by any truck must be assumed for purposes of this motion to have impaired Trans-Spec's ability to operate its business. Trans-Spec's trucks were often down for long periods of time because of delay in obtaining replacement flywheel housings. *E.g.*, Trans-Spec Deposition, Vol. 2, 53-54, 90, 118-119. Damage to other *engine* components also contributed to downtime. *E.g.*, Deposition of Trans-Spec, Vol. 1, 159; Deposition of Trans-Spec, Vol. 2, 31, 87-88. Trans-Spec also experienced a whole variety of other "chronic" *engine* problems. *E.g.* Plaintiff, Trans-Spec Truck Service Inc., d/b/a Truck Services Amended Supplemental Amended Answers to Caterpillar Inc.'s First Set of Interrogatories, supplemental responses to ##7 and 15 (Exhibit L in the Appendix). It is thus established beyond peradventure – for purposes of this motion – that Trans-Spec experienced substantial downtime that prevented proper operation of its business by reason of *engine* problems alone.

Trans-Spec therefore needs competent evidence (a) quantifying, with respect to each flywheel housing failure on each truck, the downtime (if any) attributable to repair of damaged *non-engine* components rather than to repair of the flywheel housing and other *engine* components, and (b) to prove that, but for that additional quantum of downtime, Trans-Spec's customers would not have withdrawn or reduced their business as they allegedly did. Trans-Spec has conceded that available information related to the many flywheel housing failures

experienced by its Sterling trucks is incomplete and inadequate to provide detail regarding the work that was done in connection with each failure. Trans-Spec Deposition, Vol. 2, 13-14, 22-23, 53-54, 80-86, 92, 97-98, 114-115, 131-132, 140-142. Thus, even if the causation issue were susceptible to determination by jurors without the aid of expert testimony, the necessary evidential basis for their doing so is absent. But assessing how long specific repair work would have taken if specific elements of the work had not needed to be done, and thus how much (if at all) the downtime of Trans-Spec's trucks would have been reduced if non-engine components had been undamaged, is not something within the ken of the average layperson. It requires expert testimony; and Trans-Spec has none.

Trans-Spec provided no report on this subject pursuant to Rule 26(a)(2) from any witness "retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony," though the deadline for such reports was December 7, 2005.[14]    Trans-Spec did not provide a report from anyone to testify on the subject of damages, the cause of any element of damages, or the manner in which repairs on the trucks were done. Trans-Spec identified an accountant, Mr. Pappas, in response to Caterpillar's interrogatory asking it to "identify every person whom you expect to offer expert testimony on your behalf at trial and, as to each such person, state the subject matters on which he or she will testify, state the substance of the facts and opinions to which he or she will testify, and summarize the grounds for each opinion to which he or she will testify," but did not disclose anything further about him -- no subject matter on which he would testify, no opinions he holds,

---

[14]  Neither of Trans-Spec's putative expert witnesses identified any opinion on repair issues or on the cause of specific losses sustained by Trans-Spec. See the excerpts from their reports collected in Exhibit I in the Appendix. Their opinions focus exclusively on alleged deficiencies in the design of C-12 engines generally.

no basis for any such opinions.[15] Plaintiff, Trans-Spec Truck Service Inc., d/b/a Truck Services, Amended Supplemental Amended Answers to Caterpillar Inc.'s First Set of Interrogatories, supplemental answer #1.

Mr. Pappas, moreover, was deposed as Trans-Spec's Rule 30(b)(6) designee on certain matters concerning Trans-Spec's financial performance, and in that capacity testified as follows:

> Q.    When I was looking through the tax returns for Trans-Spec and also financial statements, it appeared to me that in the year 2002, Trans-Spec's gross receipts declined significantly from what they had been in 2001, as did its cost of goods sold, as did its gross profit, as did its total income. Do you have an understanding of what the reason for that decline was?
>
> A.    I don't.

*****

> Q.    It appears to me from the tax returns that between 2002 and – between 2002 and 2003, there was an increase of a little more than half a million dollars in Trans-Spec's gross receipts. Does that – is that true?
>
> A.    About right. Yeah. Uh-huh.
>
> Q.    And there was an increase of about 1.8 million dollars in its gross profit, correct, between 2002 and 2003?
>
> A.    That's about right.
>
> Q.    And an increase of about a million eight hundred thousand dollars in its total income?
>
> A.    Correct.
>
> Q.    Do you have an understanding for why Trans-Spec's revenues, why the revenue side of Trans-Spec's business experienced that increase between 2002, year-end 2002, and year-end 2003?
>
> A.    No, I don't.

---

[15]  Trans-Spec's counsel notified Caterpillar by letter that no Rule 26(a)(2) report would be supplied by Pappas. Exhibit M in the Appendix of Exhibits. Caterpillar's interrogatory, however, did not ask only about testimony to be offered by experts falling within the scope of Rule 26(a)(2). It asked for information about *everyone* who would offer expert testimony on Trans-Spec's behalf, whether specially retained or customarily employed for that purpose or not, and is therefore broader than the automatic disclosure requirement contained in Rule 26(a)(2).

Q.      It appears from the tax returns that between year-end 2003 and year-end 2004 Trans-Spec then had a decline in gross receipts of maybe $340,000.

A.      Yes.

Q.      So at the year-end 2004, its gross receipts were just a little higher than they had been in 2002, right?

A.      Yes.

Q.      Do you have an understanding for the cause of that decline in Trans-Spec's gross receipts?

A.      No.

Q.      Trans-Spec's gross profits for 2004, at least according to the tax returns, is about 200,000 more than it was in 2003, correct?

A.      Correct.  Yes.

Q.      And that reflects the fact that its cost of goods sold declined considerably more than its gross receipts, right?

A.      That's correct.

Q.      Do you have an understanding for why its cost of goods sold declined so much in 2004?

A.      No.

Deposition of Pappas, 67-70.  And elsewhere:

Q.      Do you have an understanding of the reason why Trans-Spec lost such a large amount of money in 2004 to have a taxable income of negative 216, almost 217,000, correct?

A.      I think because they had a terrible winter business-wise.  That is the only thing I know.

Q.      What do you mean they had a terrible winter business-wise?

A.      They didn't have as much income generated during the winter as they usually do.

Q.      The gross receipts that they had in 2004 was actually more than they had in 2002. They had a --- 2002 they didn't have any significant loss.  Do you understand, do

15

you have an understanding for what the reason for the difference between those two years is?

A.    No, I don't.

Q.    Okay.  You haven't attempted to analyze the cause for Trans-Spec's poor performance in 2004?

A.    I have not.

*Id.*, 94-95. There will thus be no evidence from which the jury could find that any lost income or diminution of the value of Trans-Spec's business – if there really was any -- was caused by damage to non-engine truck components resulting from flywheel housing failures, as distinct from the flywheel housing failures (and other alleged *engine* failures) themselves.

