UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TRANS-SPEC TRUCK SERVICE INC.,<br>D/B/A TRUCK SERVICE<br><br>                        Plaintiff,<br>v.<br><br>CATERPILLAR INC.<br><br>                        Defendant. | CIVIL ACTION NO.:04-11836RCL |

**TRANS-SPEC TRUCK SERVICE INC.'S OPPOSITION TO CATERPILLAR INC.'S MOTION FOR SUMMARY JUDGMENT ON ALL REMAINING CLAIMS AND REQUEST FOR ORAL ARGUMENT**

Plaintiff Trans-Spec Truck Service Inc., d/b/a Truck Service ("Trans-Spec"), hereby opposes Caterpillar Inc.'s ("Caterpillar") Motion for Summary Judgment on All Remaining Claims ("Motion for Summary Judgment"), for the reasons discussed below.

**I.    BACKGROUND**

**A.    Factual History**

In December 1999 and January 2000, Trans-Spec took delivery of twenty-two heavy-duty, custom built trucks to be used by Trans-Spec in its oil delivery service and dump trailer operations. Caterpillar's Statement of Undisputed [sic] Material Facts, ¶¶ 3, 5. Caterpillar's C-12 engine was an appropriate engine for fuel hauler and dump trailer operations in the New England area where Trans-Spec operates its trucks. Caterpillar Rule 30(b)(6) Deposition, September 21, 2005 ("Caterpillar depo. Day 1"), 134.12-15, attached as Ex. A.[1] Caterpillar C-12 engines powered all twenty-two of Trans-Spec's new trucks. Caterpillar's Statement of Undisputed [sic] Material Facts, ¶¶ 3, 5.

Caterpillar orally waived exclusions of express or implied warranties or negligence on multiple occasions. Trans-Spec's Amended Answer to Interrogatory No. 10, 11, attached as Ex. B; Joseph M. Howard, Jr. Deposition, 66.16-70.16; 109.15-111.19, attached as Ex. C; Albert

---

[1] All exhibits are attached to *Appendix Of Exhibits To Trans-Spec Truck Service, Inc.'s Opposition To Caterpillar Inc.'s Motion For Summary Judgment And Affidavit Of Christian G. Samito, Esq.*, filed herewith.

Cardoza Deposition, 49.4-51.15, attached as Ex. D; Ralph A. Lind, Jr. Deposition, 66.1-67.4, 122.23-125.14, attached as Ex. E; Harry Calderbank Deposition, 37.11-38.23, attached as Ex. F; Donald Medbery Deposition, 29.21-36.19; 38.4-24; 41.15-24, attached as Ex. G. Around the time Trans-Spec contemplated what types of engines to purchase, two employees of Caterpillar's agent and local distributor, Albert Cardoza ("Cardoza") and Harry Calderbank ("Calderbank"), repeatedly met with Trans-Spec personnel to make representations regarding the capabilities of the C-12 engine and warranties associated with it as well as to show Trans-Spec computer simulations, on Caterpillar software, that the C-12 was appropriate for its trucks. *Id.* Not only did Cardoza and Calderbank participate frequently in the determination of the trucks' configuration, a regional Caterpillar representative based out of Caterpillar's Hartford, Connecticut office also made representations regarding the capabilities of and warranties associated with the C-12 engine. Medbery depo., 29.21-36.19; 38.4-24; 41.15-24, Ex. G.

As part of its purchase, at or around the time of delivery, Trans-Spec received from Caterpillar an extended warranty "against defects in materials or workmanship under normal use" for five years or 500,000 miles, according to the terms and conditions as specified on the back of the Registration Certificate attached as Ex. H. Caterpillar also agreed in writing to reimburse Trans-Spec for any "failures due to defects in materials or workmanship under normal use" and to "pay 100% of the components and labor charges for covered failures, with no deductible charges," for a period of five years/500,000 miles, see Ex. H. Thus, Caterpillar offered Trans-Spec a warranty that its engines would be free from "defects in materials or workmanship under normal use" during a five year period and represented that if any defects in materials or workmanship arose during that specified time, Caterpillar would pay for the necessary repairs. See Ex. H.

As part of its purchase, at or around the time of delivery, Trans-Spec also received a concurrent two year warranty, attached as Ex. I, pursuant to which "Caterpillar Inc. or any of its subsidiaries ('Caterpillar') warrants new . . . C-12 . . . engines sold by it for use in powering on-

highway vehicles . . . to be free from defects in material and workmanship" for "24 months after date of delivery to the first user."[2]

According to Caterpillar's records and those of one of its authorized dealers, Minuteman Trucks, Inc., the first of many flywheel housing problems Trans-Spec suffered manifested itself in November 2001. See Repair Records attached as Exhibit J. At first, Caterpillar paid for the corresponding work performed on the engines in connection with the flywheel housing failures pursuant to the five year/500,000 mile warranty and the two year warranty at Exhibits H and I. Caterpillar Statement of Undisputed [sic] Material Facts, ¶ 10 (first phrase; the remainder of this paragraph is denied).[3] The Registration Certificate attached as Ex. H provides reimbursement for covered components' failures "due to defects in Caterpillar materials or workmanship under normal use."; see also Ex. I ("Caterpillar Inc. or any of its subsidiaries ('Caterpillar') warrants new . . . C-12 . . . engines sold by it for use in powering on-highway vehicles . . . to be free from defects in material and workmanship" for "24 months after date of delivery to the first user" and explaining that Caterpillar would "correct the defect" "[i]f a defect in materials or workmanship is found during the *standard warranty* period[.]" (emphasis in original)). Thus, by authorizing repair and replacement for Trans Spec's initial flywheel housing problems, Caterpillar admitted: a) defects in Caterpillar materials or workmanship caused the failures[4]; b) Trans-Spec operated the trucks within normal parameters; and, c) the two year and five year/500,000 mile warranties on defects in materials of workmanship on Trans Spec's engines applied. See also Caterpillar

