UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| TRANS-SPEC TRUCK SERVICE, INC. d/b/a TRUCK SERVICE, | ) ) ) | |
| Plaintiff | ) ) | |
| vs. | ) ) | CIVIL ACTION NO. 04-11836-RCL |
| CATERPILLAR INC. | ) ) | |
| Defendant | ) ) | |

CATERPILLAR INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT ON ALL REMAINING CLAIMS

Trans-Spec has kept this litigation going for a long time by the simple expedient of saying in court filings whatever is necessary to keep it going, regardless of whether there is evidence or law to support what it says. The purpose of Fed. R. Civ. P. 56 is to dispose of just such cases. A plaintiff confronted with a motion for summary judgment can no longer rely on self-serving assertions by its attorneys in their briefs and self-serving speculation about what helpful evidence might turn up by the time of trial.[1] A plaintiff opposing a motion for summary judgment must bring forward concrete evidence which, if the jury believed it all, would entitle the plaintiff to win. Trans-Spec has not done that. It has just given the Court more of the same.

---

[1] *See* Trans-Spec's Opposition at 13, where it says "a substantial portion of Caterpillar's argument regarding the categorization and proof of Trans-Spec's damages is fact-sensitive and should be determined by the jury. ... In bringing this Motion for Summary Judgment, Caterpillar inappropriately seeks to eliminate Trans-Spec's right to present oral testimony to be heard and weighed by the jury." Characteristically, that statement is followed by no citation to actual *evidence* that might be "heard and weighed by the jury."

1.  <u>Trans-Spec's Argument that the Limitation-of-Remedies Provision in Caterpillar's
    Express Warranty Failed of its Essential Purpose is Irrelevant as a Matter of Law</u>

Trans-Spec argues (a) Caterpillar's warranties that it would repair or replace defective
components and assemblies failed of their essential purpose, so (b) the provision in the
warranties excluding liability for negligence is ineffective.  That argument is premised on a
fundamental error of law and is, therefore, meritless.

G.L. c. 106, §2-719(2) says , "Where circumstances cause an exclusive or limited remedy
to fail of its essential purpose, remedy may be had *as provided in this chapter*" (emphasis
supplied).  "This chapter" means G.L. c. 106, that is to say, our version of the Uniform
Commercial Code.  The Uniform Commercial Code provides a variety of *contractual* remedies
for *breaches of contract* and, if Trans-Spec could have proven the limitation-of-damages
provision in the warranty with respect to any of its engines had failed of its essential purpose,
then Trans-Spec would have been entitled to recover *contractual* remedies in a timely breach of
warranty action with respect to that particular engine.  But Trans-Spec *did not bring* a timely
breach of warranty action.  Its breach of warranty action was time-barred[2]: that decision has
already been made and is the law of this case.  All that remains is a non-UCC, non-contractual,
common law negligence action. G.L. c. 106 does not provide remedies for negligence.

So whether or not provisions in the warranties limiting Caterpillar's responsibility to
repair or replacement of defective parts and assemblies failed of their essential purpose – the
evidence would have shown they did not -- is beside the point (or, to use more lawyerly Rule 56
language, not "material"):  Trans-Spec is not suing for a remedy "provided in" G.L. c. 106.
What is *not* beside the point is that when a limitation-of-remedies provision in a contract fails of

---

[2] Judge Alexander so ruled in her Report and Recommendation on Caterpillar Inc.'s Motion to Dismiss the Second
Amended Complaint dated January 31, 2006; Trans-Spec objected to the Report and Recommendation; but Judge
Lindsay adopted it and granted the motion to dismiss by order dated February 23, 2006.

its essential purpose the effect is not to void the entire contract. Canal Elec. Co. v. Westinghouse Elec. Corp., 406 Mass. 369, 372-375 (1990) (where an "exclusive remedy" provision failed of its essential purpose, a separate provision excluding liability for consequential damages remained enforceable). Its effect is that described in §2-719(2): it makes other UCC contractual remedies available to the plaintiff if the plaintiff has an otherwise viable claim under the UCC. Tokio Marine and Fire Ins. Co. v. McDonnell Douglas Corp., 617 F.2d 936, 941 (9th Cir. 1980); S.M. Wilson & Co. v. Smith International, Inc., 587 F.2d 1363, 1374-1375 (9th Cir. 1978). Trans-Spec does not have a viable claim under the UCC: this Court has already held those claims time-barred. So even if Trans-Spec could present evidence with respect to one or more of the 22 separate engine warranties it received that the provision limiting its contractual remedies to repair or replacement of defective parts and assemblies had failed of its essential purpose, the *separate* contractual provision excluding liability for negligence would remain unimpaired. Tokio Marine, 617 F.2d at 941; *compare* Canal Elec. Co., 406 Mass. at 372-375. The Court will find nothing to the contrary in any case cited by Trans-Spec.

2.    Trans-Spec's Argument that the Exclusion of Negligence Liability is Unconscionable is
      Improperly Based on Unsupported Factual Assertions by Counsel and is Contrary to law

      Massachusetts law is clear that as a general matter contractual provisions excluding liability for negligence are, at least outside the context of consumer transactions, enforceable, not contrary to public policy, and reflect "sensible business judgments." Minassian v. Ogden Suffolk Downs, Inc., 400 Mass. 490, 493 (1987); *accord*, Sharon v. City of Newton, 437 Mass. 99, 105 (2002); Schell v. Ford, 270 F.2d 384, 386 (1st Cirl 1959). Nonetheless, Trans-Spec says the conspicuous and unambiguous (*see* Exhibit E in the Appendix of Exhibits to Caterpillar's motion) exclusion of negligence liability contained in the warranty contract between the commercial parties to this case is unconscionable and therefore unenforceable. To support its

3

argument, Trans-Spec adopts its usual practice of making factual statements in its brief that are unsupported by reference to the record.  In addition, Trans-Spec cites the Court to authority that does not support the proposition for which it is cited. The issue of unconscionability is one of law for the court, *e.g.*, Zapatha v. Dairy Mart, Inc., 381 Mass. 284, 291 (1980), and Trans-Spec's argument fails as a matter of law.

Trans-Spec says in its brief that Caterpillar and its alleged agents made misrepresentations and "affirmatively misrepresented the capabilities and reliability of its C-12 engine." Opposition at 11 and n.3.  Neither statement is followed by citation to the record or to Trans-Spec's statement of allegedly undisputed facts.  Instead, Trans-Spec tells the Court to "see" page 2 of its brief.  Turning to page 2, we find citations to Exhibits H and I to Trans-Spec's Opposition, which are just copies of the warranty and an extended service contract containing nothing of the type described by Trans-Spec.  We also find citations to selected pages of deposition testimony of Messrs. Cardoza, Lind, Calderbank, and Medbery.  Trans-Spec does not say which of those transcripts supposedly supports its statements about fraud and misrepresentation, so there is no escaping having to discuss them all.

Mr. Cardoza testified he met with Trans-Spec employee Lind at Trans-Spec's facility and told him the C-12 engine was very similar to a model 3176 engine.  That's it.  Nothing about flywheel housings or reliability.  The Court will search the record for any suggestion that what Cardoza said was even relevant, much less false.[3]

Mr. Lind remembers he spoke with Cardoza but not the actual conversations.  He knows they "talked about the engines.  Their ability.  The horsepower ratings.  The torque ratings." Cardoza showed him that the C-12 engine was a suitable engine for Trans-Spec's business

---

[3]  Mr. Cardoza was not an employee or agent of Caterpillar.  He works for Southworth-Milton, Inc., a Caterpillar dealership.  In light of what he said, though, who employed him is immaterial.

purposes and for use in 80,000 lb. gross commercial weight rating vehicles. They did not talk about serviceability. Lind spoke with no one else from Southworth-Milton and no one at all from Caterpillar. The Court will search the record in vain for any suggestion that the horsepower and torque ratings were not as specified or that the C-12 engine was not a suitable engine for Trans-Spec's business purposes. Indeed, Trans-Spec states as an undisputed fact that the C-12 engine *was* an appropriate one for use in its type of business. So Lind's testimony provides no support for Trans-Spec's statements about supposed misrepresentations.

Next comes testimony of Harry Calderbank, another Southworth-Milton employee. The testimony supplied by Trans-Spec discloses nothing Mr. Calderbank told it. All it discloses is that he provided information from a computer program "regarding speed capabilities, torque capabilities, startability, things of that nature." It does not say *what* information on those subjects he provided, so it cannot support an assertion that the information was false.[4]

Lastly, we have testimony of Don Medbery. Mr. Medbery worked for the Sterling dealership from which Trans-Spec bought its trucks. He did not work for Caterpillar or even for a Caterpillar dealer, and he did not work for Trans-Spec. Mr. Medbery spoke with Southworth-Milton's Harry Calderbank, a "very, very knowledgeable" and "very conscientious" man who in Medbery's experience "didn't want to do the wrong thing."[5] Calderbank gave Medbery certain data about the C-12 engine for Sterling's use in designing the trucks: "fuel economy, road speed, gradibility, miles per hour, horsepower ... performance capability," but the transcript does not disclose *what* data on those subjects he provided or whether it was accurate. Medbery also met someone whose name he could not recall who, unlike Calderbank, was a Caterpillar employee;

---

[4] Exemplifying Trans-Spec's approach to court filings, it excised from what it gave the Court Mr. Calderbank's testimony at page 35 of his transcript where he said that, except for *Trans-Spec's* flywheel housing problems, he has never seen a failed flywheel housing and has never heard of anyone having a flywheel housing failure. *See* Attachment 1 hereto, a copy of the entire minuscript page from which Trans-Spec culled what it gave the Court.

[5] *Compare* Note 4.

but Medbery did not report that person telling him anything specific about C-12 engines. All he remembers is that he "was bragging up" the engine. So, once again, the cited testimony does not support Trans-Spec's assertion in its brief that Caterpillar made misrepresentations. It identifies no actual representation at all, much less one that the record indicates was untrue.

That's it. That is the supposed record support for Trans-Spec's statements in its brief that Caterpillar made material misrepresentations with respect to C-12 engines. As those statements are unsupported by the record, the Court must disregard them entirely, and disregard so much of Trans-Spec's argument as is purportedly based on the unconscionability of contract provisions obtained by fraud. There is simply no evidence of fraud.

