**EXHIBIT**

*Exhibit H*

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TRANS-SPEC TRUCK SERVICE INC., D/B/A TRUCK SERVICE<br><br>Plaintiff,<br><br>v.<br><br>CATERPILLAR INC.<br><br>Defendant. | CIVIL ACTION NO.:04-11836RCL |

## THIRD AMENDED COMPLAINT AND JURY CLAIM

The plaintiff, Trans-Spec Truck Service Inc., d/b/a Truck Service, by and through their undersigned counsel, files this Complaint against the defendant, Caterpillar Inc., and alleges the following:

## THE PARTIES

1.    Plaintiff, Trans-Spec Truck Service Inc., d/b/a Truck Service ("Trans-Spec"), is a duly organized Massachusetts corporation with its principal place of business located at 7 Cristo Lane Millbury, Massachusetts 01527.

2.    Defendant, Caterpillar Inc. ("Caterpillar"), is a duly organized foreign corporation with its principal place of business located at 100 N.E. Adams, Peoria, Illinois 61629.

## JURISDICTION AND VENUE

3.    Plaintiff, Trans-Spec, is a duly organized Massachusetts corporation with its principal place of business located at 7 Cristo Lane, Millbury, Massachusetts 01527.

4.    Caterpillar is a duly organized foreign corporation with a principal place of business at 100 N.E. Adams, Peoria Illinois 61629.    Caterpillar is in the business of manufacturing and selling heavy equipment and heavy-duty engines throughout the United States and conducts business in the Commonwealth of Massachusetts.    Caterpillar is engaged in trade or commerce as defined by Mass. Gen. L. ch. 93A.    Caterpillar's agent for service in Massachusetts is CT Corporation System, 101 Federal Street, Boston, Massachusetts, 02210

5.    The jurisdiction of this Court is invoked and is proper pursuant to 28 U.S.C. Sec. 1332(a) on the basis of diversity of the parties.

6.    The amount in controversy in this matter exceeds $75,000.

7.    Venue in this Court is proper pursuant to 28 USC §1391(b) and the Local Rules of the United States District Court for the District of Massachusetts.

## FACTS

8.    In 1999, Trans-Spec and Sterling Truck Corporation ("Sterling") prepared specification proposals for Trans-Spec's anticipated purchase of twenty-two heavy-duty, custom-built trucks to be used by Trans-Spec's oil delivery service and dump trailer operations.

9.    Around that time in which Trans-Spec contemplated what types of engines to purchase for the twenty-two trucks, two representatives from Caterpillar's local agent and distributor, Southworth Milton, Inc. ("Milton"), repeatedly met with Trans-Spec personnel to discuss and make representations regarding the capabilities of the Caterpillar C-12 engine, its appropriateness for Trans-Spec's intended use, and the warranties associated with it.  These representatives were named Albert Cardoza ("Cardoza") and Harry Calderbank ("Calderbank").

10.    Additionally, a regional Caterpillar representative based out of Caterpillar's Connecticut office took part in the discussions leading up to Trans-Spec's purchase of Caterpillar C-12 engines, including making representations regarding the capabilities of the C-12 engine, the appropriateness of the C-12 engine for Trans-Spec's intended use, and the warranties associated with the C-12 engine.

11.    Caterpillar orally waived any exclusion of express or implied warranties during the communications referenced in paragraphs 9 and 10.

12.    As indicated in the final Specification Sheet attached as Exhibit A, Trans-Spec purchased Caterpillar C-12 engines for installation in the twenty-two trucks (there is a Specification Sheet for each of the twenty-two trucks; Trans-Spec attaches only one as an exemplar).

13.    Caterpillar's C-12 engine was an appropriate engine for fuel hauler and dump trailer operations in the New England area where Trans-Spec operates its trucks.

14.    Caterpillar shipped completely-assembled C-12 model engines to Sterling, which then incorporated the engines into the trucks pursuant to the Specification Sheet at Exhibit A.

15.    Pursuant to page 3 of Caterpillar's Truck Application and Installation Guide attached as Exhibit B, Caterpillar approved Sterling's installation procedure prior to installation of the C-12 engines in Trans-Spec's trucks.

16.    Trans-Spec accepted delivery of the twenty-two trucks, powered by Caterpillar C-12 engines, in or around December 1999 and January 2000.

17.    Each truck cost Trans-Spec $74,500.00 plus a $5,200.00 set-up charge.

18.    As part of its purchase, at or around the time of delivery, Trans-Spec received from Caterpillar coverage for the engines "against defects in materials or workmanship under normal use" for five years or 500,000 miles, according to the terms and conditions as specified on the back of the Registration Certificate attached as Exhibit C.

19.    As part of its purchase, at or around the time of delivery, Trans-Spec also received from Caterpillar a concurrent two year warranty, attached as Exhibit D, pursuant to which "Caterpillar Inc. or any of its subsidiaries ('Caterpillar') warrants new . . . C-12 . . . engines sold by it for use in powering on-highway vehicles . . . to be free from defects in material and workmanship" for "24 months after date of delivery to the first user."

20.    At all relevant times, Trans-Spec operated the trucks within normal parameters.

21.    By November 2001, serious problems with the flywheel housings in Trans-Spec's C-12 engines began to manifest. Specifically, flywheel housings and/or flywheel housing bolts began to loosen from the Caterpillar C-12 engines. These flywheel housings and/or flywheel housing bolts also began to crack.

22.    At first, Caterpillar paid for the corresponding work performed on the engines in connection with the flywheel housing failures pursuant to the five year/500,000 mile warranty at Exhibit C and the two year warranty at Exhibit D.

23.    During this period, Caterpillar authorized work that made it appear to Trans-Spec as if Caterpillar had honored its two year and five year/500,000 mile warranties as to Trans-Spec's flywheel housing failures.

24.    During this period, Caterpillar chose to continually replace one defective part on Trans-Spec's engines with a part containing the same defects.

25.    During this period, Caterpillar did not rectify the defect on all twenty-two of Trans-Spec's engines.

26.    Caterpillar did not offer Trans-Spec a permanent or reliable fix for these problems.

27.    Beginning in 2003, Caterpillar further breached its warranty obligations and refused to further reimburse for work performed on the flywheel housings on the engines in Trans-Spec's trucks.

28.     Caterpillar's decision referenced in Paragraph 26 forced Trans-Spec to perform in-house repairs, with Caterpillar's knowledge and assent, on multiple flywheel housing failures which subsequently occurred.

