Westlaw.

Not Reported in F.Supp.

Page 1

Not Reported in F.Supp., 1995 WL 337072 (D.Mass.)
**(Cite as: Not Reported in F.Supp.)**

**H**
Briefs and Other Related Documents
Nasco, Inc. v. Public Storage, Inc.D.Mass.
1995Only the Westlaw citation is currently
available.
United States District Court,D. Massachusetts.
NASCO, INC., Plaintiff,
v.
PUBLIC STORAGE, INC., Defendant.
**Civ. A. No. 92-12731-RCL.**

May 20, 1995.

Joseph G. Abromovitz, Abromovitz & Leahy, P.C.,
Boston, MA, for plaintiff.
James E. Carroll, John P. Connelly, Peabody &
Arnold, Ben L. Fernandez, Fitzhugh & Associates,
Boston, MA, for defendant.
LINDSAY, District Judge.
*1 Report and Recommendation accepted.

REPORT AND RECOMMENDATION
REGARDING DEFENDANT'S MOTIONFOR
PARTIAL SUMMARY JUDGMENT ON THE
ISSUEOF LIQUIDATED DAMAGES (DOCKET
NO. 44)

May 3, 1995.

KAROL, United States Magistrate Judge.
Plaintiff, NASCO, Inc. ("NASCO"), and defendant,
Public Storage, Inc. ("PSI"), entered into a
Purchase and Sale Agreement dated February 2,
1990 (the "P&S"), whereby, for the sum of
$3,575,000, PSI agreed to purchase, and NASCO
agreed to sell, a warehouse owned by NASCO in
Chelsea, Massachusetts. The deal fell through, and
the warehouse was sold at foreclosure for
approximately $800,000. In an Amended
Complaint, NASCO seeks damages of $2,775,000,
and multiple damages, under a variety of legal
theories, including breach of contract, violation of

Mass. Gen. L. ch. 93A, breach of the implied
covenant of good faith and fair dealing, and
estoppel. Summary judgment on NASCO's original
complaint was previously granted in favor of PSI on
all then-pending counts, but this decision was
reversed on appeal. *See NASCO, Inc. v. Public
Storage, Inc.,* 29 F.3d 28 (1st Cir. 1994) ("*NASCO I*
"). PSI has now set its sights lower and is presently
moving for an order limiting NASCO's damages
under the breach of contract count (Count I) to
$350,000, in accordance with a liquidated damages
provision in the P&S. *See Def.'s Mot. for Partial
Summ. J. on the Issue of Liquidated Damages
(Docket No. 44), at 1.FN1 For reasons stated
below, it is recommended that PSI's motion be
ALLOWED.

*I. Background and Prior Proceedings*

The facts and proceedings leading up to the
decision on appeal are set forth in *NASCO I* and
will not be repeated. Following remand, NASCO
amended its complaint to add several new counts
and theories of recovery. In due course, PSI filed
the present motion, styled as one for partial
summary judgment, to limit the damages which
NASCO might recover for breach of contract to
$350,000, in accordance with Paragraph 7(c) of the
P&S. Paragraph 7 is entitled, "*Termination;
Default; Remedies.*" Subparagraph (c) states, in its
entirety:
If Buyer [PSI] shall fail to consummate this
Agreement for any reason except Seller's
[NASCO's] default, then Seller shall be entitled to
retain the deposit paid hereunder as Seller's sole
remedy at law and equity against the Buyer for
Buyer's failure to consummate this Agreement.

It is undisputed that the deposit was in the amount
of $350,000, and that, if this provision is given
effect, this will be the limit of the damages
recoverable by NASCO under Count I for breach of
contract. *See* Mem. in Opp'n (Docket No. 46) at 4

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1995 WL 337072 (D.Mass.)
**(Cite as: Not Reported in F.Supp.)**

n.2.[FN2]

In its original memorandum in opposition, NASCO urged the court to take a so-called "second look" at the effect of Paragraph 7(c) and to deny enforcement on the ground that the damages recoverable under it were so low relative to actual damages as to constitute a penalty. The court requested, and the parties submitted, supplemental memoranda addressing two points which had not been briefed by either side: (1) whether enforcement of a liquidated damages clause might ever be denied on the ground that the damages for which it provides are so *low* as to penalize the recipient, and (2) whether enforcement of Paragraph 7(c) should be denied in this case on the related, but distinct, ground of unconscionability. Based on the supplemental memoranda filed by the parties, the court concludes, for reasons discussed below, that (1) enforcement of a liquidated damages clause should not be denied on the ground that the damages are so low as to penalize the non-breaching recipient of those damages; and (2) while, in an extreme case of overreaching, enforcement might be denied on the ground of unconscionability, this is not such a case. Accordingly, it is recommended that PSI's motion for partial summary judgment be ALLOWED.

### II. Liquidated Damages

**\*2** A substantial body of law has developed in Massachusetts and elsewhere regarding the circumstances under which a liquidated damages provision will be invalidated on the ground that enforcement would impose a penalty. *See, e.g., Shapiro v. Grinspoon,* 541 N.E.2d 359, 364-66 (Mass. App. Ct. 1989); *Colonial at Lynnfield, Inc. v. Sloan,* 870 F.2d 761, 764-67 (1st Cir. 1989) (applying Massachusetts law). The cases tend to address three principal issues: whether, as of the time the contract was made, the parties might reasonably have believed that damages for breach would be difficult to ascertain; the reasonableness of the amount of the liquidated damages, relative to actual damages; and whether the disproportionality issue should be addressed with the benefit of post-breach hindsight or only based on the necessarily limited information available to the parties at the time the contract was made. Significantly, however, the overwhelming majority of the reported decisions cited by the parties or found by the court, and all the Massachusetts and First Circuit decisions, address these issues in the context of challenges by the party in breach to payment of a liquidated sum which is alleged to be too high. In only a handful of reported decisions from other jurisdictions has the non-breaching party argued that enforcement should be denied on the ground that the liquidated sum was so low as to constitute an unenforceable penalty. In each such case, the court rejected the argument.[FN3]

In *Mahoney v. Tingley,* 529 P.2d 1068 (Wash. 1975), the plaintiff agreed to sell a piece of residential property to defendant for a fixed sum and to accept a deposit of $200 as earnest money. The purchase and sale agreement contained a clause which the court interpreted as limiting plaintiff's damages for defendant's breach to the amount of the earnest money deposit. Following a breach by defendant and a sale of the property by plaintiff to a third party, plaintiff sued to recover actual damages claimed to be in excess of $3,000, or more than fifteen times the liquidated amount. Plaintiff argued that the clause limiting his damages to a liquidated sum was a penalty that should not be enforced. The court squarely rejected the argument. First, the court correctly noted that there was simply no penalty where a nondefaulting seller is paid the liquidated sum it agreed to accept in the event of a default by the buyer:

A penalty exists where there is an attempt to enforce an obligation to pay a sum fixed by agreement of the parties as a punishment for the failure to fulfill some primary contractual obligation. 5 S. Williston, Contracts, § 770, at 641 (3d ed. 1961). In this case, it is not the party in default who seeks relief from an excessively high liquidated damages provision. Rather, the provision operates to limit the recovery of the party who incurred a loss as a result of the other parties' [sic] breach. There being no element of punishment involved, it cannot be said that plaintiff is being penalized in any sense.

**\*3** *Id.* at 1070.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1995 WL 337072 (D.Mass.)
**(Cite as: Not Reported in F.Supp.)**

Page 3

The court then took into account various practical considerations. It noted that a seller of property might have good reason to accept the certainty of liquidated damages over the uncertainty of being able to prove any damages at all. Equally important, the buyer's willingness to enter into the contract may well have been influenced by the limitation of damages. Further, a seller always has the right in an arms-length transaction to insist upon a deposit in a larger amount, or to refuse to accept any limitation at all.

The court did not foreclose the possibility that, in an extreme case, enforcement of a clause which provided for damages that were too low might be denied on the ground of unconscionability. Such instances would be rare, however. "Except where extraordinary circumstances are involved such as fraud or serious overreaching by the purchaser, a seller who chooses to utilize the device of liquidated damages in an earnest money agreement, with its attendant features of certainty and reliance upon the limitation, cannot avoid the effect of that agreement." *Id.* at 1071.