(iv)    <u>Clean-Up Costs</u>

Trans-Spec also appears to seek recovery for expenses it incurred cleaning up oil that allegedly leaked onto its property as a result of flywheel housing failures. <u>Second Amended Complaint</u>, ¶23. Trans-Spec was unable or unwilling, however, to identify during the discovery process any specific instance in which any specific truck leaked oil on its property as a result of a flywheel housing failure, notwithstanding the fact that it was explicitly asked to provide Rule 30(b)(6) testimony on that subject and produced a witness supposedly designated to do so. <u>Notice of Taking Resumed Deposition</u>, Schedule A, ¶19 (Exhibit N in the Appendix); <u>Trans-Spec Deposition, Vol. 2</u>, 23-26. *See also* <u>Second Set of Supplemental Answers of the Plaintiff, Trans-Spec Truck Service, Inc. d/b/a Truck Service, to the Third Set of Interrogatories of the Defendant, Caterpillar Inc.</u>, supplemental answer to #3 (stating "flywheel house failures caused numerous oil leaks on Trans-Spec's property which needed to be cleaned up pursuant to environmental and hazardous materials regulations" but failing to disclose the date of any such event, to identify any engine or truck involved in such an event or the specific Trans-Spec

property damaged by the leak, to identify who cleaned up the leak, or to state the amount paid by Trans-Spec as a result of the leak). There will, consequently, be no evidence on the basis of which a jury could award any damages for such alleged spills: without knowing how many such spills occurred, the property on which they occurred, who cleaned them up, or how much Trans-Spec paid to clean them up, any award would of necessity be speculative.

3.    Trans-Spec's Claim to Recover Punitive Damages is not Cognizable Under Well-Settled Massachusetts Law

Paragraph 2 of Trans-Spec's Prayer for Relief asks the Court to award "multiple, consequential, and punitive damages." Since a different paragraph of the Prayer, namely ¶3, specifically requested exemplary damages pursuant to G.L. c. 93A, Caterpillar understands ¶2 to refer to Trans-Spec's other purported claims, including the purported common law negligence claim in Count III.

> Punitive damages are not allowed in this Commonwealth unless expressly authorized by statute.

Flesner v. Technical Communications Corp., 410 Mass. 805, 813 (1991).

> Punitive or exemplary damages are not allowed in Massachusetts except under statutory authority.

Santana v. Registrars of Voters of Worcester, 398 Mass. 862, 867 (1986).

> We have consistently maintained that punitive damages are not to be allowed in the absence of statutory authorization.

USM Corp., v. Marson Fastener Corp., 392 Mass 334, 353 (1984).

> In this Commonwealth exemplary damages are not allowed unless authorized by statute.

Lowell v. Mass. Bondings & Ins. Co., 313 Mass. 257, 269 (1943).

> In this Commonwealth there is no such thing known to the common law as the recovery of punitive damages in addition to compensatory damages. It is only by express statute that such damages may be awarded.

Boott Mills v. Boston & Maine Railroad, 218 Mass. 582, 589 (1914) (citation omitted).

Trans-Spec's statutory claim under G.L. c. 93A was dismissed.  Its only remaining claim sounds in common law negligence.  That claim fails as a matter well-settled Massachusetts law insofar as it seeks punitive or exemplary damages.

CONCLUSION

It is undisputed that Trans-Spec's contract with Caterpillar bars any recovery on a negligence theory.  For that reason, Caterpillar is entitled to summary judgment on Count III – the only remaining count -- of the Second Amended Complaint in its entirety.  Even if it were not undisputed that Trans-Spec's negligence claim is contractually barred, Caterpillar would be entitled by the economic loss doctrine to summary judgment on Count III in its entirety insofar as it seeks damages caused by defects in engines 2KS27878 and 2KS27861 and, with respect to all other engines, to the extent it seeks recovery of damages for anything other than the expense Trans-Spec incurred in repairing damage to non-engine components of its Sterling trucks.

CATERPILLAR INC.,

By its attorneys,

CAMPBELL CAMPBELL EDWARDS
& CONROY, P.C.

John A.K. Grunert  (BBO: 213820)
One Constitution Plaza
Boston, MA  02129
(617) 241-3000

<u>CERTIFICATE OF SERVICE</u>

I, John A.K. Grunert, hereby certify that on March 17, 2006, I served the within memorandum electronically on Nancy Reimer, Esquire, Donovan Hatem LLP, Two Seaport Lane, Boston, MA 02210.

John A.K. Grunert

Westlaw.

Not Reported in N.E.2d

Not Reported in N.E.2d, 19 Mass.L.Rptr. 406, 2005 WL 1683869 (Mass.Super.)

(Cite as: 2005 WL 1683869 (Mass.Super.))

Page 1

H

Superior Court of Massachusetts.
CITY OF EVERETT
v.
BARLETTA ENGINEERING CORP. et al. [FN1],
[FN2]

FN1. Firemen's Fund Insurance Co.

FN2. Third-party defendants are Earl R. Flansburgh Associates, Inc., A & A Window Products, Inc., B & T Masonry Construction Co., Inc., DeBrino Caulking Associates, Inc., Modern Glass & Aluminum, Inc., Soloco, Inc., and Embree Elevator, Inc.

No. 004884.

May 20, 2005.

*MEMORANDUM OF DECISION AND ORDER ON FLANSBURGH ASSOCIATES, INC.'S MOTION FOR SUMMARY JUDGMENT AS TO BARLETTA ENGINEERING CORPORATION'S CLAIMS AGAINST FLANSBURGH AND REQUEST FOR ENTRY OF SEPARATE AND FINAL JUDGMENT*

S. JANE J. HAGGERTY, Justice.

**\*1** This is an action brought by the plaintiff, the City of Everett ("Everett"), against the defendant, Barletta Engineering Corporation ("Barletta"), arising out of an owner-contractor agreement entered into by the parties. Barletta, as a third-party plaintiff, also brings claims against several third-party defendants involved in the construction project of the Lafayette Elementary School in Everett, Massachusetts, including the architect of the project, Flansburgh Associates, Inc. ("Flansburgh"). Everett brings two claims against

Barletta. Count I alleges Barletta's failure to complete the construction of the Lafayette School Building in accordance with the Contract Documents, and Count II alleges Barletta's failure to construct a ballfield in accordance with the agreement. Included in Barletta's claim against the third-party defendants are two claims against Flansburgh. Count I alleges negligence in preparation of the Contract Documents used to solicit bids by Everett, and Count II alleges negligent misrepresentation in Flansburgh's depiction of the site conditions in the contract.