---

[2] In describing the five year/500,000 mile warranty in the text of the two year warranty, Caterpillar states that "parts are warranted against defects in material and workmanship for 60 months or 500,000 miles . . . whichever occurs first after date of delivery to the first user." Ex. I. This indicates that the five year/500,000 mile warranty is more than simply a "repair or replace" warranty but one that warrants against defects in material or workmanship for five years or 500,000 miles. As noted by Caterpillar in Paragraph 7 of its Statement of Undisputed [sic] Material Facts, two versions of the two year warranty exist, one applicable to engines delivered before January 1, 2000 and one applicable to engines delivered on or after that date. As Caterpillar also notes, the relevant language is identical in each.
[3] The Affidavit of Clarissa Colmer at Exhibit D to Caterpillar's Appendix of Exhibits appears to be erroneous; Ms. Colmer claims that all of the initial repairs were performed under the two year warranty at Exhibit I. Due to the continuing nature of Trans-Spec's engine problems, several repairs were done pursuant to the five year warranty at Exhibit H after the two year warranty expired.
[4] See also Caterpillar Depo. Day 2, 76.12-14, Ex. K: "The decision to reimburse is based upon whether or not the failure is the result of a defect in CAT material or workmanship."

depo. Day 1, 207.3-208.18, Ex. A. In choosing to continually replace one defective part on Trans-Spec's engines with a part containing the same defects, and not immediately and effectively rectifying the defect on all twenty two of Trans-Spec's engines, Caterpillar repeatedly breached both the two year and the five year/500,000 mile warranties and negligently failed to perform pursuant to either. Caterpillar failed "to correct the defect," as mandated by the two year warranty at Ex. I or "repair" the failures as called for in the five year/500,000 mile warranty at Ex. H.

Beginning in 2003, moreover, Caterpillar openly breached its five year/500,000 mile warranty by refusing to further reimburse for work performed on the flywheel housings on the engines in Trans-Spec's trucks. Caterpillar Rule 30(b)(6) Deposition, September 22, 2005 ("Caterpillar depo. Day 2"), 14.4-9, attached as Ex. K; see also Caterpillar depo. Day 1, 207.3-208.18, Ex. A. The Caterpillar employees who stopped reimbursement for Trans-Spec's flywheel housing failures did not consult with any engineers to confirm whether defective Caterpillar materials or workmanship caused Trans-Spec's problems prior to making their decision, nor did they consult with Caterpillar's Warranty Administration Department. Caterpillar depo. Day 2, 52.7-60.23, 68.15-23, Ex. K. To this day, Caterpillar does not offer a permanent, reliable fix for these problems. Caterpillar depo Day 1, 170.1-175.13, Ex. A.

Trans-Spec's expert, Dr. Ekchian, concluded *inter alia* that: 1) Caterpillar knew the aluminum flywheel housings used in its C-12 engines were flawed; 2) the design of the flywheel housings rendered the Caterpillar C-12 engine model defective; 3) Caterpillar had no basis for rejecting Trans-Spec's warranty claims; and, 4) Caterpillar was aware of alternatives to fix the defect including use of cast iron flywheel housings, a flywheel housing disclosed in a Caterpillar patent application dated in July 1998 (prior to Trans-Spec's purchase of the trucks), or the use of a metal plate under bolt heads as suggested in a Caterpillar document. See Dr. Ekchian Report (without exhibits) attached as Ex. L.

Patent Number 6,065,757, attached as Exhibit M and filed by Caterpillar on July 2, 1998 – a year and a half before Trans-Spec took delivery of the trucks – notes that in aluminum

4

flywheel housings such as the ones on Trans-Spec's engines, "[d]uring normal operation of an engine, cyclic temperature changes can cause thermal expansion and contraction of various components at varying rates.  The use of components made of different materials adds to the relative movement between components.  For example, the flywheel housing experiences thermal expansion greater than the thermal expansion of a cylinder block causing relative movement between the flywheel housing and the cylinder block.  The relative movement . . . **can cause the flywheel housing** or seal to leak, **crack or can destroy connecting bolts used for connecting the flywheel housing to the cylinder block**." (emphasis added)  This is precisely what happened on the C-12 engines in Trans-Spec's trucks.

Trans-Spec's second expert, Dr. Service, concluded *inter alia* that the flywheel housing and the bolted connection between the housing and the engine block revealed inherent design defects including overstressing of the flywheel housings under normal operating conditions and an under-designed bolted connection resulting from improper joint design.  These defects, according to Dr. Service, could be remedied by proper engineering design and analysis.  See Dr. Service Report (without exhibits) attached as Ex. N.

Caterpillar repeatedly assured Trans-Spec that Caterpillar would compensate it for the damages it suffered in connection with the flywheel house failures.  Affidavit of Joseph M. Howard dated June 2005, ¶ 3, attached as Ex. O; see also Ex. B.  Soon after the flywheel housings began to fail in late 2001, Cardoza and Calderbank repeatedly told Trans-Spec that it would be made whole for the damage it suffered as a result of the defective C-12 engines.  Trans-Spec's Amended Answer to Interrogatory No. 10, No. 11, Ex. B.  In June 2004, officers of Trans-Spec attended a meeting to address the defective engines.  Howard depo., 231.14-23, Ex. C.  This meeting included, among others, Caterpillar's Truck Engine District Manager for the New England region, Troy Guidotti ("Guidotti").  Howard depo, 231.14-23; 233.18-234.6, Ex. C.  During this meeting, Guidotti told Trans-Spec that "Caterpillar will make you whole," and assured that the problems with the C-12 engines were not Trans-Spec's fault.  Howard depo., 238.14-239.15, Ex. C; Trans-Spec's Amended Answer to Interrogatory No. 10, No. 11, Ex. B.  In

August 2004, officers of Trans-Spec again attended a meeting. Howard depo., 247.18-248.2, Ex. C. Along with Guidotti, Caterpillar Regional Manager Stephen Schoening ("Schoening"), attended and explicitly stated, "this is absolutely not your [Trans-Spec's] fault and Caterpillar will make you whole." Howard depo., 250.13-19, Ex. C.