Turning now to cases cited by Trans-Spec on the subject of unconscionability.

Trans-Spec correctly cites Zapatha as relevant on the subject even though Zapatha had nothing to do with an exclusion of liability for negligence.[6] Zapatha says unconscionability is determined as of the time the contract was made and that particular attention should be given to whether the allegedly unconscionable provision could result in "unfair surprise" and was "oppressive." Here, Caterpillar's negligence disclaimer is printed in **BOLD-FACED CAPITAL LETTERS** in the section of the 2-page warranty document that contains other limitations and exclusions. That is to say, it was conspicuous as a matter of law, G.L. c. 106, §1-201(10), and located right where one would expect to find it. Its language is clear and unequivocal. Trans-Spec's principal, Mr. Howard, was an experienced businessman who had been buying trucks and engines for years. Deposition of Howard (Exhibit A in Caterpillar's Appendix of Exhibits) at 13, 107-108; Trans-Spec Deposition, Vol. 1 (Exhibit B in Caterpillar's Appendix of Exhibits) at 52-53. He had available (if he chose to take advantage of it) the advice of an attorney who routinely

---

[6] It involved a provision in a franchise agreement permitting the franchisor to terminate the contract without cause. The provision was held not unconscionable and enforced.

advised him on matters related to Trans-Spec's business. Deposition of Robert Parks at 15-19 (Attachment 2 to this Reply). *Compare* Zapatha, 381 Mass. at 294 (the provision held not to be unconscionable was not obscurely worded or buried in fine print, the plaintiff chose not to consult his attorney, the plaintiff was an experienced businessman.)  On this record there is no genuine issue of "unfair surprise" related to this contract provision.[7]

Trans-Spec presents no developed argument on why a straightforward exclusion of negligence liability might be "oppressive."  The Supreme Judicial Court has authoritatively told us that such provisions are not contrary to public policy and should ordinarily be enforced in a commercial context even when they are contained in a contract of adhesion.  Minassian, 400 Mass. at 492-493. *Contrast* Waters v. Min Ltd., 412 Mass. 64, 65 (1992) (cited by Trans-Spec) (finding unconscionable a contract whereby a "naive, insecure, vulnerable" twenty-one year old woman, unrepresented by counsel and unduly influenced by her drug-pushing boyfriend, had assigned to an insurance company for a fraction of its value the annuity she received as a child in settlement of a personal injury claim); Lechmere Tire & Sales Co. v. Burwick, 360 Mass. 718, 721 n.3 (1972) (cited by Trans-Spec) (suggesting public policy may require *consumers* to be protected from disclaimers of negligence liability in credit card contracts of adhesion).  The Supreme Judicial Court has told us authoritatively that such provisions are a "sensible way" for businesses to allocate risks between themselves.  Minassian, 400 Mass. at 493.  Permitting commercial parties to allocate risks between themselves as they choose is a fundamental principle underlying the UCC. That is all that happened here.  Trans-Spec was not compelled to specify Caterpillar C-12 engines – it had other options – and it actively negotiated the terms on

---

[7]  Trans-Spec argues there was unfair surprise because it had no reason to know of the engines' allegedly negligent design and manufacture.  This is a stunning argument.  When a person of ordinary intelligence sees a capitalized, bold-faced statement in a contract saying the seller will not be liable for negligence with respect to the manufacture or supply of goods, such person knows a possibility exists that there may have been negligence with respect to the manufacture or supply of the goods. Otherwise, what reason would there be to include such language?

which it could acquire these engines. <u>Deposition of Howard</u> (Exhibit A) at 33, 37-38, 65-68, 77-82. It obtained warranty coverage that bound Caterpillar to repair or replace at its own expense engine components or assemblies that were defective in material or workmanship, coverage from which Trans-Spec obtained benefit. *See* <u>Affidavit of Clarissa Kolmer</u> (Exhibit D in Caterpillar's Appendix of Exhibits), ¶5.[8] Nothing in this record would permit a finding that this run-of-the-mill exclusion of negligence liability was "oppressive."

Finally, Trans-Spec argues that exclusion of negligence liability is unconscionable because it caused Trans-Spec to have no "minimum adequate remedies." For that proposition Trans-Spec cites <u>Andover Air Ltd. Partnership</u> v. <u>Piper Aircraft Corp.</u>, 1989 WL 110453 (D. Mass. 1989).[9] There, the Court held that a limitation-of-remedies provision that (a) excluded consequential, incidental, and general damages and (b) limited the warrantor's responsibility to repair or replacement of the specific component that failed while eliminating responsibility for all other damage to the product caused by the failure did not provide a minimally adequate remedy. The exclusion of "general" damages was at the heart of the case: there was not even a claim that a provision excluding only consequential and incidental damages caused there to be no minimally adequate remedy. 1989 WL 110453 at *9. Here, by contrast, Caterpillar's warranties did not exclude general damages caused by a breach of warranty; the exclusion for contract damages was for consequential and incidental damages only. In addition, Caterpillar's warranties obligated it to provide all parts "and assembled components" needed to correct a

---

[8] Trans-Spec says in footnote 3 to its Opposition that Ms. Kolmer's affidavit "appears to be erroneous." Trans-Spec's statement reflects failure to read what Ms. Kolmer said in her affidavit. Ms. Kolmer did not say *all* repairs to Trans-Spec's engines were made under the warranties. Some were made under the warranties; some were made pursuant to an extended service contract; some were made as goodwill gestures. The point is that many repairs (not limited to repairs of flywheel-related problems, but also of various other warrantable problems) were made to Trans-Spec's engines under the warranties. Trans-Spec thus received and accepted benefits of the warranties.

[9] The <u>Andover Air.</u> decision was withdrawn by the Court pursuant to a settlement. A copy is attached to this Reply as Attachment 3 for the Court's convenience, as no copy was attached to the papers Trans-Spec served on Caterpillar so Caterpillar assumes no copy was supplied to the Court either.

defect in material or workmanship and all the labor needed to repair the defect.  Caterpillar also agreed to replace all service items made unusable by the defect.  In addition, Caterpillar agreed in its Extended Service Contract to "pay the components and labor charges for any engine component which is rendered unserviceable by the failure of a covered component."  *See* Trans-Spec Exhibit I, second page, "Caterpillar's Responsibilities."  The <u>Andover Air</u> case thus does nothing to support Trans-Spec's position.  If anything, by the contrast it provides, it is *contrary* to Trans-Spec's position.

3.    <u>Trans-Spec's Explication of the Economic Loss Doctrine is Simply Wrong as a Matter of Law, and Reflects Misreading of the Authority Trans-Spec Cites</u>

Trans-Spec says at page 14 of its Opposition:

The applicability of the economic loss doctrine is an "all or nothing" matter – it either applies in a case or it does not.  "The economic loss doctrine ... does not bar a commercial purchaser's claims based on personal injury or damage to property other than the product, **or economic loss claims that are alleged in conjunction with noneconomic losses.**"  *Daanan & Jansen, Incorporated v. Cedarapids, Incorporated*, 216 Wis.2d 395, 402 (1997) (emphasis added).

Trans-Spec understands the quoted language to mean that as soon as *any* damage to "other property" is shown the economic loss rule vanishes entirely from the case and all economic losses become recoverable in tort.  *See contra, e.g.,* <u>W.R. Construction & Consulting, Inc.</u> v. <u>Jeld-Wen, Inc.</u>, 2002 WL 31194870 (D. Mass. 2002), <u>Icelandic Coast Guard</u> v. <u>United Technologies Group</u>, 722 F. Supp. 942 (D. Conn. 1989), and <u>Queen City Terminals, Inc.</u> v. <u>General American Transp. Corp.</u>, 73 Ohio St. 3d 609, 653 N.E.2d 661 (1995), cited at pages 8-9 of Caterpillar's principal brief.  Trans-Spec simply misreads the Wisconsin case.

<u>Daanan</u> itself did not involve the proposition for which Trans-Spec cites it. The issue in <u>Daanan</u> was whether the economic loss doctrine applies if there was no privity of contract between the plaintiff and defendant; the Wisconsin court held it does; dismissal of the claim

under the economic loss doctrine was upheld. The language quoted by Trans-Spec comes from a general background discussion of the economic loss doctrine and is followed by citations to three earlier cases, Northbridge Co. v. W.R. Grace & Co., 162 Wis.2d 918, 471 N.W.2d 179 (1991), Stoughton Trailers, Inc. v. Henkel Corp., 965 F. Supp. 1227 (W.D. Wis. 1997), and Moorman Mfg. Co. v. National Tank Co., 91 Ill.2d 69, 435 N.E.2d 443 (1982). If one wants to understand correctly what a statement in a judicial opinion means, it is generally a good idea to read the cases cited by the opinion's author. Had Trans-Spec's counsel done so, they would have learned that Wisconsin law does not differ from the law discussed in Caterpillar's principal brief: if a product defect damages property *other than* the defective product itself, the plaintiff may recover damages *proximately caused by the damage to the other property.* Neither Daanan nor the cases cited in it says anything about the economic loss doctrine being "an all or nothing matter."

Thus, in Northbridge, the plaintiff alleged Monokote fireproofing supplied by the defendant was defective because it contained asbestos and that asbestos fibers from the Monokote had contaminated the entire building in which it had been used and caused the plaintiff to incur expense for inspection, testing, and removal of the Monokote and diminished resale value of the property. 162 Wis. 2d at 922 and 937, 471 N.W.2d at 180 and 186. The defendant argued, in part, that because *the nature of the damages sought* was typical of what is sought in economic loss cases, the tort claim was barred by the economic loss doctrine. 162 Wis.2d at 931, 471 N.W.2d at 184. The court had no trouble with that analytic fallacy:

> While economic loss is *measured by* repair costs, replacement costs, loss of profits, or diminution of value, the *measure of damages* does not determine whether the complaint is for physical harm or economic loss. In other words, the fact that the measure of the plaintiff's damages is economic does not transform *the nature of its injury* into a solely economic loss. Physical harm to property may be measured by the cost of repairing the buildings to make them safe.