29.     The Caterpillar employees who stopped reimbursement for Trans-Spec's flywheel housing failures did not investigate whether defective Caterpillar materials or workmanship caused Trans-Spec's problems prior to making their decision, did not consult with any engineers, and did they consult with Caterpillar's Warranty Administration Department.

30.     Caterpillar knew that the aluminum flywheel housings used in its C-12 engines were flawed.  For examples of the resultant failures, see the photographs of cracked C-12 flywheel housings, formerly in Trans-Spec's trucks, attached as Exhibit E.

31.     Caterpillar knew or should have known of the design defect(s) in its C-12 engine. Caterpillar had full opportunity to inspect and examine the engines in question as well as to repair them.  Caterpillar failed, however, to take adequate and appropriate remedial steps to address the problems once it became aware of them.

32.     The design of the flywheel housings in Caterpillar's C-12 rendered that engine model defective.

33.     Defects in Caterpillar materials or workmanship caused the flywheel housing failures Trans-Spec suffered.

34.     Caterpillar had no basis for rejecting Trans-Spec's claims for reimbursement pursuant to the warranties at Exhibits C and D.

35.     Caterpillar was aware of alternatives to fix the C-12 engine defects including the use of: a) cast iron flywheel housings; b) a flywheel housing disclosed in a Caterpillar patent application dated in July 1998 (a year and a half before Trans-Spec took delivery of the engines) attached as Exhibit F and which described precisely what happened on the C-12 engines in Trans-Spec's trucks; or, c) the use of a metal plate under bolt heads as suggested in a confidential Caterpillar document produced in the course of discovery in this case.  Caterpillar did not employ any of these three fixes on the C-12 engines in Trans-Spec's trucks.

36.     The flywheel housing and the bolted connection between the housing and the engine block reveal inherent design defects including overstressing of the flywheel housings under normal operating conditions and an under-designed bolted connection resulting from improper joint design.  These defects could be remedied by proper engineering design and analysis.

37.   Upon Caterpillar's demand, in January 2004, Sterling agreed to supply additional transmission mounts to be installed in all the trucks in an effort to provide additional support and prevent flywheel housing failures.

38.   The transmission mounts referenced in Paragraph 36 were installed into all twenty-two trucks to no effect.  The flywheel housings on the C-12 engines in Trans-Spec's trucks continued to fail.

39.   Trans-Spec believed that Caterpillar would correct the defects in its engines pursuant to assurances in its warranties attached at Exhibits C and D.

40.   Trans-Spec initiated this litigation only after years of negotiation, beginning in 2002, with Caterpillar and Caterpillar's local agent and distributor, Milton, failed to remedy its losses.

41.   Trans-Spec declined to file suit earlier because it relied on repeated assurances that Caterpillar would compensate it for the damages it suffered.

42.   Caterpillar's actions in agreeing to repair the initial flywheel housing failures until 2003 gulled Trans-Spec into thinking that Caterpillar had and would implement an adequate and reliable fix for the flywheel housing defects on its truck engines and that Caterpillar would employ that fix on every one of the truck engines when they failed.

43.   Caterpillar simply replaced the defective flywheel housings on Trans-Spec's engines with similarly flawed parts until refusing, in 2003, to do even that.

44.   Caterpillar's affirmative acts referenced in paragraphs 42 and 43 prevented Trans-Spec from discovering its cause of action until Trans-Spec realized, though repeat flywheel housing failures, that Caterpillar never fixed the defective parts in the first place.

45.   Cardoza, an employee of Caterpillar's agent and local distributor, Milton, had continual conversations with both Caterpillar and Trans-Spec about the flywheel housing failures beginning in late 2002.

46.   Cardoza and Calderbank made repeated representations to Trans-Spec that Trans-Spec would be made whole for the damage it suffered as a result of the defective C-12 engines.

47.   Early in 2004, Cardoza accompanied Caterpillar's Truck Engine District Manager for the New England region, Troy Guidotti ("Guidotti"), on a site visit to Trans-Spec's facility to inspect failed flywheel housings.

48.   In June 2004, Joseph M. Howard, Jr. ("Howard") and Robert Barton ("Barton") of Trans-Spec attended a meeting at the Milton facility in Milford, Massachusetts to address the

defective engines. This meeting included, among others, Guidotti and Cardoza. Additionally, Edward Blake and Michael Bumpus represented Sterling, and William Witcher represented Minuteman Trucks Inc. (the dealer through which Trans-Spec purchased the trucks in 1999) at this June 2004 meeting.

49.    Caterpillar, through Guidotti, said at this June 2004 meeting: a) it would repair all of the engine breakdowns pursuant to its warranty obligations, thus acknowledging that Trans-Spec's engine problems were Caterpillar's responsibility; b) "Caterpillar will make you whole"; and, c) assured that the problems with Trans-Spec's C-12 engines were not Trans-Spec's fault..

50.    In August 2004, Howard and Barton met with Stephen W. Schoening, Caterpillar's Northeast Region Manager, who reiterated that Caterpillar needed to address Trans-Spec's situation and assured Trans-Spec that its C-12 engine problems were not its fault and that Caterpillar would make Trans-Spec whole.

51.    When Caterpillar repeatedly failed to make Trans-Spec whole for the damages it suffered as a result of the faulty C-12 engines, Trans-Spec reluctantly commenced this litigation on August 23, 2004.

52.    Caterpillar mandated inappropriate or inadequate repairs to be performed on Trans-Spec's engines even where it purported to honor its warranty obligations or otherwise assume financial responsibility for repair of the flywheel housings on Trans-Spec's C-12 engines.

53.    Caterpillar authorized work which it knew would not fix Trans-Spec's flywheel housings but which would extend performance of the engines to the future, make Trans-Spec believe that Caterpillar had fixed the problems, and postpone this lawsuit.

54.    In some instances, repairs had to be repeatedly performed on the same engine.

55.    The problems described above fell under Caterpillar's warranty obligations and should have been rectified by Caterpillar. See Exhibits C and D. Caterpillar's repeated failure to do so forced Trans-Spec to take this action.

56.    These flywheel housing problems have resulted in several of the trucks leaking oil, a violation of environmental laws. In some instances, the oil leakage began while the truck was at a job site. This caused friction between Trans-Spec and some of its customers and even a loss of some business.