More recently, the Supreme Court of Idaho was persuaded by *Tingley* and its reasoning to reach the same result in a case with very similar facts:
The trial court was correct in stating that a liquidated damage clause will not be enforced if it is found to be a penalty. Typically, a defaulting buyer objects to enforcement of a liquidated damage clause because he believes the amount forfeited is too high. In this case, we are confronted with a nondefaulting seller who claims that the amount of liquidated damages is too low.... Under the circumstances of this case, [the nondefaulting seller] is not being penalized in any way. We find that limiting [the nondefaulting seller's] recovery to the amount of earnest money deposited would not constitute a penalty within the meaning of the cases cited, and therefore reverse the trial court's ruling that the liquidated damages clause was unenforceable as a penalty.

*Margaret H. Wayne Trust v. Lipsky,* 846 P.2d 904 (Idaho 1993); *see also City of Kinston v. Suddreth,* 146 S.E.2d 660, 663 (N.C. 1966) ("It seems quite apparent that defendant intended to limit the amount

of damages which could be recovered against him in the event he did not purchase the property. Whatever the [plaintiff] City may have intended, that was the effect of the contract which it accepted. ")[FN4]

The court finds the reasoning of these cases persuasive. A damage limitation that turns out to be low relative to actual damages does not in any sense "penalize" the nondefaulting seller who agreed to accept it. Nor, for that matter, does such a limitation confer a windfall on the defaulting buyer who had the foresight and negotiating skill to obtain it, any more than an unexercised option provides an unfair benefit to its owner.[FN5] The limitation should therefore be enforced, unless it is unconscionable.

### *III. Unconscionability*

*\*4* Under Massachusetts law, unconscionability may be raised as a defense to the enforcement of a contract or any of its clauses. *Zapatha v. Dairy Mart, Inc.,* 408 N.E.2d 1370, 1374 n.6 (Mass. 1980) . If the contract involves the sale of goods, the unconscionability provision of the Uniform Commercial Code, Mass. Gen. L. ch. 106, § 2-302, will apply directly; if it does not, the same provision will apply by analogy. *Id.* at 1375. Section 2-302 provides, in pertinent part, that a court, "as a matter of law," may refuse to enforce a contract or any clause if it finds the contract or the clause under consideration "to have been unconscionable at the time it was made." The court noted in *Zapatha* that the Code does not define the term " unconscionability" and that there could be no " all-purpose definition." *Id.* at 1375. Rather, said the court, "unconscionability must be determined on a case-by-case basis ... giving particular attention to whether, at the time of the execution of the agreement, the contract provision could result in unfair surprise and was oppressive to the allegedly disadvantaged party." *Id.*

Although there is no "all-purpose definition" of unconscionability, *Zapatha* and its progeny do highlight certain principles that are useful in analyzing any particular set of facts:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                        Page 4

Not Reported in F.Supp., 1995 WL 337072 (D.Mass.)
**(Cite as: Not Reported in F.Supp.)**

1. Unconscionability is to be determined as a matter
of law. Mass. Gen. L. ch. 106, § 2-302.

2. Unconscionability is to be determined as of the
time of the making of the contract, not as of the
time of the occurrence of the contingency to which
the challenged clause applies. *Id. See, e.g., Canal
Elec. Co. v. Westinghouse Elec. Co.,* 973 F.2d 988,
997 (1st Cir. 1992).

3. "The principle is one of prevention of oppression
and unfair surprise ... and not of disturbance of
allocation of risks because of superior bargaining
power." Mass. Gen. L. ch. 106, § 2-302 cmt. 1
(citation omitted).

4. Even adhesion contracts offered on a "
take-it-or-leave-it" basis are not necessarily
unconscionable. *E.g., Zapatha* 408 N.E.2d at 1373;
*Minassian v. Ogden Suffolk Downs, Inc.,* 509
N.E.2d 1190, 1192 (Mass. 1987).

5. Practices expressly permitted by the Uniform
Commercial Code are not per se unconscionable.
*E.g., Zapatha* at 1376 (stating that provision
permitting termination without cause is permitted by
UCC and is thus not per se unconscionable).[FN6]

6. In determining whether a practice is unfair or
oppressive, the court may take into account a
myriad of factors, such as the commercial
sophistication of the party claiming
unconscionability; whether such party was
represented by counsel; whether the clause was
obscure or buried in fine print, or, conversely,
whether it was out on the table and the subject of
active negotiation; the frequency with which clauses
of the type challenged are used in analogous
situations; whether the relationship between the
parties was arms length or quasi-fiduciary; whether
there was a gross disparity between the value of the
consideration given and received; and whether the
party seeking to enforce the challenged provision
took unfair advantage of the other party's weakness,
vulnerability, or dependency, or used unfair or
improper means to place the other party in such
position.

*5 Taking all these principles into account, the

limitation of damages provision in the P&S was not
unconscionable as of the time the contract was
made. The undisputed evidence establishes that
NASCO was under considerable economic
pressure, but the pressure was being generated by
NASCO's lender bank and was not at all the result
of conduct by PSI. Further, despite such pressure,
NASCO, like PSI, was financially sophisticated and
ably represented by experienced counsel. At least
six months before the P&S was signed, PSI let it be
known to NASCO that it would require a limitation
of damages provision in the agreement, as it had
done in each of the multitude of other real estate
transactions in which it had been involved in
Massachusetts. There is no suggestion that
provisions of this type are uncommon in
commercial real estate transactions or that PSI
exploited NASCO's particular weakness in this case
to extract a uniquely favorable concession that it
would otherwise not have insisted upon. Nor is
there any suggestion that, either before or after PSI
let its intentions be known, there was anything
preventing NASCO from attempting to sell the
property to other prospective purchasers on more
favorable terms.

PSI initially proposed a damages limitation of
$225,000, but, after a period of negotiation, a
liquidated sum of $350,000 was agreed upon. This
represented nearly 10% of the purchase price. There
is no reason to believe that, at the time this sum was
agreed upon, either party had any reason to believe
that it would prove to be inadequate. In fact, the
implication of NASCO's argument that PSI had
superior bargaining power is just the opposite. If
PSI indeed had such power, it may be inferred that
the purchase price, far from providing NASCO a
substantial premium over market, would have been
closer to the low end of the fair market value range.
And, if that were the case, it is not at all apparent
why either party would have had any reason to
believe that the fair market value would fall by
substantially more than 10% in the relatively short
period between the date the P&S was signed
(February 2, 1990) and the latest date on which the
closing might occur (September 14, 1990).

Even if it is assumed that the negotiated purchase
price did represent a substantial premium over

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 5

Not Reported in F.Supp., 1995 WL 337072 (D.Mass.)
**(Cite as: Not Reported in F.Supp.)**

market, such that it might have been anticipated that the damages upon a default by PSI would exceed the 10% liquidated sum, the limitation would still not be unconscionable. To conclude otherwise would require that the price term and the damages limitation term be completely disassociated from each other, as though there were no connection between them. But the agreement must be read as a whole, and not disassembled on a "heads I win, tails you lose basis," leaving in place only those provisions favorable to NASCO. If the price offered by PSI was indeed too good for NASCO to refuse, it is not unconscionable to hold NASCO to other, integral aspects of that same deal which it now finds unattractive.

### IV. Conclusion

*6 For all the foregoing reasons, it is recommended that PSI's motion for partial summary judgment be ALLOWED.

### V. IMPORTANT NOTICE OF RIGHT TO OBJECT AND WAIVER OF RIGHT TO APPEAL FOR FAILURE TO DO SO WITHIN TEN DAYS

The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court WITHIN 10 DAYS of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has indicated that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court's order entered pursuant to this Report and Recommendation. *See United States v. Valencia-Copete,* 792 F.2d 4 (1st Cir. 1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1stCir. 1980); *United States v.*

*Vega,* 678 F.2d 376 (1st Cir. 1982); *Scott v. Schweiker,* 702 F.2d 13 (1st Cir. 1983); *see also Thomas v. Arn,* 474 U.S. 140 (1985).

> FN1. NASCO's fear, as expressed in its Mem. in Opp'n (Docket No. 46) at 4 n.2, that PSI's motion, if granted, will limit NASCO's recovery to $350,000, or, perhaps, to a multiple of that pursuant to M.G.L. c. 93A, is unfounded. Even if PSI prevails, nothing in its present motion seeks to limit the 93A damages sought by NASCO in Count III of the Amended Complaint or, for that matter, any of the damages sought in any count other than Count I.