Flansburgh asserts that the owner-contractor agreement between Barletta and Everett contains a covenant not to sue Flansburgh which is enforceable, and that the economic loss doctrine bars the third-party claims. Barletta responds that the covenant not to sue does not apply to the claims against Flansburgh based on active negligence, and is unenforceable, and that the economic loss doctrine is inapplicable to the claims. The matter is before this court on Flansburgh's motion for summary judgment as to all of Barletta's claims against them.

For the reasons set forth below, Flansburgh Associates, Inc.'s motion for summary judgment as to all of Barletta Engineering Corporation's claims against Flansburgh is *ALLOWED.*

*BACKGROUND*

This dispute arises as the result of defects in the fitness of the Lafayette School Building. At this summary judgment stage, the facts are reported in the light most favorable to the non-moving party. *Anderson Street Associates v. City of Boston,* 442 Mass. 812, 816 (2004), citing *Augat, Inc. v. Liberty Mut. Ins. Co.,* 410 Mass. 117, 120 (1991).

Barletta and Everett entered into a general contract for the construction of the school building on March 5, 1998. The project was to be completed by July 5,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                 Page 2

Not Reported in N.E.2d, 19 Mass.L.Rptr. 406, 2005 WL 1683869 (Mass.Super.)

**(Cite as: 2005 WL 1683869 (Mass.Super.))**

1999. Flansburgh prepared the Contract Documents, including the Plans and Specifications, which Everett utilized for the purpose of soliciting bids from potential general contractors. Barletta commenced construction in accordance with the Plans and Specifications after receiving the General Contract from Everett. Included in the Contract Documents was information regarding the site conditions at the project site, which Barletta also relied on.

During the construction process, Everett authorized certain change orders which resulted in adjustments to the contract price, as well as an extension of time to complete the project. Barletta was unable to meet the extension deadline, and did not achieve substantial completion of the project until October 25, 1999. However, the building was still not able to be occupied for its use as a school building until February 28, 2000 due to several problems. These included breakdowns of the heating system, problems with air balancing, broken ceiling tiles, and required cleaning of the building. In addition, significant water leaks have plagued the project, causing damage to the walls, ceilings, and floors. Covino Environmental Associates, Inc. was hired by Everett to conduct a visual inspection and environmental sampling of the building, and the resulting assessment revealed the presence of mold and microbial contamination.

**\*2** As a result of these problems, as well as several other defects in the construction of the building, Everett has been denied its use and enjoyment of the property, the benefit of contract compliance, and has incurred significant expenses in maintenance and repair costs. In addition, Barletta's failure to submit the required documentation verifying the sufficient fill and topsoil cover for the ball field on the property led to Everett's hiring of an independent consultant to verify the depth of the cover. The consultant reported that the cover was insufficient, and that the field was required to be closed down. Everett has incurred costs in assessing the cover for the field, as well as in contracting for remediation of the defects.

At issue is the language of the Owner-Contractor Agreement concerning a covenant not to sue. The Supplementary General Conditions of the agreement contains an additional paragraph that was added to paragraph 3.18 of the General Conditions. Paragraph 3.18.4 states as follows:

> The Contractor, or any successor, assign or subrogee of the Contractor, agrees not to bring any civil suit, action or other proceeding in law, equity or arbitration against the Architect, or the officers, employees, agents or consultants, of the Architect, for the enforcement of any action which the Contractor may have arising out of or in any manner connected with the Work. The Contractor shall assure that this covenant not to sue is contained in all subcontracts and subcontractors of every tier, and shall assure its enforcement. The Architect, its officers, employees, agents, and consultants are intended third-party beneficiaries of this covenant not to sue, who are entitled to enforce this covenant in law or equity.

*DISCUSSION*

Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Highland Ins. Co. v. Aerovox, Inc.,* 424 Mass. 226, 232 (1997), citing Mass.R.Civ.P. 56(c). In a case such as this, where the opposing party will have the burden of proof at trial, the moving party is entitled to summary judgment if he can demonstrate by reference to these materials, "unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case." *Kourouvacilis v. General Motors Corp.,* 410 Mass. 706, 716 (1991).

The Supreme Judicial Court has stated that "an unambiguous agreement must be enforced according to its terms." *Schwanbeck v. Federal-Mogul Corp.,* 412 Mass. 703, 706 (1992), citing *Freelander v. G. & K. Realty Corp.,* 357 Mass. 512, 516 (1970). It is appropriate for a court to address the interpretation of such unambiguous terms of a contract as a matter of law. See *Allstate*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                 Page 3

Not Reported in N.E.2d, 19 Mass.L.Rptr. 406, 2005 WL 1683869 (Mass.Super.)

**(Cite as: 2005 WL 1683869 (Mass.Super.))**

*Ins. Co. v. Bearce,* 412 Mass. 442, 446-47 (1992). The SJC has clearly established that there is no general rule in Massachusetts preventing a party from validly contracting for exemption from liability for its own negligence. *Cormier v. Central Mass. Chapter of the Nat. Safety Council,* 416 Mass. 286, 288-89 (1993).

**\*3** In addressing the validity of a release in a contractual dispute, the Court has stated that "[a] party may, by agreement, allocate risk and exempt itself from liability that it might subsequently incur as a result of its own negligence." *Sharon v. City of Newton,* 437 Mass. 99, 105 (2002). The Court continued that pursuant to the laws of the Commonwealth, "in the absence of fraud a person may make a valid contract exempting himself from any liability to another which he may in the future incur as a result of his negligence or that of his agents or employees acting on his behalf." *Id.,* quoting *Schell v. Ford,* 270 F.2d 384, 386 (1st Cir.1959). "Whether such contracts be called releases, covenants not to sue, or indemnification agreements, they represent 'a practice our courts have long found acceptable.'" *Sharon,* 437 Mass. at 105, quoting *Minassian v. Ogden Suffolk Downs,* 400 Mass. 490, 493 (1987).

The Commonwealth has taken the approach that there is no reason to deny the enforcement of contracts which are arguably contracts of adhesion in the business context nor to designate them as unconscionable. *Minassian,* 400 Mass. at 492. Further, "[t]he allocation of risk by agreement is not contrary to public policy." *Id.* at 493. In the absence of duress or improper pressure, such a clause in a contract can merely represent "sensible business judgments." *Id.* [FN3]

> FN3. In a recent Superior Court decision in *Castagna Construction Corp. v. Town of Brookline,* No. 02-818A (Oct. 5, 2004), Judge Whitehead upheld an identical covenant not to sue and entered summary judgment for the architect. Barletta cites a previous Superior Court decision, *Stone/Congress v. The Town of Andover,* 1997 WL 11737 (Mass.Super.) (6 Mass. L.