In sum, Caterpillar sold Trans-Spec engines it knew or should have known to be defective; provided warranties on those engines, including warranties against defects in materials or workmanship for two years and for five years/500,000 miles; authorized initial repairs that made it appear to Trans-Spec as if Caterpillar had honored its two year and five year/500,000 mile warranties as to Trans-Spec's flywheel housing failures; and, disclaimed the warranties which failed of their essential purpose.

### B.     Procedural History

Trans-Spec brought this suit against Caterpillar on August 23, 2004 alleging breach of warranty and violation of Mass. Gen. Laws c. 93A ("Chapter 93A"). Trans-Spec amended its Complaint on August 26, 2004 so as to correct a clerical mistake in naming one of the parties. Trans-Spec subsequently sought leave from the Court to amend its Complaint to assert a claim of negligence; the Court granted leave to do so on May 20, 2005.

On January 31, 2006, Magistrate Judge Joyce London Alexander submitted her Report and Recommendations regarding Caterpillar's *Motion to Dismiss the Second Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6)*. The Magistrate Judge recommended dismissing Counts I and II of the Second Amended Complaint, regarding Caterpillar's breach of warranty and violation of Chapter 93A, on statute of limitation grounds. On February 9, 2006, Trans-Spec filed its Objection to the Magistrate Judge's Report and Recommendations. In this Objection, Trans-Spec sought leave to amend its Complaint. On February 22, 2006, Caterpillar filed its Reply to Trans-Spec's Objection. On February 23, 2006, Judge Reginald C. Lindsay adopted the Magistrate Judge's Report and Recommendations and dismissed Counts I and II of the Second Amended Complaint. The District Court did not address the Motion to Amend contained in

Trans-Spec's Objection. Accordingly, Trans-Spec moved on March 1, 2006 for leave to amend its Complaint. This Motion to Amend is still pending.

## II. ARGUMENT

### A. Caterpillar Fails to Meet its Summary Judgment Burden and Improperly Raises Issues Appropriate for the Jury

"A party moving for summary judgment assumes the burden of affirmatively demonstrating that there is no genuine issue of fact on every relevant issue raised by the pleadings. This is so even though, as a defendant, he would have no burden if the case were to go to trial." *Mack v. Cape Elizabeth School Bd.*, 553 F.2d 720, 722 (1st Cir. 1977). As evidenced by Trans-Spec's Response to Caterpillar's Statement of Undisputed [sic] Material Facts as well as Trans-Spec's Statement of Supplemental Facts, Caterpillar has failed to meet its burden.

Moreover, a substantial portion of Caterpillar's argument is fact-sensitive. Throughout its Motion for Summary Judgment, and particularly at paragraphs 11, 12, 22, 23, 24, and 25 of its Statement of Undisputed [sic] Material Facts, Caterpillar argues for inferences as to the lack of credibility or lack of accuracy of firsthand knowledge held by Trans-Spec. Credibility or assertions as to lack of credibility are not a basis for summary judgment. Instead, in a motion for summary judgment, the Court must review "the entire record 'in the light most flattering to the nonmovant and indulge[] all reasonable inferences in that party's favor." *Cadle Company v. Hayes*, 116 F.3d 957, 959 (1st Cir. 1997); *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 581 (1st Cir. 1994). "Only if the record, viewed in that manner **and without regard to credibility determinations**, reveals no genuine issue as to any material fact may the court enter summary judgment." *Cadle Company*, 116 F.3d at 959 (emphasis added); *Greenburg v. Puerto Rico Maritime Shipping Auth.*, 835 F. 2d 932, 936 (1st Cir. 1987). As the *Greenburg* court held,

> Fed. R. Civ. P. 56 does not ask which party's evidence is more plentiful, or better credentialled, or stronger. Rather, the rule contemplates an abecedarian, almost one dimensional, exercise geared to determining whether the nonmovant's most favorable evidence and the most flattering inferences which can reasonably be drawn therefrom are sufficient to create any authentic question of material fact. Among other things, apart from that which may be inherently incredible, the nonmoving

> party is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in [the evidence] resolved favorably to him[.]' The precincts patrolled by Rule 56 admit of no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, no room for the judge to superimpose his own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon the carapace of the cold record.

*Greenburg*, 835 F.2d at 936 (citations omitted). Accordingly, this Court must deny Caterpillar's Motion for Summary Judgment.

### B. Caterpillar's Purported Disclaimer Does Not Bar Trans-Spec's Negligence Claim

Caterpillar claims that Trans-Spec's negligence count is barred by Caterpillar's disclaimer on the two-year warranty document at Ex. I.[5] As shown above, Caterpillar a) knew or should have known that its C-12 engines were defective prior to Trans-Spec's purchase; b) made misrepresentations about its C-12 engines; and, c) ignored and otherwise negligently breached its warranty obligations. In choosing to continually replace a defective part on Trans-Spec's engines with a part containing the same defects, and in not rectifying the defect on all twenty two of Trans-Spec's engines, Caterpillar repeatedly breached its two year and five year/500,000 mile warranties and made other misrepresentations. Caterpillar failed "to correct the defect," as mandated by the two year warranty at Ex. I or "repair" the failures as called for in the five year/500,000 mile warranty at Ex. H. Because Caterpillar failed "to correct the defect," the two-year warranty failed of its essential purpose and its disclaimer of negligence is void. Moreover, because Caterpillar unfairly surprised Trans-Spec, imposed on Trans-Spec an oppressive contract, and left Trans-Spec without a fair quantum of remedy by disclaiming its negligence on a part it knew to be defective, Caterpillar's purported negligence disclaimer is void as unconscionable.