162 Wis.2d at 931-932, 471 N.W.2d at 184 (emphasis supplied; citations omitted).  The applicability of the economic loss doctrine does not depend on whether the *type of damages sought* is economic; it depends on *what caused* the damages.  If the losses were *caused by damage to the product itself*, they are not recoverable in tort; if they were *caused by damage to persons or "other property,"* they may be recovered in tort.  That is what the Wisconsin court meant when it said economic loss claims are compensable in tort if alleged in conjunction with "noneconomic losses," *i.e.*, with damage to persons or "other property."

Similarly, in Stoughton Trailers, Inc. v. Henkel Corp., 965 F. Supp. 1227 (W.D. Wis. 1997), applying Wisconsin law, the district court judge recognized that the *type of damages sought* is not what is relevant in applying the economic loss doctrine but, instead, that it is the *cause of the damages* that is determinative.  Losses caused by damage to "other property" or persons are recoverable in tort even if they are economic-type losses; losses caused by damage to the allegedly defective product alone are not.  965 F. Supp. at 1232, 1235-1236.  Similarly, in Moorman Mfg. Co. v. National Tank Co., 91 Ill.2d 69, 85, 435 N.E.2d 443, 450 (1982), the Illinois court reasoned that in distinguishing claims barred by the economic loss doctrine from those that are not barred, "the items for which damages are sought, such as repair costs, are not determinative. Rather, the line between tort and contract must be drawn by analyzing interrelated factors such as the nature of the defect, the type of risk, *and the manner in which the injury arose*" (emphasis supplied).

Caterpillar's argument in Section 2(b) of its principal brief is not that Trans-Spec's claim for alleged repair costs,  reduced resale value, lost income and value of its business, and clean-up costs is barred because those are economic-type damages; Caterpillar's argument is that Trans-Spec is barred as a matter of law from recovering those alleged damages because there is no

evidence they were *proximately caused by damage to property other than the engines* instead of simply by the alleged engine malfunctions themselves. Trans-Spec has no answer to that argument, except to misread the law.[10]

4.    <u>Trans-Spec Still has not Identified Admissible Evidence to Prove any Losses were Proximately Caused by Damage to Property Other than the Engines Themselves</u>

As noted at the outset, Trans-Spec has prolonged this litigation just by having its lawyers say in court filings whatever they think is necessary to keep the case going. Trans-Spec is trying the same ploy now. The law is clear, however, that when the summary judgment stage arrives, and a defendant comes forward with evidence showing the plaintiff is unlikely to prove a *prima facie* case, the plaintiff can no longer get by on assertions in briefs and pleadings. The plaintiff has to come forward with specific, concrete evidence showing it can get to the jury. It is not enough to *say* such evidence exists: the plaintiff has to *present it to the Court.*

So what does Trans-Spec give the Court?

It gives the Court Mr. Howard's "affidavit" in which he says (a) "the damage caused by Caterpillar's defective engine units was not confined to the engines alone" and (b) "Caterpillar's defective engine units not only caused damage to other critical systems throughout Trans-Spec's trucks, they caused oil leaks which damaged Trans-Spec's property and that of Trans-Spec's customers." Because Mr. Howard's affidavit does not "show affirmatively that [he] is competent to testify to" those two matters, Fed. R. Civ. P. 56(e) – it does not affirmatively demonstrate he has personal knowledge of those matters or any other basis on which he could provide competent

---

[10] Trans-Spec says, "Although the Court has twice rejected Caterpillar's contention that Trans-Spec's negligence claim is barred by the economic loss doctrine, ... Caterpillar raises it yet a third time here," citing to the orders granting Trans-Spec's motion to amend the complaint to add the negligence claim and its denial of Caterpillar's Rule 12(b)(6) motion to dismiss the claim. Caterpillar trusts there is no need to discuss how in deciding motions to amend and Rule 12(b)(6) motions the Court just looks at averments in the complaint and assumes them to be true, whereas the whole point of a summary judgment motion is that the plaintiff can no longer get by just on what its lawyer is willing to say in a pleading but, instead, must come forward with concrete evidence sufficient to *prove* its case.

testimony about them -- it is inadmissible in opposition to a summary judgment motion and the Court may not properly consider it at all. *E.g.*, Garside v. Osco Drug, Inc., 895 F.2d 46, 49-50 (1st Cir. 1990); Murphy v. Ford Motor Co., 170 F.R.D. 82, 84-85 (D. Mass. 1997). Trans-Spec also gives the Court its own answers to interrogatories, which must similarly be disregarded for failure to show affirmatively that the person who signed them would be competent to testify to their contents.[11] Garside, 895 F.2d at 50.

Even if what Mr. Howard said could properly be considered, however, it would not get Trans-Spec over the rail. Caterpillar frankly told the Court it does not seek summary judgment on the basis of the economic loss doctrine with respect to so much of the claim as seeks recovery for alleged cost of replacing non-engine truck parts damaged by flywheel housing failures. Caterpillar Memorandum at 7[12]. Insofar as Caterpillar's motion is based on the economic loss doctrine, it is one for *partial* summary judgment disposing of so much of the claim as seeks recovery for alleged lost income, etc. Trans-Spec has not even purported to direct the Court's attention to evidence which, if true, would support a finding that damage to non-engine truck parts – as distinct from downtime caused solely by inoperable engines – proximately caused any loss other than the cost of replacing damaged parts. Nor has Trans-Spec purported to direct the Court's attention to evidence which, if true, would support a finding of damages attributable to oil leaks supposedly caused by flywheel housing failures. Trans-Spec limits itself to the kind of vague and aspirational assertions that Rule 56 is designed to dispense with. Caterpillar will not dwell on this subject here: it is sufficient that Trans-Spec's effort to sow confusion be pointed out so that the Court will not be misled by it.

---

[11] Caterpillar has moved to strike the incompetent paragraphs of the affidavit and the interrogatory answers.
[12] It does, however, seek dismissal of the entire claim based on its contractual exclusion of negligence liability.

5.    There is No Claim and No Evidence of Negligent Misrepresentation

Adopting the scattershot approach typical of those who have no confidence in any of their arguments, Trans-Spec asserts its claim is not barred by the economic loss doctrine because of a supposed exception for claims based on negligent misrepresentation.  There are at least two problems with that argument, which may be stated summarily.

First, the Second Amended Complaint does not aver negligent misrepresentation.  This is another example of Trans-Spec's willingness to say anything anytime anywhere if it thinks it can keep the litigation alive by doing so.  In effect, what Trans-Spec is trying to do is amend its complaint (again) by means of a brief in opposition to summary judgment, a practice which is not permitted.  *See* Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 (7th Cir. 1984), *cert. denied* 470 U.S. 1054 (1985) (citation omitted).  It is especially not permitted where, as here, the Scheduling Order deadline for amendments to the pleadings expired over a year ago.

Second, as discussed *supra* at 4-6, Trans-Spec has directed the Court to no *evidence* of a material misrepresentation.  True to form, it just gives the Court assertions by its lawyer, unsupported by citation to the record.  Whatever may be thought of that practice at earlier stages of a case, once summary judgment time arrives the time for unsupported assertions in briefs is past.

Enough said on this subject. Trans-Spec has not pleaded negligent misrepresentation and has directed the Court to no evidence that would support such a claim had it been pleaded.  Its argument at pages 16-17 of its Opposition is meritless as a matter of law.

6.    There is No Claim and No Evidence of Negligent Breach of Contract

Continuing the scattershot approach, Trans-Spec argues in perfunctory fashion that its claim survives the economic loss doctrine because of a supposed exception for claims of

negligent breach of contract. The Second Amended Complaint contains no claim for negligent breach of contract. The claim is for "negligent design, development, assembly, manufacture, inspection, testing, marketing, advertising, and distribution" of the engines. Second Amended Complaint, ¶52. Once again, Trans-Spec is trying to amend its complaint, more than a year after the Scheduling Order deadline for motions to amend, by means of a brief. Trans-Spec seems to think, the Scheduling Order notwithstanding, that it can just keep changing the claim it asserts indefinitely, presenting a constantly moving target. Conduct of that type is not permitted. In any event, Trans-Spec has not directed the Court to any evidence of a negligent *breach of contract*; the only ostensible evidence it presents is of supposed negligent design or manufacture, exactly the kind of negligence the economic loss doctrine is intended to address.

7.    There was no Waiver Either of the Contractual Exclusion of Liability for Negligence or of the Benefits of the Economic Loss Doctrine

Trans-Spec's "waiver" argument, to the extent it can be characterized as argument at all, comes in two parts. Caterpillar will address them seriatim.

Trans-Spec seems to argue that Caterpillar fraudulently induced it to enter into the contract containing the exclusion of negligence liability and that the exclusion is therefore ineffective. This, at least, is what can be inferred from the authorities cited in the first paragraph of Section D of Trans-Spec's Opposition, both of which deal with fraud in the inducement. The problem is that Trans-Spec does not identify any fraudulent representation that allegedly induced it to enter into the contract. Trans-Spec's lawyer *says in the brief* that Caterpillar made fraudulent misrepresentations about the warranty coverage, but as usual counsel's statements are not only unsupported by the record but actually contrary to it. The relevant evidence is cited *supra* at pages 4-6 and need not be repeated here. Trans-Spec further says Caterpillar "assured Trans-Spec of the suitable design and fitness" of the C-12 engines; but once again, it fails to

direct the Court to any specific evidence to support the assertion. The *evidence* on this subject is cited *supra* at pages 4-6. To the extent factual representations are said to have been made about the engines, there is no indication they were untrue.[13] There is no claim and no evidence the C-12 engines did not deliver the horsepower, torque, startability, etc. that was described.

Second, Trans-Spec appears to argue that Caterpillar waived the contractual exclusion of negligence liability and the benefits of the economic loss doctrine because employees and alleged agents told Trans-Spec that Caterpillar "would make it whole."[14] It is not a coincidence that Trans-Spec cites no legal authority for this argument.