57.    These flywheel housing problems have damaged not only the Caterpillar C-12 engines in the trucks but separately caused damage to the trucks themselves, including but not limited to: 1) clutches; 2) clutch brakes; 3) input shafts; 4) input shaft bearings; 5) motor mounts; 6) starters; and, 7) transmissions.

58.    Flywheel house failures caused several of Trans-Spec's Trucks to require towing and these trucks suffered damage caused by tow trucks.

59.    By reason of the contents of paragraphs 1 through 58, the warranties at Exhibits C and D failed of their essential purpose.

## COUNT I
### Breaches of Warranties of Merchantability and Fitness and Express Warranties

60.    Plaintiff repeats and realleges the contents of paragraphs 1 through 59 as if set forth in full herein.

61.    Defendant Caterpillar is a designer, manufacturer, distributor and marketer of goods and has extended express and implied warranties concerning the product at issue in this action.

62.    From 2001 to the present, serious defects in the C-12 engines supplied by Caterpillar have caused continual, long-term breakdowns among Trans-Spec's twenty-two trucks.

63.    Caterpillar knew or should have known of the design defects in its C-12 engines.

64.    As a result of the engine defects, Caterpillar has breached several warranties under Massachusetts law.

65.    Caterpillar made express and/or implied warranties of merchantability, safety and fitness for ordinary purposes, pursuant to Mass. Gen. L. ch. 106, §§ 2-313; 2-314; and 2-315, for which the trucks were to be used, and made further warranties that the trucks would be fit for the particular purpose for which they were to be used.   All of these warranties were relied upon by Plaintiff.

66.    Caterpillar made express warranties pursuant to Exhibits C and D that the engines, and specifically their flywheel housings and flywheel housing bolts, were covered against defects in materials or workmanship.  Caterpillar drafted these warranties.  All of these warranties were relied upon by Plaintiff.

67.    Caterpillar breached the warranties referenced in paragraphs 65 and 66 as well as the implied warranty of to perform repairs in a workmanlike manner.  The C-12 engines sold by Caterpillar to Trans-Spec were not merchantable, not fit for the ordinary purposes for which they were used, not fit for the particular purposes for which they were used, and not repaired when they broke.

68. Trans-Spec gave Caterpillar timely notification of said breaches and Caterpillar had full opportunity to inspect or examine its engines as well as to repair them pursuant to their warranty obligations. Caterpillar failed to take adequate and appropriate remedial steps to address the problems once they became known to it.

69. The injuries sustained by Trans-Spec were the direct and proximate result of Caterpillar's negligence and breaches of warranties.

70. The damages accrued by Trans-Spec to date now exceed $ 2.5 million, and include, without limitation, direct, incidental and consequential damages, costs of repair, loss of use, costs for additional service employees who would not otherwise have been necessary, as well as attorneys' fees and court costs.

71. Plaintiff seeks recovery with interest thereon as available at law.

WHEREFORE, Plaintiff, Trans-Spec Truck Service Inc., d/b/a Truck Service, hereby demands judgment by this Court against Defendant, Caterpillar, Inc., in an amount which is adequate to compensate it for its damages together with interest, costs, and attorneys' fees.

## COUNT II
### Violation of Mass. Gen. L. ch. 93A

72. Plaintiff repeats and realleges the contents of paragraphs 1 through 71 as if set forth in full herein.

73. At all relevant times, Caterpillar engaged in trade or commerce within the meaning of Mass. Gen. L. ch. 93A, § 1(b).

74. The conduct of Caterpillar constituted a violation of the Massachusetts Consumer Protection Act, Mass. Gen. L. ch. 93A, § 11, causing Trans-Spec substantial loss and injury in excess of $ 2.5 million.

75. The conduct of Caterpillar complained of herein occurred primarily and substantially in the Commonwealth of Massachusetts.

76. Caterpillar breached its warranties under Massachusetts law, statute and regulation, and therefore, is guilty of violation of Mass. Gen. L. ch. 93A, §§ 2 and 11 by its breaches of warranties and duties pursuant to the statutes and regulations.

77. Caterpillar's violations of the Massachusetts Consumer Protection Act were willful and/or knowing violations of said statute, entitling Trans-Spec to recovery of multiple damages pursuant to Mass. Gen. L. ch. 93A, § 11.

78.     As a direct and proximate result of Caterpillar's unfair and deceptive acts and practices and violations of Mass. Gen. L. ch. 93A, Trans-Spec has been seriously injured and significantly damaged, suffering, without limitation, direct, incidental and consequential damages, costs of repair, loss of use, costs for additional service employees who would not otherwise have been necessary, as well as attorneys' fees and court costs.

WHEREFORE, Plaintiff, Trans-Spec Truck Service Inc., d/b/a Truck Service, hereby demands judgment by this Court against Defendant, Caterpillar, Inc., in an amount which is adequate to compensate it for its damages, trebled pursuant to G.L. c. 93A § 11, together with interest, costs, and attorneys' fees.

## COUNT III
### Negligence

79.     Plaintiff repeats and realleges the contents of paragraphs 1 through 78 as if set forth in full herein.

80.     The injuries sustained by Trans-Spec are the direct and proximate result of Caterpillar's negligent design, development, assembly, manufacture, inspection, testing, marketing, advertising, and distribution of the C-12 engines purchased by Trans-Spec.

81.     As a direct and proximate result of Caterpillar's negligence, Trans-Spec has accrued damages to date in excess of $2.5 million, including, without limitation, direct, incidental, and consequential damages, costs of repair, loss of use, costs for additional service employees who would not otherwise have been necessary, as well as attorneys' fees and court costs.

82.     Plaintiff seeks recovery with interest thereon as available at law.

WHEREFORE, Plaintiff, Trans-Spec Truck Service Inc., d/b/a Truck Service, hereby demands judgment by this Court against Defendant, Caterpillar, Inc., in an amount which is adequate to compensate it for its damages together with interest, costs, and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Trans-Spec Truck Service Inc., d/b/a Truck Service, demands that this Court:

1.    Award money damages to the Plaintiff in an amount to be determined at trial, in excess of $2.5 million, exclusive of interest, and treble the damages pursuant to G.L. c. 93A § 11;

2.    Award multiple, consequential and punitive damages;

3.    Award exemplary damages pursuant to Mass. Gen. L. ch. 93A;

4.    Award interest;

5.    Award attorneys' fees, costs and disbursements of this action; and,

6.    Order such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff, Trans-Spec Truck Service Inc., d/b/a Truck Service, requests a jury trial.