> FN2. As set forth in *NASCO I,* the deposit was not in fact paid prior to PSI's default. Indeed, a critical point on which NASCO prevailed in *NASCO I* was that the P&S might nevertheless have come into and remained in effect despite such failure. Assuming that NASCO ultimately prevails on this issue, as it must if it is to establish PSI's liability for breach of contract, it would be inconsistent to deny enforcement of the liquidated damages clause based upon PSI's failure to pay the deposit prior to its default. NASCO's only argument on this point is that such failure somehow estops PSI from invoking the liquidated damages clause, but NASCO does not even attempt to establish the *sine qua non* of estoppel -- some form of detrimental reliance on its part. *See also Warner v. Wilkey,* 307 N.E.2d 847 (Mass. App. Ct. 1974) (defaulting buyer ordered to pay deposit that the parties had agreed could be retained by seller as liquidated damages if buyer defaulted.)

> FN3. The First Circuit has stated, "A diversity court faced with a paucity of apposite decisional law may look to analogous decisions, considered dicta, scholarly works, and any other reliable data tending to convincingly show how the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1995 WL 337072 (D.Mass.)
**(Cite as: Not Reported in F.Supp.)**

highest court [in the relevant jurisdiction] would decide the issue at hand." *Sainz Gonzalez v. Banco de Santander-Puerto Rico,* 932 F.2d 999, 1001 (1st Cir. 1991).

FN4. The court in *Suddreth* also quoted Williston as follows:
Contractual limitation of liability to an agreed maximum must be distinguished from a penalty or liquidated damages.... Aside from certain restrictions in the field of public utility law, chiefly relating to common carriers, if the agreed amount to which liability is limited is something more than a merely nominal sum, the validity of the provision has long been recognized. 5 Williston, Contracts § 781A (3d Ed. 1961) and cases cited therein.
*Id.* at 663. *See also* E. Allan Farnsworth, § 12.18, at 936 (2d ed. 1990) ("Since it is the *in terrorem* effect that is objectionable, the proscription applies only if the stipulated sum is on the high, rather than the low, side of conventional damages, although a provision stipulating an unreasonably low sum as damages may be attacked as unconscionable.").

FN5. The well-established right of the holder of an option purchased for consideration to allow the option to expire without incurring a penalty is to be distinguished from the situation addressed by the First Circuit in *NASCO I.* There, the court condemned PSI's attempt to exploit NASCO's financial situation "so as to create for itself, *at no cost,* both a fully enforceable option to buy the property and a textual basis for repudiating the agreement at its discretion. This was more than PSI bargained for ...." *NASCO I,* 29 F.3d at 34 (emphasis in original). Here, of course, PSI did bargain for the very right it now seeks to exercise, at a not inconsiderable cost to itself.

FN6. The Uniform Commercial Code does, of course, permit limitation of damages clauses in sales contracts. *See*

Mass. Gen. L. ch. 106, § 2-719(3).
D.Mass. 1995
Nasco, Inc. v. Public Storage, Inc.
Not Reported in F.Supp., 1995 WL 337072 (D.Mass.)

Briefs and Other Related Documents (Back to top)

• 1:92cv12731 (Docket) (Nov. 16, 1992)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

7 UCC Rep.Serv.2d 1494                                                                                   Page 1

1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

**(Publication page references are not available for this document.)**

►

ANDOVER AIR LIMITED PARTNERSHIP
v.
PIPER AIRCRAFT CORP.
v.
KLADSTRUP
No. 87-0532-Z
United States District Court, D. Massachusetts
January 4, 1989

Callaghan & Company's Headnote and Classification

P2608.4(2), P2608.4(5), P2711.1
Buyer's election of remedies.
D.Mass. Jan. 4, 1989
Buyer of aircraft was entitled to pursue against manufacturer the alternate recovery theories of (1) revocation, and (2) breach of both contract and warranty since they were brought in good faith. Although the Code appears to limit the use of the revocation remedy against a "seller," some courts have permitted such revocation against manufacturers. Case law also provided support for buyer's other recovery theory. Finally, the pleading of alternate recovery theories is permitted by the Federal Rules of Civil Procedure.
ANDOVER AIR LIMITED PARTNERSHIP v. PIPER AIRCRAFT CORP. 1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

Callaghan & Company's Headnote and Classification

P2608.4(5)
Revocation action against manufacturer.
D.Mass. Jan. 4, 1989
Although the Code provides that revocation of acceptance is a remedy to be used against the "seller," the majority of the courts define "seller" as including a manufacturer that played an active role in, or was the principal of, the sale. Assuming that Massachusetts courts would follow the majority rule: absent a showing that aircraft seller acted as agent for manufacturer or that manufacturer passed title directly to buyer, buyer was not entitled to bring a revocation action against manufacturer.
ANDOVER AIR LIMITED PARTNERSHIP v. PIPER AIRCRAFT CORP. 1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

Callaghan & Company's Headnote and Classification

P2608.2, P2608.6(2), P2608.6(4)
Actions inconsistent with revocation claim--use of plane before and after discovery of defect.
D.Mass. Jan. 4, 1989
Assuming that Massachusetts courts would follow the decisions of courts in other jurisdictions: whether buyer's use, repair, and maintenance of aircraft prior to discovery (through a crash landing) of a defective landing gear

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

**(Publication page references are not available for this document.)**

precluded its revocation of acceptance first required determination of the issue whether there had been any "substantial change" in the condition of the plane, a question for the jury. Whether continued use of the aircraft after discovery of the defect precluded revocation of acceptance depended on whether use after revocation was reasonable, which is also a question of fact for the jury.
ANDOVER AIR LIMITED PARTNERSHIP v. PIPER AIRCRAFT CORP. 1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

Callaghan & Company's Headnote and Classification

P1204.1, P2608.2
Revocation within a reasonable time.
D.Mass. Jan. 4, 1989
Whether buyer of an aircraft which crashed landed as the result of defective landing gear failed to revoke its acceptance within a reasonable time is a question of fact for the jury.
ANDOVER AIR LIMITED PARTNERSHIP v. PIPER AIRCRAFT CORP. 1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

Callaghan & Company's Headnote and Classification

P2608.4(3), P2608.4(4), P2711.2, P2711.3(2)
Damages allowable to revoking buyer.
D.Mass. Jan. 4, 1989
Assuming that Massachusetts courts would follow the majority of the decisions of courts in other jurisdictions: if buyer of aircraft was permitted to revoke its acceptance, it would be entitled to recover the purchase price of the plane, plus any out-of-pocket incidental and consequential damages, but not loss of use or the value of the lost resale option since revocation does not permit a buyer to recover the benefit of his bargain. Moreover, the jury properly could reduce buyer's damages award by an amount equal to the value of buyer's use of the plane both before and after its discovery that the plane had a defective landing gear. Thus, for this and other reasons, motion by defendants seller and manufacturer to prohibit the introduction of evidence of consequential and incidental damages during the damage phase of the trial is denied.
ANDOVER AIR LIMITED PARTNERSHIP v. PIPER AIRCRAFT CORP. 1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

Callaghan & Company's Headnote and Classification

P2714.2(2), P2719.7(2), P2719.7(6)
Failure of exclusive repair-or-replacement remedy; effect on damages liability disclaimer.
D.Mass. Jan. 4, 1989
In a breach of warranty action by buyer of aircraft against manufacturer (which, in turn, sued seller), if buyer can establish that manufacturer's limited repair-or-replacement warranty failed of its essential purpose, manufacturer's disclaimer of liability for consequential and incidental damages will become inoperative, and buyer may recover such damages as allowed by the Code. Thus, for this and other reasons, motion by defendants (manufacturer and seller) to prohibit the introduction of evidence of consequential and incidental damages during the damage phase of the trial is denied.
ANDOVER AIR LIMITED PARTNERSHIP v. PIPER AIRCRAFT CORP.