Rptr. 330), issued by Judge Sikora, which denied a summary judgment motion because of the relation of the terms of the covenant not to sue with other provisions of the contract. Judge Whitehead acknowledged this holding in *Castagna,* but determined that the court had incorrectly emphasized the relation of the covenant to the other provisions and challenged the court's emphasis on the intent of the parties. *Castagna.* Judge Whitehead held that the general contractor actively sought out the contract by participating in the competitive bidding process, and thus it did not amount to a contract of adhesion. *Id.* Further, he stated that the covenant was not unenforceable on public policy grounds because the receipt of essential services was not involved, and that enforcing the covenant actually furthered important public policies in the Commonwealth. *Id.* This analysis is applicable here.

In this case, the terms of the covenant not to sue are clear and unambiguous, and should therefore be enforced. Flansburgh appropriately allocated the risk and exempted itself from suit by Barletta pursuant to the terms of the contract. There is no evidence that Flansburgh engaged in any fraudulent conduct or that Barletta was placed under duress in signing the contract. The inclusion of the covenant not to sue does not violate any public policy of the Commonwealth. Further, even if we were to accept Barletta's argument that the contract was a contract of adhesion, the covenant should still be enforced in such a business context. [FN4]

> FN4. Flansburgh argues that the economic loss doctrine bars Barletta's claims as an alternative basis for their motion for summary judgment. The court finds it unnecessary to address this argument based on the determination that the covenant not to sue is enforceable as to all of Barletta's claims against Flansburgh.

*ORDER*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                      Page 4

Not Reported in N.E.2d, 19 Mass.L.Rptr. 406, 2005 WL 1683869 (Mass.Super.)

**(Cite as: 2005 WL 1683869 (Mass.Super.))**

For the foregoing reasons, it is hereby *ORDERED* that Flansburgh Associates, Inc.'s motion for summary judgment to all of Barletta Engineering Corporation's claims against Flansburgh is *ALLOWED.*

Not Reported in N.E.2d, 19 Mass.L.Rptr. 406, 2005 WL 1683869 (Mass.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1

Not Reported in F.Supp.2d, 2002 WL 31194870 (D.Mass.), Prod.Liab.Rep. (CCH) P 16,429

**(Cite as: 2002 WL 31194870 (D.Mass.))**

**C**

**Motions, Pleadings and Filings**

United States District Court, D. Massachusetts.
W.R. CONSTRUCTION & CONSULTING, INC.
and Elizabeth F. Pratt, as she is Trustee
of the Powder House Real Estate Trust, Plaintiffs,
v.
JELD-WEN, INC., d/b/a/ Pozzi Window,
Defendant.
**No. Civ.A.01-10098-DPW.**

Sept. 20, 2002.

*MEMORANDUM AND ORDER*

WOODLOCK, J.

**\*1** Plaintiffs Elizabeth Pratt and W.R. Construction & Consulting, Inc. ("W.R.Construction") bring this action against defendant Jeld-Wen, Inc. ("Pozzi Window") to recover damages allegedly caused by defendant's defective windows and failure to repair or replace its defective product adequately. Plaintiffs allege four separate theories of liability--breach of contract, breach of warranty, common law negligence, and unfair and deceptive business practices under Massachusetts Ch. 93A. Defendant moves for summary judgment in its favor on all counts asserted by plaintiff W.R. Construction.

A. BACKGROUND
1. Parties

Plaintiff Elizabeth Pratt is a trustee of the Powder House Real Estate Trust. She, with her husband, Stuart Pratt, President of Hunneman Real Estate Corporation, reside with their children at 15 Tree Hill Road, in Essex, the home at issue in this litigation.

W.R. Construction is a privately held corporation located in Marblehead, Massachusetts, engaged in the business of land development, consulting, and construction. William Rice, Jr. is the principal, the sole shareholder and officer of W.R. Construction.

Jeld-Wen, Inc., is the parent company of Pozzi Windows. Pozzi Windows, with headquarters in Oregon, manufactures custom-designed windows and doors which are distributed through independent distributors. Pozzi Windows manufactured the windows at issue in this litigation.

2. Facts

W.R. Construction alleges the following version of events for purposes of summary judgment. In April 1997, Elizabeth Pratt and her husband Stuart Pratt contracted with W.R. Construction to oversee the construction of a new home on their property in Essex, Massachusetts. Under the terms of the Construction Management Agreement, W.R. Construction agreed to consult, source, and price the components of the design plans and to supervise the construction of the residence in exchange for payments totaling $55,000. The Pratts were responsible for all of the costs of construction.

In the course of the construction of the residence, W.R. Construction sought to purchase Pozzi windows, a brand known for high quality products and service. To this end, William Rice contacted Lynx Windows & Doors, a Massachusetts distributor of Pozzi windows with a showroom in Framingham. Over the course of months, Mr. Rice had numerous conversations and meetings with representatives of Lynx, Matthew Curley and John O'Keefe, to arrange for the manufacture, sale and delivery of specially designed Pozzi windows. Curley represented to W.R. Construction that he was trained by Pozzi to assist customers purchasing Pozzi windows, that he knew individuals at Pozzi's headquarters in Oregon personally, and that Pozzi

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 31194870 (D.Mass.), Prod.Liab.Rep. (CCH) P 16,429

**(Cite as: 2002 WL 31194870 (D.Mass.))**

Page 2

would warrant and service the windows. Curley told Rice that he would have to speak to Pozzi headquarters to determine whether Pozzi could manufacture the windows according to the architect's design, whether storm windows could be installed, and when delivery could take place. Curley received approval from Rod Clark, National Sales Manager of Pozzi windows, to sell the specific windows requested by W.R. Construction and explained to Rice that frame extenders would be required which Pozzi could provide. Curley also reported to Rice that non-Pozzi storm windows could be installed without voiding Pozzi's warranty.

*2 In November 1997, William Rice placed an order for Pozzi windows through John O'Keefe, an independent sales agent representing Lynx. The order included "windows and doors per enclosed Pozzi schedule", white aluminum Stergis brand storm windows, and "two inch extruded aluminum frame expanders." The total price for the order was $75,000, and two checks totaling that amount paid to the order of Lynx windows were drawn on the checking account of Hunneman Real Estate Corporation, Mr. Pratt's employer.

Delivery of the windows, originally scheduled for February 1998, occurred in several installments between February and June 1998. W.R. Construction began installation of the Pozzi windows in late spring and summer of 1998. Problems soon arose. Several of the windows cracked immediately. Mr. Rice contacted Mr. O'Keefe who told him that Lynx no longer represented Pozzi. Rice eventually contacted Dolly Raymond from Pozzi headquarters who sent a Pozzi representative, Mike Kuhn, to inspect and replace the cracked windows. Rice states that Kuhn assured him that the loss of Lynx as a distributor was not significant and that Pozzi would stand behind its product.

Later, Rice experienced difficulties opening the windows caused by defective window sashes. In spring 1999, Pozzi sent a mechanic, Scott Fletcher, to repair and replace the sashes, a project that required multiple visits and took approximately sixteen months to complete.