---

[5] The purported disclaimer reads, "**CATERPILLAR EXCLUDES ALL LIABILITY FOR OR ARISING FROM ANY NEGLIGENCE ON ITS PART OR ON THE PART OF ANY OF ITS EMPLOYEES, AGENTS, OR REPRESENTATIVES IN RESPECT OF THE MANUFACTURE OR SUPPLY OF GOODS OR THE PROVISION OF SERVICES RELATING TO THE GOODS.**" Exhibit I (emphasis in original).

i.  **Caterpillar's purported disclaimer is unenforceable because the two-year warranty failed of its essential purpose**

A limitation on a remedy is unenforceable "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose[.]" Mass. Gen. Laws Ann. ch. 106, § 2-719(2); *Hadar v. Concordia Yacht Builders, Inc.*, 886 F.Supp. 1082, 1099-1100 (S.D.N.Y. 1995) (decided under Massachusetts law). A remedy fails of its essential purpose where applying it would cause a buyer to receive less than what the contract calls for; whether a remedy fails of its essential purpose is a question of fact. *Boston Helicopter Charter, Inc. v. Agusta Aviation Corporation*, 767 F.Supp. 363, 373 (D. Mass. 1991); *Sosik v. Albin Marine, Inc.*, 2003 Mass. Super. LEXIS 160, *16. "To determine whether a remedy fails of its essential purpose the court must look at the way it operates under the circumstances of the transaction at issue." *Hadar*, 886 F. Supp. at 1099 (citing Mass. Gen. Laws Ann. ch. 106, § 2-719); see also *Kos Kam Inc. v. Triangle Pacific Corp.*, 1987 U.S. Dist. LEXIS 16725, at *6 (D. Mass. 1987).

A buyer may receive less than what the contract calls for, causing a remedy to fail, **"as a result of a quality inherent in the defect, for example where the defect cannot be cured, where it is impossible to discover which of many parts has created the defect, or where the defect has completely destroyed the entire product."** *Hadar*, 886 F. Supp. at 1100 (emphasis added); *Boston Helicopter Charter, Inc. v. Agusta Aviation Corp.*, 767 F. Supp. 363, 373-74 (D. Mass. 1991); *Kos Kam*, 1987 U.S. Dist. LEXIS 16725, at *6. **"A remedy may also fail as a result of the warrantor's actions, as where 'the seller completely refuses to honor its duty to repair or replace.'"** *Hadar*, 886 F. Supp. at 1100 (emphasis added); *Boston Helicopter Charter, Inc.*, 767 F. Supp. at 373-74; see also *Neuhoff v. Marvin Lumber and Cedar Company*, 370 F.3d 197, 201 (1st Cir. 2004) ("If the promisor does not abide by the promise to repair, then the promisee has a cause of action for the underlying breach of warranty for the defective product."); *R.W. Murray Co. v. Shatterproof Glass Corp.*, 697 F.2d 818, 823 (8th Cir. 1983) ("when a manufacturer limits its obligation to replacement of defective goods, 'and repeatedly fails to correct the defect as promised within a reasonable time, it is liable for the breach of that promise

9

as a breach of warranty.' In this situation the limited exclusive warranty is considered to fail of its essential purpose . . . and 'all contractual remedies are available to the buyer.'" (citations omitted)).

Caterpillar's two year warranty failed of its essential purpose for multiple reasons. Although Trans-spec's engine failures repeatedly occurred, Caterpillar did not offer a cure for Trans-Spec's engine failures. Caterpillar Depo Day 1, 170.1-175.13, Ex. A. Moreover, Caterpillar breached its two year warranty containing the purported negligence disclaimer when it failed "to correct the defect." Because the two year warranty containing the purported negligence disclaimer failed of its essential purpose, so also does the purported disclaimer in the warranty.

### ii. Caterpillar's purported disclaimer is unenforceable because of its oppressive and unconscionable nature

The oppressive and unconscionable nature of Caterpillar's purported negligence disclaimer warrants its nullification. Mass. Gen. Laws Ann. ch. 106, § 2-302(1) ("If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contact, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."); *Somerset Savings Bank v. Chicago Title Insurance Company*, 420 Mass. 422, 431-32 (1995) (rejecting a disclaimer of negligence after "balancing . . . the freedom of contract against possible harm to the public resulting from allowing such exculpation"); *Omni Flying Club, Inc. v. Cessna Aircraft Co.*, 366 Mass. 154, 159-160 (1974) (rejecting a disclaimer of negligence where the disclaimer appeared, as here, "in [Caterpillar's] own standard warranty provision which was not signed by either party . . . and which the plaintiff may or may not have had a copy of at the time the agreement was signed."); see also *Andover Air Limited Partnership v. Piper Aircraft Corp.*, 1989 U.S. Dist. LEXIS 7345, *19, 21 (D. Mass. 1989) ("Massachusetts courts have required that a contract clause resulting in unfair surprise and oppression of the allegedly disadvantaged party will be declared unconscionable"); *Zapatha v. Dairy Mart Inc.* 381 Mass. 284, 292-92, 294 (1980);

*Lechmere Tire & Sales Co. v. Burwick*, 360 Mass. 718, 721 n. 3 (1972) (provisions "attempting to exculpate [Caterpillar] from the consequences of its own negligence . . . are not viewed with favor[.]"); *Chase Commercial Corporation v. Owen*, 32 Mass. App. Ct. 248, 253 (1992) ("contracts are enforceable unless they are unconscionable, offend public policy, or are shown to be unfair in the particular circumstances"); *Sosik*, 2003 Mass. Super. LEXIS 160, *19-23 (finding disclaimer unconscionable and denying summary judgment). Courts determine unconscionability on a case by case basis. *Zapatha*, 381 Mass. at 292-93.