General Laws c. 106, §2-209(5), governs waivers. It says a waiver may be retracted at any time by the party making it "unless the retraction would be unjust in view of material change of position in reliance on the waiver." Until Trans-Spec belatedly moved to amend its complaint to insert a negligence claim, Caterpillar had no reason to think the effectiveness of the negligence exclusion or the application of the economic loss doctrine might be an issue. As soon as that motion was forthcoming, however, Caterpillar expressly asserted both the negligence exclusion and the economic loss doctrine. *See* Caterpillar Inc.'s Opposition to the Plaintiff's Motion to Amend the Complaint at 2 and 10-12 (filed April 12, 2005). When Caterpillar answered the Second Amended Complaint it again asserted both the negligence exclusion and the economic loss doctrine. Caterpillar Inc.'s Answer to Count III of the Second Amended Complaint, and Jury Demand, Second, Fourth, Fifth, Eighth and Ninth Affirmative Defenses. If there was a waiver, it was indisputably retracted. Yet Trans-Spec does not even *assert* detrimental reliance on a supposed waiver, much less identify evidence that could support a finding of reliance. Detrimental reliance goes wholly unmentioned, not only in Trans-Spec's Opposition but also in

---

[13]  The "bragging up" of the engines reported by Mr. Medbury was classic non-actionable puffing. *E.g.*, Cummings v. HPG International, Inc., 244 F.3d 16, 21 (1st Cir. 2001), cited by Trans-Spec.

[14]  Caterpillar assumes for present purposes, counterfactually, that such statements were really made.

its Response to Caterpillar's Statement of Undisputed [Sic] Material Facts.  Trans-Spec has

therefore presented no evidence sufficient, if believed, to create a genuine issue as to the viability

and effectiveness of Caterpillar's contractual exclusion of negligence liability or as to the

application of the economic loss doctrine.[15]

CONCLUSION

It is time for this meritless action to be brought to a close without further ado.  Trans-Spec has kept it going for a year-and-three-quarters by just *saying* whatever it takes to keep the case alive.  Just *saying* things is no longer sufficient.  Trans-Spec has adduced no *evidence* to create a factual issue with respect to its negligence claim and that failure is fatal to its claim.

CATERPILLAR INC.,

By its attorneys,

CAMPBELL CAMPBELL EDWARDS
& CONROY, P.C.

_____
John A.K. Grunert  (BBO: 213820)
One Constitution Plaza
Boston, MA  02129
(617) 241-3000

---

[15]  There is thus no need to decide whether a general statement of the type ascribed by Trans-Spec to Caterpillar and Southworth-Milton employees could ever, under applicable law, be considered to amount to a waiver of the negligence disclaimer or the benefits of the economic loss doctrine.

ATTACHMENT 1

32

| | | |
|---|---|---|
| 1 | A. | **It was an introduction to the C10 and C12 and** |
| 2 | | **some people were invited to attend that.** |
| 3 | Q. | Did you invite anyone from Truck Service? |
| 4 | A. | **I did.** |
| 5 | Q. | Who? |
| 6 | A. | **Jay Howard.** |
| 7 | Q. | Did he go? |
| 8 | A. | **He did not.** |
| 9 | Q. | Did someone from Truck Service go? |
| 10 | A. | **Yes.** |
| 11 | Q. | Who was that? |
| 12 | A. | **Andy Lind.** |
| 13 | Q. | Did you meet with Andy Lind during the |
| 14 | | conference? |
| 15 | A. | **Yes.** |
| 16 | Q. | Was there a cut-away of a C12 engine at the |
| 17 | | conference? |
| 18 | A. | **I don't remember it.** |
| 19 | Q. | Was there informational materials given out at |
| 20 | | the conference? |
| 21 | A. | **Yes.** |
| 22 | Q. | What sort of materials do you remember being |
| 23 | | given out? |
| 24 | A. | **Similar to what we previously discussed,** |

33

| | | |
|---|---|---|
| 1 | | **advertising brochures, spec sheets.** |
| 2 | Q. | Was there someone from Caterpillar discussing |
| 3 | | the capabilities of the engines -- |
| 4 | A. | **Yes.** |
| 5 | Q. | -- there for the attendees? |
| 6 | A. | **Yes.** |
| 7 | Q. | Do you know if it's generally common for you to |
| 8 | | have flywheel housing failures in engines? |
| 9 | A. | **Repeat that.** |
| 10 | Q. | Sure. |
| 11 | | Do you know if it's generally common to |
| 12 | | have flywheel housing failures in engines? I |
| 13 | | can make it more specific, heavy-duty truck |
| 14 | | engines, not automotive, but in a truck engine. |
| 15 | A. | **I hate to be obtrusive. I need to ask you to do** |
| 16 | | **that one more time.** |
| 17 | Q. | Not at all. I will try to rephrase it. |
| 18 | | Is it generally common for there to be |
| 19 | | flywheel house failures in truck engines such as |
| 20 | | the 3176 or C10 or C12 or C13, that type of |
| 21 | | engine? |
| 22 | A. | **No.** |
| 23 | Q. | What sort of damage can a failed flywheel |
| 24 | | housing do to a truck? |

34

| | | |
|---|---|---|
| 1 | A. | **Well, it could be truck -- to the truck or whole** |
| 2 | | **engine.** |
| 3 | Q. | Everything, engine and truck. Take a truck that |
| 4 | | has a flywheel housing that's starting to fail, |
| 5 | | what kind of damage can it lead to? |
| 6 | A. | **I don't think it could do much damage to the** |
| 7 | | **truck per se, but it could certainly do a lot of** |
| 8 | | **damage to the engine.** |
| 9 | Q. | What kind of damage? |
| 10 | A. | **It could rip the flywheel from the back of the** |
| 11 | | **engine; could cause problems remounting the** |
| 12 | | **flywheel. Transmission damage could be done** |
| 13 | | **along with that.** |
| 14 | Q. | Significant transmission damage? |
| 15 | A. | **Possible.** |
| 16 | Q. | Driveshaft damage? |
| 17 | A. | **Possible.** |
| 18 | Q. | How about to clutches when you have a failed |
| 19 | | flywheel house, does it damage the clutch or |
| 20 | | does the repair produce damage to the clutch? |
| 21 | | MR. GRUNERT: Object to form. |
| 22 | A. | **Not always.** |
| 23 | Q. | Sometimes? |
| 24 | A. | **Yes.** |

35

| | | |
|---|---|---|
| 1 | Q. | Have you ever seen a failed flywheel housing? |
| 2 | A. | **No.** |
| 3 | Q. | Have you ever heard of failed flywheel housings |
| 4 | | other than Truck Service's problem? |
| 5 | A. | **I know of none other.** |
| 6 | Q. | So the only flywheel house problem that you have |
| 7 | | heard of is with Truck Service's trucks? |
| 8 | A. | **Yes.** |
| 9 | Q. | When did you first learn of those problems? |
| 10 | A. | **A couple years after they took delivery of those** |
| 11 | | **C12s.** |
| 12 | Q. | Would you be able to estimate when that was? |
| 13 | A. | **Well, if my recollection is valid, they took** |
| 14 | | **delivery of those in January or thereabouts or** |
| 15 | | **December of '99 or January of 2000, I would have** |
| 16 | | **to tell you it would be sometime in the middle** |
| 17 | | **of 2002.** |
| 18 | Q. | Are trucks of the type used by Trans-Spec or |
| 19 | | Truck Service custom designed? |
| 20 | | MR. GRUNERT: Object to the form. |
| 21 | A. | **In the sense that the purchaser selects how** |
| 22 | | **these vehicles are to be constructed, the answer** |
| 23 | | **would be yes.** |
| 24 | Q. | What's the term for that process of designing a |

36

| | | |
|---|---|---|
| 1 | | truck? |
| 2 | A. | **Speccing.** |
| 3 | Q. | Have you ever personally specced a truck for a |
| 4 | | customer? |
| 5 | A. | **No.** |
| 6 | Q. | Have you been involved in helping spec trucks |
| 7 | | for customers? |
| 8 | A. | **No.** |
| 9 | Q. | Do you know how a truck gets specced? |
| 10 | A. | **Yes.** |
| 11 | Q. | Can you tell me about this procedure? |
| 12 | A. | **Depends upon the individual who's purchasing it.** |
| 13 | | **He determines what sorts of things they want for** |
| 14 | | **their particular usage, and they inform the** |
| 15 | | **truck salesperson how they want the truck built.** |
| 16 | Q. | Do you know what considerations are taken into |
| 17 | | account in speccing a truck? |
| 18 | A. | **Yes.** |
| 19 | Q. | What are some of the considerations? |
| 20 | A. | **The load that the truck is going to be required** |
| 21 | | **to be working, the areas in which it's going to** |
| 22 | | **be required to work.** |
| 23 | Q. | So the intended application of the truck would |
| 24 | | be a consideration, what load and what that load |

37

| | | |
|---|---|---|
| 1 | | is? |
| 2 | A. | **Yes.** |
| 3 | Q. | And the intended region of travel is a |
| 4 | | consideration? |
| 5 | A. | **Yes.** |
| 6 | Q. | Do you know what kind of computer software is |
| 7 | | involved in speccing a truck? |
| 8 | A. | **From the individual OEM?** |
| 9 | Q. | Yes. |
| 10 | A. | **No.** |
| 11 | Q. | Does Caterpillar have any computer programs that |
| 12 | | they use in terms of helping determine the |
| 13 | | appropriateness of engines? |
| 14 | A. | **Driveline Spec, yes.** |
| 15 | Q. | Could you tell me about that program. |
| 16 | A. | **That program will allow you to simulate vehicle** |
| 17 | | **capabilities regarding speed capabilities,** |
| 18 | | **torque capabilities, startability, things of** |
| 19 | | **that nature.** |
| 20 | Q. | Do you know if that was ever shown to anyone |
| 21 | | from Truck Service when they were considering |
| 22 | | the purchase of the 22 trucks that are at issue |
| 23 | | in this lawsuit? |
| 24 | A. | **Yes.** |

ATTACHMENT 2

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 04-11836RCL

TRANS-SPEC TRUCK SERVICE, INC. )
D/B/A TRUCK SERVICE,            )
                               )
        Plaintiff              )
                               )
vs.                            )
                               )
CATERPILLAR, INC.,             )
                               )
        Defendant              )

DEPOSITION OF ROBERT G. PARKS, a witness called on behalf of the Defendant, pursuant to Massachusetts Rules of Civil Procedure, before Susan E. Wilson, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Law Offices of Campbell, Campbell, Edwards & Conroy, One Constitution Plaza, Boston, Massachusetts, on Thursday, September 8, 2005, commencing at 10:04 a.m.