                                    Plaintiff,
                                    TRANS-SPEC TRUCK SERVICE INC.,
                                    D/B/A TRUCK SERVICE
                                    By their attorneys

                                    /s/ Christian G. Samito
                                    Nancy Reimer, Esq., BBO#555373
                                    Christian G. Samito, Esq., BBO#639825
                                    Donovan Hatem, LLP
                                    Two Seaport Lane
                                    Boston, MA 02210
                                    (617) 406-4500

Date:  March 1, 2006
00982272

10

## <u>CERTIFICATE OF SERVICE</u>

I, Christian G. Samito, hereby certify that on this 1st day of March, 2006 I caused a copy of the foregoing THIRD AMENDED COMPLAINT AND JURY CLAIM to be served electronically and by mail, postage prepaid, to:


John A. K. Grunert, Esq.
Campbell Campbell Edwards & Conroy
One Constitution Plaza, 3rd Floor
Boston, MA 02129


                                        /s/ Christian G. Samito_____
                                        Christian G. Samito

00982272

**65**

1      I'm a very faithful person, and I really
2      had to take all of this under
3      consideration.
4 **Q.**   What research did you do the next day in
5      order to learn that Hartford was not
6      within Southworth Milton's district?
7 **A.**   I believe I called Harry Calderbank.
8 **Q.**   What did you say to him and what did he
9      say to you?
10 **A.**   **I was -- at that point, I think I had**
11      **called Harry on concessions of the**
12      **multiple purchase of Caterpillar engines**
13      **versus the M11 Cummins. And Harry**
14      **informed me that -- and I'm not even**
15      **sure if this was before or after the**
16      **conversation with Kevin Holmes, but he**
17      **informed me that Hartford wasn't in his**
18      **district, that I would have to deal with**
19      **New Haven.**
20 **Q.**   Did he tell you the company that you
21      would have to deal with if you bought
22      these trucks in Connecticut?
23 **A.**   Well, I know the Caterpillar dealer in
24      New Haven. I can't even think of the

**66**

1      name.
2 **Q.**   H.O. Penn?
3 **A.**   **Yes. That is what it was.**
4 **Q.**   Did Mr. Calderbank tell you that if you
5      purchased these trucks from the
6      Connecticut dealership that you would
7      have to deal with H.O. Penn in terms of
8      servicing for the engines?
9 **A.**   **Yes. Or warranty for the engines or**
10      **concessions for the engines. Anything**
11      **about the engine, he couldn't help me.**
12      **He could fix them. He could fix**
13      **anybody's Caterpillar, but he couldn't**
14      **offer any assistance on the financial**
       **arrangement.**
  **Q.**   You mentioned having talked with Mr.
     Calderbank about concessions on
     purchasing multiple engines relative to
     the Cummins engine. Tell me about that
     conversation. What did you say and what
     did he say?
22 **A.**   **I really don't recall the exact**
23      **conversation, but it was about**
24      **performance, about weight, about the**

**67**

1      **warranty, the cost of warranty, the**
2      **discounting and, of course, who would**
3      **stand behind their warranty the best.**
4 **Q.**   In the conversation with Mr. Calderbank
5      comparing the Cummins M11 and the C-12,
6      what did he tell you about relative
7      performance?
8 **A.**   **He showed me comparison charts between**
9      **the two engines, economy charts. The --**
10 **Q.**   I'm sorry. I interrupted you. Finish
11      your answer.
12 **A.**   **I was primarily done. I wanted it to be**
13      **Caterpillar.**
14 **Q.**   Did you keep those charts that he showed
15      you?
16 **A.**   **No. No. Not that long.**
17 **Q.**   What do you remember them showing that
18      was of interest to you?
19 **A.**   **Torque curve, actual power, gross**
20      **horsepower, grade ability versus**
21      **economy. One of the big things that he**
22      **was selling was the cleanliness of the**
23      **Caterpillar versus the Cummins. I**
24      **believe he said the Cummins is the --**

**68**

1      **M11 is the dirtiest engine on the**
2      **market.**
3 **Q.**   Does that mean it has high emissions?
4 **A.**   **I think, internally, soot. Soot in the**
5      **oil, if you do an oil analysis.**
6 **Q.**   Anything else that you remember him
7      telling you about relative performance
8      of the Cummins engine and the C-12?
9 **A.**   **He knew I wanted to be talked out of it.**
10      **So it really wasn't a heated**
11      **conversation of any kind. I wanted to**
12      **be talked out of it. I wanted him to**
13      **match what they were trying to sell me.**
14 **Q.**   Have you given me your best memory of
15      the information that Mr. Cummins gave
16      you in the conversation that you had
17      with him comparing the M11 Cummins
18      engine to the C-12?
19           MS. REIMER: Objection
20      as to form.
21 **A.**   **I didn't quite understand it.**
22           MS. REIMER: You got the
23      wrong name in there.
24 **Q.**   Have you given me your best and most

Exhibit I

**69**

1  complete memory of your conversation you
2  had with Mr. Calderbank comparing the
3  Cummins engine and the C-12 engine?
4  A.  Yes.
5  Q.  He also talked to you about relative
6      weights of the two engines?
7  A.  Yes.
8  Q.  C-12 was lighter?
9  A.  No.
10 Q.  C-12 was heavier?
11 A.  He said they were the same.  There was
12     about 60 pounds difference.
13 Q.  What did he tell you about relative
14     warranties?
15 A.  They were the same.
16 Q.  Did he describe the warranties other
17     than just telling you that they were the
18     same?
19 A.  I believe he called it a serious
20     nucleus, and he gave us literature
21     showing everything that it covered.
22 Q.  Was so-called serious nucleus coverage
23     something that you had on other
24     Caterpillar engines that you already

**70**

1  owned?
2  A.  Everything, yes.
3  Q.  Technically speaking, it was an extended
4      service contract that you purchased,
5      correct?
6  A.  Yes.
7  Q.  When I say that you purchased, either
8      you purchased it by paying money or you
9      got it as part of the overall
10     transaction whereby you purchased the
11     truck with the Caterpillar engine in it?
12 A.  Yes.  Had a figure -- had a cost figure
13     on it.  If you didn't want it and wanted
14     the money, I don't think they would give
15     it to you.  No.  It did have a cost
16     figure.  It had a value.
17 Q.  Let me just show you a document.  What I
18     have got is a package of documents
19     contained with a letter from your
20     attorneys.  I'm just going to hand it to
21     you in that form.  But I will ask you to
22     look at the third page of the document,
23     third page, including the first page,
24     which is your attorney's letter, and ask