Callaghan & Company's Headnote and Classification

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7 UCC Rep.Serv.2d 1494                                                                                                        Page 3

1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

**(Publication page references are not available for this document.)**


P2714.1, P2715.1, P2715.2(2)
Types of buyer's damages.
D.Mass. Jan. 4, 1989
"General damages" are those that flow naturally and necessarily from the complained of wrong and do not depend on the special character, condition, or circumstances of the plaintiff-buyer. In contrast, "consequential damages" are not immediate and direct even though they result from the complained of wrong. "Incidental damages" include such things as the expense of inspection, receipt, transportation and custody of goods rightfully rejected, etc.
ANDOVER AIR LIMITED PARTNERSHIP v. PIPER AIRCRAFT CORP. 1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

Callaghan & Company's Headnote and Classification


P2302.4(2), P2302.4(4), P2302.32, P2719.7(6), P2719.11(2)
Failure of exclusive repair-or-replacement remedy; unconscionability of damages liability disclaimer.
D.Mass. Jan. 4, 1989
The question of unconscionability is one of law to be decided by the court. Aircraft manufacturer's limited repair or replacement warranty coupled with a disclaimer of liability for general, consequential and incidental damages, which would result in manufacturer being liable only for the repair or replacement of a defective landing gear (costing tens of dollars) even though the gear was the alleged cause of the plane's crash landing (resulting in damages in excess of $100,000 and which might have been worse but for the skill of the pilot), was unconscionable since it left buyer without a "fair quantum of remedy," notwithstanding that the buyer's negotiator was a sophisticated party, and the terms of the warranty/disclaimer were sufficiently clear and readable as to bar a claim by buyer of "unfair surprise." Thus, despite manufacturer's pledge that it would only take advantage of the consequential and incidental damages part of the disclaimer (which are often upheld), and not the general damages part, the entire disclaimer is voided.
ANDOVER AIR LIMITED PARTNERSHIP v. PIPER AIRCRAFT CORP. 1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

Callaghan & Company's Headnote and Classification


P2711.1, P2714.2(2), P2715.11
Recovery of damages for breach of warranty.
D.Mass. Jan. 4, 1989
In a breach of warranty action by buyer of aircraft against manufacturer arising out of the plane's crash landing allegedly as the result of a defective landing gear, if buyer establishes that the breach occurred, it will be entitled to recover its cost of repair, its loss of use of the plane, its increased insurance cost, and the value of its lost repurchase option.
ANDOVER AIR LIMITED PARTNERSHIP v. PIPER AIRCRAFT CORP. 1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

UCC Sections Cited: § 2-103(1)(d), § 2-106(1), § 2-302(1), § 2-602(2)(a), § 2- 608(2), (3), § 2-715(1), (2), § 2-719(1)(a), (2) and Official Comment 1.

EDITORS' NOTE

For more on one the issues discussed in this case, see Foss, When to Apply the Doctrine of Failure of Essential Purpose to an Exclusion of Consequential Damages: An Objective Approach, 25 Duq L Rev 551 (1987), and Mather, Consequential Damages When Exclusive Repair Remedies Fail: UCC 2-719, 38 SCL Rev 673 (1987). For

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7 UCC Rep.Serv.2d 1494                                                    Page 4

1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

**(Publication page references are not available for this document.)**

more on damages, see Damages Under the Uniform Commercial Code (Callaghan 1988), by R. Anderson.

Harold W. Potter, Jr. and Miriam Goldstein Altman, both of Sherburne, Powers & Needham, Boston, for plaintiffs.

Peter J. Black for defendants.

Albert F. Cullen for third-party defendants.

ZOBEL, District Judge.

Piper Aircraft Corporation and Lear Siegler, Inc. ("Piper") have filed a motion in limine requesting that this court prohibit Andover Air Limited Partnership ("Andover Air") from introducing evidence of consequential or incidental damages during the damage portion of the plaintiff's action against the defendants. Although Piper's motion specifically addresses consequential and incidental damages, both Piper and Andover have thoroughly briefed all of the relevant damage issues and thus this court treats the motion in limine as a request for the court to clarify the applicability of the damage theories that Andover intends to pursue.

Andover presents two alternative theories of recovery. First, it argues that its purchase of an aircraft may be revoked against Piper under § 2-608 of the Uniform Commercial Code. Second, it seeks damages for breach of contract and implied and express warranties.

Piper initially asserts that Andover may not proceed with both its revocation and breach claims because they are mutually exclusive. Piper also claims that regardless of whether Andover may proceed on both claims in theory, revocation is, in any event, unavailing for three reasons: First, although Piper manufactured the aircraft, it was not the "seller" and the Uniform Commercial Code allows for revocation only against the "seller"; second, Andover repaired and maintained the aircraft prior to revocation; and third, Andover repaired, maintained, and used the aircraft after Piper refused to acknowledge plaintiff's revocation of acceptance. Regarding Andover's breach of contract and warranty claims, Piper asserts that it has limited its liability on breach of contract and warranty claims to the cost of repair or replacement of any part, component or installation work proved defective. Furthermore, regardless of whether the warranty it issued for the aircraft failed of its essential purpose, Piper claims that its express exclusion of liability for any and all consequential and incidental damages remains effective. Andover disputes all of Piper's assertions.

## I. BACKGROUND

Andover purchased a Piper Cheyenne 1A aircraft and a five-year warranty from Northeast Cheyenne Sales, Inc. ("Northeast") on November 25, 1985. On November 19, 1986, the aircraft made a gear-up forced landing requiring repairs allegedly at a cost of more than $100,000. Andover sued Piper alleging that the right main landing gear failed to extend because of a defective uplock hook assembly. A jury found that the failure of the gear to extend was the proximate result of a defect for which Piper was responsible.

## II. MULTIPLE THEORIES OF RECOVERY

Piper asserts that Andover is proceeding to trial on two mutually exclusive remedies in an effort to avoid the consequences of an unfavorable ruling on their breach of warranty claims. Pursuing such claims, according to Piper, violates Fed. R. Civ. P. 11, which requires that a party or attorney possess a good faith belief that the claim for relief is warranted by existing law. Piper suggests that Andover cannot have a good faith belief in two mutually exclusive remedies and that proceeding on both claims is different than pursuing two alternative theories of liability

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7 UCC Rep.Serv.2d 1494                                                                Page 5

1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

**(Publication page references are not available for this document.)**

such as negligence and breach of warranty in a personal injury action. Piper cites no case authority in support of its proposition.

The Federal Rules of Civil Procedure govern the pleadings that a party may make, and a party "may set forth two or more statements of a claim . . . regardless of consistency." Fed. R. Civ. P. 8(e)(2). Rule 8(a)(2) provides that a party may demand "[r]elief in the alternative or of several different types." Id. at 8(a)(2). Nothing precludes Andover from pursuing inconsistent claims, even where the theories of liability are mutually exclusive. The only constraint is that a judgment in Andover's favor "cannot be supported by inconsistent theories if one theory precludes the other or is mutually exclusive of the other." Fredonia Broadcasting Corp. v. RCA Corp., 481 F.2d 781, 801 [12 UCC Rep Serv 1088] (5th Cir. 1973). Several courts have explicitly allowed the plaintiff to pursue both breach of warranty and revocation of acceptance claims. E.g., Fargo Machine & Tool Co. v. Kearney & Trecker Corp., 428 F. Supp. 364, 377 [21 UCC Rep Serv 80] (E.D. Mich. 1977); Parsons v. Motor Homes of America, Inc., 465 So. 2d 1285, 1289 [40 UCC Rep Serv 1264] (Fla. Dist. Ct. App. 1985); General Motors Acceptance Corp. v. Anaya, 703 P.2d 169, 171 [41 UCC Rep Serv 824] (N.M. 1985). Of course, even though Andover may pursue both claims, the jury could not return a damage award inconsistent with the theories presented.

Andover has a reasonable basis for pursuing either of its claims. Sufficient case law exists on the issue of revocation against a manufacturer to suggest that Andover may be entitled to revoke its purchase against Piper. Similarly, existing case law supports Andover's breach of contract and warranty claim. Contrary to Piper's assertion, Andover's claim for relief under the two alternative theories advanced is not made in bad faith. Thus, Andover may proceed to trial on both theories of recovery.

### III. RECOVERY UNDER THE THEORY OF REVOCATION

Andover asserts that revocation of acceptance is available not only against Northeast Cheyenne but also against Piper. Because no Massachusetts court has considered this issue, I must attempt to foretell what a Massachusetts court would do if faced with a revocation claim against a manufacturer.