In late 1999, plaintiffs discovered that the windows leaked water during severe rain storms, causing water damage inside the house, including damage to approximately $2,000 of equipment belonging to W .R. Construction. Rice again notified Pozzi representatives who visited the home on several occasions but were unable to remedy the problem. In June 2000, Dudley Ruppel from Jeld-Wen was sent to examine the leaking windows. He initially promised to pay for W.R. Construction to repair the problem, but later told Rice that the problem lay in the frame expanders which Pozzi did not manufacture and were not covered by the limited warranty. Rice invested approximately 500 uncompensated hours trying to remedy the problems created by the defective windows and frame extenders.

## B. THE CLAIMS
### 1. Count I--Breach of Contract

A contract for the sale of goods is governed by Article 2 of the UCC. Mass. Gen. Laws ch. 106 § 2-102. The UCC defines goods as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale." Mass. Gen. Laws ch. 106, § 2-105. The sale of large components or systems to be installed in buildings are included within the scope of Article 2, notwithstanding the fact that they are eventually attached to realty, as long as they are movable at the time of identification. *See Cambridge Plating Co., Inc. v. NAPCO, Inc.,* 991 F.2d 21, 24 (1st Cir.1993) (commercial wastewater treatment system is a "good"). The windows, window extenders, and doors in question were movable at the time of identification and therefore their sale falls squarely within the scope of Article 2 of the UCC.

*3 Defendant contends that no contract existed between itself and defendant W.R. Construction. The seller, defendant urges, was Lynx Windows, not defendant, and the Pratts were the buyer. W.R. Construction contends that Pozzi's extensive involvement in the transaction made it a seller, or alternatively that Lynx was an agent of Pozzi, and Pozzi was thereby the party-seller. W.R. Construction further contends that it was actually a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                           Page 3

Not Reported in F.Supp.2d, 2002 WL 31194870 (D.Mass.), Prod.Liab.Rep. (CCH) P 16,429

**(Cite as: 2002 WL 31194870 (D.Mass.))**

party to the transaction, not merely an agent to a disclosed principal.

The U.C.C. provides straightforward, albeit not entirely helpful, definitions of buyer and seller. A buyer is one who "buys or contracts to buy goods"; a seller is one "who sells or contracts to sell goods." Mass. Gen. Laws ch. 106, § 2-105(1)(3). "A 'sale' consists in the passing of title from the seller to the buyer for a price." Mass. Gen. Laws ch. 106, § 2-106(1).

a. *Was Pozzi Windows a Seller?*

I turn first to the question of whether Pozzi was a party to the particular transaction involving plaintiffs. W.R. Construction appears to argue two separate theories as to why Pozzi Windows should be treated as a seller. First, it cites Pozzi's involvement throughout the history of the transaction as evidence that it, presumably in combination with Lynx, acted as seller. Specifically, W.R. Construction points to Pozzi's reservation of the right to approve the sale, its custom manufacture of the windows, its handling of repairs and warranty issues, and its receipt of payment from W.R. Construction for materials involved in the repair of leaking windows as evidence of its position as seller.

W.R. Construction does not offer a standard for determining when a manufacturer should be treated as a seller based on its level of involvement in the transaction. In the normal course of commerce, manufacturers sell their wares to retailers who in turn sell the goods to consumers. As described, two separate sales occur, the first between manufacturer and retailer, the second between retailer and consumer. In both transactions, title passes from the seller to the buyer, in exchange for a price. There is, however, neither a contract nor a sale between manufacturer and consumer. A manufacturer may warranty the product, may service a product under that warranty, may produce a product to certain specifications, or may engage in a subsequent transaction directly with the consumer. However, none of those occurrences changes the economic reality that Pozzi as the manufacturer sold the windows to Lynx who turned around and sold them

to the Pratts/W.R. Construction.

The evidence in the record generally supports a finding that Lynx was the seller in the transaction in question. The November 13, 1997 Order, the primary written sales contract, appears on a form bearing the name Lynx Window and Door, Inc. at the head. Attached to the order is a form titled "Terms and Conditions of Sale" that also bears Lynx's name, signed by Rice that lays out the conditions imposed on Lynx and the buyer without mention of any obligations, rights or duties on the part of Pozzi. Moreover, the critical elements of sale--payment and transfer of title--apparently took place between Lynx Windows and the buyer.

**\*4** The second theory, that Lynx was not an independent seller, but rather acted as an agent for Pozzi Windows, presents a more demanding issue. This argument is grounded in the laws of both agency and the UCC. Agency is the fiduciary relationship whereby one consents to act on behalf of--and subject to the control of--a principal. *See* Restatement (Second) of Agency, § 1(1) (1958); *Work-A-Day of Fitchburg, Inc. v. Commissioner,* 412 Mass 578, 580 (1992). Formation of a principal-agent relationship does not require a formal written agreement, so long as there is the requisite manifestation of consent by the parties that the agent be subject to the principal's control. Restatement (Second) of Agency, § 26. Whether one is acting as another's agent is a question of fact. *Pedersen v. Leahy,* 397 Mass. 689, 691 (1986).

In determining whether a distributor of goods qualifies as an independent seller or as an agent of the manufacturer, courts examine the intent of the parties and the facts and circumstances of the transaction. *Staco Energy Products Co. v. Driver-Harris Co.,* 578 F.Supp. 700, 702 (S.D.Ohio, 1983). Courts "have looked to, *inter alia,* the manufacturer's relationship with the agent/seller and ultimate consumer, which party(ies) have received compensation, possessed the goods, and effected the transfer of goods, and which party guaranteed the quality of the goods." *Id.* at 703.

In *Gaha v. Taylor-Johnson Dodge, Inc.,* 53

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 4

Not Reported in F.Supp.2d, 2002 WL 31194870 (D.Mass.), Prod.Liab.Rep. (CCH) P 16,429

**(Cite as: 2002 WL 31194870 (D.Mass.))**

Or.App. 471 (1981), the Oregon appellate court upheld a finding that the manufacturer of a motor home was the seller and the dealer was his agent, notwithstanding the fact that the contract of sale was between the plaintiff and the dealer. In support of an inference of agency, the court cited evidence that the customer had contacted the manufacturer directly to request a product built to his specifications and that the manufacturer, due to heavy demand, had arranged for the dealer to install equipment on its behalf. *Id.* at 476.

The record before me includes sufficient evidence to raise a material issue of fact as to whether Lynx was acting as an agent of Pozzi Windows. Starting with the parties' intent, W.R. Construction originally approached Lynx in order to purchase Pozzi windows. Mr. Pratt and Rice made clear that they were interested in Pozzi windows, rather than other brands carried by Lynx. Similarly, Lynx presented itself to customers as a Pozzi distributor, featuring Pozzi's insignia on its order form. Lynx employed Curley as a Pozzi-trained expert who would work directly with the manufacturer to facilitate the sale of custom-made Pozzi windows. Lynx also represented that Pozzi would be involved throughout the transaction, from approving the design through providing all service and warranty coverage for the windows.