Trans-Spec suffered unfair surprise and oppression at the hands of Caterpillar at the time it purchased the engines. Trans-Spec had no reason to know about the engines' negligent design and manufacture, especially in light of (mis)representations made by Caterpillar and Caterpillar's agents.[6] See above at p. 2. The unfair surprise wrought on Trans-Spec reaches new heights of oppression when one considers that Caterpillar knew of the engine defects at least a year and a half before Trans-Spec took delivery of the trucks, see Exs. L, M. Caterpillar did not inform Trans-Spec of the negligent design and manufacture of the engines such that Trans-Spec knowingly chose to waive the damages caused by Caterpillar's negligence. Instead, Caterpillar was "bragging that engine up like there was no tomorrow," Medbery depo., 41.15-24, Ex. G, even while it knew of the C-12's deeply flawed nature. These circumstances created "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party" such that oppression and unconscionability exists. *Zapatha*, 381 Mass. at 294 n. 13.[7]

---

[6] Courts recognize misrepresentation as a factor rendering a contract unconscionable. *Waters v. Min Ltd.*, 412 Mass. 64, 68 (1992). Ironically, Caterpillar quotes that, "[t]here can be no doubt that under the law of Massachusetts **in the absence of fraud** a person may make a valid contract exempting himself from any liability to another which he may in the future incur as a result of hs negligence or that of his agents or employees acting on his behalf." *Sharon v. City of Newton*, 437 Mass. 99, 105 (2002) (emphasis added). Here, however, Caterpillar affirmatively misrepresented the capabilities and reliability of its C-12 engine and failed to disclose the C-12 engine's negligent design and manufacture.

[7] In more general terms, courts have defined an unconscionable contract as one "such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other." *Waters*, 412 Mass. at 66; *Bull HN Information Systems Inc. v. Hutson*, 118 F. Supp. 2d 55, 61 (D. Mass. 1999) (both quoting *Hume v. U.S.*, 132 U.S. 406, 411 (1889)). No commercial party such as Trans-Spec would disclaim negligence under the circumstances of the relevant sale had Caterpillar provided an honest and accurate representation of the capabilities and defects of the C-12 engine.

Moreover, in nullifying a disclaimer against incidental and consequential damages in a contract between two commercial parties, the *Andover Air Limited* court held that pursuant to Massachusetts law, there must "be at least a fair quantum of remedy for breach [and] any clause purporting to modify or limit the remedial provisions . . . in an unconscionable manner is subject to deletion." *Andover Air Limited*, 1989 U.S. Dist. LEXIS 7345, at *19. Despite the commercial sophistication of both parties in the *Andover Air Limited* case, as well as the inability of the plaintiff to sustain a claim of unfair surprise because of the "distinct and readable" terms of the warranty, the court found that it "must consider whether the terms of the contract are oppressive and leave the allegedly disadvantaged party without adequate remedy." *Andover Air Limited*, 1989 U.S. Dist. LEXIS 7345, *20-21. Where, as here, the defendant manufacturer sought to limit liability to replacement or repair of a single part, the court held that "when the defective part has allegedly caused damage to [Trans-Spec's truck]," the warranty left "[Trans-Spec] without a 'fair quantum of remedy' and is therefore unconscionable." *Andover Air Limited*, 1989 U.S. Dist. LEXIS 7345, *22-23.[8]

Caterpillar unfairly surprised Trans-Spec, imposed upon it an oppressive contract, and left it without a fair quantum of remedy by disclaiming its negligence on an engine it knew to be defective. Accordingly, this Court must nullify Caterpillar's purported negligence disclaimer on the basis of its unconscionability.

C. **The Economic Loss Doctrine Does Not Apply Here and Does Not Preclude Trans-Spec From Recovering On Any Of Its Damages**

Although this Court has twice rejected Caterpillar's contention that Trans-Spec's negligence claim is barred by the economic loss doctrine, see Order on Motion to Amend Complaint dated May 20, 2005, p. 7, and Report and Recommendation on Caterpillar Inc.'s Motion to Dismiss adopted February 23, 2006, p. 12-13, Caterpillar raises it yet a third time here.

---

[8] It is disingenuous for Caterpillar to claim, as it does on page 5 of its Memorandum in Support of the Motion for Summary Judgment, that "Trans-Spec sought and received benefits under those warranties" which Caterpillar, by its own admission, breached. See Caterpillar depo. Day 2, 14.4-9, 52.7-60.23, 68.15-23, attached as Ex. K; see also Caterpillar depo. Day 1, 207.3-208.18, Ex. A.

Moreover, a substantial portion of Caterpillar's argument regarding the categorization and proof of Trans-Spec's damages is fact-sensitive and should be determined by the jury, see above at pp. 7-8. In bringing this Motion for Summary Judgment, Caterpillar inappropriately seeks to eliminate Trans-Spec's right to present oral testimony to be heard and weighed by the jury.[9]

The economic loss doctrine as applied by Massachusetts law provides that purely economic losses are not recoverable in tort actions absent personal injury or property damage. *Shipway Place Condominium Association v. Osmose, Inc.*, 2001 U.S. Dist. LEXIS 2326, *3 (D. Mass. 2001). The doctrine does not apply where, as here, there exists a causal connection between property damage and the economic loss. *W.R. Construction & Consulting, Inc. v. Jeld-Wen, Inc.*, 2002 U.S. Dist. LEXIS 18686, *22-24 (D. Mass. 2002); *Berish v. Bornstein*, 437 Mass. 252, 267-68 (2002); *Commonwealth v. Johnson Insulation*, 425 Mass. 650, 653 (1997); *Fine v. Huygens, DiMella, Shaffer & Assoc.*, 57 Mass. App. Ct. 397, 400 (2003)).[10]

---

[9] By its own choice, Caterpillar has yet to conclude Trans-Spec's Rule 30(b)(6) deposition. Resumed Trans-Spec Rule 30(b)(6) Deposition, September 28, 2005, page 143, attached as Ex. P. Therefore, Trans-Spec's testimony on damages, oil spillage on various properties, and other material matters is incomplete on the record. The Court should also note that Caterpillar has already taken two days of Rule 30(b)(6) testimony of Trans-Spec, despite the one-day limitation of Fed. R. Civ. P. 30(d)(2), and still did not conclude its questioning. Moreover, Caterpillar did not depose several individuals who have knowledge that the defective engines caused property damage to the trucks beyond the engines as well as that oil leaks caused damage to Trans-Spec's property as well as the property of its customers. Caterpillar also declined to fully question other deponents on these issues.