C.J. REPORTING
A5 Colonial Drive, No. 7
Andover, Massachusetts 01810
978.409.9090
www.cjreporting.com

15

1    so forth happened between us all the time

2    over the years, but I don't necessarily

3    draw them into the realm of seeking my

4    advice.  Warranty work would be a

5    mechanical-type issue in my mind.  It's

6    possible that he talked to me, but we talk

7    about a lot of things all of the time.  I

8    just don't remember.

9              MR. GRUNERT:  Why don't we

10   mark as the third exhibit the package of

11   documents that you brought with you today.

12   I see you have your own copy.

13             MS. REIMER:  Yes.

14             (Package of Documents marked

15             as Exhibit No. 3 for

16             identification.)

17   Q.   I want to go back to a little bit of

18        background information, sir.

19   A.   Sure.

20   Q.   I take it you represent Trans-Spec Truck

21        Service, Inc., correct?

22   A.   I have in many instances, yes.

23   Q.   About how long have you been representing

24        Trans-Spec in various matters?

16

```
 1    A.    Probably 20 years very intermittently.
 2          They have other corporations that at times
 3          drew more of my attention.  So I say at
 4          least, you know, once or twice a year for
 5          twenty years.
 6    Q.    What type of representation do you provide
 7          to Trans-Spec?  Mr. Howard at his
 8          deposition referred to you as his corporate
 9          attorney.  How do you view the role that
10          you play with respect to Trans-Spec?
11    A.    Probably in somewhat of a less broad light.
12          I'm not on retainer or a staff attorney.
13          When they have an issue that he thinks I
14          can be helpful with, he uses me for that
15          and I bill him accordingly.  This is
16          Trans-Spec.
17    Q.    Do you handle litigation for him?
18    A.    At times but not on extremely large scales.
19          I have done a few collection matters,
20          whether defending or seeking.  I have done
21          some personnel administrative cases for
22          him.
23    Q.    Do you also provide non-litigation services
24          such as, for example, advice on regulatory
```

17

| | | |
|---|---|---|
| 1 | | matters or advice on contracts? |
| 2 | A. | Both.  Yes.  For example, the Department of |
| 3 | | Transportation regulates their operations |
| 4 | | to some degree.  I'm speaking now on the |
| 5 | | broader sense of their other entities and |
| 6 | | real estate partnerships and so forth. |
| 7 | | Trans-Spec specifically I remember handling |
| 8 | | a few DOT matters.  I think there was an |
| 9 | | OSHA claim against another affiliate that I |
| 10 | | was involved in.  It's an ad hoc type |
| 11 | | relationship.  I'm not the go-to guy on |
| 12 | | everything. |
| 13 | Q. | You have represented Trans-Spec in |
| 14 | | litigation matters and a variety of |
| 15 | | non-litigation matters.  You have a rather |
| 16 | | broad area of assistance that you give |
| 17 | | Trans-Spec when you are consulting? |
| 18 | A. | That's quite correct. |
| 19 | Q. | One of the other entities that you |
| 20 | | represented is called TS Truck Service, |
| 21 | | Inc.; is that correct? |
| 22 | A. | Yes. |
| 23 | Q. | Have you represented TS Truck Service, Inc. |
| 24 | | for something like 20 years as well? |

18

```
 1    A.    I think so.  I forget which dates they have

 2          for incorporation, but it's a relationship

 3          that goes back to the '80s.  And I can't be

 4          too much more specific than that without

 5          checking everything I ever did, some of

 6          which is nonexistent now anyway.

 7    Q.    I don't need any real specificity on the

 8          subject.  I take it that you also represent

 9          various other business entities that either

10          Mr. Howard or his wife, Donna Howard, have

11          an ownership or a controlling interest in;

12          is that correct?

13    A.    Over the years I have, yes.

14    Q.    Do you also represent Mr. Howard and his

15          wife individually?

16    A.    In certain things, yes.

17    Q.    You have a long-standing relationship with

18          the Howards and their business enterprises?

19    A.    You are quite correct.

20    Q.    Mr. Howard at his deposition testified that

21          he holds weekly meetings with you.  Do you

22          have regularly scheduled meetings with him?

23    A.    No.  No.  I can't imagine a week has gone

24          by for a long time where I haven't talked
```

1      to him at least by telephone.  But there's

2      nothing of a pattern or agenda.  It's kind

3      of on an as needed ad hoc basis.

4    Q.  So you don't have penciled into your

5      calendar any particular day or time when

6      you are going to go meet with Mr. Howard or

7      he is going to meet with you?

8    A.  I do.  I often do, but it would be I need

9      to talk to you about the claim of an

10     employee or something and I need some of

11     your time and records, why don't you come

12     up next Tuesday, and I will schedule

13     something like that in a datebook.  But it

14     wouldn't be obviously revealing.  It would

15     be the fact that I'm going there.

16   Q.  The meetings that you have with him or the

17     telephone conversations you have with him

18     are ad hoc in the sense that you are

19     contacted, there's a need, you have a

20     meeting, there's no regularly scheduled

21     meetings far into the future every week or

22     every two weeks?

23   A.  Nothing like that.

24   Q.  Now, you told me that you recall a meeting

DEPOSITION REPORTED BY: __SUSAN E. WILSON, RPR__    ON: _____

## ERRATA SHEET/SIGNATURE PAGE

I, the undersigned, _____ do hereby certify, under the pains and penalties of perjury, that I have read the foregoing deposition and that, to the best of my knowledge, said deposition is true and accurate with the exception of the following corrections listed below:

| PAGE | LINE | CORRECTIONS | |
|------|------|-------------|---|
| 30 | 8 | CHANGE: "Merely" to "NEARLY" | REASON: |
| 34 | 10 | "Cadrent" to "Cadrin" | |
| 31 | 14 | "ANY" to "anything" | |
| 36 | 13 | "dontext" to "context" | |
| 42 | 15 | "CAN" to "KEN" | |
| 36 | 5 | Add "not" before | |
| | | "the major" | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

DEPONENT'S SIGNATURE: _____

Subscribed and sworn before me this _30th_ day of _September_, 20 _05_.

NOTARY PUBLIC

JAMES F. WALKER
Notary Public
Commonwealth of Massachusetts
My Commission Expires
June 28, 2007

ATTACHMENT 3

## History

(Showing 1 document)

## Direct History

SELECT TO PRINT, EMAIL, ETC.

☐ ➡ <u>1</u>   KeyCited Citation:
**Andover Air Ltd. Partnership v. Piper Aircraft Corp.,** 1989 WL 110453, 13
Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494 (D.Mass. Jan 04, 1989 ) (NO. 87-0532-Z)

*Withdrawn Pursuant to Settlement (Jun 14, 1989)*

© Copyright 2006 West, Carswell, Sweet & Maxwell Asia and Thomson Legal & Regulatory Limited, ABN 64 058 914 668, or their Licensors. All rights reserved.

Westlaw.

7 UCC Rep.Serv.2d 1494                                                                                    Page 1

1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

**(Publication page references are not available for this document.)**

►

ANDOVER AIR LIMITED PARTNERSHIP
v.
PIPER AIRCRAFT CORP.
v.
KLADSTRUP
No. 87-0532-Z
United States District Court, D. Massachusetts
January 4, 1989

Callaghan & Company's Headnote and Classification

P2608.4(2), P2608.4(5), P2711.1
Buyer's election of remedies.
D.Mass. Jan. 4, 1989
Buyer of aircraft was entitled to pursue against manufacturer the alternate recovery theories of (1) revocation, and (2) breach of both contract and warranty since they were brought in good faith. Although the Code appears to limit the use of the revocation remedy against a "seller," some courts have permitted such revocation against manufacturers. Case law also provided support for buyer's other recovery theory. Finally, the pleading of alternate recovery theories is permitted by the Federal Rules of Civil Procedure.
ANDOVER AIR LIMITED PARTNERSHIP v. PIPER AIRCRAFT CORP. 1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

Callaghan & Company's Headnote and Classification

P2608.4(5)
Revocation action against manufacturer.
D.Mass. Jan. 4, 1989
Although the Code provides that revocation of acceptance is a remedy to be used against the "seller," the majority of the courts define "seller" as including a manufacturer that played an active role in, or was the principal of, the sale. Assuming that Massachusetts courts would follow the majority rule: absent a showing that aircraft seller acted as agent for manufacturer or that manufacturer passed title directly to buyer, buyer was not entitled to bring a revocation action against manufacturer.
ANDOVER AIR LIMITED PARTNERSHIP v. PIPER AIRCRAFT CORP. 1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

Callaghan & Company's Headnote and Classification

P2608.2, P2608.6(2), P2608.6(4)
Actions inconsistent with revocation claim--use of plane before and after discovery of defect.
D.Mass. Jan. 4, 1989
Assuming that Massachusetts courts would follow the decisions of courts in other jurisdictions: whether buyer's use, repair, and maintenance of aircraft prior to discovery (through a crash landing) of a defective landing gear

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

**(Publication page references are not available for this document.)**

precluded its revocation of acceptance first required determination of the issue whether there had been any "substantial change" in the condition of the plane, a question for the jury. Whether continued use of the aircraft after discovery of the defect precluded revocation of acceptance depended on whether use after revocation was reasonable, which is also a question of fact for the jury.
ANDOVER AIR LIMITED PARTNERSHIP v. PIPER AIRCRAFT CORP. 1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

Callaghan & Company's Headnote and Classification

P1204.1, P2608.2
Revocation within a reasonable time.
D.Mass. Jan. 4, 1989
Whether buyer of an aircraft which crashed landed as the result of defective landing gear failed to revoke its acceptance within a reasonable time is a question of fact for the jury.
ANDOVER AIR LIMITED PARTNERSHIP v. PIPER AIRCRAFT CORP. 1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

Callaghan & Company's Headnote and Classification

P2608.4(3), P2608.4(4), P2711.2, P2711.3(2)
Damages allowable to revoking buyer.
D.Mass. Jan. 4, 1989
Assuming that Massachusetts courts would follow the majority of the decisions of courts in other jurisdictions: if buyer of aircraft was permitted to revoke its acceptance, it would be entitled to recover the purchase price of the plane, plus any out-of-pocket incidental and consequential damages, but not loss of use or the value of the lost resale option since revocation does not permit a buyer to recover the benefit of his bargain. Moreover, the jury properly could reduce buyer's damages award by an amount equal to the value of buyer's use of the plane both before and after its discovery that the plane had a defective landing gear. Thus, for this and other reasons, motion by defendants seller and manufacturer to prohibit the introduction of evidence of consequential and incidental damages during the damage phase of the trial is denied.
ANDOVER AIR LIMITED PARTNERSHIP v. PIPER AIRCRAFT CORP. 1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

Callaghan & Company's Headnote and Classification

P2714.2(2), P2719.7(2), P2719.7(6)
Failure of exclusive repair-or-replacement remedy; effect on damages liability disclaimer.
D.Mass. Jan. 4, 1989
In a breach of warranty action by buyer of aircraft against manufacturer (which, in turn, sued seller), if buyer can establish that manufacturer's limited repair-or-replacement warranty failed of its essential purpose, manufacturer's disclaimer of liability for consequential and incidental damages will become inoperative, and buyer may recover such damages as allowed by the Code. Thus, for this and other reasons, motion by defendants (manufacturer and seller) to prohibit the introduction of evidence of consequential and incidental damages during the damage phase of the trial is denied.
ANDOVER AIR LIMITED PARTNERSHIP v. PIPER AIRCRAFT CORP.