**71**

1  you if that is the serious nucleus
2  coverage that you understood Mr.
3  Calderbank to be talking about.  It's a
4  two-sided document.
5  A.  All I really remember is I did see a
6      list of numbers on a page, and this
7      would have been explained to me, and
8      then Andy would have -- he is my
9      technical guy -- he would have taken it
10     from there.
11 Q.  Andy Lind?
12 A.  Yes.
13 Q.  The document that I have shown you that
14     says on the front of it On Highway
15     Vehicle Engine Extended Service
16     Coverage, is that a form of document
17     that Mr. Calderbank showed you in
18     connection with these conversations he
19     was having with you concerning --
20 A.  He never showed me a document.
21 Q.  You had seen a document of this type
22     before in connection with your other
23     Caterpillar engines, correct?
24 A.  I don't remember ever seeing it.  I

**72**

1  possibly could have, but I don't recall
2  it.
3  Q.  In the conversation that you had with
4      Mr. Calderbank concerning the warranty,
5      relative warranties as to the Cummins
6      engine or the C-12 engine, although he
7      didn't show you the document, did he
8      tell you what the coverage would be?
9  A.  Yes, he did.
10 Q.  What did he say?
11 A.  He said it would be a 500,000 mile
12     extended warranty.
13 Q.  Did he tell you anything else?
14 A.  He told me what it would cover and what
15     it wouldn't cover.
16 Q.  What did he tell you on that subject?
17 A.  All the heavy parts after a certain
18     time.  I don't believe it would cover --
19     on the extended it wouldn't cover a
20     turbocharger or injector or an ECM or
21     something like that, but as far as the
22     internal combustion parts, pistons,
23     valves, crankshaft, timing gears,
24     totally everything.

109

1  specifications for these trucks?
2  A.  I had run across them not too long ago.
3      I don't believe that we have -- we still
4      have them.
5  Q.  When did you last see them?
6  A.  It could have been a couple of years
7      ago. I really don't recall.
8  Q.  Where were they when you saw them?
9  A.  I don't know if they were in my
10     briefcase. I continually throw things
11     away. Old things get thrown away.
12     Whether it's my briefcase or my desk or
13     what have you, things I don't have to
14     keep, I don't keep.
15 Q.  During the process whereby Mr. Medbery
16     sent you these line sheets and corrected
17     line sheets and you then spoke with him
18     about changes to them, during the period
19     that that process was going on, did you
20     have any communications with Mr.
21     Calderbank or anyone else employed by
22     Southworth-Milton or Caterpillar
23     concerning the engines that were to be
24     in these trucks?

110

1  A.  Yes.
2  Q.  Who did you have those conversations or
3      communications with?
4  A.  Primarily Harry Calderbank.
5  Q.  Anybody other than Harry Calderbank?
6  A.  I'm sure I had spoken to Al Cardoza, but
7      I don't really recall a specific
8      conversation.
9  Q.  During the period where you are going
10     back and forth with Mr. Medbery about
11     these line sheets, what were the
12     communications you had with Mr.
13     Calderbank concerning the engines that
14     you wanted to be in these trucks that
15     you were discussing?
16 A.  We discussed other Caterpillar engines
17     also and the weight factor between at
18     that time a 3406E. It was 600 pounds
19     and it was just too heavy, so we
20     reverted back to the C-12, and it had
21     been working out, so we decided on that,
22     and then he told me about the
23     discounting.
24 Q.  Why were you considering a 3406E for

111

1      these trucks?
2  A.  Retail.
3  Q.  What do you mean by that?
4  A.  A truck with, they call it, a big bore
5      engine has a higher resale than a
6      smaller engine.
7  Q.  Other than resale value, was there
8      anything about the performance
9      characteristics or the quality or the
10     accessories or the equipment on a 3406E
11     that caused you to be interested in that
12     as a possible alternative to a C-12 for
13     these trucks?
14 A.  No.
15 Q.  Was it you who raised the subject with
16     Mr. Calderbank about possibly having the
17     trucks equipped with a 3406E, or did Mr.
18     Calderbank raise that possibility?
19 A.  I did.
20 Q.  Had Mr. Medbery, or anyone from
21     Minuteman, suggested the possibility of
22     a 3406E?
23 A.  No.
24 Q.  So you raised, during this period of

112

1      time, with Mr. Calderbank about a 3406E,
2      and you and he discussed the weight
3      penalty that that would entail?
4  A.  Yes.
5  Q.  The weight penalty was more than you
6      wanted to pay basically, correct?
7  A.  Yes.
8  Q.  You also said that during this period of
9      time you discussed discounting with Mr.
10     Calderbank. What discussion was had on
11     the subject of discounting?
12 A.  Basically, how bad do you want my
13     business?
14 Q.  What did you say to him and what did he
15     say to you?
16 A.  I believe he had given us or offered us
17     an extra $500 discount off of each
18     engine over and above what the dealer
19     could get from Sterling itself on an OEM
20     basis and free of charge extended
21     500,000 mile warranty.
22 Q.  So is that what you and he discussed in
23     terms of discounting?
24 A.  What we had to do was match the M11

Court Reporting    (978) 409-9090

**197**

1    correct?

2  A.  **Changing oil, servicing is all that**

3    **won't be on here.**

4  Q.  Is changing oil the only routine

5    servicing and maintenance work that was

6    done on these engines?

7  A.  **That really is hard to say.**

8  Q.  Take a minute and look through Exhibits

9    11 through 30 and tell me whether any of

10    those packages contain records of

11    routine repair, servicing or maintenance

12    work done on the engines in the trucks

13    to which those exhibits pertain?

14  A.  **To be crystal clear, repeat the exact**

15    **question you want answered.**

16  Q.  What I want to know is whether any of

17    Exhibits 9 through 30 contain any

18    records of routine servicing or

19    maintenance work that was performed on

20    Caterpillar C-12 engines in the

21    Trans-Spec trucks to which these

22    exhibits pertain?

23  A.  **No.**

24  Q.  So if Caterpillar or anyone else wanted

**198**

1    to know what routine servicing and

2    maintenance work was done on those

3    engines, it would not be able to learn

4    that information from the documents

5    contained in Exhibits 9 through 30?

6  A.  **Correct.**

7  Q.  When you asked Mr. Barton and Mr.

8    LaFlash to assemble records relating to

9    the engines, did you ask them to

10    assemble records of that type, that is

11    to say records concerning routine

12    servicing and maintenance work on the

13    engines?