#### A. Revocation Against the Manufacturer

The Uniform Commercial Code ("the Code") allows revocation of acceptance against a "seller" if certain conditions are met. Mass. Gen. Laws Ann. ch. 106, § 2-608 (West 1958). The Code defines a "seller" as one who "sells or contracts to sell goods," id. § 2-103(1)(d), and defines a "sale" as "the passing of title from the seller to the buyer for a price." Id. § 2-106(1). Piper argues that Northeast Cheyenne acted as the seller in the transaction while Andover claims that excluding Piper from the concept of seller is contrary to the purposes of the Code.

Both parties support their respective positions with cases from jurisdictions other than Massachusetts. Andover cites Durfee v. Rod Baxter Imports, Inc., 262 N.W.2d 349 [22 UCC Rep Serv 945] (Minn. 1977) and Volkswagen of America, Inc. v. Novak, 418 So. 2d 801 [34 UCC Rep Serv 1150] (Miss. 1982), two cases in which automobile manufacturers were considered "sellers" for the purposes of revocation. The Durfee court seemed primarily concerned that the buyer would be left without any remedy if he could not revoke against the manufacturer and decided that the Code provision allowing for the liberal provision of remedies weighed in favor of permitting the buyer to revoke against the manufacturer. Durfee, 262 N.W.2d at 357-58. In Novak, the Mississippi court felt bound by a statutory provision that eliminated privity as a requirement for breach of warranty actions brought under the provisions of the Code. Novak, 418 So. 2d at 803. A New Jersey court has advanced a third rationale: when a manufacturer offers a warranty to consumers it creates a direct contractual obligation to the buyer making revocation an appropriate remedy, at least where both the limited remedy provided for in the warranty and the implied warranty of merchantability fail. Ventura v. Ford Motor Corp., 433 A.2d 801, 811-12 [32 UCC Rep Serv

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

**(Publication page references are not available for this document.)**

57] (N.J. Super. Ct. App. Div. 1981).

More numerous are the courts that require privity between buyer and seller before allowing revocation. E.g., Voytovich v. Bangor Punta Operations, Inc., 494 F.2d 1208, 1211 [15 UCC Rep Serv 45] (6th Cir. 1974); Seekings v. Jimmy GMC of Tucson, Inc., 638 P.2d 210, 214 [32 UCC Rep Serv 1450] (Ariz. 1981); Gasque v. Mooers Motor Car Co., 313 S.E.2d 384, 390 [38 UCC Rep Serv 120] (Va. 1984). These cases express the underlying rationale that revocation under the Code (like rescission in general contract law) operates to restore the status quo ante. The buyer returns the goods to the seller in exchange for the purchase price. But where a manufacturer has sold goods outright to a wholesaler or retailer, it no longer has an ownership interest in the goods and never receives the purchase price from the ultimate buyer. Thus, the argument goes, a manufacturer having no part in the sales transaction has no role to play in the restoration of the parties to their former positions. The only exception is when the buyer demonstrates that the retailer/seller acted as the agent of the manufacturer. E.g., Seekings, 638 P.2d at 214; Conte v. Dwan Lincoln-Mercury, Inc., 374 A.2d 144, 149-50 [20 UCC Rep Serv 899] (Conn. 1976); see also Hitchcock v. Emergency Lighting and Systems, Inc., 12 Mass. App. Ct. 930, 425 N.E.2d 396 [32 UCC Rep Serv 14] (1981).

Such authority as exists indicates that Massachusetts courts would adopt the more limited definition of "seller" as set forth in the majority of cases dealing with this issue. In part, this limited concept of seller underlies a decision by the Appeals Court of Massachusetts in Hitchcock v. Emergency Lighting and Systems, Inc., 12 Mass. App. Ct. 930, 930-31, 425 N.E.2d 396, 397 [32 UCC Rep Serv 14] (1981). In Hitchcock, the court ruled that the defendant retailer was not a "seller" because it neither passed title to the plaintiff nor acted as agent for the manufacturer. Id. at 930-31, 425 N.E.2d at 397. Thus, absent a showing that Northeast Cheyenne acted as agent for Piper or that Piper passed title directly to plaintiff, Andover may not revoke against Piper.

B. Revocation After Use

Piper also asserts that even if revocation were a remedy generally available to Andover, that remedy is not available in this particular instance because the aircraft's condition had changed substantially due to use, repairs, and maintenance both before and after Andover notified Piper of its revocation. In response, Andover argues that it would eviscerate the Code if its revocation claim were prohibited on the ground that substantial use of the aircraft had occurred before the discovery of the defect.

Section 2-608(2) of the Code requires that revocation of acceptance "occur within a reasonable time after the buyer discovers . . . the ground for it and before any substantial change in condition of the goods which is not caused by their own defects." Mass. Gen. Laws Ann. ch. 106, § 2-608(2) (West 1958). Apparently no Massachusetts court has considered this issue but courts in other jurisdictions applying the same Code provision have treated the question of substantial change in the condition of goods as one of fact. E.g., Lackawanna Leather Co. v. Martin & Stewart, Ltd., 730 F.2d 1197, 1202-03 [38 UCC Rep Serv 475] (8th Cir. 1984) (applying Nebraska law, issue of substantial change properly submitted to jury for determination); Gasque v. Mooers Motor Car Co., 313 S.E.2d 384, 389 [38 UCC Rep Serv 120] (Va. 1984) (whether substantial change in goods occurred before revocation requires factual determination). Therefore, whether Andover's use, repair, and maintenance of the aircraft precludes revocation of acceptance requires resolution of a question of fact. [FN1]

C. Use After Revocation

Finally, Piper argues, even if Andover's use of the aircraft before the accident does not preclude revocation, its use thereof following the accident does. Piper cites the Code, which states that once a party revokes, it has "the same rights and duties with regard to the goods involved as if he had rejected them." Mass. Gen. Laws Ann. ch.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

**(Publication page references are not available for this document.)**

106, § 2-608(3) (West 1958). Upon rejection, "any exercise of ownership by the buyer with respect to any commercial unit is wrongful as against the seller." Id. § 2-602(2)(a).

However, continued use of the product does not always preclude revocation of acceptance. At least one Massachusetts court has noted that whether use of goods invalidates a revocation of acceptance is a question of fact subject to a test of reasonableness. Charney v. Ocean Pontiac, Inc., 17 U.C.C. Rep. Serv. (Callaghan) 982, 985 (Mass. Dist. Ct., App. Div. 1975). Courts in other jurisdictions have similarly held. E.g., CPC International, Inc. v. Techni-Chem, Inc., 660 F. Supp. 1509, 1514-15 [4 UCC Rep Serv 2d 485] (N.D. Ill. 1987); Fargo Machine & Tool Co. v. Kearney & Trecker Corp., 428 F. Supp. 364, 378 [21 UCC Rep Serv 80] (E.D. Mich. 1977); H.G. Fischer X-Ray Co. v. Meredith, 433 A.2d 1306, 1309 [31 UCC Rep Serv 1586] (N.H. 1981). One court has noted that a fact finder determining the reasonableness of use after revocation may consider the following factors: the seller's instructions to the buyer after revocation of acceptance; the degree of economic and other hardship that the buyer would suffer if he discontinued using the good; the reasonableness of continued use after revocation as a method for mitigating damages; the degree of prejudice to the seller; and whether the seller acted in good faith. Johannsen v. Minnesota Valley Ford Tractor Co., 304 N.W.2d 654, 658 [31 UCC Rep Serv 558] (Minn. 1981); see also McCullough v. Bill Swad Chrysler-Plymouth, Inc., 449 N.E.2d 1289, 1293 [36 UCC Rep Serv 513] (Ohio 1983). Therefore, whether Andover's continued use of the aircraft bars revocation is a question of fact for resolution at trial.

### D. Damages Under Revocation

Neither party has cited Massachusetts authority outlining the elements of recovery available to a plaintiff upon revocation. One Massachusetts case includes language that suggests that upon revocation of acceptance a plaintiff may seek recovery that would "place [the buyer] in as good a position as it would be in if [the seller] had properly performed, but does not [permit] overcompensation." Delano Growers' Cooperative Winery v. Supreme Wine Co., 393 Mass. 666, 680, 473 N.E.2d 1066, 1074-75 [40 UCC Rep Serv 93] (1985). Upon closer examination, however, the recovery in Delano was based on breach of contract and is therefore inapplicable here. Id. at 668, 473 N.E.2d at 1068. Another Massachusetts court permitted the recovery of consequential damages but the court did not extensively detail its reasoning. Fortin v. Ox-Bow Marina, Inc., 4 U.C.C. Rep. Serv. (Callaghan) 1046, 1053 (Mass. Super. Ct. 1987). Although there exists little guidance on how a Massachusetts court might decide this issue, in most cases the remedy for revocation of acceptance is seen as restoring the buyer to the economic position that would have been enjoyed if the seller had not delivered the goods. E.g., Hemmert Agricultural Aviation, Inc. v. Mid-Continent Aircraft Corp., 663 F. Supp. 1546, 1550 [4 UCC Rep Serv 2d 726] (D. Kan. 1987). However, revocation, like rescission, does not permit the buyer to obtain the benefit of his bargain. Therefore, Andover may recover the purchase price of the aircraft and any out-of-pocket incidental and consequential damages.