Several factors identified in *Staco Energy Products* support treating Pozzi as a seller and Lynx as its agent. First, Pozzi was closely involved in the process leading up to the sale of the windows, and had repeated contact with the consumer. Since Pozzi windows are custom made, distributors such as Lynx do not stock standard products. Instead, the customer's proposed window design must be approved by Pozzi headquarters. This process was mediated by Curley who regularly dealt directly with Pozzi headquarters on orders. On several different occasions Curley was required to consult Pozzi headquarters to ensure that the Pratts' windows could be manufactured to design and to address concerns regarding delivery dates, compatibility with storm windows and warranties. Second, Pozzi warrantied the windows and provided service when problems appeared. In the

terms of sale, Lynx's limited warranty consists solely of supplying copies of the Manufacturer's warranty to the buyer after completion of payment.

**\*5** To be sure, other factors, though less clear from the record, appear to favor treating Lynx as an independent seller. First, the total price for the order was apparently set by Lynx and covered the Pozzi products as well as the non-Pozzi storm windows and extenders. The payment was made directly to Lynx, and the record does not reveal how this total price was set nor how much of the total amount Pozzi received. Second, the terms and conditions form indicates that Lynx was responsible for delivering the product to the buyer, and therefore that Lynx possessed the goods prior to delivery and effected the transfer of the goods to the buyer.

W.R. Construction presents limited evidence of Pozzi's control over Lynx. Its chief argument is that Pozzi exhibited control over the transaction through Curley and the approval process leading up to the transaction. Curley, though apparently a Lynx employee, was trained by Pozzi Windows to handle Pozzi sales on the distributors' end. Curley testified that no sale of Pozzi windows could occur without approval by Pozzi headquarters. There were additional matters specific to this transaction that had to be brought directly to Pozzi through Curley. The fact that Curley began to work for Horner Millwork when Lynx ceased to be a Pozzi distributor supports the argument that Curley served as an agent for Pozzi at the site of its distributors. While plaintiff's evidence in favor of agency is by no means conclusive, it is sufficient to raise a genuine issue of fact on summary judgment.

b. *Was W.R. Construction a Party to the Contract?*

Pozzi argues that W.R. Construction cannot recover for breach of contract because it was merely an agent for a disclosed principal, the Pratts, and therefore not an independent party to the sale. W.R. Construction contends that as an agent to an undisclosed principal it was a party to the contract.

An agent acts on behalf of a disclosed principal if, at the time of a transaction, the other party knows

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 5

Not Reported in F.Supp.2d, 2002 WL 31194870 (D.Mass.), Prod.Liab.Rep. (CCH) P 16,429

**(Cite as: 2002 WL 31194870 (D.Mass.))**

that the agent is acting on behalf of the principal and knows the principal's identity. *See* Restatement (Second) of Agency, § 4(1). Absent an agreement to the contrary, an agent for a disclosed principal does not become a party to a contract that it enters into on behalf of the principal within the scope of agency. *Colonial Securities Inc. v. Merrill Lynch, Inc.,* 461 F.Supp. 1159, 1165 (S.D.N.Y.1978) (citing Restatement (Second) of Agency §§ 363, 372 (1958)). However, if the other party to the contract has no notice that the agent is acting for a principal, the agent is said to act for an undisclosed principal. Restatement (Second) of Agency, § 4(3). An agent of an undisclosed principal is a party to the contract it enters into on behalf of the principal and therefore can be held liable to the third party. Restatement (Second) of Agency, § 322. And an agent who makes a contract on behalf of an undisclosed principal may also maintain an action for breach in his own name against the other party. *See Buffington v. McNally,* 192 Mass. 198, 202 (1906).

*6 W.R. Construction contends that it did not contract to purchase the windows on behalf of a disclosed principal. Though Lynx was aware that the windows were to be used in the Pratt's house, plaintiff contends, it was never told that W.R. Construction was contracting as the Pratt's agent. *Cf. Atlantic Salmon A/S v. Curran,* 32 Mass.App.Ct. 488, 492 (1992) ("It is the duty of the agent, if he would avoid personal liability on a contract entered into by him on behalf of his principal, to disclose not only that he is acting in a representational capacity, but also the identity of his principal.").

W.R. Construction offers barely sufficient evidence to raise a genuine issue of material fact as to whether, at the time of the contract, Lynx, which was at a minimum an agent of Pozzi, was notified of the fact that W.R. Construction was contracting as the Pratts' agent. The contract of sale contains only Rice's signature, though the signature line indicates that the person is either the buyer or the buyer's agent. The order does indicate that the windows are for the Pratt residence and Mr. Pratt attended at least one of the meetings at the Lynx showroom. However, Rice never informed anyone at Lynx or

Pozzi of the nature of his contractual relationship with the Pratts. Under the circumstances, I find that there exists a genuine issue as to whether W.R. Construction was an agent of a disclosed principal.

Accordingly, for purposes of summary judgment, having found that there are genuine issues of material fact regarding who was a party to the contract, I will deny defendant's motion for summary judgment on Count I.

2. Count II--Breach of Warranty

Pozzi contends that W.R. Construction cannot recover for its economic losses under its breach of warranty claim because there is no privity of contract between W.R. Construction and Pozzi. Having found above that there exists a genuine issue of material fact as to the existence of a contract between the parties, Pozzi's principal argument fails for purposes of summary judgment. However, for purposes of guidance in trial preparation, I will consider W.R. Construction's other contentions, assuming *arguendo* that no privity of contract is established between W.R. Construction and Pozzi. [FN1]

> FN1. For this reason, *Matsushita Electric Corp. of America v. Sonus Corp.,* 362 Mass. 246 (1972) and *Delano Growers' Cooperative Winery v. Supreme Wine Co., Inc.,* 393 Mass. 666 (1985), which the plaintiff referenced in a post-hearing memorandum, are inapposite. The plaintiff is correct that these cases allow for the recovery of economic losses stemming from the breach of an express warranty, *Matsushita,* or an implied warranty, *Delano.* Nonetheless, *Matsushita* and *Delano* are inapplicable here because the parties in both cases were in privity of contract.

Massachusetts law recognizes two different breach of warranty theories--one that derives from contract law, the other from strict liability in tort. An action that seeks only recovery of economic loss is grounded in contract law, whereas an action for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 6

Not Reported in F.Supp.2d, 2002 WL 31194870 (D.Mass.), Prod.Liab.Rep. (CCH) P 16,429

**(Cite as: 2002 WL 31194870 (D.Mass.))**

personal injuries caused by a defective product proceeds in tort. *Bay State Spray & Provincetown Steamship, Inc. v. Caterpillar Tractor, Co.,* 404 Mass. 103, 107 (1989); *Sebago Inc. v. Beazer East, Inc.,* 18 F.Supp.2d 70, 98 (D.Mass.1998). Economic loss refers to "damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits without any claim of personal injury or damage to other property." *Marcil v. John Deere Indus. Equip. Co.,* 9 Mass.App.Ct. 625, 630 n. 3 (1980) (quoting *Alfred N. Koplin & Co. v. Chrysler Corp.,* 49 Ill.App.3d 194, 199 (1977)).