[10] The economic loss rule has been described as "one of the most confusing doctrines in tort law," R. Joseph Barton, DROWNING IN A SEA OF CONTRACT: APPLICATION OF THE ECONOMIC LOSS RULE TO FRAUD AND NEGLIGENT MISREPRESENTATION CLAIMS, 41 Wm. And Mary L. Rev. 1789 (2000), and "the most quickly and confoundingly expanding legal doctrine[,] . . . both ever-present and ever-misunderstood." Paul J. Schwiep, THE ECONOMIC LOSS RULE OUTBREAK: THE MONSTER THAT ATE COMMERCIAL TORTS, 69 Fla. B.J. 34 (1995). "[T]he American law of liability for purely economic losses is much less well settled and less uniform than one might wish it to be." Herbert Bernstein, CIVIL LIABILITY FOR PURE ECONOMIC LOSS UNDER AMERICAN TORT LAW, 46 Am. J. Comp. L. 111, 125 (1998). According to one commentator, "judges, lawyers, and commercial clients alike are all desperately struggling to define the parameters of the economic loss doctrine," and "[a]s for the bench (at least at the circuit and district court level), judges are . . . grappling with the rule's proper application"; as one judge admitted: "[t]here isn't a damn thing about the economic loss rule that's clear to me." Schwiep, THE ECONOMIC LOSS RULE OUTBREAK, 69 Fla. B.J. at 34. Another judge noted that the "economic loss rule is stated with ease but applied with great difficulty." *Id.* (quoting Judge Chris W. Altenbernd). The recent trend toward greater protection for purchasers has invigorated challenges to the economic loss rule. Moreover, an increasing number of commentators argue that "the economic loss doctrine, at least in certain of its iterations, is illogical and ill-founded. . . . Insatiable, the doctrine has claimed as its victims actions for negligence, fraud, and demands for punitive damages." *Id.* at 37. Furthermore, "economic injury from tortious conduct and its ripple effects may be severe and inescapable for the innocent victim[.]" Eileen Silverstein, ON RECOVERY IN TORT FOR PURE ECONOMIC LOSS, 32 U. Mich. J.L. Reform 403, 437 (1999). Thus, many of the central rationales posited in favor of the economic loss doctrine have recently come under attack. Steven R. Swanson, THE CITADEL SURVIVES A NAVAL BOMBARDMENT: A POLICY ANALYSIS OF THE

Caterpillar inappropriately claims that certain portions of Trans-Spec's economic damages are barred by the economic loss doctrine. The applicability of the economic loss doctrine is an "all or nothing" matter – it either applies in a case or it does not. "The economic loss doctrine . . . does not bar a commercial purchaser's claims based on personal injury or damage to property other than the product, **or economic loss claims that are alleged in combination with noneconomic losses.**" *Daanen & Jansen, Incorporated v. Cedarapids, Incorporated*, 216 Wis. 2d 395, 402 (1997) (emphasis added). While Massachusetts courts have not addressed the issue of whether economic damages are recoverable if they are combined with non-economic damages in a negligence claim as explicitly as the Supreme Court of Wisconsin did in *Daanen*, the cases cited in the preceding paragraph indicate that Massachusetts follows the same reasoning. **Where, as here, economic and non-economic losses are alleged pursuant to a negligence claim, the economic loss doctrine as a whole does not apply.**[11]

Moreover, in the binding *Berish v. Bornstein* case, The Massachusetts' Supreme Judicial Court held that a negligence action could be brought where "defects and deficiencies" in the construction of condominium units caused property defects "beyond the defects" in the units. In *Berish*, the Supreme Judicial Court allowed the plaintiffs to seek damages for economic losses incurred in correcting the property damage. *W.R. Construction*, 2002 U.S. Dist. LEXIS 18686, *22-24; *Berish*, 437 Mass. at 267-68.

Here, as in *Berish*, the economic loss caused by Caterpillar's defective engines goes "beyond the defects" in the engines and the damage caused was not confined to the engines alone. Affidavit of Joseph M. Howard, Jr. dated April 19, 2005, ¶ 10, attached as Ex. Q; Second

---

ECONOMIC LOSS DOCTRINE, 12 Mar. Law 135, 162, 166-68, 184 (1987)(showing that the economic loss doctrine is "reminiscent of the arguments that were presented by manufacturers against the development of negligence and strict liability principles in the products liability context," arguments which were overruled by advancing social and technological change, and advocating that when a product is defective, **"recovery for economic losses should be allowed no matter how the defect manifests itself. To do otherwise is to encourage sloppy manufacturing, continued use of a defective product, and complete avoidance of liability through disclaimers. Such should not be the goal of a developing tort law."** (emphasis added)).

[11] Taken collectively, the cases cited in the preceding paragraph hold that the economic loss doctrine bars recovery of economic losses in negligence actions absent personal injury or damage to property other than the product itself. Accordingly, where personal injury or damage to property other than the product itself occurs, the economic loss doctrine does not apply at all in the case.