Callaghan & Company's Headnote and Classification

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

**(Publication page references are not available for this document.)**

P2714.1, P2715.1, P2715.2(2)
Types of buyer's damages.
D.Mass. Jan. 4, 1989
"General damages" are those that flow naturally and necessarily from the complained of wrong and do not depend on the special character, condition, or circumstances of the plaintiff-buyer. In contrast, "consequential damages" are not immediate and direct even though they result from the complained of wrong. "Incidental damages" include such things as the expense of inspection, receipt, transportation and custody of goods rightfully rejected, etc.
ANDOVER AIR LIMITED PARTNERSHIP v. PIPER AIRCRAFT CORP. 1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

Callaghan & Company's Headnote and Classification

P2302.4(2), P2302.4(4), P2302.32, P2719.7(6), P2719.11(2)
Failure of exclusive repair-or-replacement remedy; unconscionability of damages liability disclaimer.
D.Mass. Jan. 4, 1989
The question of unconscionability is one of law to be decided by the court. Aircraft manufacturer's limited repair or replacement warranty coupled with a disclaimer of liability for general, consequential and incidental damages, which would result in manufacturer being liable only for the repair or replacement of a defective landing gear (costing tens of dollars) even though the gear was the alleged cause of the plane's crash landing (resulting in damages in excess of $100,000 and which might have been worse but for the skill of the pilot), was unconscionable since it left buyer without a "fair quantum of remedy," notwithstanding that the buyer's negotiator was a sophisticated party, and the terms of the warranty/disclaimer were sufficiently clear and readable as to bar a claim by buyer of "unfair surprise." Thus, despite manufacturer's pledge that it would only take advantage of the consequential and incidental damages part of the disclaimer (which are often upheld), and not the general damages part, the entire disclaimer is voided.
ANDOVER AIR LIMITED PARTNERSHIP v. PIPER AIRCRAFT CORP. 1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

Callaghan & Company's Headnote and Classification

P2711.1, P2714.2(2), P2715.11
Recovery of damages for breach of warranty.
D.Mass. Jan. 4, 1989
In a breach of warranty action by buyer of aircraft against manufacturer arising out of the plane's crash landing allegedly as the result of a defective landing gear, if buyer establishes that the breach occurred, it will be entitled to recover its cost of repair, its loss of use of the plane, its increased insurance cost, and the value of its lost repurchase option.
ANDOVER AIR LIMITED PARTNERSHIP v. PIPER AIRCRAFT CORP. 1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

UCC Sections Cited: § 2-103(1)(d), § 2-106(1), § 2-302(1), § 2-602(2)(a), § 2- 608(2), (3), § 2-715(1), (2), § 2-719(1)(a), (2) and Official Comment 1.

EDITORS' NOTE

For more on one the issues discussed in this case, see Foss, When to Apply the Doctrine of Failure of Essential Purpose to an Exclusion of Consequential Damages: An Objective Approach, 25 Duq L Rev 551 (1987), and Mather, Consequential Damages When Exclusive Repair Remedies Fail: UCC 2-719, 38 SCL Rev 673 (1987). For

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7 UCC Rep.Serv.2d 1494                                                                  Page 4

1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

**(Publication page references are not available for this document.)**

more on damages, see Damages Under the Uniform Commercial Code (Callaghan 1988), by R. Anderson.

Harold W. Potter, Jr. and Miriam Goldstein Altman, both of Sherburne, Powers & Needham, Boston, for plaintiffs.

Peter J. Black for defendants.

Albert F. Cullen for third-party defendants.

ZOBEL, District Judge.

Piper Aircraft Corporation and Lear Siegler, Inc. ("Piper") have filed a motion in limine requesting that this court prohibit Andover Air Limited Partnership ("Andover Air") from introducing evidence of consequential or incidental damages during the damage portion of the plaintiff's action against the defendants. Although Piper's motion specifically addresses consequential and incidental damages, both Piper and Andover have thoroughly briefed all of the relevant damage issues and thus this court treats the motion in limine as a request for the court to clarify the applicability of the damage theories that Andover intends to pursue.

Andover presents two alternative theories of recovery. First, it argues that its purchase of an aircraft may be revoked against Piper under § 2-608 of the Uniform Commercial Code. Second, it seeks damages for breach of contract and implied and express warranties.

Piper initially asserts that Andover may not proceed with both its revocation and breach claims because they are mutually exclusive. Piper also claims that regardless of whether Andover may proceed on both claims in theory, revocation is, in any event, unavailing for three reasons: First, although Piper manufactured the aircraft, it was not the "seller" and the Uniform Commercial Code allows for revocation only against the "seller"; second, Andover repaired and maintained the aircraft prior to revocation; and third, Andover repaired, maintained, and used the aircraft after Piper refused to acknowledge plaintiff's revocation of acceptance. Regarding Andover's breach of contract and warranty claims, Piper asserts that it has limited its liability on breach of contract and warranty claims to the cost of repair or replacement of any part, component or installation work proved defective. Furthermore, regardless of whether the warranty it issued for the aircraft failed of its essential purpose, Piper claims that its express exclusion of liability for any and all consequential and incidental damages remains effective. Andover disputes all of Piper's assertions.

## I. BACKGROUND

Andover purchased a Piper Cheyenne 1A aircraft and a five-year warranty from Northeast Cheyenne Sales, Inc. ("Northeast") on November 25, 1985. On November 19, 1986, the aircraft made a gear-up forced landing requiring repairs allegedly at a cost of more than $100,000. Andover sued Piper alleging that the right main landing gear failed to extend because of a defective uplock hook assembly. A jury found that the failure of the gear to extend was the proximate result of a defect for which Piper was responsible.

## II. MULTIPLE THEORIES OF RECOVERY

Piper asserts that Andover is proceeding to trial on two mutually exclusive remedies in an effort to avoid the consequences of an unfavorable ruling on their breach of warranty claims. Pursuing such claims, according to Piper, violates Fed. R. Civ. P. 11, which requires that a party or attorney possess a good faith belief that the claim for relief is warranted by existing law. Piper suggests that Andover cannot have a good faith belief in two mutually exclusive remedies and that proceeding on both claims is different than pursuing two alternative theories of liability

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

**(Publication page references are not available for this document.)**

such as negligence and breach of warranty in a personal injury action. Piper cites no case authority in support of its proposition.

The Federal Rules of Civil Procedure govern the pleadings that a party may make, and a party "may set forth two or more statements of a claim . . . regardless of consistency." Fed. R. Civ. P. 8(e)(2). Rule 8(a)(2) provides that a party may demand "[r]elief in the alternative or of several different types." Id. at 8(a)(2). Nothing precludes Andover from pursuing inconsistent claims, even where the theories of liability are mutually exclusive. The only constraint is that a judgment in Andover's favor "cannot be supported by inconsistent theories if one theory precludes the other or is mutually exclusive of the other." Fredonia Broadcasting Corp. v. RCA Corp., 481 F.2d 781, 801 [12 UCC Rep Serv 1088] (5th Cir. 1973). Several courts have explicitly allowed the plaintiff to pursue both breach of warranty and revocation of acceptance claims. E.g., Fargo Machine & Tool Co. v. Kearney & Trecker Corp., 428 F. Supp. 364, 377 [21 UCC Rep Serv 80] (E.D. Mich. 1977); Parsons v. Motor Homes of America, Inc., 465 So. 2d 1285, 1289 [40 UCC Rep Serv 1264] (Fla. Dist. Ct. App. 1985); General Motors Acceptance Corp. v. Anaya, 703 P.2d 169, 171 [41 UCC Rep Serv 824] (N.M. 1985). Of course, even though Andover may pursue both claims, the jury could not return a damage award inconsistent with the theories presented.

Andover has a reasonable basis for pursuing either of its claims. Sufficient case law exists on the issue of revocation against a manufacturer to suggest that Andover may be entitled to revoke its purchase against Piper. Similarly, existing case law supports Andover's breach of contract and warranty claim. Contrary to Piper's assertion, Andover's claim for relief under the two alternative theories advanced is not made in bad faith. Thus, Andover may proceed to trial on both theories of recovery.

## III. RECOVERY UNDER THE THEORY OF REVOCATION

Andover asserts that revocation of acceptance is available not only against Northeast Cheyenne but also against Piper. Because no Massachusetts court has considered this issue, I must attempt to foretell what a Massachusetts court would do if faced with a revocation claim against a manufacturer.

### A. Revocation Against the Manufacturer

The Uniform Commercial Code ("the Code") allows revocation of acceptance against a "seller" if certain conditions are met. Mass. Gen. Laws Ann. ch. 106, § 2-608 (West 1958). The Code defines a "seller" as one who "sells or contracts to sell goods," id. § 2-103(1)(d), and defines a "sale" as "the passing of title from the seller to the buyer for a price." Id. § 2-106(1). Piper argues that Northeast Cheyenne acted as the seller in the transaction while Andover claims that excluding Piper from the concept of seller is contrary to the purposes of the Code.