14  A.  **No.**

15  Q.  Exactly what documents did you ask Mr.

16    Barton and Mr. LaFlash to assemble?

17  A.  **The information on the flywheel housing**

18    **failures.**

19  Q.  Did you ask them to assemble information

20    about failures of any type other than

21    flywheel housing failures?

22  A.  **Any major type of Caterpillar warranty**

23    **work.**

24  Q.  Did you ask them to assemble any type --

**199**

1    any documents relating to engine

2    failures that they did not consider to

3    be a Caterpillar warrantable item?

4  A.  **We didn't have any.**

5  Q.  Did you limit what they were to look for

6    to documents that they deemed to be

7    Caterpillar warrantable failures?

8  A.  **Yes.**

9  Q.  If there were failures that Mr. Barton

10    or Mr. LaFlash did not consider to be

11    warrantable by Caterpillar, they would

12    not have included those documents in

13    what they assembled; is that accurate?

14  A.  **Yes.**

15  Q.  To your knowledge, has any effort been

16    made to assemble all of Trans-Spec's

17    documents relating to the engines in the

18    22 Sterling trucks involved in this

19    case?

20  A.  **I believe your people were there.**

21  Q.  Other than what people from my office

22    had been trying to do, has anyone acting

23    on behalf of Trans-Spec tried to do

24    that?

**200**

1  A.  **Complete, no.**

2  Q.  Is it your understanding, however, that

3    Exhibits 9 through 30 contain all of

4    Trans-Spec's records relating to

5    problems with the Cat C-12 engines in

6    the 22 Sterling trucks that were

7    failures that you think are warrantable

8    failures?

9         MS. REIMER:  Objection.

10    You can answer.

11  A.  **I really can't tell.  This is your**

12    **paperwork, not mine.**

13  Q.  I can tell you it's the paperwork that

14    was produced to me by your attorney,

15    sir.

16  A.  **If you have it all there.**

17  Q.  If this paperwork duplicates the

18    documents that you provided to your

19    attorneys, then this stack of paper

20    would reflect all of the failures that

21    you deemed to be warrantable failures

22    with respect to the Caterpillar C-12

23    engines up until the date that you

24    supplied these to your attorney

225

1 Q. During the year 2004, did Minuteman do
2 any work, non-engine work, on these
3 trucks?
4 A. No.
5 Q. Did Trans-Spec do non-engine work on the
6 trucks?
7 A. Yes.
8 Q. Why did Trans-Spec stop using Minuteman
9 for non-engine work on these trucks in
10 2004?
11 A. Trucks were out of warranty.
12 Q. Any other reason?
13 A. Not really.
14 Q. Had you been satisfied with the service
15 that Trans-Spec had received from
16 Minuteman Truck with respect to work on
17 these trucks or these engines?
18 A. Yes.
19 Q. You would have no complaints for that
20 work?
21 A. I have complaints with everything.
22 Q. You had no complaints about Minuteman's
23 work more than you have complaints about
24 any other dealership's work?

226

1 A. That's a true statement.
2 Q. In the year 2004, other than Trans-Spec
3 itself, who performed non-engine work on
4 these trucks?
5 A. Just Trans-Spec.
6 Q. So all of the non-engine work in 2004
7 was done by Trans-Spec?
8 A. Correct.
9 Q. And is that true for 2005 as well?
10 A. Yes.
11 Q. In 2004, who did the engine work on the
12 engines in the Sterling trucks?
13 A. Milton CAT or Tri-State Freightliner.
14 Q. Did Trans-Spec do any engine work in
15 2004 on these trucks?
16 A. In the very beginning, I believe we did.
17 Q. What kind of engine work?
18 A. Whatever we had to.
19 Q. Do you remember what that was?
20 A. Flywheel housings.
21 Q. Anything else?
22 A. I don't recall anything else.
23 Q. Then in 2005, who has done engine work
24 on these trucks?

227

1 A. Milton CAT and the Tri-State
2 Freightliner.
3 Q. Trans-Spec hasn't done any?
4 A. No.
5 Q. Up until the time when you learned from
6 Minuteman that Caterpillar had told that
7 it would not pay for engine work that
8 you would take the truck or sent the
9 truck to Minuteman for, had you had any
10 discussions with anyone from Southworth
11 or anyone from Caterpillar concerning
12 engine problems that you were having
13 with the Sterling trucks?
14 A. Yes.
15 Q. When did you first have a discussion on
16 that subject with someone from
17 Southworth or from Caterpillar?
18 A. We consistently had discussions with
19 Harry Calderbank and Al Cardoza.
20 Q. When did you have the first such
21 discussion with one of those two
22 gentlemen?
23 A. When things started getting more
24 non-coincidental.

228

1 Q. Can you bracket when that was?
2 A. It's pretty tough to say. As long as
3 they were accepting responsibility in
4 repairing them, I really didn't complain
5 much. The frequency was, you know, kin
6 of tough.
7        And trying to get a
8 truck fixed in a reasonable amount of
9 time was sometimes a problem where I
10 would call Harry and say, Okay, Harry,
11 where do we go? And he would try to
12 find us a place to get the truck fixed
13 in short order. That was his job.
14        But when all of a sudden
15 we have two trucks down, three trucks
16 down, four trucks down, I believe that
17 was by 2000 -- late 2002, mid 2002, just
18 an estimate, but now it was a concern,
19 and that's when they denied a claim and
20 we were in trouble.
21 Q. Let me ask you this. You mentioned
22 dispatchers. Do the dispatchers at
23 Trans-Spec, in order to do their job,

229

1  them that lists out all of the trucks
2  that they are going to be -- all the
3  trucks that might be dispatched for work
4  on a particular day?
5  A. Yes.
6  Q. And do those forms that the dispatchers
7  use identify Trans-Spec trucks that are
8  out of service on that day?
9  A. What a coincidence. Yes.
10 Q. So if I wanted to know specific days
11 when particular trucks were out of
12 service, I could learn that by looking
13 at those dispatcher forms, if they are
14 still in existence, correct?
15 A. Yes.
16 Q. And has Trans-Spec kept those dispatcher
17 forms for the last several years?
18 A. Yes.
19 Q. Where are they located?
20 A. 22 Eskow Road.
21 Q. Are they located in the storage trailer
22 there, or are they located somewhere
23 else?
24 A. No. They are on the dispatch system.