Specifically, Andover may present evidence about the purchase price of the aircraft, the cost of the warranty, and the interest paid on the aircraft loan, repair costs, and increased insurance costs. Andover may not recover for its loss of use of the aircraft or the value of the lost resale option because these are benefits that flow from the completed bargain and would not have occurred in the absence of the purchase. In addition, because Andover had use of the aircraft for a significant period of time, Piper may introduce evidence regarding the value of Andover's use of the aircraft both before and after the accident. The jury may properly reduce Andover's recovery by this amount.

### IV. Recovery Under Breach of Warranty Theory

Piper argues that under the warranty issued for the aircraft, Andover's remedy is limited to repair or replacement of any defective parts or components. [FN2] Piper's warranty also disclaims liability for "general, consequential, or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7 UCC Rep.Serv.2d 1494                                                                                                          Page 8

1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

**(Publication page references are not available for this document.)**

incidental damages relating to property damage or economic loss." Andover asserts that the limited warranty failed of its essential purpose and, as a result, it may pursue any remedy allowed under the Code, including consequential and incidental damages. [FN3] Andover also takes the position that the warranty provision, excluding incidental and consequential damages, is unconscionable because it also covers general damages.

### A. Recovery When the Warranty Fails of Its Essential Purpose

Under the Code, buyers and sellers may provide for limited remedies, provided that the limitation is not unconscionable. Mass. Gen. Laws Ann. ch 106, § 2- 719 (West 1958). However, where that remedy fails of its essential purpose, a buyer may seek any "remedy . . . as provided in this chapter." Id. § 2-719(2). The parties disagree about Andover's right to seek consequential and incidental damages upon failure of a limited remedy when Piper's warranty expressly disclaims any such liability.

Apparently only one Massachusetts opinion exists on this issue. In Reynolds v. Preferred Mutual Insurance Co., 11 U.C.C. Rep. Serv. (Callaghan) 701 (Mass. Dist. Ct., App. Div. 1972), a contractor attempted to limit its liability for defects in workmanship and material to the cost of labor and materials. The court, without extensively detailing its reasoning, ruled that because the warranty failed of its essential purpose, the plaintiff could recover under the general remedy provisions of the Code and thus allowed the plaintiff consequential damages. Id. at 708. A substantial number of courts have ruled similarly. But other courts have enforced the damage limitation clause even when the limited warranty fails of its essential purpose. Special Project, Article Two Warranties in Commercial Transactions: An Update, 72 Cornell L. Rev. 1159, 1307-09 (1987).

The reasoning of those courts that refuse to give effect to the damage exclusion clause upon failure of the limited remedy is more persuasive. The Ninth Circuit examined the conflicting case law in Fiorito Brothers, Inc. v. Fruehauf Corp., 747 F.2d 1309 [39 UCC Rep Serv 1298] (9th Cir. 1984), and concluded that the validity of a limitation clause requires an examination of "each case and each contract . . . on its own merits." Id. at 1314. Fundamentally, an exclusive "repair or replace" remedy that limits consequential damages represents a bargain struck between the parties. The buyer sacrifices its right to recover consequential damages in exchange for a promise from the seller that prompt and effective repair or replacement will be forthcoming so as to limit the consequential damages that the buyer might bear. In Fiorito, the court concluded that

" '[i]t cannot be maintained that it was the parties' intention that [the seller] be enabled to avoid all consequential liability for breach by first agreeing to an alternative remedy provision designed to avoid consequential harms, and then scuttling that alternative remedy through it recalcitrance in honoring the agreement.' " Id. at 1315 (quoting trial court's denial of motion for new trial) (emphasis supplied by reviewing court). Viewing the limitation clause as a trade between Andover and Piper, it is unfair to allow Piper to retain the benefit of the trade if it unjustifiably refused to honor its portion of the bargain. Therefore, if Andover proves that the warranty failed of its essential purpose, the exclusion of other damages becomes inoperative and Andover may seek consequential and incidental damages as allowed by the Code.

### B. Unconscionability of the Limited Remedy Clause

Andover also asserts that even if the limited remedy did not fail of its essential purpose, the exclusionary clause in the warranty is unenforceable because it unconscionably limits Piper's liability for defective parts or components to the repair or replacement of that component and precludes recovery of general as well as consequential and incidental damages. [FN4] Piper contends that § 2-719(1)(a) of the Code permits enforcement of clauses limiting the buyer's remedy to "repair or replacement of nonconforming goods or parts" and permits exclusion of liability for consequential and incidental damages. Therefore, according to Piper, the liability clause is not unconscionable

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7 UCC Rep.Serv.2d 1494                                                    Page 9

1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

**(Publication page references are not available for this document.)**

and should be enforced.

The question of unconscionability is one of law to be decided by courts. Zapatha v. Dairy Mart, Inc., 381 Mass. 284, 291, 408 N.E.2d 1370, 1375 [29 UCC Rep Serv 1121] (1980) (citing Mass. Gen. L. ch. 106, § 2-302(1)). Massachusetts courts have required that a contract clause resulting in unfair surprise and oppression of the allegedly disadvantaged party will be declared unconscionable. Id. at 292, 408 N.E.2d at 1376. The comments to the Code indicate that it is "the very essence of a sales contract that . . . there be at least a fair quantum of remedy for breach [and] any clause purporting to modify or limit the remedial provisions . . . in an unconscionable manner is subject to deletion." Mass. Gen. Laws Ann. ch. 106, § 2-719 comment 1 (West 1958).

Section 6 of Piper's warranty provides that if a part or component proves to be defective, then Piper's sole liability is for the repair or replacement of the defective part or component. The Piper warranty also disclaims all other warranties, expressed or implied, stating that Piper shall not be liable for any "general, consequential or incidental damages relating to property damage or economic loss, including . . . damages for loss of use or loss of profits." [FN5] The net effect of Piper's warranty, if enforced, is that Andover would be entitled only to the repair or replacement of the defective gear-uplock bracket. The exclusion of general damages from Andover's circle of protection means that Piper has disclaimed responsibility for any repairs other than to the bracket, even assuming that Andover might recover general damages once Piper has disclaimed all other express and implied warranties, a question I do not here decide.

Thus, the question is whether Piper's warranty provides a "fair quantum of remedy" or whether the clause is unconscionable. Piper correctly notes that the sale contract and accompanying warranty lack the traditional indicia of procedural unconscionability. Plaintiff Marden, a partner in Andover involved in negotiating the sale, is an attorney and a pilot, presumably aware of the complexity of an aircraft and the legal significance of warranty limitations. I have little difficulty in concluding that the sophistication of the parties involved renders this sale a commercial transaction of the type in which courts have been reluctant to allow unconscionability claims. Zapatha v. Dairy Mart, Inc., 381 Mass. 284, 294, 408 N.E.2d 1370, 1377 [29 UCC Rep Serv 1121] (1980) (citing Fleischmann Distilling Corp. v. Distillers Co., 395 F. Supp. 221, 233 [17 UCC Rep Serv 678] (S.D.N.Y. 1975)). Also, the terms of the warranty are distinct and readable. Thus, Andover cannot sustain a claim of "unfair surprise." See id. at 291-92, 408 N.E.2d at 1376-77.

Even in absence of unfair surprise, however, a court must consider whether the terms of the contract are oppressive and leave the allegedly disadvantaged party without adequate remedy. Id. The bulk of Piper's brief addresses the contention that exclusion of consequential and incidental damages is not unconscionable, a matter about which the parties do not disagree. Piper generally ignores Andover's claim that the additional exclusion of general damages, coupled with the promise only to repair or replace defective parts, makes the entire remedy clause unconscionable. Rather, Piper states that it has never taken the position that the warranty would permit it to avoid liability for repair of damage to the aircraft. Despite Piper's stated position, the terms of the warranty allow it to contend that it bears no liability for such damage and this court should not and will not rewrite the warranty or interpret its terms in a manner inconsistent with its plain language.