*7 Section 2-318 of the Massachusetts UCC eliminates lack of privity of contract as a defense to breach of warranty claims under certain conditions. [FN2] Interpretation of § 2-318 has evolved since it was amended to eliminate privity of contract in 1971. *See Sebago,* 18 F.Supp.2d at 97-99. The Massachusetts Supreme Judicial Court ("SJC") in 1989 held in *Bay State-Spray* that § 2-318 applied only to tort-based actions. *Id.* at 98. However, in 1995, the SJC extended the scope of § 2-318 to cover contract-based breach of warranty actions involving buyers of consumer goods. *See Jacobs v. Yamaha Motor Corp.,* 420 Mass. 323, 330-31 (1995); *Sebago,* 18 F.Supp.2d at 98. *Jacobs* limited its holding to consumer transactions, noting that "contract based warranty claims involving *commercial transactions* may generally call for different treatment than tort-based warranty claims." *Jacobs,* 420 Mass. at 330. Thus, it appears a contract-based breach of warranty claim involving a commercial transaction still requires privity of contract. [FN3]

> FN2. Mass. Gen. Laws ch. 106, § 2-318 states in relevant part: "Lack of privity between plaintiff and defendant shall be no defense in any action brought against the manufacturer, seller, lessor or supplier of goods to recover damages for breach of warranty, express or implied, or for negligence, although the plaintiff did not purchase the goods from the defendant if the plaintiff was a person whom the manufacturer, seller, lessor or supplier

might reasonably have expected to use, consume or be affected by the goods. The manufacturer, seller, lessor or supplier may not exclude or limit the operation of this section."

> FN3. W.R. Construction urges extension of § 2-318 to completely eliminate the privity requirement for all breach of warranty claims. Through the early 1980s, the Massachusetts courts appeared to treat § 2-318 as covering all breach of warranty claims. *See Sebago,* 18 F.Supp.2d at 98. However, as Judge Wolf demonstrated in *Sebago,* later decisions by the SJC and the federal courts brought Massachusetts law in line with other states with respect to privity of contract by restricting its application as a defense solely concerned with economic damages involving commercial entities. *Id.; Bay State-Spray,* 404 Mass. at 107. Although *Jacobs* once again expanded the reach of § 2-318 to allow recovery of purely economic loss, its holding was premised on the "special legislative treatment" given to buyers of consumer goods by § 2-316A and § 2- 318 . 420 Mass. at 330-331. Commercial transactions receive different treatment so as not to interfere with the distribution of risks reached by commercial entities in their dealings with one another. *See Bay State-Spray,* 404 Mass at 109.

W.R. Construction contends that its breach of warranty claim sounds in tort rather than contract because it alleges $2,000 in damage to its property and equipment located in the Pratts home. There is no question that the vast majority of W.R. Construction's loss is due not to property damage suffered, but rather from the time spent repairing the defective product, which involves classic economic loss. The question is whether a nominal amount of damages is sufficient for a breach of warranty claim to sound in tort.

The distinction between contract- and tort-based warranty claims rests on the presence or absence of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 31194870 (D.Mass.), Prod.Liab.Rep. (CCH) P 16,429

**(Cite as: 2002 WL 31194870 (D.Mass.))**

personal injury or property damage. *See Sebago,* 18 F.Supp.2d at 89-90; *Berish v. Bornstein,* 437 Mass. 252, 267 (2002); *Bay State-Spray,* 404 Mass. at 107 . "[T]he economic loss doctrine, which forms the basis for the breach of warranty classifications, draws the distinction between the situation where the injury suffered is merely the 'failure of the product to function properly,' and the situation, traditionally within the purview of tort law, where the plaintiff has been exposed, through a hazardous product, to an unreasonable risk of injury to his person or property." *Sebago,* 18 F.Supp.2d at 89-90 (quoting *East River Steamship Corp. v. Transamerica Delaval,* 476 U.S. 858, 868 (1986)). The purpose of the doctrine is to preserve the "respective societal goals" of contract and tort law. *Rich Products Corp. v. Kemutec, Inc.,* 66 F.Supp.2d 937, 968 (E.D.Wis.1999). In contract law, society "seeks to divine and enforce" the justifiable expectations of the parties as determined from the language of their contract," whereas in tort law "the overriding concern is to provide a level of compensation" for victims of "unreasonable dangers" sufficient to make the victim whole and to discourage "the development of harmful products and conduct." *Id.* at 968-69.

**\*8** Thus, under the economic loss doctrine, a plaintiff may not seek to redress economic loss in tort on account of "minimal" property damage or personal injury. *Id.* at 968-69 (citing *Miller v. United States Steel Corp.,* 902 F.2d 573, 576 (7th Cir.1990)). Rather, whether such a tort-based claim may be brought depends on "a direct and continuous causal chain" between the property damage and the economic loss. *Queen City Terminals, Inc. v. General American Transportation,* 73 Ohio St.3d 609, 615-16 (1995) (holding that "in order to recover indirect economic damages in a negligence action, the plaintiff must prove that the indirect economic damages arose from tangible physical injury to persons or from tangible property damage"); *see Icelandic Coast Guard v. United Technologies Corp.,* 722 F.Supp. 942 (D.Conn.1989) (recovery in tort for economic losses permitted where losses were "attributable to and are inextricably tied to" injuries).

In *Berish v. Bornstein,* the SJC held that the economic loss doctrine did not bar suit to recover "the *substantial* expense" plaintiffs would incur in correcting alleged "defects and deficiencies" in the construction of a condominium development. *Id.* at 267-68 (emphasis supplied). The court found that a negligence action could be brought because the "defects and deficiencies," which included "poor construction of retaining walls, improper installation of sky lights" and "improper construction of foundations," caused property damage "beyond the defects" in the condominium units. *Id.* at 268. Importantly, in *Berish,* the plaintiffs sought damages for economic losses that would be incurred in "correcting" the property damage. Thus, there was a causal connection between the damage and the resulting economic loss.

In the present case, there is no sufficient causal connection between the damage to the property of W.R. Construction and its economic loss. The damage to the approximately $2,000 worth of W.R. Construction's equipment did not cause W.R. Construction's uncompensated efforts. As a result, plaintiff may not bring a tort-based action for breach of warranty under § 2-318 of the Massachusetts UCC.