Set of Supplemental Answers to Third Set of Interrogatories, Answer No. 3, attached as Ex. R; see also Kevin Holmes Deposition, 47.19-49.10, attached as Ex. S. As Caterpillar concedes on page 6 of its Memorandum in Support of the Motion for Summary Judgment, if "a failure of the flywheel housing caused substantial damage to something other than the engine itself," Trans-Spec may recover for economic losses. Here, Caterpillar's defective engine units caused damage to other critical systems and components throughout the trucks unrelated to the Caterpillar engines and caused oil leaks which damaged Trans-Spec's property and that of Trans-Spec's customers. Howard aff., ¶ 11, Ex. Q; Second Set of Supplemental Answers to Third Set of Interrogatories, Answer No. 3, Ex. R; see also Holmes depo., 47.19-49.10, Ex. S. Trans-Spec had to pay to clean these leaks in accord with environmental regulations. Resumed Trans-Spec Rule 30(b)(6) depo., September 28, 2005, page 24.1-26.18, at Ex. P; Second Set of Supplemental Answers to Third Set of Interrogatories, Answer No. 3, Ex. R. Because "it is reasonable to infer that the enumerated 'defects and deficiencies' caused property damage beyond the defects in the [engines] themselves," Trans-Spec must be allowed the opportunity to demonstrate to the jury that it is entitled to relief on all damages on its negligence claim. *Berish*, 437 Mass. at 267. As shown above, Caterpillar's contention that the economic loss doctrine bars any of Trans-Spec's negligence claim is erroneous and inapplicable.

Even if, *arguendo*, the economic loss doctrine bars damages such as the cost of repairs to the Caterpillar engines themselves – and it does not, in this case, for the reasons described both above and below – the cost of repairing or replacing other parts or systems in the trucks, the trucks' reduced resale value, and the lost income, diminished value of business, and clean-up costs for oil spills incurred by Trans-Spec are **not** barred because Trans-Spec incurred all of the latter costs as a result of damage caused by the engines to other property. *W.R. Construction*, 2002 U.S. Dist. LEXIS 18686, *22-24; *Berish*, 437 Mass. at 267-68; see also *Aldrich v. ADD Inc.*, 437 Mass. 213, 222 (2002) (in a case alleging cost of repair damages, the court denied summary judgment based on the economic loss doctrine because "where the pecuniary losses sustained by a plaintiff result from physical harm to property proximately caused by a

15

defendant's alleged negligence, such plaintiff has a right to recovery."); *Gailunas v. SPQR Management Associates, Inc.*, 6 Mass. L. Rep. 311, *8 (1997) ("the economic loss doctrine does not apply [where] the plaintiffs' pecuniary losses *are* derived from physical harm to their property." (emphasis in original)); *Gateway Condominium Trust v. Clinton*, 6 Mass. L. Rep. 133, *5-6 (1996) (defendant's motion for summary judgment denied where plaintiff seeking repair and replacement costs); *Laidlaw Waste Systems, Inc. v. Mallinckrodt, Inc.*, 925 F. Supp. 624, 635-36 (E.D. Mo. 1996) (finding economic loss doctrine inapplicable to negligence count that included damage to plaintiff's land); Caterpillar's Memorandum in Support of Motion for Summary Judgment, p. 6 (though framed in the negative, Caterpillar's supposition holds that where Trans-Spec shows "that a failure of the flywheel housing caused substantial damage to something other than the engine itself," Trans-Spec is entitled to economic damages). Accordingly, the economic loss doctrine does not apply here and does not preclude Trans-Spec from recovering on any of its damages.

> i. **The economic loss doctrine does not apply due to Caterpillar's misrepresentations**

In addition to the above, the economic loss doctrine is meant to apply where there is a contractual relationship between the parties based on a valid understanding of the agreed-upon economic risks, so that parties to a contract may allocate their risks by agreement and eliminate the need for the special protections of tort law. *Arthur D. Little International, Inc. v. Dooyang Corporation*, 928 F. Supp. 1189, 1202 (D. Mass. 1996); *Huron Tool and Engineering Company v. Precision Consulting Services, Inc.*, 209 Mich. App. 365, 372-73 (1995). Where, however, Caterpillar's (mis)representations undermined Trans-Spec's ability to negotiate freely and make an informed decision – the traditional grounds for invoking the economic loss doctrine – the economic loss doctrine does not apply. *Huron Tool*, 209 Mich. App. at 372-73. Similarly, Caterpillar made misrepresentations when it made it appear to Trans-Spec as if Caterpillar had honored its two year and five year/500,000 mile warranties as to the flywheel housing failures.

Because Caterpillar failed to exercise reasonable care or competence in obtaining or communicating, in the course of its business, false information given for the guidance of Trans-Spec's business transactions, Caterpillar is "subject to liability for pecuniary loss caused to [Trans-Spec] by [its] justifiable reliance upon the information[.]" *Lawton v. Dracousis*, 14 Mass. App. Ct., 164, 171 (1982); see also *Nota Construction v. Keyes Associates, Inc.*, 45 Mass. App. Ct. 15, 19-20 (1998). Thus, an exception to the economic loss doctrine "permits recovery for economic losses resulting from negligent misrepresentation." *Nota*, 45 Mass. App. Ct. at 20. "The damages recoverable for [Caterpillar's] negligent misrepresentation are those necessary to compensate [Trans-Spec] for the pecuniary loss to [it] of which the misrepresentation is a legal cause, including (a) the difference between the value of what [it] has received in the transaction and its purchase price or other value given for it; and (b) pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation." *Nota*, 45 Mass. App. Ct. at 20, quoting Restatement (Second) of Torts, § 552B (1977). As described more fully above, Caterpillar made misrepresentations to Trans-Spec about both the reliability and capabilities of the C-12 engine, the warranties associated with it, and made it appear to Trans-Spec as if Caterpillar had honored its two year and five year/500,000 mile warranties as to Trans-Spec's flywheel housing failures. Caterpillar accordingly stands liable for the pecuniary damages Trans-Spec suffered as a result of its reliance on these misstatements.[12]