Both parties support their respective positions with cases from jurisdictions other than Massachusetts. Andover cites Durfee v. Rod Baxter Imports, Inc., 262 N.W.2d 349 [22 UCC Rep Serv 945] (Minn. 1977) and Volkswagen of America, Inc. v. Novak, 418 So. 2d 801 [34 UCC Rep Serv 1150] (Miss. 1982), two cases in which automobile manufacturers were considered "sellers" for the purposes of a revocation. The Durfee court seemed primarily concerned that the buyer would be left without any remedy if he could not revoke against the manufacturer and decided that the Code provision allowing for the liberal provision of remedies weighed in favor of permitting the buyer to revoke against the manufacturer. Durfee, 262 N.W.2d at 357-58. In Novak, the Mississippi court felt bound by a statutory provision that eliminated privity as a requirement for breach of warranty actions brought under the provisions of the Code. Novak, 418 So. 2d at 803. A New Jersey court has advanced a third rationale: when a manufacturer offers a warranty to consumers it creates a direct contractual obligation to the buyer making revocation an appropriate remedy, at least where both the limited remedy provided for in the warranty and the implied warranty of merchantability fail. Ventura v. Ford Motor Corp., 433 A.2d 801, 811-12 [32 UCC Rep Serv

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

**(Publication page references are not available for this document.)**

57] (N.J. Super. Ct. App. Div. 1981).

More numerous are the courts that require privity between buyer and seller before allowing revocation. E.g., Voytovich v. Bangor Punta Operations, Inc., 494 F.2d 1208, 1211 [15 UCC Rep Serv 45] (6th Cir. 1974); Seekings v. Jimmy GMC of Tucson, Inc., 638 P.2d 210, 214 [32 UCC Rep Serv 1450] (Ariz. 1981); Gasque v. Mooers Motor Car Co., 313 S.E.2d 384, 390 [38 UCC Rep Serv 120] (Va. 1984). These cases express the underlying rationale that revocation under the Code (like rescission in general contract law) operates to restore the status quo ante. The buyer returns the goods to the seller in exchange for the purchase price. But where a manufacturer has sold goods outright to a wholesaler or retailer, it no longer has an ownership interest in the goods and never receives the purchase price from the ultimate buyer. Thus, the argument goes, a manufacturer having no part in the sales transaction has no role to play in the restoration of the parties to their former positions. The only exception is when the buyer demonstrates that the retailer/seller acted as the agent of the manufacturer. E.g., Seekings, 638 P.2d at 214; Conte v. Dwan Lincoln-Mercury, Inc., 374 A.2d 144, 149-50 [20 UCC Rep Serv 899] (Conn. 1976); see also Hitchcock v. Emergency Lighting and Systems, Inc., 12 Mass. App. Ct. 930, 425 N.E.2d 396 [32 UCC Rep Serv 14] (1981).

Such authority as exists indicates that Massachusetts courts would adopt the more limited definition of "seller" as set forth in the majority of cases dealing with this issue. In part, this limited concept of seller underlies a decision by the Appeals Court of Massachusetts in Hitchcock v. Emergency Lighting and Systems, Inc., 12 Mass. App. Ct. 930, 930-31, 425 N.E.2d 396, 397 [32 UCC Rep Serv 14] (1981). In Hitchcock, the court ruled that the defendant retailer was not a "seller" because it neither passed title to the plaintiff nor acted as agent for the manufacturer. Id. at 930-31, 425 N.E.2d at 397. Thus, absent a showing that Northeast Cheyenne acted as agent for Piper or that Piper passed title directly to plaintiff, Andover may not revoke against Piper.

### B. Revocation After Use

Piper also asserts that even if revocation were a remedy generally available to Andover, that remedy is not available in this particular instance because the aircraft's condition had changed substantially due to use, repairs, and maintenance both before and after Andover notified Piper of its revocation. In response, Andover argues that it would eviscerate the Code if its revocation claim were prohibited on the ground that substantial use of the aircraft had occurred before the discovery of the defect.

Section 2-608(2) of the Code requires that revocation of acceptance "occur within a reasonable time after the buyer discovers . . . the ground for it and before any substantial change in condition of the goods which is not caused by their own defects." Mass. Gen. Laws Ann. ch. 106, § 2-608(2) (West 1958). Apparently no Massachusetts court has considered this issue but courts in other jurisdictions applying the same Code provision have treated the question of substantial change in the condition of goods as one of fact. E.g., Lackawanna Leather Co. v. Martin & Stewart, Ltd., 730 F.2d 1197, 1202-03 [38 UCC Rep Serv 475] (8th Cir. 1984) (applying Nebraska law, issue of substantial change properly submitted to jury for determination); Gasque v. Mooers Motor Car Co., 313 S.E.2d 384, 389 [38 UCC Rep Serv 120] (Va. 1984) (whether substantial change in goods occurred before revocation requires factual determination). Therefore, whether Andover's use, repair, and maintenance of the aircraft precludes revocation of acceptance requires resolution of a question of fact. [FN1]

### C. Use After Revocation

Finally, Piper argues, even if Andover's use of the aircraft before the accident does not preclude revocation, its use thereof following the accident does. Piper cites the Code, which states that once a party revokes, it has "the same rights and duties with regard to the goods involved as if he had rejected them." Mass. Gen. Laws Ann. ch.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7 UCC Rep.Serv.2d 1494                                                                                    Page 7

1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

**(Publication page references are not available for this document.)**

106, § 2-608(3) (West 1958). Upon rejection, "any exercise of ownership by the buyer with respect to any commercial unit is wrongful as against the seller." Id. § 2-602(2)(a).

However, continued use of the product does not always preclude revocation of acceptance. At least one Massachusetts court has noted that whether use of goods invalidates a revocation of acceptance is a question of fact subject to a test of reasonableness. Charney v. Ocean Pontiac, Inc., 17 U.C.C. Rep. Serv. (Callaghan) 982, 985 (Mass. Dist. Ct., App. Div. 1975). Courts in other jurisdictions have similarly held. E.g., CPC International, Inc. v. Techni-Chem, Inc., 660 F. Supp. 1509, 1514-15 [4 UCC Rep Serv 2d 485] (N.D. Ill. 1987); Fargo Machine & Tool Co. v. Kearney & Trecker Corp., 428 F. Supp. 364, 378 [21 UCC Rep Serv 80] (E.D. Mich. 1977); H.G. Fischer X-Ray Co. v. Meredith, 433 A.2d 1306, 1309 [31 UCC Rep Serv 1586] (N.H. 1981). One court has noted that a fact finder determining the reasonableness of use after revocation may consider the following factors: the seller's instructions to the buyer after revocation of acceptance; the degree of economic and other hardship that the buyer would suffer if he discontinued using the good; the reasonableness of continued use after revocation as a method for mitigating damages; the degree of prejudice to the seller; and whether the seller acted in good faith. Johannsen v. Minnesota Valley Ford Tractor Co., 304 N.W.2d 654, 658 [31 UCC Rep Serv 558] (Minn. 1981); see also McCullough v. Bill Swad Chrysler-Plymouth, Inc., 449 N.E.2d 1289, 1293 [36 UCC Rep Serv 513] (Ohio 1983). Therefore, whether Andover's continued use of the aircraft bars revocation is a question of fact for resolution at trial.

### D. Damages Under Revocation

Neither party has cited Massachusetts authority outlining the elements of recovery available to a plaintiff upon revocation. One Massachusetts case includes language that suggests that upon revocation of acceptance a plaintiff may seek recovery that would "place [the buyer] in as good a position as it would be in if [the seller] had properly performed, but does not [permit] overcompensation." Delano Growers' Cooperative Winery v. Supreme Wine Co., 393 Mass. 666, 680, 473 N.E.2d 1066, 1074-75 [40 UCC Rep Serv 93] (1985). Upon closer examination, however, the recovery in Delano was based on breach of contract and is therefore inapplicable here. Id. at 668, 473 N.E.2d at 1068. Another Massachusetts court permitted the recovery of consequential damages but the court did not extensively detail its reasoning. Fortin v. Ox-Bow Marina, Inc., 4 U.C.C. Rep. Serv. (Callaghan) 1046, 1053 (Mass. Super. Ct. 1987). Although there exists little guidance on how a Massachusetts court might decide this issue, in most cases the remedy for revocation of acceptance is seen as restoring the buyer to the economic position that would have been enjoyed if the seller had not delivered the goods. E.g., Hemmert Agricultural Aviation, Inc. v. Mid-Continent Aircraft Corp., 663 F. Supp. 1546, 1550 [4 UCC Rep Serv 2d 726] (D. Kan. 1987). However, revocation, like rescission, does not permit the buyer to obtain the benefit of his bargain. Therefore, Andover may recover the purchase price of the aircraft and any out-of-pocket incidental and consequential damages.

Specifically, Andover may present evidence about the purchase price of the aircraft, the cost of the warranty, and the interest paid on the aircraft loan, repair costs, and increased insurance costs. Andover may not recover for its loss of use of the aircraft or the value of the lost resale option because these are benefits that flow from the completed bargain and would not have occurred in the absence of the purchase. In addition, because Andover had use of the aircraft for a significant period of time, Piper may introduce evidence regarding the value of Andover's use of the aircraft both before and after the accident. The jury may properly reduce Andover's recovery by this amount.

### IV. Recovery Under Breach of Warranty Theory

Piper argues that under the warranty issued for the aircraft, Andover's remedy is limited to repair or replacement of any defective parts or components. [FN2] Piper's warranty also disclaims liability for "general, consequential, or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7 UCC Rep.Serv.2d 1494

1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

(Publication page references are not available for this document.)

Page 8

incidental damages relating to property damage or economic loss." Andover asserts that the limited warranty failed of its essential purpose and, as a result, it may pursue any remedy allowed under the Code, including consequential and incidental damages. [FN3] Andover also takes the position that the warranty provision, excluding incidental and consequential damages, is unconscionable because it also covers general damages.