230

1  Q. So they are actually electronically
2  stored?
3  A. Yes.
4  Q. How far back do those records exist?
5  A. 1996.
6  Q. So for each day between the day in early
7  2000 when these trucks went into service
8  up until today, there would be a
9  dispatcher form that would tell us which
10 of the trucks was in service or out of
11 service on that day, correct?
12 A. Yes. That's correct.
13 Q. What would be involved in printing out
14 those forms?
15 A. Not much.
16 Q. It would be an easy thing to do?
17 A. Yes.
18 Q. As you sit here today, you probably
19 can't tell me the specific days when
20 each of these 22 Sterling trucks were
21 out of service, can you?
22 A. No. I can't.
23 Q. Would the best way of getting that
24 information be by looking at those

231

1  dispatcher forms?
2  A. Or just have them print it out.
3  Q. Well, whether you are looking at them on
4  the screen or getting them printed out,
5  that would be the easiest and most
6  effective way to know exactly when those
7  trucks were out of service, correct?
8  A. Absolutely.
9  Q. Those forms wouldn't tell you why they
10 were out of service, but they would tell
11 you whether they were out of service or
12 not, right?
13 A. Yes.
14 Q. I understand that in June of 2004, you
15 attended a meeting at Southworth
16 Milton's place of business in Milford,
17 Massachusetts that was attended by
18 yourself and maybe some other people
19 from Trans-Spec and some people from
20 Caterpillar and some people from
21 Southworth. Do you remember that
22 meeting?
23 A. Yes, I do.
24 Q. Was that the first meeting that you had

232

1  related to these trucks and engines with
2  people who were actually Caterpillar
3  employees as distinct from
4  Southworth-Milton employees?
5           MS. REIMER: Objection.
6  A. Yes.
7  Q. Before that meeting, had you had any
8  conversation with people who were
9  actually Caterpillar employees as
10 distinct from Southworth-Milton
11 employees about these trucks or engines?
12 A. I really never knew the difference.
13 Q. Before that meeting, you had had
14 conversations about these trucks and
15 engines with Mr. Calderbank and Mr.
16 Cardoza, right?
17 A. Amongst others, yes.
18 Q. Who are the others?
19 A. There was a fellow in a wheelchair.
20 Q. What was that fellow's name?
21 A. I really don't recall.
22 Q. Where did you have a conversation with
23 him?
24 A. I seen him a few different -- once in

**233**

1    Milton.  Once on my property.  There was
2    a fellow named Gary Blood.
3  Q.  You mentioned him earlier?
4  A.  Right.
5  Q.  Anybody else?
6  A.  There was -- there were plenty of
7    others, but one time here and one time
8    there and...
9  Q.  Can you name any of them?
10  A.  I really -- I'm not the greatest on
11    names.
12  Q.  Now, returning to this meeting in June
13    2005, you attended it and who else from
14    Trans-Spec attended it?
15  A.  Robert Barton.
16  Q.  Anybody else?
17  A.  From Trans-Spec, no.
18  Q.  Who else was present at that meeting?
19  A.  Troy.  I really can't recall his last
20    name.  He was from Caterpillar.
21  Q.  Guidotti, or something like that?
22  A.  Something like that.
23  Q.  I am not sure I am pronouncing it right.
24    But his first name was Troy and he was

**234**

1    from Caterpillar?
2  A.  Yes.
3  Q.  Did he give you a card?
4  A.  He did.
5  Q.  It said Caterpillar on it?
6  A.  Oh, yeah.
7  Q.  Who else was at the meeting?
8  A.  Al Cardoza from Southworth.  There was
9    somebody else there from Southworth.
10    There was Mike Bumpus.
11  Q.  Who is Mike Bumpus?
12  A.  He is the district rep for Sterling.
13  Q.  Who else was there?
14  A.  I believe he is with Sterling, yes.
15    Then there was another rep from
16    Sterling.
17  Q.  You don't remember his name?
18  A.  I will think of his name.  Something
19    like Bob White or Bob.
20  Q.  Bob, someone from Sterling?
21  A.  Yes.  I have been dealing with him
22    forever because he was with Freightliner
23    prior to being with Sterling.
24  Q.  Other than yourself and Mr. Barton and

**235**

1    Mr. Guidotti and Al Cardoza and someone
2    else who you can't --
3  A.  Bill Wicher.
4  Q.  -- you can't recall from SMI, Mr. Bumpus
5    and Bob from Sterling and also Mr.
6    Wicher?
7  A.  Yes.
8  Q.  Bill Wicher?
9  A.  Bill Wicher from Minuteman Trucks.
10  Q.  Anybody else there?
11  A.  I believe that was it.
12  Q.  Did anyone participate by telephone?
13  A.  No.
14  Q.  Do you remember what time of the day the
15    meeting was?
16  A.  I really don't.  I'm picturing
17    mid-morning.
18  Q.  Do you remember how long the meeting
19    lasted?
20  A.  An hour, hour and a half.
21  Q.  Did you make any notes during the
22    meeting?
23  A.  No.  I have -- Bob did.
24  Q.  Mr. Barton made notes?

**236**

1  A.  Yes.
2  Q.  Are those notes still in existence?
3  A.  I believe, yes.
4  Q.  Are they handwritten notes?
5  A.  With Bob I'm sure he put them in type.
6    He is pretty good.
7  Q.  Are these notes that were made at the
8    meeting itself?
9  A.  Yes.
10  Q.  So these aren't documents that were
11    prepared in anticipation of the meeting?
12  A.  No.
13  Q.  Did you take to that meeting any
14    documents to use at the meeting?
15  A.  Yes.
16  Q.  Were those documents that have now been
17    marked Exhibits 9 through 30?
18  A.  I believe so.
19  Q.  They were in some sort of notebook at
20    that time, right?
21  A.  Yes.
22  Q.  Did you take any additional documents to
23    that meeting?
24  A.  I don't believe I did.  I think that's

237

1   what we had.

2   Q.   Did anyone at that meeting supply you or
3        Mr. Barton with any documents during the
4        course of the meeting?