Thus, if the warranty is enforced as written then Piper has committed itself to the replacement or repair of an uplock bracket costing perhaps tens of dollars when that defective part has allegedly caused damage to the aircraft in excess of $100,000, damage that in fact might have been far greater but for the skill of the pilot involved. Andover's purchase of a warranty for an amount in excess of $39,000 would then provide it with very little meaningful protection from Piper, especially since the propellers, engines, and avionics are covered under the warranties of other manufacturers. Given that many airframe failures are potentially and foreseeably catastrophic, it is unfair to permit Piper to limit its liability under the warranty only to the cost of the part that failed. At least under

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7 UCC Rep.Serv.2d 1494                                                           Page 10

1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

**(Publication page references are not available for this document.)**

these circumstances, I find that the Piper warranty leaves Andover without a "fair quantum of remedy" and is therefore unconscionable.

### C. Recovery Under Breach of Warranty Theory

If Piper has breached its warranty, Andover may recover for its cost of repair, its loss of use of the aircraft, its increased insurance cost, and the value of its lost repurchase option.

### VI. CONCLUSION

For the foregoing reasons, defendants' motion to prohibit the introduction of evidence of consequential and incidental damages during the damage phase of this trial is denied.

> FN1 Although Piper's brief makes no specific claim that Andover failed to revoke within a reasonable period of time, such a claim would also require a determination of fact by the jury. Bevel-Fold, Inc. v. Bose Corp., 9 Mass. App. Ct. 576, 584, 402 N.E.2d 1104, 1108 [28 UCC Rep Serv 1333] (1980) (upon consideration of relevant facts, defendant's revocation of acceptance "occurred within a reasonable time").

> FN2 Piper initially contended that the aircraft warranty extended only for one year. Later, however, it agreed to make "appropriate" repairs under the five-year warranty while reserving its rights against Northeast Cheyenne for unauthorized sale of that warranty. Except for the length of time during which coverage is provided and other technical differences not relevant here, the one-year and five-year warranties are identical.

> FN3 In the September 3, 1987, Memorandum of Decision on motions for summary judgment in this case, I noted that if Andover could prove that the warranty failed of its essential purpose it could pursue other remedies under the Code. I reiterate that decision but further detail my position in light of the more extensive argument by the parties in their briefs on this motion.

> FN4 Section 6 of the Piper warranty states in relevant part:

"Remedy: If, within the duration of this warranty, a part or component or installation work covered by this warranty proves to be defective in material or workmanship, then the sole and exclusive remedy and Piper's sole liability shall be, at Piper's option, the repairing of the defective part or component or replacement of the same; parts and labor (to the extent allowed under Piper's published schedule) shall be at the expense of Piper. The replacement part or componen[t] supplied pursuant to this warranty shall be warranted only for the remainder of the warranty period applicable to the defective part or component.

. . . . . .

"The obligation of Piper set forth in Section 6, above, shall be the exclusive remedy for any breach of warranty. In no event shall Piper be liable for any general, consequential or incidental damages relating to property damage or economic loss, including without limitation any damages for loss of use or loss of profits."

> FN5 General damages are those that flow "naturally and necessarily" from the complained of wrong and do not depend on the special character, condition, or circumstances of the plaintiff. Sharrat v. Housing Innovations, Inc., 365 Mass. 141, 148, 310 N.E.2d 343, 348 (1974); see also Boylston Housing Corp. v. O'Toole, 321 Mass. 538, 562-63, 74 N.E.2d 288, 302-03 (1947). In contrast, consequential damages are

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7 UCC Rep.Serv.2d 1494                                                                Page 11

1989 WL 110453 (D.Mass.), 13 Fed.R.Serv.3d 734, 7 UCC Rep.Serv.2d 1494

**(Publication page references are not available for this document.)**

      not immediate and direct even though they result from the complained of wrong. See Mass. Gen. Laws Ann. ch. 106, § 2-715(2) (West 1958). Incidental damages, defined in the Code, are distinct from either general or consequential damages and include such things as the expense of inspection, receipt, transportation and custody of goods rightfully rejected, and so forth. Id. § 2-715(1).

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in N.E.2d

Page 1

Not Reported in N.E.2d, 20 Mass.L.Rptr. 466, 2006 WL 392123 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d)**

Pro Con, Inc. v. J & B Drywall, Inc.Mass.Super.,2006.
Superior Court of Massachusetts.
PRO CON, INC.
v.
J & B DRYWALL, INC. et al.[FN1,FN2]

FN1. Parex, Inc., Debrino Caulking Associates, Inc., Pecora Corp., Wickes, Inc., MI Home Products, Inc., All Temp HVAC Corp., and Cranton Co.

FN2. General Electric Co.
**No. 032063C.**

Jan. 31, 2006.

*MEMORANDUM OF DECISION AND ORDER ON DEFENDANT, PAREX, INC.'S PARTIAL MOTION FOR SUMMARY JUDGMENT PURSUANT TO M.R.C.P. 56*
JAMES H. WEXLER, Justice.

### INTRODUCTION

*1 Plaintiff, Pro Con, Inc. ("Pro Con"), brought this action alleging a variety of tort, warranty and contract claims against Parex, Inc. ("Parex") and other named defendants. Pro Con specifically seeks to recover damages associated with alleged construction and product defects in connection with the construction of a hotel. Parex filed a Motion for Partial Summary Judgment on Counts XXII (Negligence) and XXIV (Contribution) asserting that the Massachusetts economic loss doctrine precludes Pro Con from recovering in tort. For the following reasons, the defendant's motion is *ALLOWED.*

### BACKGROUND

Plaintiff, Pro Con, is a construction contractor with a principal place of business in Hooksett, New Hampshire. Pro Con specializes in institutional, multi-family residential, and commercial projects in New England. On November 26, 1996, Pro Con entered into a contract with Interstone Partners I, L.P. to construct a Courtyard by Marriott hotel in Westborough, Massachusetts ("the Hotel"). Thereafter, Pro Con entered into a subcontract with J & B Drywall ("J & B") to apply an exterior insulating and finish system ("EIFS") and sealant to the exterior of the Hotel. The EIFS and sealant J & B applied to the Hotel were manufactured by Parex. J & B employees completed a Parex Training Seminar and had demonstrated the ability to properly apply the EIFS to the Hotel during its construction.

The Hotel is a three-story, ninety-eight-unit, wood-framed structure made of oriented strand board ("OSB") exterior sheathing. The OSB exists under the EIFS and was sealed with a polyurethane sealant. The EIFS applied to the Hotel was a standard barrier EIFS product consisting of various components, including: adhesive, insulation board, base coat, reinforcing fiberglass mesh, finish coat and additional accessories. These components were applied over the Hotel's OSB and became an integral component of the Hotel's wall system.

In 2002, the Hotel's owner informed Pro Con that water had infiltrated through the Hotel's exterior and caused extensive property damage. Part of the property damage stemmed from water draining into the walls through the allegedly defective application of the EIFS system and sealant. Pro Con subsequently settled with the Hotel's owner and now seeks tort recovery for the alleged defects from Parex.

### DISCUSSION

#### Summary Judgment Standard

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d, 20 Mass.L.Rptr. 466, 2006 WL 392123 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d)**

Summary judgment shall be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); *Cassesso v. Comm'r of Correction,* 390 Mass. 419, 422 (1983). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving party to judgment as a matter of law. *Pederson v. Time, Inc.,* 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party's case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. *Flesner v. Technical Communications Corp.,* 410 Mass. 805, 809 (1991); *Kourouvacilis v. General Motors Corp.,* 410 Mass. 706, 716 (1991).

**\*2** The non-moving party cannot conjure up genuine issues of material fact or merely rely on the allegations or denials of her pleading. See Mass.R.Civ.P. 56(e). Conclusory statements, general denials, and allegations not based on personal knowledge are insufficient to avoid summary judgment. *Madsen v. Erwin,* 395 Mass. 715, 721 (1985). Rather, the non-moving party bears the burden of introducing enough countervailing data to demonstrate the existence of a genuine issue for trial. See *Wooster v. Abdow Corp.,* 46 Mass.App.Ct. 665, 673 (1999).