Alternatively, W.R. Construction contends that the property damage suffered by the Pratts should suffice to make W.R. Construction's claim tort-based as well. I do not find this proposition compelling. W.R. Construction and the Pratts are separate interests seeking distinct damages. Plaintiff provides no authority for allowing one plaintiff to proceed in tort strict-liability based solely on property damage suffered by a co-plaintiff.

W.R. Construction also contends that, as a buyer of consumer goods, it can bring suit against Pozzi for its economic losses under a contract-based breach of warranty theory. [FN4] *See Jacobs,* 420 Mass. at 330-31; *see also Sebago,* 18 F.Supp.2d at 99 (noting that "[t]he *Jacobs* decision has been read as creating an exception to the requirement of privity in suits against remote manufacturers only for plaintiffs who purchase consumer goods"). W.R. Construction argues that the definition of consumer

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 8

Not Reported in F.Supp.2d, 2002 WL 31194870 (D.Mass.), Prod.Liab.Rep. (CCH) P 16,429

**(Cite as: 2002 WL 31194870 (D.Mass.))**

goods looks to the ultimate use of the product rather than the use to which the particular party puts it. It contends that the windows are consumer goods because they are ultimately used for a household purpose.

> FN4. Here I assume *arguendo* that W.R. Construction is a buyer, but that Pozzi is merely the manufacturer, not the seller, and therefore there is no privity of contract.

**\*9** Consumer goods are defined by statute in Mass. Gen. Laws ch. 106, § 9-109 as those goods "used or bought for use primarily for personal, family or household purposes." *Sebago,* 18 F.Supp.2d at 99. The term "consumer goods" has been held to include a variety of products installed as part of the structure of a home when purchased by the consumer. *See, e.g., Reynolds v. Preferred Mutual Ins. Co.,* 49 Mass.App. Dec. 97 (1972) (installation of gutters is "consumer goods"); *R. Bauer & Sons Roofing v. Kinderman,* 613 N.E.2d 1083, 1089 (Ohio App.2d District, 1992) (consumer goods includes "roofing material, replacement windows and doors, aluminum siding and the like"). Residential windows to be installed in a home are no different from gutters, roofing material or other components of a home, and therefore constitute consumer goods when purchased by the homeowner.

In this case, W.R. Construction was acting for contract purposes as the agent, whether disclosed or undisclosed, of the Pratts when it purchased the residential windows to be installed in the Pratts' home. Although it did not purchase the windows for its own personal, family or household use, W.R. Construction purchased the windows on behalf of and under control of the Pratts for installation in their home. The instant case does not involve a situation in which a home builder or contractor purchased the windows for resale to a homeowner. Nor is it a situation where a large supply of windows were purchased for use in a number of different homes to be built by a contractor. In this case, W.R. Construction acted as the Pratts' agent in purchasing these custom windows for the exclusive use in the Pratts' home. Thus, the windows are consumer, not commercial goods, within the

meaning of Massachusetts law. Of course, the damages recoverable on this theory are merely coincident with those which the Pratt's may recover. W.R. Construction has no separate or additional damage as a result of contract-based warranty claims.

In conclusion, plaintiff W.R. Construction has presented issues of fact such that it may be able to recover for a contractual breach of warranty claim under § 2-318. Accordingly, I will allow defendants motion for summary judgment on Count II only as to tort-based warranty claims by W.R. Construction.

3. Count III--Negligence

Defendant contends that W.R. Construction's negligence count is also barred by the economic loss doctrine. The economic loss doctrine bars recovery of economic losses in negligence actions absent personal injury or damage to property other than the product itself. *Berish v. Bornstein,* 437 Mass. at 267 (2002); *Sebago,* 18 F.Supp.2d at 89; *FMR Corp. v. Boston Edison Co.,* 415 Mass. 393 (1993).

Having found in Section B.2, *supra,* that the economic loss doctrine bars recovery for plaintiff's tort based warranty economic losses, I will grant summary judgment on the tort of negligence count as well, to the extent that economic loss damages are sought in addition to property damages.

4. Count IV--Massachusetts General Laws Ch. 93A

**\*10** Plaintiff contends that defendant's conduct, including its repeated failure to abide by its service guarantees and warranty, constituted an unfair commercial practice under Massachusetts General laws ch. 93A.

Defendant again turns to the economic loss rule, at this point, to contest recovery under Chapter 93A. In *Canal Elec. Co. v. Westinghouse Elec. Corp.,* 973 F.2d at 988, 998 (1st Cir.1992), the economic loss doctrine barred the 93A claims of third party plaintiffs who were customers of the plaintiff power company, Canal Electric Co., and suffered

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                     Page 9

Not Reported in F.Supp.2d, 2002 WL 31194870 (D.Mass.), Prod.Liab.Rep. (CCH) P 16,429

**(Cite as: 2002 WL 31194870 (D.Mass.))**

economic loss--extra costs and lost profits--caused by defendant's negligent failure to repair Canal's turbine properly. The First Circuit noted that the third party plaintiff's theory of recovery flowed either from tort or contract law. The Court reasoned that the economic loss doctrine was equally applicable to ch. 93A, citing the potentially enormous liability if any third party adversely affected by negligent activity were allowed to collect for resulting damages based on economic loss. *Id.* at 999. Similarly, as discussed in Section B.2, *supra,* I hold that the plaintiff cannot recover for its economic loss to the extent that the doctrine applies to Chapter 93A.

That the plaintiff cannot recover under Chapter 93A on the basis of tort law does not completely foreclose a Chapter 93A action. For example, in *Jacobs,* the SJC stated that, if the defendant manufacturer "properly may be held liable for a breach of an implied warranty of merchantability, the circumstances clearly justify the judge's finding of a violation of G.L. c. 93A and his determination of damages." *Id.* at 327. The court then concluded that a manufacturer of consumer goods "may be held liable to a consumer-buyer" for breach of the implied warranty of merchantability. *Jacobs,* 420 Mass. at 327. Furthermore, "a practice or act is unfair within the meaning of ch. 93A if it is 'within the penumbra of a common law, statutory or other established concept of unfairness." ' *Sebago,* 18 F.Supp.2d at 104 (quoting *Heller Financial v. Ins. Co. of North America,* 410 Mass. 400, 408 (1991)). Given the fact that I have denied defendant's motion for summary judgment on the contract based claims in Counts I and II, I will deny defendant's motion for summary judgment on this count as well.

## CONCLUSION

For the reasons set forth more fully above, I hereby DENY the defendant's motion for summary judgment except to the extent that I conclude the plaintiff W.R. Construction may not recover economic loss damages under Counts II, III, and IV.

Not Reported in F.Supp.2d, 2002 WL 31194870 (D.Mass.), Prod.Liab.Rep. (CCH) P 16,429

**Motions, Pleadings and Filings (Back to top)**

• 1:01cv10098 (Docket) (Jan. 18, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.