---

[12] The Court can infer Trans-Spec's negligence misrepresentation claim from its negligence claim and deny Caterpillar's Motion for Summary Judgment. *Gavett v. Roto-Rooter Services Company*, 2001 U.S. Dist. LEXIS 20436, *7-8 (D. Mass.2001) (Court denies defendant's motion to dismiss after addressing the economic loss doctrine in a negligence count, holding, "[a]lthough the complaint is not artfully drawn, I interpret Plaintiffs general negligence claim to include negligent misrepresentation."); *Tasco Construction, Inc. v. Town of Winchendon*, 1994 Mass. Super. LEXIS 373, *9 footnote 4 (while plaintiff "did not actually plead negligent misrepresentation in a count separate from its negligence claim, [plaintiff] argued the issue at oral argument. This Court will liberally construe the complaint to include a claim for negligent misrepresentation."); *Craig v. Everett M. Brooks Co.*, 351 Mass. 497, 499 (1967) (even though negligent count did not use the word "misrepresentation," the Court found the allegations included negligent and erroneous representations). Here, Trans-Spec's Second Amended Complaint, avers that Caterpillar made and breached, *inter alia*, express and implied warranties of merchantability, safety, and fitness for ordinary purpose and the particular purpose for which the engines were to be used, made and breached express warranties that the engines and their subsidiary components were covered for repair or replacement, and negligently marketed, advertised, and distributed the C-12 engine. Second Amended Complaint, ¶¶ 37-39, 52. Caterpillar's misrepresentations are more explicitly pled in the Third Amended Complaint, pending before this Court.

### ii. The economic loss doctrine does not apply to Caterpillar's negligent breach of contract

Separately, Massachusetts recognizes yet another exception to the economic loss doctrine that applies here to uphold tort claims to recover economic losses from negligent breach of contractual duties. *Arthur D. Little International, Inc.*, 928 F. Supp. at 1203 (denying summary judgment by concluding that "Massachusetts law permits a cause of action to recover economic losses caused by negligent breach of a contractual duty."); *Abrams v. Factory Mutual Liability Insurance Company*, 298 Mass. 141, 144 (1937) ("Although the duty arises out of the contract and is measured by its terms, negligence in the manner of performing that duty as distinguished from mere failure to perform it, causing damage, is a tort."). Here, Trans-Spec is entitled to recover all damages resulting from Caterpillar's failure to perform under its two year or five year/500,000 mile warranties as described more fully above.

### D. Caterpillar Waived The Applicability Of The Economic Loss Doctrine Based On Its Oral Representations

While the two-year warranty document drafted by Caterpillar purports to disclaim Caterpillar's negligence in general terms, it does not contain an integration clause disclaiming any representations or warranties not set forth in the agreement or preventing Trans-Spec from introducing evidence of oral representations to the jury. *Cummings v. HPG Int'l, Inc.*, 244 F.3d 16, 21 n.2 (1st Cir. 2001); *Town & Country Fine Jewelry Group v. Hirsch*, 875 F. Supp. 872, 876-77 (D. Mass. 1994). Caterpillar assured Trans-Spec of the suitable design and fitness of the Caterpillar C-12 engine and the coverage to be provided by the Caterpillar warranties. Trans-Spec relied on these representations to its detriment and purchased Caterpillar C-12 engines which later turned out to be defective. See pp. 2-3 and citations.

Moreover, after the flywheel housings began to fail and the unconscionable two-year warranty failed of its essential purpose, Caterpillar's and Caterpillar's agents repeatedly waived any exclusions based on the economic loss doctrine. Two employees of Caterpillar's agent and local distributor (Cardoza and Calderbank) as well as two managers from Caterpillar (Guidotti

and Schoening) all told Trans-Spec that Caterpillar would make it whole for the damage it suffered as a result of the defective C-12 engines. See pp. 3-6 and citations.[13]

Accordingly, Caterpillar's representations nullify its purported negligence disclaimer. Moreover, Caterpillar's assurances that it would make Trans-Spec whole includes **all** costs and damages incurred as a result of Caterpillar's negligently designed and manufactured engines, including those damages purportedly barred by the economic loss doctrine.

### III.    CONCLUSION

WHEREFORE, Trans-Spec respectfully requests that this Court deny Caterpillar's Motion for Summary Judgment for the foregoing reasons.

Plaintiff,
TRANS-SPEC TRUCK SERVICE INC.,
D/B/A TRUCK SERVICE
By their attorneys

/s/ Christian G. Samito
Nancy M. Reimer, Esq., BBO#555373
Christian G. Samito, Esq., BBO#639825
Donovan Hatem, LLP
Two Seaport Lane
Boston, MA 02210
(617) 406-4500

Date: April 18, 2006

### REQUEST FOR ORAL ARGUMENT

The Court has already deemed it necessary to hold oral argument on this OPPOSITION TO CATERPILLAR INC.'S MOTION FOR SUMMARY JUDGMENT ON ALL REMAINING CLAIMS and scheduled this hearing for 2:00 p.m. on May 3, 2006.

---

[13] All of these statements could also be categorized as negligent misrepresentations, for which the economic loss doctrine does not apply, see above at pp. 16-17.

## **CERTIFICATE OF SERVICE**

I, Christian G. Samito, hereby certify that I have this day, April 18, 2006, served a copy of the foregoing pleading electronically and by sending a copy by first class mail, postage prepaid, to:

John A. K. Grunert, Esq.
Campbell Campbell Edwards & Conroy
One Constitution Plaza, 3rd Floor
Boston, MA  02129

/s/ Christian G. Samito
Christian G. Samito

00988558