### A. Recovery When the Warranty Fails of Its Essential Purpose

Under the Code, buyers and sellers may provide for limited remedies, provided that the limitation is not unconscionable. Mass. Gen. Laws Ann. ch 106, § 2- 719 (West 1958). However, where that remedy fails of its essential purpose, a buyer may seek any "remedy . . . as provided in this chapter." Id. § 2-719(2). The parties disagree about Andover's right to seek consequential and incidental damages upon failure of a limited remedy when Piper's warranty expressly disclaims any such liability.

Apparently only one Massachusetts opinion exists on this issue. In Reynolds v. Preferred Mutual Insurance Co., 11 U.C.C. Rep. Serv. (Callaghan) 701 (Mass. Dist. Ct., App. Div. 1972), a contractor attempted to limit its liability for defects in workmanship and material to the cost of labor and materials. The court, without extensively detailing its reasoning, ruled that because the warranty failed of its essential purpose, the plaintiff could recover under the general remedy provisions of the Code and thus allowed the plaintiff consequential damages. Id. at 708. A substantial number of courts have ruled similarly. But other courts have enforced the damage limitation clause even when the limited warranty fails of its essential purpose. Special Project, Article Two Warranties in Commercial Transactions: An Update, 72 Cornell L. Rev. 1159, 1307-09 (1987).

The reasoning of those courts that refuse to give effect to the damage exclusion clause upon failure of the limited remedy is more persuasive. The Ninth Circuit examined the conflicting case law in Fiorito Brothers, Inc. v. Fruehauf Corp., 747 F.2d 1309 [39 UCC Rep Serv 1298] (9th Cir. 1984), and concluded that the validity of a limitation clause requires an examination of "each case and each contract . . . on its own merits." Id. at 1314. Fundamentally, an exclusive "repair or replace" remedy that limits consequential damages represents a bargain struck between the parties. The buyer sacrifices its right to recover consequential damages in exchange for a promise from the seller that prompt and effective repair or replacement will be forthcoming so as to limit the consequential damages that the buyer might bear. In Fiorito, the court concluded that

" '[i]t cannot be maintained that it was the parties' intention that [the seller] be enabled to avoid all consequential liability for breach by first agreeing to an alternative remedy provision designed to avoid consequential harms, and then scuttling that alternative remedy through it recalcitrance in honoring the agreement.' " Id. at 1315 (quoting trial court's denial of motion for new trial) (emphasis supplied by reviewing court). Viewing the limitation clause as a trade between Andover and Piper, it is unfair to allow Piper to retain the benefit of the trade if it unjustifiably refused to honor its portion of the bargain. Therefore, if Andover proves that the warranty failed of its essential purpose, the exclusion of other damages becomes inoperative and Andover may seek consequential and incidental damages as allowed by the Code.

### B. Unconscionability of the Limited Remedy Clause

Andover also asserts that even if the limited remedy did not fail of its essential purpose, the exclusionary clause in the warranty is unenforceable because it unconscionably limits Piper's liability for defective parts or components to the repair or replacement of that component and precludes recovery of general as well as consequential and incidental damages. [FN4] Piper contends that § 2-719(1)(a) of the Code permits enforcement of clauses limiting the buyer's remedy to "repair or replacement of nonconforming goods or parts" and permits exclusion of liability for consequential and incidental damages. Therefore, according to Piper, the liability clause is not unconscionable

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

**(Publication page references are not available for this document.)**

and should be enforced.

The question of unconscionability is one of law to be decided by courts. Zapatha v. Dairy Mart, Inc., 381 Mass. 284, 291, 408 N.E.2d 1370, 1375 [29 UCC Rep Serv 1121] (1980) (citing Mass. Gen. L. ch. 106, § 2-302(1)). Massachusetts courts have required that a contract clause resulting in unfair surprise and oppression of the allegedly disadvantaged party will be declared unconscionable. Id. at 292, 408 N.E.2d at 1376. The comments to the Code indicate that it is "the very essence of a sales contract that . . . there be at least a fair quantum of remedy for breach [and] any clause purporting to modify or limit the remedial provisions . . . in an unconscionable manner is subject to deletion." Mass. Gen. Laws Ann. ch. 106, § 2-719 comment 1 (West 1958).

Section 6 of Piper's warranty provides that if a part or component proves to be defective, then Piper's sole liability is for the repair or replacement of the defective part or component. The Piper warranty also disclaims all other warranties, expressed or implied, stating that Piper shall not be liable for any "general, consequential or incidental damages relating to property damage or economic loss, including . . . damages for loss of use or loss of profits." [FN5] The net effect of Piper's warranty, if enforced, is that Andover would be entitled only to the repair or replacement of the defective gear-uplock bracket. The exclusion of general damages from Andover's circle of protection means that Piper has disclaimed responsibility for any repairs other than to the bracket, even assuming that Andover might recover general damages once Piper has disclaimed all other express and implied warranties, a question I do not here decide.

Thus, the question is whether Piper's warranty provides a "fair quantum of remedy" or whether the clause is unconscionable. Piper correctly notes that the sale contract and accompanying warranty lack the traditional indicia of procedural unconscionability. Plaintiff Marden, a partner in Andover involved in negotiating the sale, is an attorney and a pilot, presumably aware of the complexity of an aircraft and the legal significance of warranty limitations. I have little difficulty in concluding that the sophistication of the parties involved renders this sale a commercial transaction of the type in which courts have been reluctant to allow unconscionability claims. Zapatha v. Dairy Mart, Inc., 381 Mass. 284, 294, 408 N.E.2d 1370, 1377 [29 UCC Rep Serv 1121] (1980) (citing Fleischmann Distilling Corp. v. Distillers Co., 395 F. Supp. 221, 233 [17 UCC Rep Serv 678] (S.D.N.Y. 1975)). Also, the terms of the warranty are distinct and readable. Thus, Andover cannot sustain a claim of "unfair surprise." See id. at 291-92, 408 N.E.2d at 1376-77.

Even in absence of unfair surprise, however, a court must consider whether the terms of the contract are oppressive and leave the allegedly disadvantaged party without adequate remedy. Id. The bulk of Piper's brief addresses the contention that exclusion of consequential and incidental damages is not unconscionable, a matter about which the parties do not disagree. Piper generally ignores Andover's claim that the additional exclusion of general damages, coupled with the promise only to repair or replace defective parts, makes the entire remedy clause unconscionable. Rather, Piper states that it has never taken the position that the warranty would permit it to avoid liability for repair of damage to the aircraft. Despite Piper's stated position, the terms of the warranty allow it to contend that it bears no liability for such damage and this court should not and will not rewrite the warranty or interpret its terms in a manner inconsistent with its plain language.

Thus, if the warranty is enforced as written then Piper has committed itself to the replacement or repair of an uplock bracket costing perhaps tens of dollars when that defective part has allegedly caused damage to the aircraft in excess of $100,000, damage that in fact might have been far greater but for the skill of the pilot involved. Andover's purchase of a warranty for an amount in excess of $39,000 would then provide it with very little meaningful protection from Piper, especially since the propellers, engines, and avionics are covered under the warranties of other manufacturers. Given that many airframe failures are potentially and foreseeably catastrophic, it is unfair to permit Piper to limit its liability under the warranty only to the cost of the part that failed. At least under

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7 UCC Rep.Serv.2d 1494                                                                                    Page 10

1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

**(Publication page references are not available for this document.)**

these circumstances, I find that the Piper warranty leaves Andover without a "fair quantum of remedy" and is therefore unconscionable.

### C. Recovery Under Breach of Warranty Theory

If Piper has breached its warranty, Andover may recover for its cost of repair, its loss of use of the aircraft, its increased insurance cost, and the value of its lost repurchase option.

### VI. CONCLUSION

For the foregoing reasons, defendants' motion to prohibit the introduction of evidence of consequential and incidental damages during the damage phase of this trial is denied.

> FN1 Although Piper's brief makes no specific claim that Andover failed to revoke within a reasonable period of time, such a claim would also require a determination of fact by the jury. Bevel-Fold, Inc. v. Bose Corp., 9 Mass. App. Ct. 576, 584, 402 N.E.2d 1104, 1108 [28 UCC Rep Serv 1333] (1980) (upon consideration of relevant facts, defendant's revocation of acceptance "occurred within a reasonable time").

> FN2 Piper initially contended that the aircraft warranty extended only for one year. Later, however, it agreed to make "appropriate" repairs under the five-year warranty while reserving its rights against Northeast Cheyenne for unauthorized sale of that warranty. Except for the length of time during which coverage is provided and other technical differences not relevant here, the one-year and five-year warranties are identical.

> FN3 In the September 3, 1987, Memorandum of Decision on motions for summary judgment in this case, I noted that if Andover could prove that the warranty failed of its essential purpose it could pursue other remedies under the Code. I reiterate that decision but further detail my position in light of the more extensive argument by the parties in their briefs on this motion.

> FN4 Section 6 of the Piper warranty states in relevant part:

"Remedy: If, within the duration of this warranty, a part or component or installation work covered by this warranty proves to be defective in material or workmanship, then the sole and exclusive remedy and Piper's sole liability shall be, at Piper's option, the repairing of the defective part or component or replacement of the same; parts and labor (to the extent allowed under Piper's published schedule) shall be at the expense of Piper. The replacement part or componen[t] supplied pursuant to this warranty shall be warranted only for the remainder of the warranty period applicable to the defective part or component.

. . . . . .

"The obligation of Piper set forth in Section 6, above, shall be the exclusive remedy for any breach of warranty. In no event shall Piper be liable for any general, consequential or incidental damages relating to property damage or economic loss, including without limitation any damages for loss of use or loss of profits."

> FN5 General damages are those that flow "naturally and necessarily" from the complained of wrong and do not depend on the special character, condition, or circumstances of the plaintiff. Sharrat v. Housing Innovations, Inc., 365 Mass. 141, 148, 310 N.E.2d 343, 348 (1974); see also Boylston Housing Corp. v. O'Toole, 321 Mass. 538, 562-63, 74 N.E.2d 288, 302-03 (1947). In contrast, consequential damages are

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

**(Publication page references are not available for this document.)**

not immediate and direct even though they result from the complained of wrong. See Mass. Gen. Laws Ann. ch. 106, § 2-715(2) (West 1958). Incidental damages, defined in the Code, are distinct from either general or consequential damages and include such things as the expense of inspection, receipt, transportation and custody of goods rightfully rejected, and so forth. Id. § 2-715(1).

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.