5   A.   **When a question was asked, the fellow**
6        **that had all the information was Al**
7        **Cardoza. He had every history from**
8        **every truck I had ever owned right back**
9        **from day one.**

10  Q.   He had a large volume of documents with
11       him?

12  A.   **I think he -- I don't know if he had it**
13       **on his Palm Pilot. I really don't know.**
14       **But he opened up a book, and any**
15       **question that was asked he read off on**
16       **this date and this date, this was done,**
17       **and so on.**

18  Q.   Did Mr. Cardoza supply you or Mr. Barton
19       with any of the documents that he was
20       looking at?

21  A.   **No.**

22  Q.   When you left that meeting with Mr.
23       Barton, did you take any documents away
24       with you?

238

1   A.   **No. Just our own book.**

2   Q.   Give me your best memory of what
3        happened at that meeting and who said
4        what to whom?

5   A.   **Ed Blake is the other guy from Sterling.**
6        **I always do that.**

7   Q.   His first name wasn't Bob, it was Ed?

8   A.   **No, it was Ed. Close, though. It only**
9        **has a couple of letters in it.**

10  Q.   Tell me what happened in the meeting and
11       who said what to whom?

12  A.   **Everyone was pretty cordial. They**
13       **wanted to take care of our problems, and**
14       **I believe they did. And Troy said, We**
15       **are going to start fixing the trucks or**
16       **we are going to see about fixing the**
17       **trucks. That's what he said.**

18            At the time, we wanted
19       to get new trucks, so we were talking
20       about can Caterpillar help us out. If
21       we traded these trucks, if we sold these
22       trucks outright, could we get a discount
23       on new engines? Sterling was there.
24       Could we get -- what we were looking for

239

1   was to make this go away, and we just
2   didn't want to hurt anybody. We just
3   wanted our trucks fixed, be reimbursed
4   for what we had spent and basically get
5   a wholesale price on a truck and an
6   engine, or we discussed it anyway.

7        We got out of it they
8   are going to fix the trucks. And Troy
9   basically confirmed what we were being
10  told by the Milton employees that,
11  historically, Caterpillar will make this
12  up to us. And the term that Troy used,
13  for the first time I heard at that
14  meeting, was that Caterpillar will make
15  you whole.

16        So we left feeling very
17  confident that we felt great. This
18  thing is going to go away, and we are
19  going to be back where we once were with
20  Caterpillar by our side and we would be
21  happy again.

22  Q.   Did you ask Mr. Guidotti what he meant
23       when he said Caterpillar will make you
24       whole?

240

1   A.   **No.**

2   Q.   Did he explain what he meant by that?

3   A.   **Financially whole is what we were**
4        **looking for, and we believed and so did**
5        **the Sterling employees believed that's**
6        **what he meant, also.**

7   Q.   Tell me exactly what Mr. Guidotti said
8        in the part of this conversation where
9        he used that phrase.

10  A.   **There were a lot of things said. That**
11       **is the one thing that stuck in my mind,**
12       **of course, because that was the most**
13       **important statement made in the whole**
14       **meeting.**

15  Q.   Other than those words, do you remember
16       the context, the sentence, the
17       discussion that those words were stated
18       in?

19  A.   **That meeting wasn't as important as the**
20       **next meeting.**

21  Q.   I'm not interested in talking right now
22       about the next meeting. I'm trying to
23       understand what was actually said at the
24       June meeting. You reported some words

**245**

1   the proposal of Sterling to help us
2   market the trucks we have. They have
3   access to, you know, probably a thousand
4   truck lots owned by Freightliner which
5   are -- they have a name for them.
6   Select. Select Truck Centers are owned
7   by Freightliner -- and maybe spread them
8   out across the country, two here, two
9   there and what have you, and sell us
10  Caterpillar engines at a really good
11  price and sell us a Sterling truck at a
12  really good price. And we needed them
13  by a certain time so that we could meet
14  our contracts the following winter.
15 Q.  What did Mr. Bumpus and Mr. Blake
16   respond to all of that?
17 A.  They couldn't get engines.
18 Q.  What do you mean they couldn't get
19   engines?
20 A.  They were willing. They couldn't get
21   engines. Caterpillar wouldn't bend one
22   inch. They told us we could have
23   Caterpillar engines by like February or
24   something like that. They were all

**246**

1   booked up.
2 Q.  What about trucks with different kinds
3   of engines other than Caterpillar
4   engines, could they get those?
5 A.  Could they have gotten those?
6 Q.  Did you discuss with them getting those?
7 A.  No. Not really.
8 Q.  Why not?
9 A.  It wouldn't help my problem.
10 Q.  What else was discussed at that meeting?
11 A.  You know, we had two meetings, and I'm
12   confusing some things possibly being
13   said at the second meeting. They are
14   real close together. The same people
15   were there except I don't think Bumpus
16   and Ed Blake were at the second one, but
17   Steve Schoening was.
18 Q.  I'm trying to --
19 A.  What I'm getting at is the events,
20   there's a little bit in each meeting and
21   I really -- I possibly could be getting
22   some confused between the two, and I'm
23   not sure if I am or not. They were
24   almost combined meetings, so my answers

**247**

1   would be correct.
2 Q.  The first meeting was there any
3   discussion specifically of the terms of
4   the extended service contract that you
5   had obtained way back when Trans-Spec
6   took delivery of these trucks?
7 A.  No.
8 Q.  Was there any discussion of what that
9   covered and what it didn't cover?
10 A.  No.
11 Q.  So that you just didn't talk about that
12   document at the meeting, correct?
13 A.  Correct.
14 Q.  You didn't talk about the Caterpillar
15   limited warranties with respect to these
16   engines, correct?
17 A.  It wasn't that kind of a meeting.
18 Q.  Then there was a second meeting, and
19   that occurred in August 2004?
20 A.  That sounds good.
21 Q.  Is it your memory that it was in August?
22 A.  My memory is it was either July or
23   August.
24 Q.  That meeting also was at

**248**

1   Southworth-Milton in Milford?
2 A.  I believe it was.
3 Q.  Was Mr. Guidotti there?
4 A.  We were in a smaller office. I still
5   believe it was there, though. Yes, he
6   was there.
7 Q.  Mr. Schoening was there?
8 A.  Yes.
9 Q.  That is S-C-H-O-E-N-I-N-G.
10     Did Mr. Schoening give
11   you a card?
12 A.  Yes.
13 Q.  Had you met Mr. Schoening before?
14 A.  I'm not sure.
15 Q.  Had you spoken with Mr. Schoening
16   before?
17 A.  No. I don't believe so.
18 Q.  Al Cardoza was there, right?
19 A.  Yes.
20 Q.  And you and Mr. Barton?
21 A.  Yes.
22 Q.  Other than Cardoza, was anyone else from
23   Southworth-Milton there?
24 A.  I don't believe so.