### Economic Loss Doctrine

Under Massachusetts law, the economic loss doctrine provides that purely economic losses are not recoverable in tort actions in the absence of personal injury or damage to property *other than* the product itself. See *Jacobs v. Yamaha Motor Corp., USA,* 420 Mass. 323, 329 n. 5 (1995); *FMR Corp. v. Boston Edison Co.,* 415 Mass. 393, 395 (1993); *East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 871-75 (1986). Massachusetts courts have defined economic loss as "damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits without any

claim of personal injury or damage to other property." *Marcil v. John Deere Indus. Equip. Co.,* 9 Mass.App.Ct. 625, 630 n. 3 (1980).

The rationale underlying the economic loss doctrine is that when a commercial product fails without harming persons or other property, "the resulting loss due to repair costs, decreased value, and lost profits is essentially the failure of the purchaser to receive the benefit of its bargain-traditionally the core concern of contract law." *East River,* 476 U.S. at 870. When the product injures only itself, such contractual losses can be minimized by insurance or warranties. See *Bay State-Spray & Provincetown S.S., Inc. v. Caterpillar Tractor Co.,* 404 Mass. 103, 109-10 (1989). However, when the failure of a defective product causes damages to a person or other property, the economic loss doctrine does not apply and the damage claim sounds in tort. See *Aldrich v. ADD, Inc.,* 437 Mass. 213, 222 (2002) ("[W]here the pecuniary losses sustained by a plaintiff result form physical harm to property proximately caused by a defendant's alleged negligence, such plaintiff has a right to recovery"). Instead, "[w]hen a person is injured, the 'cost of an injury and the loss of time or health may be an overwhelming misfortune,' and one the person is not prepared to meet." *East River,* 476 U.S. at 871-72 (internal citations omitted). Thus, tort recourse is appropriate because the resulting injury occurs outside the scope of the underlying contract. *Id.*

In claims involving defective component parts, most courts have held that the relevant "product" is the finished product into which the component is integrated.[FN3] See, e.g., *East River,* 476 U.S. at 867-68 (stating in admiralty law that "[s]ince all but the very simplest of machines have component parts, [a contrary] holding would require a finding of 'property damage' in vitally every case where a product damages itself ... and would eliminate the distinction between warranty and strict products liability."); *King v. Hilton-Davis,* 855 F.2d 1047, 1051 (3rd Cir.1988) (no recovery for damage caused by chemical to seed potatoes because plaintiffs purchased treated seed potatoes, not chemical); *Chicago Heights Venture v. Dynamit Nobel of America, Inc.,* 782 F.2d 723 (7th Cir.1986)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d, 20 Mass.L.Rptr. 466, 2006 WL 392123 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d)**

(economic loss doctrine precluded tort recovery of damages caused to exterior and interior of apartment building by allegedly defective roofing materials); *American Home Assurance Co. v. Major Tool and Mach., Inc.,* 767 F .2d 446, 447-48 (8th Cir.1985) (turbine assembler could not recover in tort from manufacturer of defective component parts because damage from those defective parts to remainder of turbine was not damage to other property). Therefore, where a component is necessarily attached to a structure and the alleged defect causes damage only to surrounding parts of that structure, the economic loss doctrine applies. *Chicago Heights Venture,* 782 F.2d at 729.

> FN3. The court notes that *Sebago, Inc. v. Manville Corp.,* 18 F.Sup.2d 70 (D.Mass.1998) is particularly on point with the facts in the case at bar. There, plaintiffs were precluded by the economic loss doctrine from recovering in negligence and strict liability against the manufacturer of a roofing component. Like Pro Con here, the *Sebago* plaintiffs argued that the product they purchased was the roofing component itself (i.e., phenolic foam roof insulation, or "PFRI"), and not the fully constructed rooftop in an attempt to circumvent the economic loss doctrine. Relying on secondary sources, the district court found the *Sebago* plaintiff's argument unpersuasive because the only property damaged was the roof itself. Therefore tort recovery was precluded since the basis of the underlying bargain was the roof and no "other property" was damaged.

*3 These courts reasoned that the finished product incorporates its individual components because what the plaintiff actually bargains for is the final product. See, e.g., *Oceanside at Pine Point Condominium Owners Ass'n. v. Peachtree Doors, Inc.,* 659 A.2d 267, 270 (Me.1995) (no recovery for building damage caused by defective windows because plaintiff owners purchased completed condominium units and not windows); *King,* 855 F.2d at 1051 ("We perceive no principled basis for affording the purchaser of a defective product

greater relief against the manufacturer of a component part that has rendered a product defective than against the manufacturer of the assembled defective product"); *Shipco 2295, Inc. v. Avondale Shipyards, Inc.,* 825 F.2d 925, 930 (5th Cir.1987) (in the context of tort for economic loss, product means the finished product bargained for by the purchaser). Therefore, purely economic losses attributed to the final product bargained for in a contract preclude tort liability. See *Oceanside, King, Shipco 2295, Inc., Chicago Heights Venture,* (citations omitted).

Here, plaintiff argues that defendant is liable for water damage that occurred to the Hotel. Specifically, Pro Con asserts that Parex's EIFS product and sealant was defective and allowed water to penetrate past the underlying OSB substrate and wooden studs on the Hotel's walls. Therefore, Pro Con contends that the economic loss doctrine does not apply because the EIFS caused " other property" damage to the OSB substrate and wooden studs of the Hotel's wall structure. Defendant argues that the economic loss doctrine bars Pro Con from recovering under a negligence theory because the underlying contract was for the construction of a hotel, not the EIFS product itself. Instead, Parex asserts that the EIFS and sealant were component parts of the Hotel's wall foundation, and because the only damage that occurred was to the Hotel itself, Pro Con is barred from recovering in tort.

The court finds defendant's argument persuasive to preclude tort liability against it. As stated by the United States Supreme Court in *East River,* " [p]ermitting recovery for all foreseeable claims for purely economic loss could make a manufacturer liable for vast sums. It would be difficult for a manufacturer to take into account the expectations of persons downstream who may encounter its product." 476 U.S. at 874. Moreover, to extend the scope of tort liability to include components of a finished product would significantly undermine contract law because warranting one's product would no longer be necessary. *Id.* at 871-73; *Bay State Spray,* 404 Mass. 109-10. Instead, tort law would swallow contract law because whenever an individual component damaged anything other than

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d, 20 Mass.L.Rptr. 466, 2006 WL 392123 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d)**

itself (i.e., other components to the finished product, the finished product as a whole, a person, or other property), the manufacturer would be liable. See *East River, Oceanside, King, Shipco 2295, Inc., Chicago Heights Venture,* (citations omitted). Here, the underlying basis of the bargain was the construction of a hotel, not the use of EIFS and sealant by themselves. The warranties in use of the EIFS and sealant to the OSB to build the Hotel's infrastructure were an essential basis of the underlying bargain in the Hotel's construction. As such, no damage to "other property" occurred that would warrant a finding of tort liability.

### Contribution

**\*4** Massachusetts law recognizes a right to contribution among joint tortfeasors. See G.L.c. 231B, § 1. Thus, "where two or more persons become jointly liable in tort for the same injury to person or property, there shall be a right of contribution among them." *Id.* However, where an alleged joint tortfeasor would not be liable to the plaintiff, the joint tortfeasor is not liable in contribution. See *Correia v. Firestone Tire & Rubber Co.,* 388 Mass. 342, 346 (1983) (contribution barred where plaintiff's claim against joint tortfeasor would be barred by workers' compensation statute). *Dighton v. Federal Pac. Elec. Co.,* 399 Mass. 687, 691-93 (1987) (joint tortfeasor protected from plaintiff's suit by statute of repose and not liable for contribution).

The court finds that because Parex was not liable as a joint tortfeasor for the underlying negligence claims, plaintiff's theory of contribution also fails. See *Correia, Dighton* (citations omitted).

### ORDER

For the reasons stated herein, it is hereby ordered that defendant's Motion for Partial Summary Judgment pursuant to Mass.R.Civ.P. 56 as to both Counts is *ALLOWED.*

Mass.Super.,2006.
Pro Con, Inc. v J&B Drywall, Inc.

Not Reported in N.E.2d, 20 Mass.L.Rptr. 466, 2006 WL 392123 (Mass.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.